No. 23-1891

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

―――――――

## HMTX INDUSTRIES, LLC, HALSTEAD NEW ENGLAND CORP., METROFLOR CORPORATION, JASCO PRODUCTS COMPANY LLC,
*Plaintiffs- Appellants*

v.

## UNITED STATES, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, KATHERINE TAI, U.S. Trade Representative, UNITED STATES CUSTOMS AND BORDER PROTECTION, TROY MILLER, Acting Commissioner of U.S. Customs and Border Protection,
*Defendants-Appellees*

―――――――

Appeal from the United States Court of International Trade in No. 1:20-cv-00177-3JP, Chief Judge Mark A. Barnett, Judge Claire R. Kelly, Judge Jennifer Choe-Groves

―――――――

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS HMTX INDUSTRIES, HALSTEAD NEW ENGLAND CORP., METROFLOR CORPORATION, AND JASCO PRODUCTS COMPANY

―――――――

Pratik A. Shah
  pshah@akingump.com
Matthew R. Nicely
James E. Tysse
Daniel M. Witkowski
Devin S. Sikes
AKIN GUMP STRAUSS HAUER &
  FELD LLP
2001 K Street, N.W.
Washington, DC 20006
(202) 887-4000

July 17, 2023

**FORM 9. Certificate of Interest**

**Form 9 (p. 1)**
**March 2023**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 23-1891 |
| **Short Case Caption** | HMTX Industries LLC v. US |
| **Filing Party/Entity** | Appellants HMTX Industries LLC; Halstead New England Corp.; Metroflor Corp.; and Jasco Products Company LLC |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/25/2023

Signature: /s/ Pratik A. Shah

Name: Pratik A. Shah

FORM 9. Certificate of Interest

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| HMTX Industries LLC | | SMYNTH Trust; HMTX Acquisition LLC |
| Halstead New England Corp. | | SMYNTH Trust; HMTX Acquisition LLC; HMTX Industries LLC |
| Metroflor Corp. | | SMYNTH Trust; HMTX Acquisition LLC; HMTX Industries LLC |
| Jasco Products Company LLC | | None |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

FORM 9. Certificate of Interest

---

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable        ☐ Additional pages attached

| | | |
|---|---|---|
| Sarah B. W. Kirwin, Akin Gump Strauss Hauer & Feld LLP | | |
| | | |
| | | |

---

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)   ☐ No   ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

---

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable        ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ..................................................xii

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUES..........................................................2

INTRODUCTION................................................................................2

STATEMENT OF THE CASE ............................................................5

    I.      LEGAL FRAMEWORK ...........................................................5

    II.    FACTS AND PROCEDURAL HISTORY ..............................8

        A.    Section 301 Investigation...............................................8

        B.    Lists 1 And 2 .................................................................9

        C.    List 3.............................................................................11

            1.    *Proposed List 3 Tariffs*................................... 11

            2.    *Final Adoption of List 3* ..................................16

        D.    List 4.............................................................................19

            1.    *Proposed List 4 Tariffs*...................................19

            2.    *Final Adoption of List 4* ..................................21

        E.    Procedural History .......................................................25

SUMMARY OF THE ARGUMENT ...................................................28

STANDARD OF REVIEW.................................................................30

ARGUMENT ......................................................................................32

    I.      USTR EXCEEDED ITS MODIFICATION
          AUTHORITY UNDER THE TRADE ACT ..........................32

        A.    USTR Exceeded Its Authority Under Section
            307(a)(1)(B)...................................................................34

            1.    *Section 307(a)(1)(B) Permits Modifications*
                *Only If USTR Finds Increased Harms From*
                *The Investigated Practices* ..................................34

            2.    *The CIT Erred In Concluding That USTR*
                  *Could Rely On Subsection (B)*.............................37

B.   USTR Exceeded Its Authority Under Section 307(a)(1)(C) ................................................ 42

    1.   *Text and Context Show That Congress Authorized Only The Tapering Or Terminating Of Actions Deemed No Longer "Appropriate"* ...................................... 43

    2.   *Historical Practice Confirms That Section 307(a)(1)(C) Permits Only Tapering or Terminating.* ......................................... 49

    3.   *Constitutional Avoidance Principles Require Interpreting Subsection (C) To Permit Only Tapering Or Terminating.* .................... 52

C.   The "Major Questions" Doctrine Confirms That Lists 3 And 4A Exceed USTR's Authority .................. 55

II.   USTR VIOLATED THE APA BY FAILING TO CONSIDER AND RESPOND TO COMMENTS ADEQUATELY ......................................... 60

A.   The CIT Correctly Held That USTR Failed To Respond To Comments In The Final List 3 and 4 Notices ............................................. 60

B.   The CIT Should Have Vacated Lists 3 And 4A Rather Than Remand Without Vacatur ..................... 63

C.   USTR Failed To Cure Its APA Violations On Remand ............................................. 66

    1.   *The USTR's Remand Determination Offered Post Hoc, Conclusory, And Otherwise Insufficient Rationales* ........................ 66

    2.   *The CIT Erred In Concluding That The Remand Determination Cured The APA Violations* ........................................ 71

CONCLUSION ...................................................... 77

ADDENDUM

    19 U.S.C. § 2411(a)-(b) ................................. Add. 1

iii

19 U.S.C. § 2414 .......................................................... Add. 4

19 U.S.C. § 2417 ....................................................... Add. 8

# TABLE OF AUTHORITIES

<u>**Cases**</u>:

*Action on Smoking & Health v. C.A.B.*,
713 F.2d 795 (D.C. Cir. 1983) ............................................ 65

*Angus Chem. Co. v. Glendora Plantation, Inc.*,
782 F.3d 175 (5th Cir. 2015) ............................................ 38

*Biden v. Nebraska*,
600 U.S. ---, No. 22-506, 2023 WL 4277210 (U.S. June 30,
2023) ................................................................. *passim*

*Brotherhood of Locomotive Eng'rs & Trainmen v. Federal
R.R. Admin.*,
972 F.3d 83 (D.C. Cir. 2020) ............................................ 65

*Camp v. Pitts*,
411 U.S. 138 (1973) ..................................................... 66

*Checkosky v. SEC*,
23 F.3d 452 (D.C. Cir. 1994) ............................................ 64

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) ..................................................... 42

*Corus Staal BV v. Department of Com.*,
395 F.3d 1343 (Fed. Cir. 2005) .......................................... 30

*Crowell v. Benson*,
285 U.S. 22 (1932) ...................................................... 54

*Department of Com. v. New York*,
139 S. Ct. 2551 (2019) ........................................ 61, 67, 68

*Department of Homeland Sec. v. Regents of Univ. of Cal.*,
140 S. Ct. 1891 (2020) ........................................... *passim*

*Environmental Def. Fund v. FERC*,
2 F.4th 953 (D.C. Cir. 2021) ............................................ 64

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ............................................................... 55

*Gazelle v. Shulkin*,
868 F.3d 1006 (Fed. Cir. 2017) ........................................... 32

*Gilda Indus., Inc. v. United States*,
622 F.3d 1358 (Fed. Cir. 2010) ........................................... 31

*Gonzalez v. United States*,
553 U.S. 242 (2008) ............................................................... 52

*GPX Int'l Tire Corp. v. United States*,
780 F.3d 1136 (Fed. Cir. 2015) ........................................... 31

*Gundy v. United States*,
139 S. Ct. 2116 (2019) .......................................................... 53

*In re Sang Su Lee*,
277 F.3d 1338 (Fed. Cir. 2002) ........................................... 62

*International Union, United Mine Workers of Am. v. Mine
Safety & Health Admin.*,
626 F.3d 84 (D.C. Cir. 2010) ............................................... 62

*Levesque v. Block*,
723 F.2d 175 (1st Cir. 1983) ............................................... 75

*Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials
Safety Admin.*,
741 F.3d 1309 (D.C. Cir. 2014) ..................................... 62, 73

*MCI Telecomms. Corp. v. American Tel. & Tel. Co.*,
512 U.S. 218 (1994) ......................................................... 33, 59

*Michigan v. EPA*,
576 U.S. 743 (2015) ............................................................... 71

*Mid Continent Nail Corp. v. United States*,
846 F.3d 1364 (Fed. Cir. 2017) ........................................... 62

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983) ............................................................ 61

*National Fed'n of Indep. Bus. v. Sebelius*,
 567 U.S. 519 (2012) .......................................................... 55

*Panama Refin. Co. v. Ryan*,
 293 U.S. 388 (1935) .......................................................... 53

*Pavelic & LeFlore v. Marvel Ent. Grp.*,
 493 U.S. 120 (1989) .......................................................... 38

*SEC v. Chenery Corp.*,
 332 U.S. 194 (1947) .......................................................... 40

*Shakeproof Indus. Prods. Div. of Ill. Tool Works Inc. v. United States*,
 104 F.3d 1309 (Fed. Cir. 1997) ....................................... 30

*Solid Waste Agency v. U.S. Army Corps of Eng'rs*,
 531 U.S. 159 (2001) .......................................................... 54

*Transpacific Steel LLC v. United States*,
 4 F.4th 1306 (Fed. Cir. 2021) ............................... 31, 34, 49

*United States v. Schmidt Pritchard & Co*,
 47 C.C.P.A. 152 (1960) ..................................................... 42

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
 435 U.S. 519 (1978) .......................................................... 64

*West Virginia v. EPA*,
 142 S. Ct. 2587 (2022) ......................................... 55, 56, 59

*Whitman v. American Trucking Ass'n*,
 531 U.S. 457 (2001) ............................................. 48, 52, 56

## Constitution and Statutes:

U.S. Const. art. I, § 8 ......................................................... 5, 41

5 U.S.C.

§ 706(2)(a)..................................................................... 31, 64

19 U.S.C.

§ 1337(j)(2) ........................................................................ 49

§ 2411 ................................................................................ 41

§ 2411(a)(2)(B)(i) ............................................................... 45

§ 2411(a)(2)(B)(ii) .............................................................. 45

§ 2411(a)(2)(B)(iii) ............................................................ 45

§ 2411(a)(2)(B)(iv) ............................................................ 45

§ 2411(a)(2)(B)(v) ............................................................. 45

§ 2411(b) ...................................................................... 43, 71

§ 2411(b)(1)................................................................... 6, 35

§ 2411(b)(2).......................................................................... 6

§ 2411(c)(1)(B) ..................................................................... 6

§ 2412 ........................................................................ 6, 41, 47

§ 2413 ........................................................................ 6, 41, 47

§ 2414 ........................................................................ 6, 41, 47

§ 2414(a)(1)(A)(ii) .............................................................. 35

§ 2414(a)(2)(B)................................................................ 6, 47

§ 2414(c) ............................................................................. 35

§ 2417(a)(1)............................................................................ 7

§ 2417(a)(1)(A) .............................................................. 44, 45

§ 2417(a)(1)(B) ....................................................... 33, 34, 38, 71

§ 2417(a)(1)(C)............................................................. *passim*

§ 2417(a)(2)....................................................................... 7, 62

§ 3537 ................................................................................ 41

28 U.S.C.

§ 1295(a)(5)........................................................................... 1

§ 1581(i)............................................................................... 30

§ 1581(i)(1)(B) ...................................................................... 1

**FEDERAL REGISTER NOTICES:**

*Implementation of the U.S.-EC Beef Hormones Memorandum
of Understanding*, 74 Fed. Reg. 48,808 (Sep. 24, 2009) ..................... 56

*Modification of Action Under Section 301(b); Out-of-Cycle Review Under Section 182; and Request for Public Comment: Intellectual Property Laws and Practices of the Government of Ukraine,* 70 Fed. Reg. 53,410 (Sept. 8, 2005) ............................................................................. 51

*Modification of Determination of Action Pursuant to Section 301 Concerning Canadian Exports of Softwood Lumber; Opportunity for Comment,* 57 Fed. Reg. 44,609 (Sept. 28, 1992) ...................................................................................... 51

*Procedures for Requests To Exclude Particular Products From the August 2019 Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 84 Fed. Reg. 57,144 (Oct. 24, 2019) ............................................. 74

*Results of Out-Of-Cycle Review Under Section 182 and Termination of Action Under Section 301(b): Intellectual Property Laws and Practices of the Government of Ukraine,* 71 Fed. Reg. 5,899 (Feb. 3, 2006) ........................................ 50

*Termination of Action: Protection of Intellectual Property Rights by the Government of Honduras,* 63 Fed. Reg. 35,633 (June 30, 1998) ................................................. 44, 51

*Termination of Section 301 Investigation and Action Regarding the People's Republic of China's Protection of Intellectual Property and Provision and Market Access to Persons Who Rely on Intellectual Property Protection,* 60 Fed. Reg. 12,582 (Mar. 7, 1995) ....................................... 50

**OTHER AUTHORITIES:**

48 C.F.R. § 25.202 .................................................................. 49

BLACK'S LAW DICTIONARY (11th ed. 2019) ............................ 33

FED. R. APP. P. 4(a)(1)(B) ........................................................ 1

Jacobs, Jennifer, Shawn Donnan, Andrew Mayeda, & Saleha Mohsin, *Trump to Back $200 Billion China Tariffs as Early as Next Week, Sources Say,* BLOOMBERG (Aug. 31, 2018) ............................................................................................ 15

