No. 23-1891

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

HMTX INDUSTRIES LLC, HALSTEAD NEW ENGLAND CORP., METROFLOR CORP., JASCO PRODUCTS COMPANY LLC,

*Plaintiffs-Appellants,*

v.

UNITED STATES, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, KATHERINE TAI, U.S. TRADE REPRESENTATIVE, UNITED STATES CUSTOMS AND BORDER PROTECTION, TROY MILLER, Acting Commissioner for U.S. Customs and Border Protection,

*Defendants-Appellees.*

Appeal from the United States Court of International Trade, Nos. 1:20-cv-00177-3JP, 1:21-cv-00052-3JP.

**BRIEF OF AMICUS CURIAE THE AMERICAN APPAREL & FOOTWEAR ASSOCIATION, THE CONSUMER TECHNOLOGY ASSOCIATION, THE FOOTWEAR DISTRIBUTORS AND RETAILERS OF AMERICA, THE JUVENILE PRODUCTS MANUFACTURERS ASSOCIATION, THE NATIONAL RETAIL FEDERATION, THE RETAIL LITIGATION CENTER, INC. IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL**

JOEL F. WACKS
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

JOSEPH R. PALMORE
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Telephone:  (202) 887-6940
JPalmore@mofo.com

*Counsel for Amici Curiae*

JULY 24, 2023

# CERTIFICATE OF INTEREST

Counsel for The American Apparel & Footwear Association, The Consumer Technology Association, The Footwear Distributors and Retailers of America, The Juvenile Products Manufacturers Association, The National Retail Federation, and The Retail Litigation Center, Inc. certify under Federal Circuit Rule 47.4 that the following information is accurate and complete to the best of their knowledge:

1.     **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case.

The American Apparel & Footwear Association, The Consumer Technology Association, The Footwear Distributors and Retailers of America, The Juvenile Products Manufacturers Association, The National Retail Federation, and The Retail Litigation Center, Inc.

2.     **Real Parties in Interest.** Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

3.     **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

The American Apparel & Footwear Association:  None.

The Consumer Technology Association:  None.

The Footwear Distributors and Retailers of America:  None.

The Juvenile Products Manufacturers Association:  None.

The National Retail Federation:  None.

The Retail Litigation Center, Inc.:  None.

4.     **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to

appear in this court for the entities.  Do not include those who have already entered an appearance in this court.

MORRISON & FOERSTER LLP:  Adam L. Sorensen (no longer with firm).

5.    **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

No.

6.    **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).

Not applicable.

Dated:  July 24, 2023

_____
/s/ Joseph R. Palmore
Joseph R. Palmore

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................. i

TABLE OF AUTHORITIES ..............................................................v

INTEREST OF AMICUS CURIAE ........................................................1

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................3

    A.    Thousands of commenters warn that the proposed List 3 and 4 tariffs would be ineffective, unnecessary, and economically harmful ...............................................................3

    B.    USTR ignores all comments ...............................................6

    C.    The CIT remands based on USTR's failure to respond to comments............................................................6

    D.    On remand, USTR principally invokes the President's direction as its rationale for adopting Lists 3 and 4 .............................8

    E.    The CIT accepts the remand submission's explanations ...................10

ARGUMENT ....................................................................................10

I.    USTR's Remand Submission Continued to Improperly Treat the President's Direction as Dispositive.............................................13

    A.    USTR was required to consider all relevant factors and not rely solely upon Presidential direction ......................................14

    B.    USTR did not adequately explain its ostensibly independent conclusion that the List 3 and 4 tariffs were appropriate and necessary ...............................................................16

II.    USTR's Responses to Significant Comments Were Conclusory and Non-Responsive..........................................................18

A.   USTR did not adequately address concerns about the potential adverse economic impact of the List 3 and 4 tariffs ...........................18

1.   USTR's invocation of its List 1 and 2 decisions was non-responsive to concerns about Lists 3 and 4...............................19

2.   USTR's response to concerns about the economic damage List 3 would cause was conclusory...........................................19

3.   USTR's response to concerns about the economic damage List 4 would cause was conclusory...........................................21

4.   USTR's subheading-level decisions did not adequately address broader concerns about economic harm .....................21

5.   Delaying the implementation of some tariffs and creating an exclusion request process could not address the economic harms commenters identified ...................................22

B.   USTR's Response To Comments Questioning The Efficacy Of Tariffs Was Conclusory ......................................24

C.   USTR Did Not Adequately Address Proposed Alternatives ..............25

III.   The Foreign Affairs Exception Does Not Excuse USTR's Failure To Adequately Respond To Significant Comments ..........................................27

CONCLUSION .................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Ass'n of Exps. & Imps. v. United States*,
751 F.2d 1239 (Fed. Cir. 1985) ...................................................27, 28

*Automotive Parts & Accessories Ass'n v. Boyd*,
407 F.2d 330 (D.C. Cir. 1968) .............................................................6

*Bloomberg L.P. v. Sec. & Exch. Comm'n*,
45 F.4th 462 (D.C. Cir. 2022) ...........................................................10

*Carlson v. Postal Regul. Comm'n*,
938 F.3d 337 (D.C. Cir. 2019)............................... 10, 11, 12, 14, 15, 16

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012).........................................................................26

*City of N.Y. v. Permanent Mission of India to United Nations*,
618 F.3d 172 (2d Cir. 2010) ..........................................................28, 29

*City of Portland v. EPA*,
507 F.3d 706 (D.C. Cir. 2007).........................................11, 19, 21, 24

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020)..........................................................7, 11, 26

*Dickinson v. Zurko*,
527 U.S. 150 (1999).........................................................................15

*East Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ..............................................................28

*Env't Health Tr. v. Fed. Commc'ns Comm'n*,
9 F.4th 893 (D.C. Cir. 2021)..........................................11, 16, 17, 20

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
805 F.2d 1050 (D.C. Cir. 1986)........................................................20

*Invenergy Renewables LLC v. United States*,
422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) .................................27, 28

*Michigan v. EPA*,
    576 U.S. 743 (2015)..................................................................11, 30