Manak, Inu, et al., *The Cost of Trump's Trade War With China Is Still Adding Up*, COUNCIL ON FOREIGN RELS. (Apr. 18, 2023 12:08 pm) ......................................................... 58

Pettypiece, Shannon, *Trump Threatens Tariffs on $267 Billion More of China Goods*, BLOOMBERG (Sept. 7, 2018) ............... 15

Press Release, Office of the U.S. Trade Representative, Statement by U.S. Trade Representative Robert Lighthizer on Section 301 Action (Aug. 1, 2018)................................ 13

Press Release, Office of the U.S. Trade Representative, Statement by U.S. Trade Representative Robert Lighthizer on Section 301 Action (July 10, 2018) ............................ 12

Press Release, Office of the U.S. Trade Representative, Under Section 301 Action, USTR Releases Proposed Tariff List on Chinese Products (Apr. 3, 2018)........................................ 9, 32

USITC Pub. 5405, ECONOMIC IMPACT OF SECTION 232 AND 301 TARIFFS ON U.S. INDUSTRIES (Mar. 2023, corrected May 2023)................................................................................................ 58

USTR, Additional Duties on Certain Products from the U.S. (last visited July 13, 2023).................................................... 41

USTR, Section 301 Tariffs Hearing Panel Schedule (last visited July 13, 2023)........................................................ 21

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) ................... 33

*White House Adviser Navarro On Why U.S. Hit China With More Tariffs*, NPR MORNING EDITION (Sept. 18, 2018) ...................... 16

York, Erica, *Tracking The Economic Impact of U.S. Tariffs and Retaliatory Actions*, TAX FOUND. ACTIONS (last updated July 7, 2023) .......................................................... 58

## STATEMENT OF RELATED CASES

This action challenges the third and fourth round of tariffs ("List 3" and "List 4A") imposed on imports from China by the United States Trade Representative ("USTR") under Section 301 *et seq.* of the Trade Act of 1974 ("Trade Act"), 19 U.S.C. § 2411 *et seq.* As explained in Plaintiffs' Notice of Related Case Information (ECF No. 5), Plaintiffs understand that more than 4,100 similar actions have been filed in the U.S. Court of International Trade ("CIT") challenging the List 3 and List 4A tariff actions.

The CIT ordered that this case (CIT Court No. 20-cv-00177) "shall serve as the sample case for purposes of the court's initial consideration and resolution" of the claims. Appx09597. Merits briefing and the CIT's opinions resolving this case were docketed under CIT Court No. 21-cv-00052, which was designated as the master case. *Id.* The CIT stayed the other actions pending resolution of this case. *Id.* As explained in Plaintiffs' Notice of Related Case Information, it would not be practicable to set forth the case information for the more than 4,100 other separate cases.

## JURISDICTIONAL STATEMENT

The CIT had jurisdiction under 28 U.S.C. § 1581(i)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1295(a)(5). After the CIT entered final judgment on March 17, 2023, Plaintiffs timely appealed on May 12, 2023. FED. R. APP. P. 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1. Whether the List 3 and 4A tariff actions exceeded Defendants' authority under Section 307 of the Trade Act.

2. Whether USTR's *post hoc* and conclusory submission on remand cured its failure to consider and respond to the most significant comments opposing the List 3 and 4A tariff actions in violation of the Administrative Procedure Act ("APA").

## INTRODUCTION

This case presents a critical question: whether there are enforceable limits on USTR's ability to expand a tariff action under Section 301 of the Trade Act for however long, by whatever amount, and by whatever means it chooses. After imposing tariffs on $50 billion of imports from China—an amount it deemed "commensurate" with the specific harms it investigated—USTR announced "supplemental" tariffs as purported "modifications" to cover another roughly $500 billion of imports, *i.e.*, virtually the entirety of annual U.S. imports from China. That radical escalation of tariffs transgressed the statutory limits carefully delineated by Congress when delegating the exercise of its constitutional foreign-trade powers to USTR.

Section 301 of the Trade Act allows USTR, a federal agency, to investigate and take action to address a foreign country's unfair trade practices. The statute also permits USTR, via tailored provisions in Section 307, to "modify or terminate" a Section 301 action under specific circumstances. But Congress nowhere gave USTR the vast power to engage in an open-ended trade war.

Yet that is precisely what happened here. Following a seven-month investigation, USTR determined that four categories of China's practices related to intellectual property and technology transfer burdened U.S. commerce, and imposed "commensurate" tariffs on goods from China across two actions (Lists 1 and 2) covering $50 billion worth of imports. Although amounting to one of the largest tariff actions in U.S. history, Lists 1 and 2 were arguably within the authority Congress delegated to USTR under Section 301.

What USTR did after that, however, was not. After China reacted with countermeasures of its own on $50 billion worth of U.S. goods imported into China, USTR retaliated in extreme fashion: first imposing 10% duties (later increased to 25%) on an additional $200 billion in Chinese imports ("List 3"), and then imposing duties of 7.5% on

approximately $120 billion more ("List 4A").    Although dubbed "supplemental," USTR multiplied more than *seven-fold* the Section 301 tariff response originally deemed "appropriate" to the discrete set of Chinese practices USTR investigated—levying a nearly $75 billion annual tax on U.S. purchasers without Congressional action or imprimatur.

USTR's List 3 and 4A tariff actions trample on the Trade Act's clear limits.    USTR made little secret that the primary reason for its extraordinary actions were China's own retaliatory tariffs.    But those actions do not reflect any corresponding increase in the $50 billion burden on the U.S. economy from the investigated unfair practices, *i.e.*, the only statutorily permitted basis to raise tariffs without a new investigation.    Nothing in the tailored "modification" provisions on which USTR relied permit the agency to increase its actions *at all*, let alone by several orders of magnitude, in retaliation for China's tit-for-tat response to USTR's initial Section 301 determination.    And nothing in Section 307 permits the Administration to prosecute a limitless trade war.

USTR's actions independently violated the APA.    USTR received over 9,000 comments from concerned American consumers, businesses,

and groups in opposition to its proposed "modification." But USTR never considered, let alone addressed, them in its rush to action. Although the CIT correctly recognized that USTR's neglect constituted a procedural APA violation, it gave USTR another shot. On remand, however, USTR's *post hoc* and conclusory responses to the most significant comments failed to cure its violation.

This Court should reverse.

## STATEMENT OF THE CASE

## I.    LEGAL FRAMEWORK

The Constitution grants Congress the power to "lay and collect Taxes, Duties, Imposts and Excises," as well as to "regulate Commerce with foreign Nations." U.S. CONST. art. I, § 8. In the Trade Act, Congress delegated to USTR the power to exercise some of that authority, but only within specified constraints.

The Trade Act defines two types of USTR action, with different criteria: (1) "mandatory" action under Section 301(a) and (2) "discretionary" action under Section 301(b). This case involves Section 301(b), under which USTR has discretion to act upon a showing that "an act, policy, or practice of a foreign country" is "unreasonable or

discriminatory" and "burdens or restricts United States commerce." 19 U.S.C. § 2411(b)(1). Congress imposed strict procedural requirements before USTR is permitted to take action, including: an investigation into the allegedly unreasonable activities (*id.* § 2412), consultation with the investigated foreign country (*id.* § 2413), factual findings in a written report (*id.* § 2414), and a twelve-month deadline to impose any "appropriate" action (*id.* § 2414(a)(2)(B)).

After an investigation, USTR must determine whether "action by the United States is appropriate." 19 U.S.C. § 2411(b)(2). If USTR so determines, USTR may "take all appropriate and feasible action authorized under [Section 301(c)], subject to the specific direction, if any, of the President regarding any such action, and all other appropriate and feasible action within the power of the President that the President may direct the Trade Representative to take under this subsection, to obtain elimination of that act, policy, or practice." *Id.* Among other responses, Section 301(c) authorizes USTR to "impose duties or other import restrictions on the goods of" the foreign country "for such time as the Trade Representative determines appropriate." *Id.* § 2411(c)(1)(B).

Once a Section 301 action has been implemented, Section 307(a)(1) allows USTR to "modify or terminate" the action in specified circumstances:

> The Trade Representative may modify or terminate any action, subject to the specific direction, if any, of the President with respect to such action, that is being taken under [Section 301] of this title if—
>
> > (A) any of the conditions described in [Section 301(a)(2)] exist,
> >
> > (B) the burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, that are the subject of such action has increased or decreased, or
> >
> > (C) such action is being taken under [Section 301(b)] and is no longer appropriate.

19 U.S.C. § 2417(a)(1).  Before acting, USTR is obligated to consult with representatives of the domestic industry concerned, and to provide an opportunity for other affected parties to present their views "concerning the effects of the modification or termination and whether any modification or termination of the action is appropriate." *Id.* § 2417(a)(2).

7

## II.   FACTS AND PROCEDURAL HISTORY

### A.   Section 301 Investigation

In August 2017, President Trump directed USTR to initiate a Section 301 investigation into China's practices that "may be harming American intellectual property rights, innovation, or technology development."  Appx01538.   USTR thereafter formally initiated an investigation into "whether actionable conduct exists under [S]ection 301(b)," the discretionary action provision.  Appx01541.

In March 2018, USTR issued a report regarding the findings of its investigation.   Appx01548-Appx01762.   On April 6, 2018, USTR published in the Federal Register its determination under Sections 301(b) and 304(a) that four categories of Chinese government policies and actions "are unreasonable or discriminatory and burden or restrict U.S. commerce":  (1) forced technology transfer through foreign ownership restrictions;   (2)   administrative   review   and   licensing   processes; (3) technology regulations; and (4) IP theft through cyberinstrusions into U.S. companies.  Appx01770.

**B.     Lists 1 And 2**

In its determination, USTR stated its intention to take action in the form of a "duty of 25 percent on a list of products of Chinese origin" on a proposed 1,333 Harmonized Tariff Schedule of the United States ("HTSUS") subheadings with a total value of "$50 billion in terms of estimated annual trade value for calendar year 2018." Appx01771. USTR explained that $50 billion was "commensurate with an economic analysis of the harm caused by China's unreasonable technology transfer policies to the U.S. economy, as covered by USTR's Section 301 investigation." Press Release, Office of the U.S. Trade Representative, Under Section 301 Action, USTR Releases Proposed Tariff List on Chinese Products (Apr. 3, 2018) ("USTR April 3, 2018 Release").[1] USTR invited comments on the proposed list and announced a public hearing. Appx01772.

On June 20, 2018, USTR published notice of its final "List 1" HTSUS items after "narrow[ing] the proposed list in the April 6, 2018 notice to 818 tariff subheadings, with an approximate annual trade value

---

[1] https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/april/under-Section-301-action-ustr.

of $34 billion." Appx01877. USTR simultaneously announced that it intended to impose a 25% duty on a proposed "List 2" of Chinese products to "maintain the effectiveness of [the] $50 billion trade action" grounded in its Section 301 investigation. Appx01878. On August 16, 2018, USTR published notice of final List 2, imposing tariffs on goods with an annual trade value of $16 billion. Appx02183. Plaintiffs do not challenge the imposition of duties on Lists 1 and 2 products in this action.



### C.    List 3

#### 1.    *Proposed List 3 Tariffs*

In response to Lists 1 and 2, China imposed 25% retaliatory duties on $50 billion worth of imports from the United States.  President Trump reacted by directing USTR, before List 2 was even finalized, to prepare for the imposition of additional duties on products from China with an estimated trade value of $200 billion—an amount that, when combined with the tariffs imposed pursuant to Lists 1 and 2, encompassed roughly half of all U.S. trade with China.  Appx01872.  President Trump acknowledged that China's retaliatory tariffs as well as the overall trade imbalance—not an increase in the burden from China's investigated acts and policies related to technology transfer and intellectual property— motivated his request:  "This latest action by China clearly indicates its determination to keep the United States at a permanent and unfair disadvantage, which is reflected in our massive $376 billion trade imbalance in goods.  This is unacceptable." *Id.*; *see also* Donald J. Trump (@realDonaldTrump), Twitter (June 10, 2018, 9:17 PM EST) ("Why should I, as President of the United States, allow countries to continue to make Massive Trade Surpluses, as they have for decades, while our

Farmers, Workers & Taxpayers have such a big and unfair price to pay? Not fair to the PEOPLE of America! $800 Billion Trade Deficit.").[2]

One month later, USTR published notice of its proposal to "modify the action in this investigation *** by taking a further, supplemental action"—specifically, "an additional 10 percent *ad valorem* duty on products [from] China *** [with] an annual trade value of approximately $200 billion," spanning 6,031 HTSUS tariff subheadings. Appx01925. As authority for its action, USTR invoked Section 307(a)(1)(C), under which USTR "may modify or terminate any action" taken under Section 301(b) when such action "is no longer appropriate." *Id.* (quoting 19 U.S.C. § 2417(a)(1)(C)).

USTR relied explicitly on China's imposition of "retaliatory duties" as a justification for its action. Appx01925; *see* Press Release, Office of the U.S. Trade Representative, Statement by U.S. Trade Representative Robert Lighthizer on Section 301 Action (July 10, 2018) (citing "China's retaliation").[3] USTR further noted that "action at this level is

_____

[2] https://twitter.com/realDonaldTrump/status/1005982266496094209.