*Mid Continent Nail Corp. v. United States*,
    846 F.3d 1364 (Fed. Cir. 2017) ...............................................27, 30

*N.C. Growers' Ass'n, Inc. v. United Farm Workers*,
    702 F.3d 755 (4th Cir. 2012) .............................................................30

*Spirit Airlines, Inc. v. U.S. Dep't of Transp.*,
    997 F.3d 1247 (D.C. Cir. 2021)..............................................14, 25

## Statutes

5 U.S.C. §§ 551-559.....................................................................................1

5 U.S.C. § 553(a)(1)...........................................................................27, 31

5 U.S.C. § 559..........................................................................................15

19 U.S.C. § 2411 ........................................................................1, 14, 30

19 U.S.C. § 2417(a)(1).......................................................................14, 16

19 U.S.C. § 2417(a)(2)............................................ 13, 16, 27, 28, 30, 31

## Other Authorities

Mary Amiti et al., *The Impact of the 2018 Tariffs on Prices and Welfare*,
    33 J. Econ. Perspectives 187 (2019)..................................................12

Fed. R. App. P. 29(a)(4)(E)......................................................................1

Aaron Flaaen & Justin Pierce, *Disentangling the Effects of the 2018-
2019 Tariffs on a Globally Connected U.S. Manufacturing Sector*,
    Fin. & Econ. Discussion Series 2019-086 (Dec. 23, 2019),
    https://doi.org/10.17016/FEDS.2019.086...........................................12

Office of the Trade Representative 2022 Special 301 Report (2022),
    https://ustr.gov/sites/default/files/IssueAreas/IP/2022%20Special%
    20301%20Report.pdf..........................................................................12

Kara M. Reynolds, *Costs of Trade Wars: The Distributional Consequences of US Section 301 Tariffs Against China* (June 8, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3862764 ........................20

UCLA Anderson Review Research Brief, *Trump's Tariffs Did, In Fact, Hurt U.S. Importers* (Nov. 10, 2021) ........................................................12

## INTEREST OF AMICUS CURIAE[1]

Amici, the Retail Litigation Center, Inc. ("RLC"), the National Retail Federation ("NRF"), the American Apparel & Footwear Association ("AAFA"), the Consumer Technology Association ("CTA"), the Footwear Distributors and Retailers of America ("FDRA"), and the Juvenile Products Manufacturers Association ("JPMA") are trade associations whose members have been harmed by the tariffs at issue here. RLC's affiliate, the Retail Industry Leaders Association ("RILA"), NRF, CTA, JPMA, AAFA, FDRA and the associations' individual members submitted comments to the United States Trade Representative ("USTR") in the List 3 and 4 proceedings. Amici filed two briefs in the Court of International Trade ("CIT"), and their counsel appeared at oral argument there.

## INTRODUCTION

In 2018 and 2019, USTR proposed billions of dollars in tariffs on virtually all Chinese imports. Recognizing that the Administrative Procedure Act[2] ("APA") and Trade Act of 1974[3] ("Trade Act") required public input on such a dramatic action,

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amici affirm that no party's counsel authored this brief in whole or in part and that no party, party's counsel, or person other than amici, their members, and their counsel made any monetary contributions to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

[2] 5 U.S.C. §§ 551-559.

[3] 19 U.S.C. § 2411 *et seq.*

USTR invited comments on "any aspect" of its proposals. The public took USTR at its word, providing thousands of comments in opposition. Among those commenters were amici and their members, who described the economic harm the tariffs would cause; showed that the tariffs would not be effective; and proposed various alternatives. USTR nonetheless raced forward without responding to a single comment.

In its first decision, the CIT correctly found a straightforward violation of USTR's most fundamental duty under the APA—to provide a reasoned explanation for its action considering significant objections. Rather than vacate the tariffs, however, the CIT remanded, giving the agency a second chance to explain itself. But USTR's remand submission only compounded USTR's original errors. In essence the agency said it imposed the tariffs because the President told it to, thus absolving itself of responsibility to meaningfully engage with opposing comments. In stark contrast to its first decision, the CIT's second order blessed that novel excuse. In the CIT's view, reasoned explanation was largely unnecessary because the President had effectively given USTR a command.

The CIT erred. The APA and the Trade Act required USTR both to acknowledge stakeholders' significant objections and to explain why it was proceeding despite them. That is so notwithstanding the President's strong views. This Court should reverse and remand with instructions to vacate Lists 3 and 4A.

# BACKGROUND

Over a few months in 2018 and 2019, as part of an accelerating trade dispute over China's unfair trade practices, USTR proposed and finalized massive tariffs on virtually all Chinese imports.  Contending that previous tariffs on approximately $50 billion worth of Chinese goods (Lists 1 and 2) had proved inadequate, USTR purported to exercise its authority under section 301 of the Trade Act to modify its initial action and go much further.  Appx1925-1926.  List 3 proposed 25% duties on $200 billion in products "cover[ing] a substantial percentage of Chinese imports." Appx1925.  List 4 proposed expanding those tariffs to "essentially all products" imported from China—another $300 billion in goods.  Appx6504.

## A.   Thousands of commenters warn that the proposed List 3 and 4 tariffs would be ineffective, unnecessary, and economically harmful

As required by both the APA and the Trade Act, USTR solicited comments regarding "any aspect" of the proposed tariffs.  Appx1926; Appx6505.  It received around 9,000 comments and extensive written testimony, most expressing serious and concrete concerns about USTR's proposed actions.

Numerous commenters, including amici and their members, warned that the List 3 and 4 tariffs would damage the American economy.  They explained that "tariffs simply act as a hidden, regressive tax on U.S. consumers," Appx5467 (AAFA), and would disproportionately burden middle- and low-income families, Appx7396 (RILA).  Amici showed that the proposed tariffs would lead to increased

prices on consumer goods regularly used by everyday Americans, including everything from televisions to paper bags to cosmetics.  Appx5808-5810 (RILA).