[3] https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/july/statement-us-trade-representative.

appropriate in light of the level of China's announced retaliatory action ($50 billion) and the level of Chinese goods imported into the United States ($505 billion in 2017)." Appx01925. USTR did not identify any increased burdens or restrictions arising from the actions it originally investigated, *i.e.*, the intellectual property/technology-transfer acts, policies, or practices that USTR found actionable under Section 301.

Weeks later, USTR announced that, in light of China's retaliatory duties, USTR would propose to increase the duty on List 3 from 10% to 25%. Again, rather than addressing the original conduct found actionable under Section 301, USTR premised the further increase in tariffs on China's "illegal[] retaliat[ion] against U.S. workers, farmers, ranchers and businesses." Press Release, Office of the U.S. Trade Representative, Statement by U.S. Trade Representative Robert Lighthizer on Section 301 Action (Aug. 1, 2018).[4] Shortly thereafter, USTR formally proposed "raising the level of the additional duty in the proposed supplemental action from 10 percent to 25 percent." Appx02153.

---

[4] https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/august/statement-us-trade-representative.

13

Approximately 350 witnesses, representing a broad array of businesses, trade associations, consumer, and public interest groups, appeared at the hearings regarding the proposed List 3 tariffs, and over 6,000 comments were submitted. *See* Section 301 Docket.[5] The overwhelming majority of the testimony and comments (~98%) revealed deep and widespread concern over the potentially devastating impact of the proposed tariffs on U.S. businesses and consumers. For example, the National Retail Federation ("NRF") noted that List 3 "includes many consumer goods" that are "purchased by nearly every American household" and "account for relatively large shares of total household spending of lower-income households." Appx05600. NRF further observed that businesses and consumers would be harmed by the disruption to supply chains, supply shortages, and price increases, and that the tariffs "would jeopardize U.S. jobs." Appx05600-Appx05601. The American Chemistry Council stated that the proposed List 3 tariffs "would have a profound and negative ripple effect throughout the U.S. economy, increasing costs and causing deep and lasting harm to domestic

---

[5] https://www.regulations.gov/docket?D=USTR-2018-0026 (last visited July 13, 2023).

manufacturers, farmers, workers, and consumers." Appx05420. SEMI, the trade association representing the semiconductor manufacturing industry, raised similar concerns regarding the impact of the proposed tariffs on jobs and global competitiveness. Appx02759, Appx02765.

Although the volume of the comments submitted and the importance of the issues raised gave USTR an enormous amount of information to process, the Administration suggested—even before the comment period ended—that USTR was ready to impose tariffs immediately. *See* Jennifer Jacobs, Shawn Donnan, Andrew Mayeda, & Saleha Mohsin, *Trump to Back $200 Billion China Tariffs as Early as Next Week, Sources Say,* BLOOMBERG (Aug. 31, 2018).[6] Indeed, less than 24 hours after the comment deadlines, President Trump added that more tariffs on an additional $267 billion in Chinese goods were "ready to go *** if I want." Shannon Pettypiece, *Trump Threatens Tariffs on $267 Billion More of China Goods*, BLOOMBERG (Sept. 7, 2018).[7]

---

[6] https://www.bloomberg.com/news/articles/2018-08-30/trump-said-to-back-200-billion-china-tariffs-early-as-next-week.

[7] https://www.bloomberglaw.com/product/blaw/document/PEP4HH6S9728?criteria_id=836874428e044c184792e389f0587b76&searchGuid=578f467f-2a95-45ab-a12d-9efb1dbf9c92

2.    *Final Adoption of List 3*

Just eleven days after the deadline for the public to submit written comments, President Trump announced that USTR would "proceed with placing additional tariffs on roughly $200 billion of imports from China." APPX06166.  Once again, the President made clear the additional tariffs were in response to China's retaliation to the $50 billion tariff action, as he promised to proceed with yet more tariffs "if China takes retaliatory action against our farmers or other industries."  *Id.*; *see White House Adviser Navarro On Why U.S. Hit China With More Tariffs*, NPR MORNING EDITION (Sept. 18, 2018) ("China retaliated.  And so in response to that, the president directed the USTR to go through the process meticulously of preparing the additional tariffs.").[8]

The next day, USTR published notice of final List 3.  Appx06172-Appx06390.  USTR announced that the additional 10% duty would apply to all listed products that entered the United States from China on or after September 24, 2018, and would rise automatically to 25% on January 1, 2019.  Although USTR purported to "have carefully reviewed

---

[8] https://www.npr.org/2018/09/18/649089105/white-house-adviser-navarro-on-why-hit-china-with-more-tariffs.

16

the public comments" and testimony, Appx06173—*i.e.*, the 6,000 written comments plus tens of thousands of transcript pages—USTR did not actually address any comments or testimony.



For legal authority, USTR this time relied on an additional provision that was not cited in the notice proposing List 3: Section 307(a)(1)(B). Appx06172. Parroting the statutory language, USTR stated, in conclusory fashion without citing any evidence or findings, that the relevant burden "continues to increase, including following the one-year investigation period." *Id.* "Furthermore," USTR added, "China's unfair acts, policies, and practices include not just its specific technology

transfer and IP polices referenced in the notice of initiation in the investigation, but also China's subsequent defensive actions taken to maintain those policies." *Id.* USTR also again cited Section 307(a)(1)(C), arguing that China's response to the $50 billion tariff action "has shown that the current action no longer is appropriate" because "China openly has responded to the current action by choosing to cause further harm to the U.S. economy, by increasing duties on U.S. exports to China." Appx06173.

In December 2018, the Administration announced its decision to delay the scheduled January 1, 2019 increase in rate from 10% to 25% for List 3 products, based on negotiations with China "with respect to North Korea" and China's apparent commitment "to purchase a not yet agreed upon, but very substantial, amount of agricultural, energy, industrial, and other product from the United States to reduce the trade imbalance between [the United States and China]." Appx06461-Appx06462; *see* Appx06474. The Administration later delayed the increase indefinitely in light of the progress of trade talks with China. Appx06484.

But after those negotiations fell apart, on May 9, 2019, USTR issued a Federal Register notice announcing its intention to raise tariffs on List 3 goods to 25%. Appx06496-Appx06497. The notice cited China's decision to "retreat from specific commitments agreed to in earlier rounds" of negotiations as the sole basis for the increase in duties. Appx06496. "In light of the lack of progress in the additional rounds of negotiations since March 2019," the Notice read, "the Trade Representative has determined that it is appropriate for the rate of additional duty under the September 2018 action to increase to 25 percent [for goods leaving China] on May 10, 2019." Appx06497. USTR made no finding of any increased burden from China's investigated trade practices.

## D.   List 4

### 1.   *Proposed List 4 Tariffs*

Just eight days after announcing the increase in the List 3 duty rate to 25%, USTR announced its intention to proceed with List 4, which would subject an additional $300 billion worth of products imported from China to up to 25% tariffs. Appx06504-Appx06579. USTR again declared that its proposed additional action was based on China's

responsive actions, not any increased burdens or restrictions from the originally investigated acts and practices: "In light of China's failure to meaningfully address the acts, policies, and practices that are subject to this investigation and its response to the current action being taken in this investigation," USTR "propose[d] to modify the [Section 301] action" by increasing the value of products subject to tariffs to approximately $500 billion total—*i.e.*, ten-fold above the initial action. Appx06504.

The public submitted nearly 3,000 additional comments outlining the expansive harms American businesses and consumers would suffer from the List 4 tariffs. The U.S. Chamber of Commerce noted that the List 4 tariffs "will dramatically expand the harm already done to American consumers, workers, businesses, and the economy," especially considering that "U.S. tariffs on imports from China are already costing American households $106 billion a year." Appx06714. It also stressed that "American farmers have become some of the most severely affected targets of retaliation." Appx06719. The Consumer Technology Association ("CTA") noted that the tariffs will "stifle *** growth and market share, diminish U.S. product adoption, and undermine [CTA's members'] ability to invest in continued innovation to drive the U.S.

industry and its global market share forward." Appx07246. The National Association of Manufacturers warned that the List 4 tariffs, by sharply increasing the cost of "raw materials, intermediate goods or capital equipment from China," will actually harm *domestic* manufacturing, by "mak[ing] it more expensive and less competitive to manufacture in the United States, undermining production, capital and R&D investment and jobs here at home while also forcing manufacturers to cede ground to their competitors overseas." Appx06675. Similar to List 3, the List 4 hearings attracted over 300 witnesses who testified about the negative impact of the proposed tariffs.[9]

### 2. *Final Adoption of List 4*

On August 1, 2019, citing China's failure to follow through on agricultural purchases and to reduce exports of fentanyl flowing into the United States, President Trump announced on Twitter that the List 4

---

[9] USTR, Section 301 Tariffs Hearing Panel Schedule, https://ustr.gov/sites/default/files/enforcement/301Investigations/Section%20301%20Hearing%20Schedule%20June%2017-June%2025%202019.pdf (last visited July 13, 2023).

tariffs would become effective September 1 at a rate of 10%.  Donald J.

Trump (@realDonaldTrump), TWITTER (Aug. 1, 2019, 1:26 PM EST).[10]

Later that month, USTR issued a final notice adopting List 4 in two

tranches.  Appx09153-09320.  List 4A would impose a 10% duty on goods

worth approximately $120 billion, effective September 1, 2019.

Appx09153.  List 4B would impose a 10% duty on the remaining goods

(with limited exclusions "based on health, safety, national security, and

other factors"), effective December 15, 2019.  Appx09154.  Once again,

USTR addressed none of the nearly 3,000 comments submitted or witness

testimony, other than to claim that its determination "takes account of

the public comments and the testimony."  *Id.*

As legal support for its action, USTR cited both Section 307(a)(1)(B)

and (C), stating that it may "modify" its prior action taken pursuant to

Section 301 if (1) "[t]he burden or restriction on United States commerce"

imposed by the investigated foreign country practice "has increased or

decreased," or (2) "the action *** is no longer appropriate."  Appx09153.

But instead of finding any increased burden on U.S. commerce from the

---

[10] https://twitter.com/realDonaldTrump/status/1156979446877962
243?lang=en

practices that were the subject of USTR's investigation, USTR pointed to "China's subsequent defensive actions taken to maintain those unfair acts, policies, and practices as determined in that investigation," such as imposing retaliatory tariffs on U.S. imports, retreating from commitments during negotiations, and devaluing its currency. Appx09153-Appx09154.

With the promulgation of Lists 3 and 4, USTR's tariff actions under Section 301 expanded from covering roughly 10% of Chinese imports (with List 1 & 2) to covering nearly all imports from China (with Lists 3, 4A, & 4B).



Just ten days after publishing List 4, USTR published notice of its decision to increase the tariff rate applicable to goods covered by Lists 4A and 4B from 10% to 15%. Appx09338-Appx-09340. The cited basis for these actions was, once again, China's retaliation as well as China's retreat from its negotiation commitments and devaluation of its currency. Appx09339 (noting that "China responded [to List 4] by announcing further tariffs on U.S. goods"). USTR did not cite increased harms from the originally investigated practices.

24

On December 18, 2019, citing a recently negotiated limited trade deal with China, USTR published notice that it would "suspend indefinitely the imposition of additional duties" on List 4B. Appx09560. USTR also later halved the duty rate (to 7.5%) for List 4A, Appx09571, which, along with Lists 1, 2, and 3, remains in effect.

### E.     Procedural History

Plaintiffs filed suit at the CIT, seeking vacatur of the List 3 and 4A tariffs and refunds of any duties paid on grounds that they were issued without statutory authority and in violation of the APA. Appx00112-Appx00141. Over 4,100 additional actions were filed thereafter raising substantively similar claims. This action was selected as the "sample case," and subsequent actions were stayed pending resolution of this action. Appx09597-Appx09601; Appx09572-Appx09576. Defendants moved to dismiss or, alternatively, for judgment on the agency record, while Plaintiffs cross-moved for judgment.[11]

On April 1, 2022, the CIT issued its first decision. Appx00030-Appx00100 (*First Opinion*). At the outset, the CIT rejected Defendants'

---

[11] Because Defendants initially objected to refunding liquidated entries in the event Plaintiffs prevailed, Plaintiffs were forced to seek a

arguments that the claims were unreviewable because they supposedly challenged Presidential (rather than agency) action or raised political questions.    Appx00048-Appx00057.    Turning to the merits, the CIT addressed whether USTR exceeded its authority under Section 307(a)(1)(B) when it promulgated Lists 3 and 4A.    Although the CIT agreed with Plaintiffs that the plain text of Section 307(a)(1)(B) allows USTR to modify its earlier action based only on an increased burden from the originally investigated acts, the CIT held that China's after-the-fact retaliation was sufficiently "link[ed]" to USTR's original investigation. Appx00065-Appx00070.    The CIT did not reach the parties' arguments on whether Section 307(a)(1)(C) independently supported Lists 3 and 4A.