Amici also warned that the tariffs would snarl supply chains and spur inflation.  Appx7396 (RILA).  They explained that "complex supply chains and supplier relationships [take] years to establish," and "cannot be grown or changed overnight, or even within six to twelve months."  Appx7248 (CTA) (emphasis omitted); Appx5837-5838 (FDRA).  They warned that "complex supply chains . . . cannot be shifted to different countries or facilities without compromising contracts, legal compliance [including with safety requirements], quality and value for the consumer."  Appx2112-2113 (JPMA).  For example, retailers must "consider whether the alternative has the infrastructure to transport items safely and securely to ports of call."  Appx5810 (RILA).  And "[c]urrent capabilities may not be readily available and thus may require an expansion of a facility or investment in new machinery and training to develop a skilled workforce."  Appx5810 (RILA).  For some products on the proposed lists, there was simply no source other than China.  Appx5808 (RILA).

Amici explained that the tariffs would force American businesses either to raise prices, "result[ing] in lost sales opportunities [and] lost jobs," or to absorb the additional costs, which would "translate into reduced investments in innovation or reduced head count."  Appx5465 (AAFA); *see* Appx5808 (RILA warning that "[t]he

risk of rising prices means lower sales, which could result in layoffs and store closures"). These impacts would hit "small- and medium-sized businesses" hardest because they are particularly unlikely to be able "to locate new suppliers who can meet their product quality, compliance, specification and cost needs," Appx5757 (NRF), or "absorb the added costs" imposed by tariffs, Appx7244 (CTA). And because the List 3 and 4 tariffs were likely to provoke retaliation, "U.S. manufacturers, farmers, ranchers, fishermen, and others [would] be hit in both directions." Appx5758 (NRF).

Amici and other commenters also challenged the efficacy of tariffs as a means of addressing China's unfair acts, arguing that "[t]ariffs (or the threat thereof) are simply not effective against a vast centrally-planned economy whose government has shown a willingness to subsidize its way through a tariff fight." Appx7255 (CTA). They pointed out that USTR itself had acknowledged that earlier tariffs failed to eliminate China's harmful practices. Appx5604 (NRF); *see* Appx7400 (RILA).

Numerous commenters, including amici, proposed less harmful and potentially more effective alternatives. Available options included promoting "existing trade tools and enforcement programs," Appx7256 (CTA), diversifying sourcing by "[n]egotiating new free trade agreements and updating existing ones" and expanding preference programs such as the Generalized System of Preferences,

5

Appx8922 (AAFA), and employing Treasury Department sanctions or the World Trade Organization's dispute settlement system, Appx6608-6609 (National Association of State Departments Agriculture).

### B.    USTR ignores all comments

USTR finalized the List 3 tariffs just 66 days after they were proposed and a mere two weeks after written comments were due, Appx6172; Appx2153; Appx1771, and the List 4 tariffs just 95 days after they were proposed and just over a month after rebuttal comments were due, Appx9153; Appx6504-6505.[4]  Neither decision responded to a single comment.  Appx6172; Appx9153.

### C.    The CIT remands based on USTR's failure to respond to comments

Plaintiffs sued, challenging Lists 3 and 4A under the Trade Act and the APA. The CIT granted plaintiffs' motion for judgment on the administrative record, finding that USTR violated the APA by failing to adequately respond to comments. Appx77-86.  The CIT explained that "[h]aving requested comments on a range of issues, the USTR had a duty to respond to the comments in a manner that enable[d] the court to understand 'why the agency reacted to them as it did.'"  Appx84 (quoting *Automotive Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968)).

---

[4] List 4 was implemented in two tranches, Lists 4A and 4B.  Appx9153.  List 4B's imposition was eventually indefinitely suspended as part of a trade deal with China.  Appx9560.

Although "USTR explained its decisions by way of reference to China's unfair practices and stated that the increase in duties and level of trade affected by the modifications [were] consistent with the specific direction of the President," "those statements fail[ed] to apprise the court how the USTR came to its decision to act and the manner in which it chose to act."  Appx82.  The CIT found that the President's direction did "not obviate the USTR's obligation to respond to significant issues raised in the comments."  Appx83.  After all, USTR itself had "not treat[ed] that direction as dispositive," given its "solicitation of comments on a broad range of issues that could—and, indeed, did—result in comments at odds with the President's direction."  Appx83-84.

Although "USTR's failure to explain its rationale in the context of the comments it received [left] room for doubt as to the legality of its chosen courses of action," the CIT remanded to give USTR a second chance to explain its decisions.  Appx88-90.  The CIT cautioned that "USTR [could] only further explain the justifications it [had already] given for the modifications," and could "not identify reasons that were not previously given unless it wishe[d] to 'deal with the problem afresh' by taking new agency action."  Appx90, Appx94 (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1908 (2020)).

The CIT also rejected USTR's argument that the foreign affairs exception excused its failure to comply with the APA's procedural requirements.  Appx71-75.

The CIT noted that USTR had in fact solicited comments, rendering its litigators' later "invocation of the exemption . . . entirely *post hoc*." Appx73-74. But the CIT found it unnecessary to decide whether USTR's conduct forfeited the exception because the court found it inapplicable for other reasons. Appx73-74. The CIT explained "that the foreign affairs exemption does not apply simply because a rule relates to ongoing negotiations." Appx75. The exemption was inapplicable because "the Government ha[d] failed to explain how [its application] would allow more cautious and sensitive consideration of the matters addressed in the contested determinations" or show that applying the exemption was necessary to avoid "definitely undesirable international consequences." Appx75-76 (internal quotation marks and alterations omitted).

### D. On remand, USTR principally invokes the President's direction as its rationale for adopting Lists 3 and 4

USTR devoted the bulk of its remand submission to granular discussion of its decisions to remove specific product categories from the finalized lists. Appx10596-10643. The agency only briefly addressed broader concerns—such as those expressed by amici and flagged by the CIT— at the end of the order. Despite the CIT's earlier finding that the President's direction did not obviate USTR's obligation to respond to significant comments on the proposed tariffs' potential adverse impact and inefficacy, the remand submission responded to these concerns by stating that "the action was based on the specific direction of the President," and that "the

President's directive . . . reflected the judgment that covering essentially all products [from China] was needed" to eliminate China's harmful practices.  Appx10648-10650.