The CIT next assessed whether USTR complied with the APA. After rejecting Defendants' argument that the foreign-affairs-function

preliminary injunction limited to the suspension of liquidation. *See* Appx09805-Appx09833 (granting injunction); *see also* Appx09834-Appx09854 (Barnett, C.J., dissenting on the ground that no injunction was necessary because CIT unquestionably has the authority to order refunds).    After the CIT granted that injunction on July 6, 2021, Defendants stipulated that, in the event Plaintiffs ultimately prevailed, Defendants would reliquidate and provide refunds for entries that were unliquidated as of the injunction date. Appx10306-Appx10322.    The CIT so modified its injunction.    Appx10339-Appx10340.

exception excused USTR from following the APA's notice-and-comment rulemaking requirements, Appx00071-Appx00073, the CIT concluded that USTR failed to consider adequately thousands of comments from interested parties.   Appx00077-Appx00086.   Instead of vacating, however, the CIT ordered USTR to reconsider or further explain its decisions to impose Lists 3 and 4A. Appx00086-Appx00090.  But the CIT underscored that USTR could only "further explain the justifications it has given for the modifications," and that if it wished to provide new reasoning, it would need to "'deal with the problem afresh' by taking new agency action.'"  Appx00090 (quoting *Department of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1908 (2020)).

After taking 120 days (including an extension) to review the thousands of comments and thousands of pages of hearing testimony, Appx10544-Appx10550; Appx10557-Appx10559, USTR issued a 90-page remand determination.   Appx10570-Appx10659.   The CIT rejected Plaintiffs' arguments that the determination was conclusory and *post*

27

*hoc*, and entered judgment sustaining Lists 3 and 4A.  Appx00001-Appx00002; Appx00003-Appx00029.  Plaintiffs appealed.

## SUMMARY OF THE ARGUMENT

USTR's Lists 3 and 4A tariff actions on hundreds of billions of dollars of imported Chinese goods are *ultra vires* and procedurally infirm.

**I.** Section 307 of the Trade Act authorizes USTR to "modify or terminate" a discretionary Section 301(b) action in two circumstances—neither of which is present here.  First, Section 307(a)(1)(B) allows USTR to modify an existing action where the burden on U.S. commerce "of the acts, policies, and practices[] that are the subject of" the Section 301 action has increased or decreased.  That means only an increase in the burden on U.S. commerce from the investigated intellectual property practices themselves (*i.e.*, "the subject of" the Section 301 action)—not from any and all acts purportedly "linked" or "connected" to the original action—could justify an increase in the existing tariff action.  The CIT erred by upholding USTR's use of Section 307(a)(1)(B) to address retaliatory acts by China beyond the specific investigated practices found to justify the original Section 301(b) action.  The CIT's holding is contrary

to the plain text of the statute and ignores the targeted scope of USTR's original Section 301(b) investigation.

Second, Section 307(a)(1)(C) permits modification if USTR deems the original Section 301(b) action to be "no longer appropriate." The statutory structure demonstrates that this provision allows USTR to reduce or terminate an existing action after mitigating circumstances undermine the original finding that certain responsive action was "appropriate." Just as its counterpart section (Section 307(a)(1)(A)) undisputedly allows USTR only to terminate or ratchet down a *mandatory* action in light of changed circumstances, Section 307(a)(1)(C) authorizes USTR only to terminate or ratchet down a *discretionary* action when it is "no longer appropriate." Past practice, legislative history, and the doctrine of constitutional avoidance confirm that construction.

If any doubt remains, the "major questions" doctrine provides additional reason to reject USTR's novel view that Section 307 confers expansive authority to escalate a highly circumscribed Section 301(b) action into an open-ended trade war. Congress would not have granted USTR authority to take action of such economic and political consequence

29

without a far clearer statement than the circumscribed grant of authority to "modify" a targeted trade action.

**II.** USTR failed to consider, let alone respond to, thousands of comments lodging significant objections to the proposed List 3 and 4A tariffs before finalizing those actions. The CIT acknowledged that USTR's failures violated the APA. But instead of vacating the tariff actions, the CIT erred in giving USTR a do-over to provide the missing reasoning. The CIT erred again when it upheld the List 3 and 4A duties based on a remand determination offering conclusory and *post hoc* responses that ultimately rested on the President's say-so rather than consideration of all the relevant statutory factors. That APA violation provides an independent basis to set aside Lists 3 and 4A.

## STANDARD OF REVIEW

This Court "review[s] the grant of judgment on the agency record by the Court of International Trade without deference." *Corus Staal BV v. Department of Com.*, 395 F.3d 1343, 1346 (Fed. Cir. 2005). Because this case arose under 28 U.S.C. § 1581(i), the "Administrative Procedure Act standard of review applies," *Shakeproof Indus. Prods. Div. of Ill. Tool Works Inc. v. United States*, 104 F.3d 1309, 1313 (Fed. Cir. 1997), under

which this Court "hold[s] unlawful and set[s] aside agency action, findings, and conclusions found to be *** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(a).

Under that standard, "legal issues"—such as issues of statutory construction—are decided without deference to the Executive Branch. *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1318 (Fed. Cir. 2021) ("This appeal involves only legal issues, which we decide de novo."); *GPX Int'l Tire Corp. v. United States*, 780 F.3d 1136, 1140 (Fed. Cir. 2015) ("We review questions of constitutional or statutory interpretation de novo.").  That is because the judiciary, not USTR or the President, "is the final authority on issues of statutory construction."  *Gilda Indus., Inc. v. United States*, 622 F.3d 1358, 1363 (Fed. Cir. 2010) ("*Gilda II*") (citation omitted).   Although this Court defers "to decisions of the Trade Representative implicating the discretionary authority of the President in matters of foreign relations," it affords no similar deference to USTR's interpretation of statutory mandates.  *Id.*; *see* Appx00059 (this Court "distinguishe[s] matters implicating presidential discretion from those requiring statutory interpretation") (citing *Gilda II*, 622 F.3d at 1363).

31

Instead, the Court determines the meaning of the statute for itself, examining "the statute's text, structure, and legislative history," while applying any "relevant canons of interpretation." *Gazelle v. Shulkin*, 868 F.3d 1006, 1010 (Fed. Cir. 2017).

## ARGUMENT

## I.    USTR EXCEEDED ITS MODIFICATION AUTHORITY UNDER THE TRADE ACT

USTR exceeded its authority under Section 307 of the Trade Act when it imposed the List 3 and 4A tariffs on Chinese goods worth hundreds of billions of dollars—an amount orders of magnitude greater than the original $50 billion Section 301 action that USTR had deemed "commensurate with an economic analysis of the harm caused by China's unreasonable technology transfer policies to the U.S. economy." USTR April 3, 2018 Release.

USTR's sole statutory basis for Lists 3 and 4A is Section 307, the "modification" provision. Before the CIT, Defendants relied on two different subsections of Section 307, but USTR did not do so originally. In proposing List 3, USTR relied solely on Section 307(a)(1)(C), which allows USTR to "modify or terminate any action, subject to the specific direction, if any, of the President with respect to such action, *** if ***

32

such action is being taken under [S]ection 301(b) of this title and is no longer appropriate." Appx01925 (second ellipsis in original) (quoting 19 U.S.C. § 2417(a)(1)(C)). Upon finalizing List 3, USTR for the first time cited Section 307(a)(1)(B), which permits modification where "the burden or restriction on United States commerce *** of the acts, policies, and practices, that are the subject of such action has increased or decreased." Appx06172 (quoting 19 U.S.C. § 2417(a)(1)(B)).

As USTR's evolving rationale suggests, neither provision supports List 3 or 4A. For starters, "statutory permission to 'modify' does not authorize 'basic and fundamental changes in the scheme' designed by Congress." *Biden v. Nebraska*, 600 U.S. ---, No. 22-506, 2023 WL 4277210, at *9 (U.S. June 30, 2023) (quoting *MCI Telecomms. Corp. v. American Tel. & Tel. Co.*, 512 U.S. 218, 225 (1994)). Instead, in both ordinary and legal definitions, the word "carries 'a connotation of increment or limitation,' and must be read to mean 'to change moderately or in minor fashion.'" *Id.* (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1952 (2002) & BLACK'S LAW DICTIONARY 1203 (11th ed. 2019)); *see also MCI Telecomms.*, 512 U.S. at 225-228 (relying on dictionaries published between 1987-1990, contemporaneous with

33

Section 307's addition in the Trade Act of 1988). Just as "[t]he authority to 'modify' statutes and regulations allows [an agency] to make modest adjustments and additions to existing provisions," the authority to "modify" tariff actions gives USTR the power to make modest adjustments to those tariffs, not the power to "transform them" into a trade war. *Biden*, 2023 WL 4277210, at \*9. Yet USTR's "modification" now represents nearly half of *all* U.S. tariffs currently in effect globally.

Beyond that threshold problem, Section 307's "text and context, including purpose and history," *Transpacific*, 4 F.4th at 1332, demonstrate that USTR exceeded its authority in promulgating the challenged duties.

## A. USTR Exceeded Its Authority Under Section 307(a)(1)(B)

### 1. *Section 307(a)(1)(B) Permits Modifications Only If USTR Finds Increased Harms From The Investigated Practices*

Section 307(a)(1)(B) allows USTR to "modify or terminate" a Section 301 action if "the burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, that are the subject of such action has increased or decreased." 19 U.S.C. § 2417(a)(1)(B). As those terms make plain, and as the CIT recognized, USTR may increase

tariffs "based on increased harm to U.S. commerce *from the acts, policies,*
*and practices that constituted the subject of the original investigation.*"
Appx00064 (emphasis added).  The question is whether USTR did so.

The answer is no.  USTR's initial $50 billion Section 301(b) tariff
action followed its "original investigation" into specific harmful acts,
policies, and practices by China.  USTR determined that "an act, policy,
or practice of a foreign country is unreasonable or discriminatory and
burdens or restricts United States commerce," and published its
investigated findings in the Federal Register.  19 U.S.C. §§ 2411(b)(1),
2414(a)(1)(A)(ii), 2414(c).  USTR described four discrete "categories" of
acts, policies, or practices as "actionable under [S]ection 301(b) of the
Trade Act":

1. China uses foreign ownership restrictions, such as joint
   venture requirements and foreign equity limitations, and
   various administrative review and licensing processes, to
   require or pressure technology transfer from U.S.
   companies.

2. China's regime of technology regulations forces U.S.
   companies seeking to license technologies to Chinese
   entities to do so on non-market based terms that favor
   Chinese recipients.

3. China directs and unfairly facilitates the systematic
   investment in, and acquisition of, U.S. companies and
   assets by Chinese companies to obtain cutting-edge

technologies and intellectual property and generate the transfer of technology to Chinese companies.

4. China conducts and supports unauthorized intrusions into, and theft from, the computer networks of U.S. companies to access their sensitive commercial information and trade secrets.

Appx01771; *see* Appx01770-Appx01771 (explaining that USTR previously asked for comments on "four categories" of conduct); Appx02183 (similar); Appx05919 (internal decision memorandum discussing how "investigation covered four categories of acts, policies, and practices").

It is undisputed that USTR's subsequent "supplemental action" (Appx01924-Appx02044), however, was not based on increased harms arising from any of those "four categories." Instead, as the Federal Register notices make clear, USTR was taking action to address (among other disparate issues) China's *retaliation* to the duties imposed on Chinese commerce via Lists 1 and 2, in the form of China's own broadly applicable tariffs on U.S. goods. *See, e.g.*, Appx01925; Appx06172; Appx06504; Appx09153-Appx09154.

Because USTR never found any "increased harm to U.S. commerce *from the acts, policies, and practices that constituted the subject of the original investigation*," Appx00064 (emphasis added), this should have

36

been an easy case. Section 307(a)(1)(B) did not authorize any "modif[cation]" to the original Section 301(b) tariff action, let alone the seven-fold increase that USTR ultimately levied.

> ### 2. *The CIT Erred In Concluding That USTR Could Rely On Subsection (B)*

Although USTR never made findings of increased harm from any of the four originally investigated practices—*i.e.*, "the subject of the [Section 301(b)] action"—the CIT upheld the List 3 and 4A "modifications." It did so on the ground that "China's defensive conduct, occurring subsequent to the original investigation" and distinct from the investigated practices, fell within "the subject of the [original] action." Appx00064-Appx00065. That was error, for multiple reasons.

*First*, this is not a case where the retaliatory conduct took the form of an exacerbation of the investigated practices. There is no finding that China ramped up its IP/technology-transfer abuses against the United States. Rather, China's "defensive conduct" took other forms, principally retaliatory tariffs against U.S. imports. As a matter of logic, such "subsequent" conduct—taken for the first time in response to the Section 301 action—could not have been the subject of the original investigation leading to the Section 301 action.

*Second*, the CIT found that the "link between the subject of the original section 301 action and China's retaliation is plain on its face." Appx00065. But the statutory inquiry is not whether USTR can point to some "link" or "connection" (Appx00067) between the two, but rather whether the economic burden from "the acts, policies, and practices, that are the subject of" the original action increased. 19 U.S.C. § 2417(a)(1)(B). USTR plainly did not find that *those* burdens increased. The CIT thus effectively revised the statute to add a new clause that would justify a modification whenever "the burden or restriction on United States commerce of *** the acts, policies, and practices, that are the subject of such action, or of any subsequent defensive measures taken in response to such action, has increased or decreased." But the CIT's task was "to apply the text, not to improve upon it." *Pavelic & LeFlore v. Marvel Ent. Grp.,* 493 U.S. 120, 126 (1989).