USTR responded to warnings that the List 3 and 4 tariffs would damage the U.S. economy by stating that "notices and press statements" regarding Lists 1 and 2 (neither of which was at issue in the litigation) had mentioned "consumer impact" and that those lists "did 'not include goods commonly purchased by American consumers.'"  Appx10651.  As for List 3, which did include a wide range of consumer goods, USTR merely claimed to have taken "account of likely impacts on U.S. consumers," without further explanation.  Appx10652.  For List 4, which expanded the scope of the tariffs to cover almost all products imported from China, USTR purported to respond to warnings about economic harm only by referring to its decisions to delay implementation of some tariffs for three months and to eventually establish an undefined exclusion process.  Appx10652-10653

USTR responded to questions about the efficacy of additional tariffs by asserting that negotiation alone would not effectively address China's trade practices, and insisting, without explanation, that the failure of past tariffs meant more tariffs were needed.  Appx10655-10657.  USTR addressed only one proposed alternative (action under Section 337 of the Tariff Act).  Appx10657-10658.  USTR asserted that it was not required to address the other alternative measures proposed

by commenters, once again invoking the President's direction as supposedly dispositive.  Appx10657-10658.

### E.     The CIT accepts the remand submission's explanations

Although the CIT had previously found that the President's direction did not obviate USTR's obligation to explain its decisions, the court in its second decision was satisfied by USTR's explanation that it did not have "much discretion to deviate from" that direction.  Appx18.  The CIT also credited USTR's unexplained statement "that the judgments reflected in the construction of *Final List 3* and *Final List 4A* were its own," *id.*, and otherwise accepted the remand submission's conclusory explanations as an adequate response to the thousands of comments submitted by amici and other stakeholders, Appx17-26.

## ARGUMENT

"Under the APA, whenever agencies promulgate a rule that intends to create new law, rights, or duties, they must engage in a process known as notice-and-comment rulemaking." *Bloomberg L.P. v. Sec. & Exch. Comm'n*, 45 F.4th 462, 476-77 (D.C. Cir. 2022) (internal citation and alterations omitted).  The agency must "respond to 'significant points' and consider 'all relevant factors' raised by the public comments." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019).  "Significant comments are those which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's

proposed rule." *City of Portland v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007) (internal quotation marks omitted).

"An agency's response to public comments . . . must be sufficient to enable the courts to see what major issues of policy were ventilated and why the agency reacted to them as it did." *Carlson*, 938 F.3d at 344 (internal quotation marks and alterations omitted). "[C]onclusory statements cannot substitute for a reasoned explanation, for they provide neither assurance that the [agency] considered the relevant factors nor do they reveal a discernable path to which the court may defer." *Env't Health Tr. v. Fed. Commc'ns Comm'n*, 9 F.4th 893, 905 (D.C. Cir. 2021) (internal quotation marks and original alterations omitted).

Nor may an agency's response to significant comments rely on post hoc rationalizations. It is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015). This prohibition applies both to litigation positions taken by agency lawyers and to belated explanations offered "by agency officials themselves." *Regents*, 140 S. Ct. at 1909.

USTR's List 3 and 4 decisions did not satisfy these foundational requirements. USTR has never denied (and cannot do so now) that the comments submitted by amici and other interested parties on the economic impact of the List 3 and 4 tariffs, their efficacy, and possible alternative actions raised significant concerns requiring

11

a response under the APA and Trade Act.[5]  Appx76-77.  But USTR's responses to

those comments were unreasoned or non-existent.  And the remand submission's

justification for that poor performance—that the President told USTR what to do so

it didn't need to fully explain itself—was legally erroneous.[6]

---

[5] USTR was required to consider and respond to all significant comments raised during the notice and comment process regardless of whether specific fears were ultimately realized, *see Carlson*, 938 F.3d at 344, but it is notable that many of the concerns raised by amici and others proved well-founded.  For example, amici's warnings accurately predicted the adverse economic impact of the List 3 and 4A tariffs.  *See, e.g.,* Mary Amiti et al., *The Impact of the 2018 Tariffs on Prices and Welfare*, 33 J. Econ. Perspectives 187, 188-89 (2019) (estimating that by December 2018, tariffs imposed by the Trump administration, including on Chinese imports, "were costing US consumers and the firms that import foreign goods an additional $3.2 billion per month in added tax costs and another $1.4 billion per month in deadweight welfare (efficiency) losses"); Aaron Flaaen & Justin Pierce, *Disentangling the Effects of the 2018-2019 Tariffs on a Globally Connected U.S. Manufacturing Sector*, Fin. & Econ. Discussion Series 2019-086 (Dec. 23, 2019), https://doi.org/10.17016/FEDS.2019.086 (describing the negative impact of the tariffs on U.S. manufacturing); UCLA Anderson Review Research Brief, *Trump's Tariffs Did, In Fact, Hurt U.S. Importers* (Nov. 10, 2021) (discussing (among other harms) negative impact on supply chains).  Similarly, amici correctly warned that the tariffs would not be effective in eliminating forced technology transfers and creating a level playing field for IP protection and enforcement.  Despite the imposition of the List 3 and 4A tariffs, USTR subsequently noted only minimal progress on these issues, while highlighting continuing concerns about China's protection of IP rights and unfair trade practices.  See, Office of the Trade Representative 2022 Special 301 Report (2022), pp 44-53, https://ustr.gov/sites/default/files/IssueAreas/IP/2022%20Special%20301%20Report.pdf.

[6] Amici agree with plaintiffs that reversal is independently warranted because USTR exceed its modification authority under the Trade Act.  *See* Plaintiffs' Br. 32-60.

## I.    USTR's Remand Submission Continued to Improperly Treat the President's Direction as Dispositive

The remand submission did not adequately explain why USTR took the actions it did.  It erroneously relied on presidential direction to the exclusion of other considerations.  And to the extent USTR articulated its own rationale it was entirely conclusory.