*Third*, it is not enough that China had retaliated to "maintain"— *i.e.*, to "keep in an existing state" or "preserve," *Angus Chem. Co. v. Glendora Plantation, Inc.*, 782 F.3d 175, 184 (5th Cir. 2015) (citing common definitions)—the policies originally deemed actionable. Appx00069. A finding that China's retaliation was "directed against the

effort to challenge its unfair acts, policies, [and] practices," Appx00070, is not equivalent to a finding that the burden of the acts, policies, and practices *themselves* has increased. And it is immaterial whether "China's retaliation also caused increased harm to U.S. commerce" generally, Appx00069-Appx00070, absent a finding of increased harm from the "subject" of the original action.

*Fourth*, the CIT was wrong to rely *sua sponte* on a few out-of-context uses of the word "retaliation" in the Section 301 report as a basis to conclude that USTR validly invoked Section 307(a)(1)(B). The report's references to "retaliation" were, as the CIT itself acknowledged, related to potential retaliation by China against *U.S. companies* for complaining about the IP and technology practices. *See* Appx00069 (USTR's "discussion of retaliation" relates to "why individual companies were unable and unwilling to pursue their own complaints against the underlying Chinese practices"); *see also* Appx01561-Appx01562 (describing general concern that U.S. companies might face retaliation if they complained about China's unfair trade practices, which led USTR to self-initiate the investigation instead of relying on a petitioner); Appx01573 (describing general concern that Chinese regulatory

39

authorities may take action against individual companies for raising issues regarding forced technology transfer and IP)). Such fleeting and inapt mentions of the word "retaliation" in reference to individual U.S. companies are obviously not proof that the "subject" of the "original investigation" included the prospect of billions of dollars in retaliatory tariffs on a broad spectrum of U.S. imports.

Proving the point, Defendants did not even rely on such retaliation "findings" below, either in briefing or in promulgating Lists 3 and 4A. Indeed, USTR's notices never claimed that potential "retaliation" by China had been the subject of investigation. Nor do the internal agency recommendation memoranda included as part of the administrative record. Appx05918-Appx05926; Appx08972-Appx09151. It is thus too late for Defendants to do so now. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (Courts "must judge the propriety of [administrative] action solely by the grounds invoked by the agency.").

*Finally*, to the extent that CIT was concerned about restricting the ability of the United States to respond to retaliation by China, that policy concern was misplaced. "The question here is not whether something should be done; it is who has the authority to do it." *Biden*, 2023 WL

4277210, at *12.   Congress remains free to exercise its constitutional powers to "lay and collect Taxes, Duties, Imposts and Excises" directly. U.S. CONST. art. I, § 8.   Beyond that, Congress gave USTR a variety of tools to respond to China's actions.   For example, USTR could have negotiated with China or filed additional cases against China before the World Trade Organization.   *See* 19 U.S.C. §§ 2413, 3537.[12]   USTR was also free to initiate a new Section 301 investigation, pursuant to the same statutory procedures under which it conducted its original investigation, which would have permitted a subsequent Section 301 action to address China's retaliation.

To be sure, those routes would have required following the procedural safeguards that Congress put in place—which, for a new Section 301 action, would have required an investigation, consultations with China, and a new report.   *See* 19 U.S.C. §§ 2411-2414.   But that is what exercising Congress's constitutionally delegated authority entails.

---

[12] USTR brought a WTO case against China in similar circumstances when China retaliated against U.S. imposition of Section 232 duties on imports of steel and aluminum.   *See* USTR, Additional Duties on Certain Products from the U.S., https://ustr.gov/node/10127 (last visited July 13, 2023).

The Executive Branch may exercise delegated authority only "subject to limitations which [Congress] imposes." *Chrysler Corp. v. Brown,* 441 U.S. 281, 302 (1979); *see United States v. Schmidt Pritchard & Co,* 47 C.C.P.A. 152, 162 (1960) ("It requires no elaborate argument to support the proposition that Congress in so delegating its powers may prescribe whatever procedures and limitations it sees fit to enact for limiting the exercise by its agents of such delegated powers."). USTR should not have been permitted to override Congress's clear limitation in Section 307(a)(1)(B) in order to arrogate trade-war powers that Congress never delegated.

### B.   USTR Exceeded Its Authority Under Section 307(a)(1)(C)

USTR also relied on Section 307(a)(1)(C) of the Trade Act as alternative authority for imposing the List 3 and 4A tariffs. Appx06172-Appx06173; Appx09153. Although the CIT did not reach that issue due to its finding on Section 307(a)(1)(B), Appx00070, it is a fully briefed question of law. Accordingly, this Court should hold that Section 307(a)(1)(C) does not authorize List 3 or 4A, either.

    *1.    Text and Context Show That Congress Authorized Only The Tapering Or Terminating Of Actions Deemed No Longer "Appropriate"*

Section 307(a)(1)(C) provides that the President may "modify or terminate" an action if "such action is being taken under [section 301(b)] and is no longer appropriate." 19 U.S.C. § 2417(a)(1)(C). Contrary to Defendants' argument, the text and structure of Sections 301 and 307 of the Trade Act demonstrate that Section 307(a)(1)(C) does not give USTR unlimited, unreviewable authority to *increase* trade actions no longer deemed "appropriate."

As noted, Section 301(b) authorizes USTR to take discretionary action within one year if (1) a foreign country's acts, policies, or practices are unreasonable or discriminatory and burden or restrict U.S. commerce; and (2) responsive action by the United States is "appropriate." 19 U.S.C. § 2411(b). Section 307(a)(1)(C), in turn, permits *modification* of a discretionary action after USTR concludes that such an action is "*no longer* appropriate." *Id.* § 2417(a)(1)(C) (emphasis added). Both sides agreed below that Sections 307(a)(1)(C) and Section 301(b) should be read in harmony with one another. *See*, *e.g.*, Appx09769-Appx09770; Appx10152-Appx10153.

Reading those sections together (as one must), Section 307(a)(1)(C)

provides authority only to *reduce or terminate* a Section 301(b) action

after changed circumstances undermine the original finding that taking

responsive action was "appropriate." Indeed, that is precisely how USTR

has historically understood the relationship between the two provisions.

*See, e.g.*, *Termination of Action: Protection of Intellectual Property Rights*

*by the Government of Honduras,* 63 Fed. Reg. 35,633, 35,633 (June 30,

1998) ("Section 307(a)(1)(C) of the Trade Act authorizes the USTR to

*terminate* any action, subject to the specific direction, if any, of the

President, if such action is being taken under Section 301(b) and is *no*

*longer appropriate.*" (emphasis added)).

The neighboring prongs of Section 307(a)(1) reinforce the conclusion

that Section 307(a)(1)(C) is a tool to taper, not expand, an existing

remedial action. Section 307(a)(1)(A) permits USTR to modify or

terminate a mandatory action taken under Section 301(a) when "any of

the conditions described in section [301(a)(2)] exist." 19 U.S.C.

§ 2417(a)(1)(A). Those "conditions" are the exceptions to mandatory

action under Section 301(a), and reflect circumstances in which the

foreign country is taking steps to remediate its offensive practices or

when a U.S. response to a foreign trade violation would "serious[ly] harm *** the national security" or "adverse[ly] impact *** the United States economy." *Id.* § 2411(a)(2)(B)(i)-(v). By authorizing USTR to modify or terminate an action when those *exceptions* to mandatory action are present, Congress clearly did not authorize USTR to *increase* tariffs thereunder, as Defendants conceded below. *See* Appx10371 (acknowledging that section 307(a)(1)(A) operates as a tapering tool only, allowing USTR to terminate or decrease mandatory actions). On the contrary, Congress permitted USTR only to withdraw or curtail a mandatory action previously taken when later-developed conditions render that action undesirable.

Importantly, Sections 307(a)(1)(A) and (C) operate in parallel with respect to mandatory and discretionary actions, respectively. That is, whereas the former provision applies to *mandatory* action under Section 301*(a)*, the latter applies to *discretionary* action under Section 301*(b)*. *See* 19 U.S.C. § 2417(a)(1)(A), (C). Just as subsection (A) allows USTR to terminate or ratchet down a *mandatory* action when that action no longer makes sense in light of changed circumstances, subsection (C) likewise authorizes USTR to terminate or ratchet down a *discretionary* action

when USTR finds that it "is no longer appropriate." *Id.* § 2417(a)(1)(C). Neither provision authorizes an escalation of a tariff action in response to changed circumstances.

Defendants argued below that nothing in subsection (C) explicitly prohibits USTR from increasing an action no longer deemed "appropriate." But the same is true of subsection (A), and all parties agree (Appx10371) that it does not permit increases in a tariff action. Indeed, Defendants' argument implies that USTR paradoxically has *less* authority to counteract retaliation in the context of international trade violations giving rise to *mandatory* actions.

If the modification authority under subsection (C) were broad enough to permit USTR to escalate a tariff action at its discretion, moreover, USTR would *always* rely on subsection (C) over (B)—and thus avoid making the factual determinations required by subsection (B) in every discretionary action case. In fact, USTR did just that in its notice of proposed List 3 action, before belatedly citing subsection (B) as well in subsequent notices. USTR also conceded below that, because section 307(a)(1)(C) "provided an independent basis" for its action, USTR was not actually required to make "*any* finding with respect to the burden on

United States commerce" before increasing the original $50 billion tariff action seven-fold.  Appx10392 (emphasis added).  This Court should not adopt a reading that renders subsection (B) superfluous.

Allowing USTR to increase (in unlimited fashion) tariff actions under subsection (C) would be especially problematic because Congress permitted the imposition of tariffs under Section 301(b) only after USTR jumps through a series of congressionally imposed hoops, including investigation requirements (19 U.S.C. § 2412), consultation requirements (*id.* § 2413), factual findings (*id.* § 2414), and a twelve-month deadline to choose "appropriate" action (*id.* § 2414(a)(2)(B)).  Subsection (C), by contrast, contains few procedural protections and requires no fact-finding on harm before taking sweeping action, as Defendants admit.  Appx10392.  The "supplemental" actions challenged here—a seven-fold escalation of the original Section 301 action, covering nearly every import from one of the U.S.'s largest trading partners—proves the point.  *Cf. Biden*, 2023 WL 4277210, at *9 ("From a few narrowly delineated situations specified by Congress, the Secretary has expanded forgiveness to nearly every borrower in the country.").

Take a hypothetical scenario under Defendants' view of subsection (a)(1)(C): USTR could decide that imposing a $1 *million* tariff action is "appropriate" based on a thorough investigation targeting discrete trade practices, and then "modify" that action as "no longer appropriate" to a $1 *trillion* action covering the entire trade portfolio—just because the targeted nation responded with its own $1 million tariff (or for virtually any other policy reason). That hypothetical differs from this case only in the precise numbers.

Congress would not have placed various procedural and substantive obstacles in the way of the Executive Branch's authority to take discretionary action under Section 301(b), only to give it "unfettered discretion" to increase those actions exponentially through a "modification" provision. *Biden*, 2023 WL 4277210, at *9; *see Whitman v. American Trucking Ass'n*, 531 U.S. 457, 468 (2001) (Congress "does not *** hide elephants in mouseholes.").

The only coherent reading is that, in light of the foreign policy concerns at stake, Congress left to the Executive Branch's discretion actions to terminate or reduce an action (subsection (C)), but ensured that any *increases* in existing actions would need to be justified by an

increased burden on U.S. commerce from the investigated practices themselves (subsection (B))—or, failing that, a new investigation. That reading aligns perfectly with the notion that relieving trade penalties should be easier than imposing trade penalties—a concept widely reflected in other trade statutes and regulations as well. *See, e.g.,* 19 U.S.C. § 1337(j)(2) (public-interest exception to section 337 action); 48 C.F.R. § 25.202 (public-interest exception to Buy American restrictions). Indeed, the parity between establishing the initial action under Section 301 and increasing such action under Section 307(a)(1)(B) is obvious: although USTR is always free to reduce or terminate penalties, USTR cannot impose *new* penalties on a U.S. trading partner absent an investigation into its allegedly unfair practices.

> ### 2. *Historical Practice Confirms That Section 307(a)(1)(C) Permits Only Tapering or Terminating.*

In addition to statutory text and structure, "[p]ractice under" the modification provision in the three decades since modification authority was added in 1988 "provide[s] strong confirmation [as to] the proper meaning of the language at issue here." *Transpacific,* 4 F.4th at 1326.

In promulgating List 3, USTR admitted in internal deliberations that its action was unprecedented: "[W]e are not aware of prior

investigations where a Trade Representative was called upon to use Section 307 modification authority to increase the level of trade action in order to achieve the statutory goal of obtaining the elimination of harmful policies covered by the investigation." Appx05922. Defendants likewise conceded below that USTR has only "previously invoked section 307(a)(1)(C) to reduce, terminate or delay section 301 actions." Appx09778 n.6.