The remand submission repeatedly invoked the same deficient rationalization underlying USTR's original decisions:  that the President's direction obviated the agency's obligation to consider other relevant factors.  *See, e.g.*, Appx10646 ("The President's direction was a key element in the Trade Representative's determination of the level of duty increase."); Appx10658 (rejecting alternative measures as inconsistent with "the President's directives").  Contrary to the CIT's warning that "USTR's invocation of the President's direction does not obviate the USTR's obligation to respond to significant issues raised in the comments," USTR again failed to "address the relationship between significant issues raised in the comments and the President's direction."  Appx83-84.  It did not meaningfully explain why it agreed that the modifications the President directed were "appropriate," whether or how it had weighed those directions against the concerns raised by "interested persons," or even what discretion it believed it retained to deviate from the President's direction.  *See* 19 U.S.C. § 2417(a)(2).

Despite its prior decision, the CIT erroneously approved the remand submission's unexplained reliance on the President's direction. Appx18-20. The CIT incorrectly concluded that the remand submission satisfied the APA because it ostensibly "[(1)] reflect[ed] USTR's conclusion that statutory language linking any modification to the specific direction of the President constrained USTR's ability to depart from that direction and [(2)] explained USTR's position vis-à-vis the President's direction." Appx20. Neither explanation justified USTR's reliance on the President's direction to the exclusion of other relevant factors.

## A.    USTR was required to consider all relevant factors and not rely solely upon Presidential direction

As the CIT explained in its first order, presidential direction was just one of the "statutory consideration[s]" USTR was required to consider. Appx78-79. "[S]tatutory factors relevant to the USTR's determination of whether and how to modify its action [also] include ensuring that appropriate action is taken to eliminate discriminatory and burdensome acts." Appx79 (citing 19 U.S.C. §§ 2411(b); 2417(a)(1)(B), (C)). Determining whether an action is appropriate includes considering its economic impacts, efficacy, and alternative measures. *Carlson*, 938 F.3d at 391 (agency must "consider 'all relevant factors' raised by the public comments"); *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (agency must "consider responsible alternatives" (internal quotation marks omitted)). As the CIT held, USTR invited input on all three topics by

14

requesting comments regarding "*any* aspect of the proposed supplemental action." Appx79-80 (quoting Appx1925; Appx6504-6505).   And it specifically requested comments on both "[t]he level of the increase, if any, in the rate of duty" and "[t]he appropriate aggregate level of trade to be covered by additional duties."  Appx1925. Relying solely on the President's direction, without "evaluat[ing] how other statutory objectives and factors might bear on the proposed" action or "outweigh" that direction, was insufficient under the APA.  *Carlson*, 938 F.3d at 347-48.

USTR's apparent position that the Trade Act's reference to presidential direction supersedes the APA's requirement that agencies "respond to 'significant points' and consider 'all relevant factors' raised by the public comments" is wrong. *Id.* at 344.   The APA's requirements apply to all federal regulatory actions with limited exceptions.  Subsequently enacted statutes, like the Trade Act, "may not be held to supersede or modify [the APA] except to the extent that [they do] so expressly."  5 U.S.C. § 559.  That statutory directive is necessary to effectuate the APA's purpose of "bring[ing] uniformity to a field full of variation and diversity." *Dickinson v. Zurko*, 527 U.S. 150, 155 (1999).  Courts have thus held that subsequent statutes cannot be read to "modif[y] the reasoned decisionmaking requirements of the APA," "absent a clear statement."  *Carlson*, 938 F.3d at 395.  The Trade Act contains no such clear statement.  Instead, the Trade Act makes "the specific direction, if any, of the President," *a factor* USTR must consider, but does *not*

expressly excuse USTR's obligation under the APA to respond to significant comments. 19 U.S.C. § 2417(a)(1); *see Carlson*, 938 F.3d at 391. To the contrary, it *requires* USTR to solicit and consider such comments from "representatives of the domestic industry concerned" and "other interested persons." 19 U.S.C. § 2417(a)(2).

And in any event, USTR failed to explain what discretion (if any) it believed it had to depart from the President's direction. The most the CIT could divine was "that USTR did not interpret the statute to accord USTR much discretion." Appx18. That does not show why (or even whether) USTR concluded that the President's direction outweighed the significant concerns aired by amici and others. USTR's failure to reveal "a discernable path" to the court is fatal under the APA. *See Env't Health Tr.*, 9 F.4th at 905 (citation omitted).

**B.     USTR did not adequately explain its ostensibly independent conclusion that the List 3 and 4 tariffs were appropriate and necessary**

USTR's supposed explanation that, even apart from presidential direction, it had independently concluded that the List 3 and 4 tariffs were appropriate was entirely unexplained and thus inadequate. The CIT relied on USTR's bare statements that the tariffs were "appropriate" or "needed" "to obtain the elimination of China's harmful acts, policies, and practices," and that the List 3 and 4 duties struck "the appropriate balance" between pressuring "China to eliminate its harmful

practices" and the economic harm amici and other commenters predicted.  Appx18-19 (quoting Appx10646, Appx10649-10650); see *supra* footnote 5.  But USTR never explained *why* it concluded these actions were appropriate or necessary—it simply asserted they were.  *See* Appx10646-10650.

Courts have repeatedly rejected such abbreviated explanations as impermissibly conclusory.  For example, in *Environmental Health Trust* the D.C. Circuit considered the FCC's refusal to modify its existing guidelines for exposure to radiofrequency radiation.  9 F.4th at 900.  The FCC's only "respon[se] to record evidence that exposure to RF radiation at levels below the . . . current limits [might] cause negative health effects" was to invoke the FDA's statement that after reviewing "'the totality' of 'scientific evidence," it had concluded that "exposure to RF radiation at levels below the [FCC]'s current limits does not cause harmful health effects."  *Id.* at 903-05.  Because that statement "offer[ed] no articulation of the factual bases for the FDA's conclusion," it could not "substitute for a reasoned explanation" of the FCC's decision.  *Id.* at 905 (internal quotation marks and alterations omitted).  USTR's explanation similarly omits an "articulation of the factual bases" for its unadorned statement that its actions were "appropriate" or "necessary."