Given the statutory structure, that is no surprise. USTR has invoked Section 307(a)(1)(C) on five occasions in the 35 years since its enactment (not including this investigation). In three of those instances, including in a prior action against China, USTR terminated the action completely. *See, e.g., Termination of Section 301 Investigation and Action Regarding the People's Republic of China's Protection of Intellectual Property and Provision and Market Access to Persons Who Rely on Intellectual Property Protection,* 60 Fed. Reg. 12,582, 12,583 (Mar. 7, 1995) ("Section 307(a)(1)(C) of the Trade Act authorizes the USTR to terminate any action *** if, inter alia, the USTR determines that the action being taken under section 301(b) of the Trade Act is no longer appropriate."); *see also Results of Out-Of-Cycle Review Under Section 182*

*and Termination of Action Under Section 301(b): Intellectual Property Laws and Practices of the Government of Ukraine,* 71 Fed. Reg. 5,899 (Feb. 3, 2006); *Termination of Action: Protection of Intellectual Property Rights by the Government of Honduras,* 63 Fed. Reg. 35,633 (June 30, 1998). On another occasion, USTR decided to terminate in part a Section 301 action after "the Government of Ukraine *** addressed one of the two issues *** that were the basis of *** the Trade Representative's finding that Ukraine's inadequate IPR protections were actionable under Section 301(b)." *Modification of Action Under Section 301(b); Out-of-Cycle Review Under Section 182; and Request for Public Comment: Intellectual Property Laws and Practices of the Government of Ukraine,* 70 Fed. Reg. 53,410, 53,411 (Sept. 8, 2005). In the last instance, USTR delayed implementation of a Section 301(b) action to allow for completion of review under a trade agreement. *See Modification of Determination of Action Pursuant to Section 301 Concerning Canadian Exports of Softwood Lumber; Opportunity for Comment,* 57 Fed. Reg. 44,609 (Sept. 28, 1992).

What USTR has never done is rely on subsection (C) (or subsection (B)) to *expand* a tariff action—never mind by such a mind-boggling

magnitude.    The Government's unbroken past practice is further confirmation that neither "mousehole" provides the "elephant"-size authorization for the List 3 and 4A tariff actions.  *Whitman*, 531 U.S. at 468.

> ### 3.    Constitutional    Avoidance    Principles    Require Interpreting Subsection (C) To Permit Only Tapering Or Terminating.

To the extent any doubt remains regarding the appropriate interpretation of Section 307(a)(1)(C), principles of constitutional avoidance should eliminate it.  *See, e.g., Gonzalez v. United States*, 553 U.S. 242, 251 (2008) ("[W]hen 'a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided,'" the court's "'duty is to adopt the latter.'") (citations omitted).

If Section 307 delegated to USTR the authority to use a single investigation targeting a narrow set of unfair IP and technology transfer policies (which warranted a "commensurate" $50 billion action) to justify an unlimited trade war against the entire volume of trade with China, simply because USTR found the original action "no longer appropriate," that would present a serious non-delegation problem.  The Supreme

Court has long required Congress to "lay down by legislative act an intelligible principle to which the person or body \*\*\* is directed to conform." *See Panama Refin. Co. v. Ryan*, 293 U.S. 388, 429-430 (1935) (citation omitted); *see Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) ("The constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion."). If USTR is correct, there is no intelligible principle guiding USTR's (apparently unbounded) discretion.

Defendants below admitted the premise of that non-delegation doctrine problem in making the startling argument that "whether maintaining a prior action is 'no longer appropriate' \*\*\* presents a judicially unmanageable standard." Appx09771. As noted, USTR takes the position that it could convert a $1 *million* tariff action issued (after the completion of a full investigation) into a $1 *trillion* action for any policy reason that, in USTR's unilateral view, rendered the initial action "no longer appropriate"—with no judicial review. Of course, a more sensible (and constitutional) conclusion exists: Congress, consistent with the terms and structure of Section 307 as a whole, designed Section

53

307(a)(1)(C) to permit only *reducing or terminating* a Section 301(b) action when that action is "no longer appropriate."

Importantly, this Court need not actually find the delegation unconstitutional. "[E]ven if a *serious doubt* of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson,* 285 U.S. 22, 62 (1932) (emphasis added). The avoidance canon, moreover, applies to an "administrative interpretation of a statute [that] invokes the outer limits of Congress' power" without "a clear indication that Congress intended that result." *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-173 (2001) (canon rests on "assumption that Congress does not casually authorize administrative agencies to interpret a statute to push the limits of congressional authority").

Given the non-delegation doctrine concern over whether Congress intended to delegate unlimited, unreviewable authority to USTR to increase a Section 301 action, the Court should adopt Plaintiffs' interpretation, which avoids that constitutional concern. Because Plaintiffs' interpretation is at least "plausible"—in fact, it is

unambiguously correct—this court's "plain duty" is to adopt it. *National Fed'n of Indep. Bus. v. Sebelius,* 567 U.S. 519, 562 (2012).

## C. The "Major Questions" Doctrine Confirms That Lists 3 And 4A Exceed USTR's Authority

The "major questions" doctrine, as recently articulated by the Supreme Court, further undercuts USTR's claim of expansive authority under Section 307's "modification" provision to engage in an open-ended trade war.

That doctrine implicates "cases in which the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer" sweeping authority on an agency. *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (alteration in original) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-160 (2000)). In those cases, "something more than a merely plausible textual basis for the agency action is necessary. The agency instead must point to clear congressional authorization for the power it claims." *Id.* at 2609 (internal quotation marks omitted). This is because "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,'

or 'subtle device[s].'" *Id.* (alteration in original) (quoting *Whitman*, 531 U.S. at 468). Courts should presume that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.*

This is a classic example of a "major questions" case. As in *West Virginia v. EPA*, USTR (1) "claim[ed] to discover in a long-extant statute an unheralded power representing a transformative expansion in [its] regulatory authority," (2) "located that newfound power in the vague language of an ancillary provision[ ] of the Act" that "had rarely been used in the preceding decades," and (3) took action of "vast economic and political significance." 142 S. Ct. at 2605, 2610-2613 (alterations in original) (internal quotation marks and citations omitted).

*First*, although USTR claimed below that the power to increase duties and prosecute a trade war was critical to trade policy, USTR had invoked its Section 307(a)(1)(C) modification authority only five other times in the provision's 35-year-history—always to terminate, reduce, or delay an action, never to expand it. Appx09778 n.6; *see* pp. 50-51, *supra*. And USTR had invoked Section 307(a)(1)(B) just once—to *terminate* duties. *See Implementation of the U.S.-EC Beef Hormones Memorandum of Understanding*, 74 Fed. Reg. 48,808 (Sep. 24, 2009); *cf. Biden*, 2023

WL 4277210, at *12 (noting that "[t]he Act has been used only once before" in a like manner).

*Second*, as USTR admitted in internal deliberations, its "supplemental" tariff actions here are unprecedented: "[W]e are not aware of prior investigations where a Trade Representative was called upon to use Section 307 modification authority to increase the level of trade action in order to achieve the statutory goal of obtaining the elimination of harmful policies covered by the investigation." Appx05922. USTR has never relied on Section 307 to increase tariffs by any amount, much less by multiples of the original Section 301 action and by hundreds of billions of dollars. As in *Biden*, the agency "has never previously claimed powers of this magnitude." 2023 WL 4277210, at *12.

*Third*, USTR's List 3 and 4A actions undeniably are of vast economic and political significance. USTR initially investigated and identified four specific categories of IP/technology-transfer acts, policies, or practices that, in USTR's expert view, warranted imposition of tariffs on $50 billion of annual imports from China as "commensurate" with the harm to U.S. economic interests. USTR then "modified" that action to impose tariffs on essentially all trade with China representing *several*

*hundred billion dollars* of imported Chinese goods annually—effectively taxing all U.S. consumers and businesses. *See, e.g.*, Erica York, *Tracking The Economic Impact of U.S. Tariffs and Retaliatory Actions*, TAX FOUND. ACTIONS (last updated July 7, 2023), https://taxfoundation.org/tariffs-trump-trade-war/ (estimating that Section 301 action cost over $50 billion in U.S. GDP, 160,000 full time equivalent jobs, as well as over $8 billion in GDP and 26,000 jobs as a result of China's retaliation).[13] The action has other serious political ramifications (domestic and foreign) as well. Over 9,000 comments from consumers, businesses, farmers, and groups, representing every facet of the American economy, made their opposition to the actions clear. "A decision of such magnitude and consequence on a matter of earnest and profound debate across the country must rest with Congress itself, or an agency acting pursuant to

---

[13] *See also, e.g.*, Inu Manak, et al., *The Cost of Trump's Trade War With China Is Still Adding Up*, COUNCIL ON FOREIGN RELS. (Apr. 18, 2023 12:08 pm), https://www.cfr.org/blog/cost-trumps-trade-war-china-still-adding (citing economic analyses on the impact of the tariffs); USITC Pub. 5405, ECONOMIC IMPACT OF SECTION 232 AND 301 TARIFFS ON U.S. INDUSTRIES at 20, 23 (Mar. 2023, corrected May 2023) (estimating that Section 301 tariffs "resulted in a nearly one-to-one increase in prices of U.S. imports," meaning that U.S. importers and consumers have borne almost the full burden of the tariffs), *available at* https://www.usitc.gov/publications/332/pub5405.pdf.

a clear delegation from that representative body." *Biden*, 2023 WL 4277210, at *13 (internal quotation marks and alteration omitted).

Even if USTR could identify a "plausible textual basis" in Section 307 for Lists 3 and 4A, it falls far short of a "clear statement" that USTR can piggyback on a targeted Section 301 investigation resulting in tariffs on $50 billion of imports to then impose tariffs on hundreds of billions of dollars in additional imports to address a range of trade issues beyond the originally investigated practices. *West Virginia*, 142 S. Ct. at 2609. As noted, Section 307(a)(1) gives USTR the power to "modify or terminate" Section 301 actions—*i.e.*, "change [them] moderately or in minor fashion"—not "transform them." *Biden*, 2023 WL 4277210, at *9. The Supreme Court has repeatedly refused to defer to an agency interpretation relying on "modify" to make a major change. *See id.*; *MCI Telecomms.*, 512 U.S. at 229. Although USTR claims unbridled (and unreviewable) authority, "the word 'modify' simply cannot bear that load." *Biden*, 2023 WL 4277210, at *10. In sum, the Trade Act "provides no authorization for [USTR's] plan even when examined using the ordinary tools of statutory interpretation—let alone [the] 'clear

congressional authorization'" needed to sustain Lists 3 and 4A.  *Id.* at *15.

## II.  USTR VIOLATED THE APA BY FAILING TO CONSIDER AND RESPOND TO COMMENTS ADEQUATELY

In addition to exceeding its statutory authority, USTR committed a serious procedural violation of the APA by failing to consider significant comments the first time around and then failing to offer more than conclusory responses (primarily invoking the President's say-so) the second time around after the CIT's remand.  That violation constitutes an independent basis (twice-over) to vacate the List 3 and 4A tariffs.

### A.  The CIT Correctly Held That USTR Failed To Respond To Comments In The Final List 3 and 4 Notices

Before promulgating Lists 3 and 4, USTR solicited comments on "*any aspect* of the proposed supplemental action," including "[t]he level of the increase, if any, in the rate of duty" and "[t]he appropriate aggregate level of trade to be covered by additional duties."  Appx01925 (emphasis added);  Appx00082-Appx00084  (recognizing  that  USTR  solicited comments on "a broad range of issues," including the "wisdom of the enterprise" itself).  In response, USTR received over 6,000 comments on proposed List 3, nearly 3,000 comments on proposed List 4, and

testimony from hundreds of witnesses on each proposed List. The public raised deep concerns over the potentially devastating impact of the "supplemental" tariffs on U.S. interests, cast doubt on whether the tariffs' benefits outweighed their costs, and proposed viable alternatives.

Yet in promulgating final List 3 (just 11 days after the comments deadline), USTR stated only that, based on its "careful[] review[,] *** the Trade Representative, at the direction of the President, has determined not to include certain tariff subheadings." Appx06173. USTR took a similar bare-bones approach in finalizing List 4 (just six weeks after the deadline for post-hearing submissions), stating in a single conclusory sentence that it had "take[n] account of the public comments and the testimony." Appx09154.

As the CIT confirmed in the *First Opinion*, those perfunctory responses violated the APA. *See* Appx00077-Appx00087. The APA obligated USTR to have "examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" *Department of Com. v. New York*, 139 S. Ct. 2551, 2569 (2019) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,

43 (1983)); *see In re Sang Su Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002) (agency "must present a full and reasoned explanation of its decision," by "set[ting] forth its findings and the grounds thereof, as supported by the agency record"); *see also* 19 U.S.C. § 2417(a)(2) (imposing similar requirements for considering public input before modifying Section 301 actions). An agency flunks that test when it offers mere "[c]onclusory explanations" for its choices, *International Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010) (citation omitted), or when it fails to respond "in a reasoned manner[] to any comments received by the agency that raise significant issues with respect to a proposed rule," *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1379 n.11 (Fed. Cir. 2017) (citation omitted). That is because such a failure "generally demonstrates that the agency's decision was not based on a consideration of the relevant factors." *Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1312 (D.C. Cir. 2014) (internal quotation marks and citation omitted).

As the CIT recognized, USTR utterly "fail[ed] to provide a response to the comments it solicited when providing the rationale for its final determinations." Appx00084.  In particular,

> USTR's statements *** fail to apprise the court how the USTR came to its decision to act and the manner in which it chose to act, taking account of the opposition and support for the increased duties and the inclusion or exclusion of particular subheadings, the concerns raised about the impact of the duties on the U.S. economy, and the potential availability of alternative courses of action, within the context of the specific direction provided by the President.