## II.    USTR's Responses to Significant Comments Were Conclusory and Non-Responsive

USTR's remand submission was also defective because its responses to significant concerns raised by commenters were conclusory or non-existent.  As explained above, USTR received many comments warning that its proposed tariffs would hurt the American economy, including by acting as a hidden tax on consumers and businesses, impairing supply chains, and inviting further retaliation from China.  Amici and others also challenged the efficacy of more tariffs, noting that the List 1 and 2 decisions failed to curb China's unfair practices and proposing less burdensome alternatives.  *See supra* pp. 3-6.  USTR's remand submission did not adequately respond to these significant concerns.

### A.    USTR did not adequately address concerns about the potential adverse economic impact of the List 3 and 4 tariffs

USTR's remand submission failed to adequately respond to the numerous comments warning that imposing tariffs on virtually all imports from one of America's largest trading partners would inflict multiple harms on the nation's economy.  Amici and other commenters explained that the tariffs would negatively impact:  U.S. consumers (especially low-income consumers), *e.g.*, Appx5808 (RILA); American businesses that export to China, *e.g.*, Appx5758 (NRF); and American manufacturers reliant on Chinese raw materials and component parts, *e.g.*, Appx5757 (NRF).  USTR failed to address most of those concerns at all, instead

narrowly focusing on harm to consumers and invoking past actions not at issue here. The responses the agency did offer were unreasoned, entirely failing to show "what major issues of policy were ventilated and why the agency reacted to them as it did." *Portland*, 507 F.3d at 715 (internal quotation marks and alterations omitted).

### 1.    USTR's invocation of its List 1 and 2 decisions was non-responsive to concerns about Lists 3 and 4

The agency's initial response to comments warning that Lists 3 and 4 would adversely impact U.S. consumers and damage the American economy was to explain that *Lists 1 and 2* excluded products purchased by American consumers. Appx10651. But USTR's rationalizations for earlier actions not challenged in this litigation obviously cannot explain its List 3 and 4 decisions. That is especially true because by the time USTR formulated List 4, it had determined that it was necessary to impose tariffs on "essentially all products not covered by previous actions," including consumer goods excluded from the earlier lists. Appx10650.

### 2.    USTR's response to concerns about the economic damage List 3 would cause was conclusory

As to the decisions actually at issue, USTR justified List 3 by simply quoting the statement from its original request for comments on List 3 that it "took account of likely impacts on U.S. consumers" when it removed "subheadings identified by analysts as likely to cause disruptions to the U.S. economy." Appx10652 (quoting Appx1925). But USTR's response gives no indication of which "impacts" the

agency considered "likely," the factual basis for that conclusion, or how removing specific subheadings accounted for those impacts. Merely "[s]tating that a factor was considered . . . is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). And USTR completely ignored concerns about the regressive impact of the tariffs, which disproportionately burdened lower income consumers. Appx5808 (RILA); *see* Kara M. Reynolds, *Costs of Trade Wars: The Distributional Consequences of US Section 301 Tariffs Against China* (June 8, 2021), (analyzing the tariffs' disproportionate impact on lower income consumers).[7]

USTR's narrow focus on "likely impacts on U.S. consumers" also failed to respond at all to the many other economic risks amici and other commenters identified, including the harm the tariffs would inflict on U.S. importers and exporters, the damage they would do to global supply chains, and the risk of further Chinese retaliation. *See, e.g.*, Appx5807 (RILA); Appx5759 (NRF); Appx5767 (CTA), Appx5770 (CTA); Appx7248 (CTA). USTR's failure to respond to these significant concerns rendered its final decision arbitrary and capricious. *Env't Health Tr.*, 9 F.4th at 910.

---

[7] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3862764

### 3. *USTR's response to concerns about the economic damage List 4 would cause was conclusory*

USTR's discussion of the economic harm caused by List 4 was equally deficient. The agency stated that its decision to include "all remaining imports from China" in List 4 "necesitat[ed] the need for USTR to include consumer products." Appx10652. That circular logic failed to address the question raised by commenters: Was it appropriate for USTR to subject virtually all imports from China to tariffs given the economic harm that would ensue? *See, e.g.,* Appx5756 (JPMA); *see also* Amiti, *supra*, at 188-89. USTR's explanation that extending tariffs to all remaining imports from China was justified because it had decided to extend tariffs to all remaining imports from China was entirely non-responsive. *See City of Portland*, 507 F.3d at 715.

### 4. *USTR's subheading-level decisions did not adequately address broader concerns about economic harm*

The CIT was incorrect to suggest that USTR's explanation of its subheading-level decisions adequately "reflect[ed] USTR's weighing of economic harm." Appx22. Those responses focused on the impacts of tariffs on specific product categories, not the economy-wide impacts amici and other commenters documented. *See generally* Appx10596-10643. And even apart from that, USTR's explanation for why it declined to remove certain subheadings was completely unreasoned. That explanation again relied on the President's direction, Appx10623, and a cursory

assertion that "most comments urging for additional inputs to be removed failed to demonstrate how imposing the additional duties on the input would not be practicable or effective to eliminate China's acts, policies, and practices or failed to show how imposing the additional duties would cause disproportionate economic harm," Appx10623. USTR discussed a single example of comments that failed to make the required showing but did not otherwise explain why it had found that other comments requesting the exclusion of specific subheadings were unconvincing. Appx10623-10625.