Appx00082.  Although USTR had "noted" the President's direction, it "did not treat that direction as dispositive in light of [its] solicitation of comments on a broad range of issues that could—and, indeed, did—result in comments at odds with the President's direction."  Appx00083-Appx00084.  Thus, "while the President's direction is statutorily significant, the USTR's invocation of the President's direction does not obviate the USTR's obligation to respond to significant issues raised in the comments." Appx00083.

## B.    The CIT Should Have Vacated Lists 3 And 4A Rather Than Remand Without Vacatur

Instead of vacating List 3 and List 4A in light of that violation, over Plaintiffs' objections the CIT remanded to the agency without vacatur to

"elaborate" on why it had rejected key comments before promulgating the final lists.  Appx00051-Appx00061 & n.10; Appx10461.

That was error.  The APA *requires* courts to "hold unlawful and set aside agency action" that is "not in accordance with law."  5 U.S.C. § 706(2)(a).  "Section 706(2)(A) provides that a 'reviewing court' faced with an arbitrary and capricious agency decision 'shall' – **not may** – 'hold unlawful and set aside' the agency action"—and "[s]etting aside means vacating."  *Checkosky v. SEC*, 23 F.3d 452, 491 (D.C. Cir. 1994) (separate opinion of Randolph, J.).  As the Supreme Court has held:

> We have made it abundantly clear before that when there is a contemporaneous explanation of the agency decision, the validity of that action must 'stand or fall on the propriety of that finding[.] *** If that finding is not sustainable on the administrative record made, then the [agency's] decision *must be vacated* and the matter remanded to [it] for further consideration."

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978) (emphasis added).

Even assuming the text affords a court discretion to remand without vacatur, at a minimum "vacatur is the normal remedy when [the court is] faced with unsustainable agency action."  *Environmental Def. Fund v. FERC*, 2 F.4th 953, 976 (D.C. Cir. 2021) (alteration, internal

quotation marks, and citation omitted).  After correctly holding that USTR's action could not be sustained on the basis of the "contemporaneous explanation" it had offered, the CIT should have followed the "normal" course and vacated Lists 3 and 4A. *See Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 798 n.2 (D.C. Cir. 1983) (vacatur appropriate when "the required explanation of the agency's action is totally absent, or 'palpably inadequate'").

Instead, the CIT maintained List 3 and 4A because it "weigh[ed] heavily the disruptive consequences of (potentially interim) vacatur." Appx00088.  In the CIT's view, vacating the Lists "would disrupt a complex and evolving process that was designed by Congress to allow for ongoing negotiations." *Id.*  But if a court confronts "a total explanatory void" because the agency has not offered "one word" of reasoning, such that the agency's reasons for its action "are non-existent," the agency has committed unsustainable action.  *Brotherhood of Locomotive Eng'rs & Trainmen v. Federal R.R. Admin.*, 972 F.3d 83, 117 (D.C. Cir. 2020). Based on USTR's "fail[ure] to provide a response to the comments it solicited," the CIT should have vacated List 3 and List 4A.  Appx00084.

### C.    USTR Failed To Cure Its APA Violations On Remand

#### 1.    *The USTR's Remand Determination Offered Post Hoc, Conclusory, And Otherwise Insufficient Rationales*

The CIT compounded its error by sustaining, in the *Second Opinion*, USTR's conclusory and *post hoc* remand rationales.  Appx0008-Appx00026.

As a legal matter, USTR was permitted to defend Lists 3 and 4A only on the basis of contemporaneous reasoning found in the administrative record.  *See Regents*, 140 S. Ct. at 1907-1909 (It is a "foundational principle of administrative law" that "[a]n agency must defend its actions based on the reasons it gave when it acted," not "belated justifications.").   "When an agency's initial explanation 'indicate[s] the determinative reason for the final action taken,' the agency may elaborate later on that reason (or reasons) but may not provide new ones."  *Id.* at 1908 (alteration in original) (citing *Camp v. Pitts*, 411 U.S. 138, 143 (1973) (per curiam)).  The agency's "explanation," moreover, "must be *viewed critically* to ensure that the [action] is not upheld on the basis of impermissible *post hoc* rationalization."  *Id.* (internal quotation marks omitted and first emphasis added).  That rule "promotes agency accountability," "ensur[es] that parties and the public

can respond fully and in a timely manner to an agency's exercise of authority," and "instills confidence" in the agency's work. *Id.* at 1909 (internal quotation marks and citations omitted). Thus, "USTR had a duty to respond to the comments" so that interested parties, the public at large, and reviewing courts could understand why USTR reacted to the comments in the manner it did. Appx00084; *see Department of Com.,* 139 S. Ct. at 2575-2576 (responses to comments ought to "be scrutinized by courts and the interested public").

When promulgating Lists 3 and 4A, however, USTR offered *no response whatsoever*—whether public or private—to the public's most significant comments regarding such fundamental topics as the appropriate tariff level, potential alternatives, and even the wisdom of the enterprise as a whole. *See* Appx06173 (stating only that, based on its "careful[] review[,] *** the Trade Representative, at the direction of the President, has determined not to include certain tariff subheadings" in List 3); Appx09154 (stating only that it had "take[n] account of the public comments and the testimony"). Having limited its reasoning at the time to mere assertions that it had "reviewed" public input, USTR on remand could "not provide new" explanations absent from the administrative

record. *Regents*, 140 S. Ct. at 1908; *see Department of Com.,* 139 S. Ct. at 2573 ("[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record."). Absent a contemporaneous explanation of how it weighed the most significant comments, USTR's recourse was to "deal with the problem afresh by taking *new* agency action," where it could provide new reasons for its actions. *Regents*, 140 S. Ct. at 1908 (internal quotation marks and citation omitted).

USTR's Remand Determination failed those standards. The vast majority of the Remand Determination focuses on immaterial issues such as why USTR *removed* certain products from the lists. Appx10591-Appx10650. In fact, of the approximately 90 pages of explanation the agency promulgated on remand, USTR crammed into the final eight pages its consideration of (i) the wisdom of the enterprise, (ii) the appropriate tariff level, and (iii) potential alternative courses of action. But even then, USTR offers zero contemporaneous evidence, from the administrative record or otherwise, that it meaningfully grappled with those substantial comments *at the time* it developed Lists 3 and 4A. Appx10650-Appx10658. Indeed, given the short amount of time between

when the comment periods for the two Lists closed and when USTR announced its decision (as few as eleven days), it is readily apparent that USTR did not even have time to read, let alone give reasoned consideration to, the thousands of submitted comments—especially compared to the *120 days* (including an extension) the CIT took to review the same comments and testimony on remand. *See* p. 27, *supra*. USTR's submission does not weigh the costs and benefits to the U.S. economy, businesses, and consumers (even in the most qualitative fashion); evaluate whether the tariffs would be effective; or meaningfully consider alternative measures. *See* Appx10650-Appx10658. USTR's *post hoc*, litigation-driven efforts to gin up adequate reasoning falls far short of what the APA requires.

That leaves only USTR's reliance on Presidential direction. On remand, USTR claimed little room to maneuver due to the President's directives. *See, e.g.*, Appx10646 ("The President's direction was a key element in the Trade Representative's determination of the level of duty increase."); Appx10649 ("[T]he President's direction was central to the Trade Representative's determination of the appropriate aggregate level of the trade action."); *see also* Appx10596, Appx10623, Appx10642-

69

Appx10643. Indeed, the *only* rationale offered for USTR's lack of responsiveness to the List 4 comments addressing specific products is that USTR had "limited flexibility" to remove additional tariff subheadings "[c]onsidering that the value of the proposed modification was approximately $300 billion, and the specific direction of the President to place tariffs on goods of China with a value of approximately $300 billion." Appx10642.

That excuse is not good enough—as a matter of law. Because "Congress delegated to the USTR authority over modifications to section 301 actions," USTR—not the President—is the one "acting for purposes of the APA." Appx00050-Appx00051 & n.10. USTR further "indicated its willingness to consider factors other than the President's direction in the respective NPRMs." Appx00084; *see* Appx00083 n.27 (recognizing that "USTR treated the imposition of increased duties at the NPRM stage as an open question, and not one that was predetermined based on the direction of the President"). Thus, the "statutory factors relevant to the USTR's determination of whether and how to modify its action include" not only "the President's specific direction, if any," but also independently "ensuring that *appropriate* action is taken to eliminate discriminatory

and burdensome acts." Appx00079 (emphasis added) (citing 19 U.S.C.
§§ 2417(a)(1)(B), (C), 2411(b)). The word "appropriate," moreover, is a
broad term, requiring consideration of all relevant factors, including "at
least some attention to cost." *Michigan v. EPA*, 576 U.S. 743, 752 (2015).
Furthermore, "[n]o regulation is 'appropriate' if it does significantly more
harm than good." *Id.*

Yet, despite the "broad range of issues" on which USTR solicited
comments, Appx00082-Appx00084, the Remand Determination confirms
that USTR treated presidential direction as *dispositive*. Although USTR
claims in conclusory fashion that it found presidential direction
"appropriate" or "needed," Appx10649-Appx10650, it neither explains
why it did so nor points to a single piece of record evidence
(contemporaneous or otherwise) supporting those conclusions. Such
conclusory and *post hoc* responses flunk APA requirements.

> ### 2. *The CIT Erred In Concluding That The Remand Determination Cured The APA Violations*

In holding that USTR cured its APA violations on remand, the CIT
made several critical errors. *First*, although it had originally
acknowledged that USTR "may not identify reasons that were not
previously given," Appx00090 (quoting *Regents*, 140 S. Ct. at 1908), the

CIT excused that error on the ground that some other "courts have ordered remands for agencies to respond to significant comments." Appx0012 (citations omitted). But not one of the cited decisions even mentions, much less discusses, the Supreme Court's decision in *Regents*.

*Second*, the CIT took USTR at its word that it had considered the nearly 9,000 comments and testimony from hundreds of witnesses when promulgating Lists 3 and 4A, such that USTR had room to "provide an 'amplified articulation' of a prior 'conclusory' rationale." Appx00013 (quoting *Regents*, 140 S. Ct. at 1908); *see* Appx00013-Appx00015. But in doing so, the CIT ignored that it would have been impossible for USTR to "carefully review[]" approximately 6,000 comments, and thousands of pages of transcript testimony, in the 11-day period from the List 3 comment deadline and the final List 3 (or to review the List 4 comments and testimony in another condensed timeframe). The CIT further ignored that USTR did not provide even a "conclusory" explanation for rejecting the comments, either in the Federal Register notices or in any other record documents. For example, USTR failed to point to any contemporaneous analysis of how it determined that additional tariffs outweighed the harms (correctly) predicted by thousands of commenters.

And USTR effectively conceded that it never considered alternatives to Section 301 when it argued instead that USTR had not actually intended to solicit comments about potential alternatives to further action under Section 301 (despite having requested comments on "any aspect" of the proposed List 3 and List 4A tariffs). *See* Appx10743. Such examples demonstrate not only that USTR's failure to respond to comments was an APA violation in its own right, but that its "decision was not based on a consideration of the relevant factors." *Lilliputian Sys.*, 741 F.3d at 1312 (internal quotation marks and citation omitted).

*Third*, the CIT erred in holding that USTR's addition or subtraction of particular subheadings to Lists 3 and 4A, as well as USTR's announcement of an exclusion process for List 4A, amounted to sufficient consideration of the significant comments on the wisdom of the enterprise, the appropriate tariff level, and potential alternative courses of action. *See* Appx00015 ("USTR further explained the removal or retention of certain tariff subheadings. *** In so doing, USTR responded to significant concerns within the context of China's actionable conduct and the specific direction of the President."); Appx00019 (similar). USTR's explanations regarding its decisions on a small subset of requests

to remove specific tariff lines from the Lists do not show that it grappled with the cumulative harms of imposing tariffs on hundreds of billions of dollars of imports—*i.e.*, the critical comments regarding the wisdom of the enterprise. Appx10596-Appx10643.

USTR does not explain in the Remand Determination, and certainly did not explain at the time it issued List 4A, how *temporary* product exclusions that *might* be issued at some indefinite point in the future—pursuant to procedures that were not even announced until two months after List 4A was finalized[14]—constituted sufficient consideration of public comments. Nor can the exclusion process for *List 4A* act as a sufficient response to the comments submitted with respect to *List 3*; as the CIT itself concluded in the *First Opinion*, List 3 lacked any reference to an exclusion process and thus could not satisfy USTR's APA obligations. Appx00085.

*Fourth*, the CIT attacked a strawman when it concluded that Plaintiffs "effectively take issue with the conclusions that USTR

---

[14] *See Procedures for Requests To Exclude Particular Products From the August 2019 Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 57,144 (Oct. 24, 2019).

reached," or that Plaintiffs' "[m]ere disagreement with USTR's actions is not a basis for the court to overturn them."    Appx00022-Appx00023 (citation omitted).    That badly misses the point:  Plaintiffs challenge the conclusory and *post hoc* nature of USTR's remand response, not whether USTR reached the right result.[15]  In fact, if such *post hoc* explanations were upheld because they (eventually) got to the "right" answer, USTR and other agencies would have free rein to ignore significant comments whenever convenient to do so, and then get a "do-over" years later, without consequence.  But courts have long "discourage[d] the attitude of 'act now, make up reasons later'" by "[h]olding a decision maker to [its] contemporaneous statement of reasons." *Levesque v. Block*, 723 F.2d 175, 180 (1st Cir. 1983).  There is no question that USTR, which offered no contemporaneous response to comments at all, fails that standard.