### 5.    *Delaying the implementation of some tariffs and creating an exclusion request process could not address the economic harms commenters identified*

USTR's decisions to initially set List 3 duties at 10% for 3 months, delay implementation of List 4B tariffs, and promise to eventually create an undefined product-by-product exclusion request process for List 4 similarly failed to adequately address concerns about broader economic harm. Appx21-22; Appx10646, Appx10652-10653. Those modest measures simply did not address many of the comments submitted by amici and others. For example, a few months of delay could not meaningfully address warnings that the List 3 and 4 tariffs would disrupt and adversely impact global supply chains. Comments repeatedly warned that American businesses could not move their sourcing out of China overnight, "or even within six to twelve months." *See, e.g.,* Appx7248 (CTA) (emphasis omitted).

Indeed, U.S. retailers make "purchasing decisions anywhere from six to 12 months in advance," so a delay of a few months would not give those companies time to change suppliers to avoid the tariffs. Appx7418 (NRF). The remand submission offered no response. *See* Appx10646-10647, Appx10652-10653. Similarly, promising the eventual creation of a scalpel-like subheading-by-subheading exclusion process did not respond to the industry- and economy-wide harms amici described in their comments. USTR's remand submission did not even explain how the exclusion process would work, let alone how or why it addressed the much broader economic damage Lists 3 and 4 threatened to inflict. Appx10653.

The CIT incorrectly dismissed these objections as "[m]ere disagreement" with the USTR's conclusions. Appx22. As evidence, it cited plaintiffs' statement that "the fundamental point commenters raised was that USTR's proposed cure for China's unfair acts was worse than the disease," and that "[n]o regulation is 'appropriate' if it does significantly more harm than good." Appx22 (quoting Appx10756). The CIT erred. Plaintiffs were not asking *the court* to exercise independent judgment and reach its own conclusion that USTR's "proposed cure" was in fact "worse than the disease." Instead, plaintiffs were showing that USTR's response to comments arguing that the tariffs would do more harm than good did not adequately explain why *the agency* had reached a contrary conclusion. *See* Appx10756.

23

**B.    USTR's Response To Comments Questioning The Efficacy Of Tariffs Was Conclusory**

USTR likewise did not adequately address comments challenging the efficacy of additional tariffs given the failure of Lists 1 and 2 to deter China's unfair trade practices.    USTR's primary response was that negotiations alone would not "be successful in obtaining the elimination of the harmful practices without accompanying economic pressure through additional tariffs."    Appx10656-10657. But USTR's conclusion that diplomacy alone would be insufficient to address China's harmful acts does not explain why tariffs would be sufficient or, as discussed below, why alternative options for pressuring China to end its unfair practices would be inadequate.    *See infra* pp. 25-27.

USTR's other response was an unexplained statement that the failure of List 1 and 2 to curb China's harmful practices indicated that even more tariffs were called for.    Appx10656.    The CIT thought it was "unclear . . . what more USTR could state on this point."    Appx24.    Not so.    USTR could (and should) have explained why it believed that previous tariffs' failure to achieve the desired results indicated that more tariffs were an appropriate course of action, rather than just the opposite.    *City of Portland*, 507 F.3d at 715.    Indeed, USTR itself concluded that the failure of prior negotiations indicated that an alternative approach was needed.    Appx10656.    Its failure to explain why it reached a contrary conclusion on the efficacy of tariffs after

24

their acknowledged failure rendered its response to this concern impermissibly conclusory.

### C.    USTR Did Not Adequately Address Proposed Alternatives

USTR impermissibly refused to address most of the alternative measures amici and other commenters proposed, including better promotion of "existing trade tools and enforcement programs," Appx7256 (CTA), "[n]egotiating new free trade agreements and updating existing ones," and utilizing "[p]reference programs," Appx8922 (AAFA). That flouted USTR's obligation "to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives," an obligation that "goes to the heart of reasoned decisionmaking." *Spirit Airlines*, 997 F.3d at 1255 (internal quotation marks omitted).

USTR's remand submission responded to only one of these alternative options, stating that the "broader set of issues" Lists 3 and 4 were meant to remedy "could not be addressed through the Section 337 process." Appx10657-10658. Even that explanation was impermissibly post hoc. USTR's initial decisions did not address any proposed alternative, including action under Section 337. *See* Appx6172; Appx9153. And the remand submission cited nothing from the administrative record showing that this response reflected USTR's original rationale. *See* Appx10657-10658. Without any showing that the explanation offered in the

remand submission reflected USTR's contemporaneous reasoning, there was no way for the CIT to conclude that this explanation reflected anything other than a "convenient litigating position[]." *Regents*, 140 S. Ct. at 1909 (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (alteration omitted)).

The CIT noted that USTR "*was* pursuing additional courses of action, such as initiating a dispute at the World Trade Organization, requesting consultations with China, and proceeding with negotiations." Appx25. But USTR's utilization of those other options does not explain why more tariffs were *also* needed. Nor did USTR explain why it declined to pursue the alternatives proposed by amici, or why, given the availability of those alternatives, the List 3 and 4 tariffs were still an appropriate course of action.

Rather than responding to the proposed alternatives, USTR wrongly argued that it didn't have to. Appx10658. Again falling back on the President's directive, USTR asserted that it was required to act under section 301, and therefore "did not intend to invite comments on alternative measures." Appx10658. The CIT accepted this argument in its second decision, Appx25-26, despite its earlier recognition that comments regarding "whether alternative measures would be more effective" were "[c]onsistent with the [notices of proposed rulemaking]," Appx80.

The CIT was right the first time. By requesting comments on "any aspect" of the proposed action, *see* Appx1925; Appx6505, USTR naturally invited comments

explaining that the proposed action was unnecessary because more effective alternatives were available. And in any event, USTR was required by statute to solicit comments regarding "whether any modification . . . of the action [was] appropriate," 19 U.S.C. § 2417(a)(2), an inquiry that should have encompassed whether more effective, less damaging alternatives were available.

## III. The Foreign Affairs Exception Does Not Excuse USTR's Failure To Adequately Respond To Significant Comments

The CIT correctly rejected USTR's argument that the APA's narrow exception to notice-and-comment requirements for rules that "involve[] . . . a military or foreign affairs function of the United States" absolved USTR of its APA obligations. Appx71-75; *see also* 5 U.S.C. § 553(a)(1). If USTR reasserts that argument here, the Court should reject it.