*Finally*, the CIT's embrace of USTR's reliance on Presidential direction (in conflict with its *First Opinion*) cannot salvage the Remand

---

[15] This characterization was especially anomalous given that the *Second Opinion* elsewhere recognizes that Plaintiffs were not contesting USTR's "subjective determination[s] of what is 'appropriate' (or any other discretionary determination[s])."    Appx00020 n.17 (alterations in original).

Determination.  The CIT held that USTR adequately "explained that the judgments reflected in the construction of *Final List 3* and *Final List 4A* were its own."   Appx00018 (citing Appx10649-Appx10650).   But everything the CIT cited is wholly conclusory.  As quoted by the CIT itself, USTR asserted—without more—that "covering a substantial percentage of U.S. goods exported from China [via List 3] *was appropriate* to obtain the elimination of China's harmful acts, policies, and practices." Appx00018-Appx00019 (emphasis added) (citing Appx10649).  USTR also asserted—again without more—that the level of trade in List 4 "reflected the judgment that covering essentially all products not covered by previous actions *was needed* to obtain the elimination of China's acts, policies and practices."  Appx00019 (emphasis added) (citing Appx10650); *see also id.* (quoting USTR as believing it struck "the appropriate balance").

Remarkably, the CIT felt that such "explanations" could be favorably "contrast[ed] to the conclusory treatment of comments in *Final List 3* and *Final List 4*."  Appx00020.  In reality, those "explanations" are equally "conclusory"; they are certainly not the record-grounded explanations of USTR's contemporaneous consideration that were

required.    The CIT just assumed that USTR exercised independent judgment in deciding whether to proceed with the tariffs, at what rates, and in what amounts, *apart from* presidential direction.    That will not do.  Even following the remand determination, the record remains devoid of any reasoned explanation as to how USTR arrived at the conclusion that the List 3 and 4A actions overall were "appropriate"—and thus "raises doubts about whether the agency appreciated the scope of its discretion or exercised that discretion in a reasonable manner." *Regents*, 140 S. Ct. at 1916.

## CONCLUSION

For the foregoing reasons, the Court should reverse the CIT's judgment and vacate the List 3 and List 4A tariff actions.

Respectfully submitted,


/s/ *Pratik A. Shah*
Pratik A. Shah
Matthew R. Nicely
James E. Tysse
Daniel M. Witkowski
Devin S. Sikes
AKIN GUMP STRAUSS HAUER &
  FELD LLP


*Counsel to Plaintiffs-Appellants*
*HMTX Industries, LLC, Halstead*
*New England Corp., Metroflor*
*Corporation, and Jasco Products*
*Company LLC*


July 17, 2023

# ADDENDUM

# TABLE OF CONTENTS

19 U.S.C. § 2411(a)-(b) ...................................................... Add. 1

19 U.S.C. § 2414 ............................................................. Add. 4

19 U.S.C. § 2417 ............................................................. Add. 8

**United States Code**

**Title 19. Customs Duties**

**Chapter 18.  Trade Act of 1974**

**Subchapter III. Enforcement of United States Rights Under Trade Agreements and Response to Certain Foreign Trade Practices**

**§ 2411.  Actions by United States Trade Representative**

(a) Mandatory action

> (1) If the United States Trade Representative determines under section 2414(a)(1) of this title that--

>> (A) the rights of the United States under any trade agreement are being denied; or

>> (B) an act, policy, or practice of a foreign country--

>>> (i) violates, or is inconsistent with, the provisions of, or otherwise denies benefits to the United States under, any trade agreement, or

>>> (ii) is unjustifiable and burdens or restricts United States commerce;

> the Trade Representative shall take action authorized in subsection (c), subject to the specific direction, if any, of the President regarding any such action, and shall take all other appropriate and feasible action within the power of the President that the President may direct the Trade Representative to take under this subsection, to enforce such rights or to obtain the elimination of such act, policy, or practice. Actions may be taken that are within the power of the President with respect to trade in any goods or services, or with respect to any other area of pertinent relations with the foreign country.

> (2) The Trade Representative is not required to take action under paragraph (1) in any case in which--

Add. 1

(A) the Dispute Settlement Body (as defined in section 3531(5) of this title) has adopted a report, or a ruling issued under the formal dispute settlement proceeding provided under any other trade agreement finds, that--

> (i) the rights of the United States under a trade agreement are not being denied, or
>
> (ii) the act, policy, or practice--
>
>> (I) is not a violation of, or inconsistent with, the rights of the United States, or
>>
>> (II) does not deny, nullify, or impair benefits to the United States under any trade agreement; or

(B) the Trade Representative finds that--

> (i) the foreign country is taking satisfactory measures to grant the rights of the United States under a trade agreement,
>
> (ii) the foreign country has--
>
>> (I) agreed to eliminate or phase out the act, policy, or practice, or
>>
>> (II) agreed to an imminent solution to the burden or restriction on United States commerce that is satisfactory to the Trade Representative,
>
> (iii) it is impossible for the foreign country to achieve the results described in clause (i) or (ii), as appropriate, but the foreign country agrees to provide to the United States compensatory trade benefits that are satisfactory to the Trade Representative,
>
> (iv) in extraordinary cases, where the taking of action under this subsection would have an adverse impact on the United States economy substantially out of proportion to the benefits of such action, taking into

Add. 2

account the impact of not taking such action on the credibility of the provisions of this subchapter, or

(v) the taking of action under this subsection would cause serious harm to the national security of the United States.

(3) Any action taken under paragraph (1) to eliminate an act, policy, or practice shall be devised so as to affect goods or services of the foreign country in an amount that is equivalent in value to the burden or restriction being imposed by that country on United States commerce.

(b) Discretionary action

If the Trade Representative determines under section 2414(a)(1) of this title that--

(1) an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce, and

(2) action by the United States is appropriate, the Trade Representative shall take all appropriate and feasible action authorized under subsection (c), subject to the specific direction, if any, of the President regarding any such action, and all other appropriate and feasible action within the power of the President that the President may direct the Trade Representative to take under this subsection, to obtain the elimination of that act, policy, or practice. Actions may be taken that are within the power of the President with respect to trade in any goods or services, or with respect to any other area of pertinent relations with the foreign country.

\* \* \* \* \*

**United States Code**

**Title 19. Customs Duties**

**Chapter 18.  Trade Act of 1974**

**Subchapter III. Enforcement of United States Rights Under Trade Agreements and Response to Certain Foreign Trade Practices**

**§ 2414. Determinations by Trade Representative**

(a) In general

> (1) On the basis of the investigation initiated under section 2412 of this title and the consultations (and the proceedings, if applicable) under section 2413 of this title, the Trade Representative shall--

>> (A) determine whether--

>>> (i) the rights to which the United States is entitled under any trade agreement are being denied, or

>>> (ii) any act, policy, or practice described in subsection (a)(1)(B) or (b)(1) of section 2411 of this title exists, and

>> (B) if the determination made under subparagraph (A) is affirmative, determine what action, if any, the Trade Representative should take under subsection (a) or (b) of section 2411 of this title.

> (2) The Trade Representative shall make the determinations required under paragraph (1) on or before--

>> (A) in the case of an investigation involving a trade agreement, except an investigation initiated pursuant to section 2412(b)(2)(A) of this title involving rights under the Agreement on Trade-Related Aspects of Intellectual Property Rights (referred to in section 3511(d)(15) of this title) or the GATT 1994 (as defined in section 3501(1)(B) of this title) relating to products subject to intellectual property protection, the earlier of--

Add. 4

(i) the date that is 30 days after the date on which the dispute settlement procedure is concluded, or

(ii) the date that is 18 months after the date on which the investigation is initiated, or

(B) in all cases not described in subparagraph (A) or paragraph (3), the date that is 12 months after the date on which the investigation is initiated.

(3)(A) If an investigation is initiated under this subchapter by reason of section 2412(b)(2) of this title and--

(i) the Trade Representative considers that rights under the Agreement on Trade-Related Aspects of Intellectual Property Rights or the GATT 1994 relating to products subject to intellectual property protection are involved, the Trade Representative shall make the determination required under paragraph (1) not later than 30 days after the date on which the dispute settlement procedure is concluded; or

(ii) the Trade Representative does not consider that a trade agreement, including the Agreement on Trade-Related Aspects of Intellectual Property Rights, is involved or does not make a determination described in subparagraph (B) with respect to such investigation, the Trade Representative shall make the determinations required under paragraph (1) with respect to such investigation not later than the date that is 6 months after the date on which such investigation is initiated.

(B) If the Trade Representative determines with respect to an investigation initiated by reason of section 2412(b)(2) of this title (other than an investigation involving a trade agreement) that--

(i) complex or complicated issues are involved in the investigation that require additional time,

Add. 5

(ii) the foreign country involved in the investigation is making substantial progress in drafting or implementing legislative or administrative measures that will provide adequate and effective protection of intellectual property rights, or

(iii) such foreign country is undertaking enforcement measures to provide adequate and effective protection of intellectual property rights,

the Trade Representative shall publish in the Federal Register notice of such determination and shall make the determinations required under paragraph (1) with respect to such investigation by no later than the date that is 9 months after the date on which such investigation is initiated.

(4) In any case in which a dispute is not resolved before the close of the minimum dispute settlement period provided for in a trade agreement, the Trade Representative, within 15 days after the close of such dispute settlement period, shall submit a report to Congress setting forth the reasons why the dispute was not resolved within the minimum dispute settlement period, the status of the case at the close of the period, and the prospects for resolution. For purposes of this paragraph, the minimum dispute settlement period provided for under any such trade agreement is the total period of time that results if all stages of the formal dispute settlement procedures are carried out within the time limitations specified in the agreement, but computed without regard to any extension authorized under the agreement at any stage.

(b) Consultation before determinations

(1) Before making the determinations required under subsection (a)(1), the Trade Representative, unless expeditious action is required--

(A) shall provide an opportunity (after giving not less than 30 days notice thereof) for the presentation of views by interested persons, including a public hearing if requested by any interested person,

(B) shall obtain advice from the appropriate committees established pursuant to section 2155 of this title, and

(C) may request the views of the United States International Trade Commission regarding the probable impact on the economy of the United States of the taking of action with respect to any goods or service.

(2) If the Trade Representative does not comply with the requirements of subparagraphs (A) and (B) of paragraph (1) because expeditious action is required, the Trade Representative shall, after making the determinations under subsection (a)(1), comply with such subparagraphs.

(c) Publication

The Trade Representative shall publish in the Federal Register any determination made under subsection (a)(1), together with a description of the facts on which such determination is based.

**United States Code**

**Title 19. Customs Duties**

**Chapter 18.  Trade Act of 1974**

**Subchapter III. Enforcement of United States Rights Under Trade Agreements and Response to Certain Foreign Trade Practices**

**§ 2417.  Modification and termination of actions**

(a) In general

> (1) The Trade Representative may modify or terminate any action, subject to the specific direction, if any, of the President with respect to such action, that is being taken under section 2411 of this title if--
>
> > (A) any of the conditions described in section 2411(a)(2) of this title exist,
> >
> > (B) the burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, that are the subject of such action has increased or decreased, or
> >
> > (C) such action is being taken under section 2411(b) of this title and is no longer appropriate.
>
> (2) Before taking any action under paragraph (1) to modify or terminate any action taken under section 2411 of this title, the Trade Representative shall consult with the petitioner, if any, and with representatives of the domestic industry concerned, and shall provide opportunity for the presentation of views by other interested persons affected by the proposed modification or termination concerning the effects of the modification or termination and whether any modification or termination of the action is appropriate.

(b) Notice; report to Congress

The Trade Representative shall promptly publish in the Federal Register notice of, and report in writing to the Congress with respect to, any modification or termination of any action taken under section 2411 of this title and the reasons therefor.

(c) Review of necessity

(1) If--

(A) a particular action has been taken under section 2411 of this title during any 4-year period, and

(B) neither the petitioner nor any representative of the domestic industry which benefits from such action has submitted to the Trade Representative during the last 60 days of such 4-year period a written request for the continuation of such action,

such action shall terminate at the close of such 4-year period.

(2) The Trade Representative shall notify by mail the petitioner and representatives of the domestic industry described in paragraph (1)(B) of any termination of action by reason of paragraph (1) at least 60 days before the date of such termination.

(3) If a request is submitted to the Trade Representative under paragraph (1)(B) to continue taking a particular action under section 2411 of this title, or if a request is submitted to the Trade Representative under section 2416(c)(2) of this title to reinstate action, the Trade Representative shall conduct a review of--

(A) the effectiveness in achieving the objectives of section 2411 of this title of--

(i) such action, and

(ii) other actions that could be taken (including actions against other products or services), and

(B) the effects of such actions on the United States economy, including consumers.

Add. 9

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Circuit Rule 32(a). The brief contains 13,763 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman type style.

July 17, 2023                         */s/ Pratik A. Shah*
                                     Pratik A. Shah

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of the Court of the United States Court of the Federal Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.


July 17, 2023                           */s/ Pratik A. Shah*
                                        Pratik A. Shah