Like other exceptions to notice-and-comment rulemaking, the foreign affairs exception is "narrowly construed and only reluctantly countenanced." *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1380 (Fed. Cir. 2017). "The exception cannot apply to functions merely because they have impact beyond the borders of the United States." *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1289 (Ct. Int'l Trade 2019) (alterations and quotation marks omitted). Instead, it typically applies to agency action taken to implement *existing* international agreements, a situation obviously inapplicable here since Lists 3 and 4A were finalized before any agreement with China. *See, e.g., Am. Ass'n of Exps.*

& *Imps. v. United States*, 751 F.2d 1239, 1247, 1249 (Fed. Cir. 1985) (applying the exception to agency action "relevant to the enforcement of [an] existing [international] textile agreement").

Nothing about the List 3 and 4A tariffs justifies applying the foreign affairs exception. Other courts have held that the exception applies only where "the public rulemaking provisions should provoke definitely undesirable international consequences." *E.g., East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 676 (9th Cir. 2021) (citation omitted); *see Invenergy*, 422 F. Supp. 3d at 1289. This Court has similarly looked to the probability of "definitely undesirable international consequences" when deciding whether the exception applies. *American Ass'n of Exporters*, 751 F.2d at 1249. USTR cannot show that that standard is met here. After all, USTR itself invited public comments on its List 3 and 4 decisions, and Congress has separately imposed public comment requirements for modification of section 301 actions. 19 U.S.C. § 2417(a)(2).

Below, USTR argued that "definitely undesirable international consequences" are sufficient but not necessary for the exception to apply. Appx9782 n. 8 (citation omitted). That argument depended on a distinguishable Second Circuit decision applying the exception to a State Department Notice exempting foreign missions to the United Nations from New York City property taxes. *See City of N.Y. v. Permanent Mission of India to United Nations*, 618 F.3d 172, 174-75 (2d Cir. 2010).

28

The Second Circuit observed that "a case-by-case determination that public rule making would provoke 'definitely undesirable international consequences,' may well be necessary before the foreign affairs exception is applied to areas of law like immigration that only indirectly implicate international relations." *Id.* at 202. But it concluded that it was unnecessary for the government to demonstrate "definitely undesirable international consequences" when the rule in question, like the State Department Notice, "implicates matters of diplomacy directly." *Id.*

Even under the Second Circuit's standard, the foreign affairs exception would not apply here. Unlike the agency action in *City of New York*, which implicated "[t]he State Department's regulation of the reciprocal treatment to be afforded foreign missions in the United States and its conferral of benefits to the missions and consular offices of foreign governments," *id.* at 201, or the quintessential foreign affairs case in which the agency action implements an international agreement, the tariffs at issue here had only downstream impacts on international diplomacy, *see* Appx9785 (USTR conceding that the List 3 and 4 tariffs were only "bargaining chips" in negotiations with China).

USTR may incorrectly argue, as it did below, that the List 3 and 4A decisions directly implicate matters of diplomacy because they "were essential bargaining chips used in the negotiation of an international agreement" and "relate to the President's 'overall political agenda concerning relations with another country.'"

Appx9785.  But the same could be said of any tariff imposed under section 301, which comes into play only when "the rights of the United States under any trade agreement are being denied" or when "an act, policy, or practice of a foreign country" harms American interests.  19 U.S.C. § 2411(a)(1).  It cannot be the case that all section 301 tariffs are excused from notice-and-comment requirements.  To the contrary, Congress specifically imposed similar requirements under the Trade Act.  *See* 19 U.S.C. § 2417(a)(2).

USTR's invocation of the foreign affairs exception is especially suspect because it did not rely on the exemption when it promulgated Lists 3 and 4A.  Indeed, it solicited public comments and held hearings on both lists.  Appx1925; Appx6505.  In a case involving the APA's good cause exception, the Fourth Circuit recognized that "[p]ost-hoc explanations that an agency did not have to comply with regular notice and comment procedures are viewed with skepticism."  *N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 767 (4th Cir. 2012).  That skepticism makes good sense, given the general prohibition on post hoc reasoning, *Michigan*, 576 U.S. at 758, and that the APA's notice-and-comment exceptions are "narrowly construed and only reluctantly countenanced," *Mid Continent Nail*, 846 F.3d at 1380.  USTR cannot argue that the very procedures it chose to initiate threatened the national interest.

Finally, even if the exception applied, USTR's failure to comply with the Trade Act's notice-and-comment-like procedures would still be fatal.  Under the Trade Act, USTR was required to "consult . . . with representatives of the domestic industry concerned, and . . . provide [for] opportunity for the presentation of views by other interested persons affected by the proposed modification or termination concerning the effects of the modification or termination and whether any modification or termination of the action is appropriate."  19 U.S.C. § 2417(a)(2).  By failing to adequately respond to comments submitted by "representatives of the domestic industry concerned" and "other interested persons," USTR failed to consult with those persons or provide sufficient opportunity for presentation of their views.  The foreign affairs exception, which applies only to the APA's procedural requirements, 5 U.S.C. § 553(a)(1), cannot excuse that Trade Act-specific failure.

## CONCLUSION

The Court should reverse the CIT's decision and remand with instructions to vacate the List 3 and 4A tariffs and order defendants to refund plaintiffs the duties they paid.

Dated:  July 24, 2023

Respectfully submitted,

/s/ Joseph R. Palmore

JOEL F. WACKS
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

JOSEPH R. PALMORE
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Telephone:  (202) 887-6940
JPalmore@mofo.com

*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

In compliance with Fed. R. App. P. 32(g) and Fed. Cir. R. 32(b)(3), I certify that:

This brief complies with the type-volume limitations of Fed. Cir. R. 29(b) because it contains 6,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Federal Circuit Rule 32(b), as determined by the word-counting feature of Microsoft Word.

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface, including serifs, using Microsoft Word 2022 in Times New Roman 14-point font.

Dated:  July 24, 2023                          /s/ Joseph R. Palmore
                                    _____

ny-2572437.34