23-1891

# United States Court of Appeals
# for the Federal Circuit

**HMTX INDUSTRIES, LLC, HALSTEAD NEW ENGLAND CORP., METROFLOR CORPORATION, JASCO PRODUCTS COMPANY LLC,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, KATHERINE TAI, U.S. Trade Representative, UNITED STATES CUSTOMS AND BORDER PROTECTION, TROY MILLER, Acting Commissioner of U.S. Customs and Border Protection,**
*Defendants-Appellees*

Appeal from the United States Court of International Trade
in No. 1-20-cv-00177-3JP
Judges Mark A. Barnett, Claire R. Kelly, and Jennifer Choe-Groves

**CORRECTED BRIEF OF *AMICI CURIAE* AMERICAN KENDA RUBBER INDUSTRIAL COMPANY, AMERICANA DEVELOPMENT, INC., PLEXUS CORP. AND PLEXUS INTERNATIONAL SALES AND LOGISTICS IN SUPPORT OF PLAINTIFFS-APPELLANTS**

Erik O. Autor
  EA@BarlowPLLC.com
Myron P. Barlow
BARLOW & COMPANY, LLC
5335 Wisconsin Ave., NW, Suite 440
Washington, DC 20015
(202) 250-9580

*Counsel for Amici Curiae*

July 24, 2023

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 23-1891

**Short Case Caption** HMTX Indus., LLC v. US

**Filing Party/Entity** Am. Kenda Rubber Indus. Co.; Americana Devel., Inc.; Plexus Corp.; Plexus Int'l Sales & Logistics

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/24/2023

Signature: *Erik O. Autor*

Name: Erik O. Autor

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| American Kenda Rubber Industrial Company | | Kenda Rubber Industrial Company (parent) |
| Americana Development, Inc. | | American Kenda Rubber Industrial Company (parent) |
| Plexus Corp. | | Blackrock Fund Advisors (10%+ stock ownership) |
| Plexus International Sales and Logistics | | Plexus Corp. (parent) |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| Myron P. Barlow, Managing Member - Barlow & Company LLC | Erik O. Autor, Of Counsel - Barlow & Company LLC | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☐   No   ☑   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# **TABLE OF CONTENTS**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

FEDERAL CIRCUIT RULE 29 STATEMENTS . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND AND STATEMENT OF *AMICI* . . . . . . . . . . . . . . . . . . . . . . . 2

      The Contested Government Action Doubled the Nation's Total Duties
Collected on Imported Goods, Thereby Causing Significant Harm
Throughout the Entire Domestic Economy . . . . . . . . . . . . . . . . . . . . . . . . 2

INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . 6

      I.   The Regulatory Regime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      II.  Questions Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      III. Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT OF *AMICI* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      I.   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          a.  *Agency Actions under Limited Delegations to the Executive of
Congress' Exclusive Constitutional Authority Over International
Trade and Tariffs Must be Supported by Clear Authorization from
Congress* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    b.  *Agency Action Having a Significant Economic Impact Must be Supported by Clear Authorization from Congress* . . . . . . . . . . . . 12

II.  <u>USTR Lacked Clear Congressional Authorization Under Sec. 301 to Impose the Lists 3 and 4 Duties</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    a.  *There Is No Clear Congressional Authorization to Support Characterizing USTR's Imposition of Lists 3 and 4 Duties as a Mere Modification of Its Previous Action* . . . . . . . . . . . . . . . . . . . . . . . 14

    b.  *There Is No Clear Congressional Authorization to Support USTR Taking an Action With Significant Economic Impact on the U.S. Economy* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.  <u>USTR Failed to Follow Other Congressional Requirements for Taking Action Under Sec. 301</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    a.  *USTR Failed to Follow Requirements for Modifying Sec. 301 Trade Actions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    b.  *USTR Failed to Meet the Statutory Deadline for Implementation of Sec. 301 Trade Actions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    c.  *USTR Failed to Adhere to the Requirement to Minimize Costs to the U.S. Economy of Sec. 301 Trade Actions* . . . . . . . . . . . . . . . . . . . 24

    d.  *USTR Expanded the Use of Sec. 301 Far Beyond What Congress Intended* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

<u>CONCLUSION</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## TABLE OF AUTHORITIES

### United States Supreme Court Cases

*Ala. Assn. of Realtors v. HHS*, 594 U. S. ___, 141 S. Ct. 2485 (2021) . . . 13, 17, 22

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) . . . . . . . . 29

*Biden v. Nebraska*, 600 U.S. ___, No. 22-506, 2023 Lexis 2793 (U.S. June 30, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13, 15, 16, 17, 18, 19, 22

*Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976) . . . . . . . . . . . 10

*J.W. Hampton Jr., & Co. v. United States*, 276 U.S. 394 (1928) . . . . . . . . . . 10, 11

*King v. Burwell*, 576 U. S. 473 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Kingdomware Techs., Inc. v. United States*, 579 U.S. 162 (2016) . . . . . . . . . . . 23

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Marshall Field & Co. v. Clark*, 143 U.S. 649 (1891) . . . . . . . . . . . . . . . . . . . . . 29

*MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218 (1994) . . . . . . . . . . . . . . . . . 15

*United States v. Rodgers*, 461 U.S. 677 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Util. Air Regulatory Group v. EPA*, 573 U.S. 302 (2014) . . . . . . . . . . . . . . . . . . 18

*West Virginia v. EPA*, 597 U. S. ___, 142 S. Ct. 2587 (2022) . . . . 9, 14, 17, 18, 22

*Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579 (1952) . . . . . . . . . . . 11

### Federal Court Cases

*Am. Kenda Rubber Indus. Co. v. United States*, 1:20-cv-00234-3JP (Ct. Intl. Trade) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*HMTX Indus., LLC et al. v. United States*, Ct. No. 20-00177 (Ct. Int'l Trade, Mar. 17, 2023), Doc. No. 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*In re Sec. 301 Cases*, 570 F. Supp. 3d 1306 (2022) . . . . . . . . . . . . . . . . . . 1, 10, 21

*In re Sec. 301 Cases*, Slip Op. 23-35 (Ct. Int'l Trade, Mar. 17, 2023) . . . . 1, 10, 21

*Plexus Corp. v. United States*, 4:21-cv-00195-3JP (Ct. Intl. Trade) . . . . . . . . . . . 2

*Transpacific Steel LLC v. United States*, 4 F.4th 1306 (Fed. Cir. 2021), *cert. denied* 142 S. Ct. 1414 (Mar. 28, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Guy W. Capps, Inc.*, 204 F.2d 655 (4th Cir. 1953), *aff'd on other grounds*, 348 U.S. 296 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

### United States Constitution

U.S. CONST. art. 1, § 8, cl. 1, 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 11

### Federal Statutes & Public Laws

19 U.S.C. § 1862 (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

19 U.S.C. §§ 2411-2420 (2023) . . . . . . . . . . . . . . 2, 6, 7, 10, 12, 14, 20, 23, 24, 31

20 U.S.C. § 1098aa *et seq.* (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Trade Agreements Act of 1979, Pub. L. No. 96-39, 93 Stat. 144 . . . . . . . . . . . . 22

Tariff and Trade Act of 1984, Pub. L. No. 98-573, 98 Stat. 2948 . . . . . . . . . . . 22

Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 100 Stat. 1107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

### Federal Register Notices

Addressing China's Laws, Policies, Practices and Actions Related to Intellectual Property, Innovation, and Technology, 82 Fed. Reg. 39,007 (Aug. 14, 2017) . . . 20

Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Sec. 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 83 Fed. Reg. 14,906 (Apr. 6, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 83 Fed. Reg. 47,974 (Sept. 21, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 9, 14, 21, 25

Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 84 Fed. Reg. 43,304 (Aug. 20, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 14, 21, 25

## Congressional Committee Reports

U.S. Senate Committee on Finance, "Trade Reform Act of 1974: Report of the Committee on Finance, United States Senate, Together with Additional Views on H.R. 10710", S. Rep. No. 93-1298, 93rd Congress, 2nd Session, Nov. 26, 1974 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## U.S. Court of Appeals for the Federal Circuit Rules of Practice

Fed. Cir. R. 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## Other Authorities

*Black's Law Dictionary* 1203 (11th ed. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Brookings, *More Pain than gain: How the US-China trade war hurt America*, (Aug. 7, 2020) by Ryan Hass & Abraham Denmark, https://www.brookings.edu/blog/order-from-chaos/2020/08/07/more-pain-than-gain-how-the-us-china-trade-war-hurt-america/ . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Edwin P. Eichmann & Gary N. Horlick, *Political Questions in International Trade: Judicial Review of Section 301?*, 10 MICH. J. INT'L L. 735 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 29

Mary Amiti et al., *The Investment Cost of the U.S.-China Trade War*, Liberty Street Economics (Federal Reserve Bank of New York), May 28, 2020. https://libertystreeteconomics.newyorkfed.org/2020/05/the-investment-cost-of-the-us-china-trade-war/ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Office of the United States Trade Representative, Industrial Tariffs (July 13, 2023), https://ustr.gov/issue-areas/industry-manufacturing/industrial-

tariffs#:~:text=The%20United%20States%20currently%20has,20%20percent%20on%20industrial%20goods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Reuters, *Trump tweets: 'trade wars are good and easy to win'* (Mar. 2, 2018), https://www.reuters.com/article/us-usa-trade-trump/trump-tweets-trade-wars-are-good-and-easy-to-win-idUSKCN1GE1E9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

U.S. Congressional Research Service, *Section 301 of the Trade Act of 1974: Origin, Evolution, and Use*, (R46602; Dec. 14, 2020) by Andres B. Schwarzenberg, https://crsreports.congress.gov/product/pdf/R/R46604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

U.S. Customs and Border Protection, Trade Statistics (July 13, 2023), https://://www.cbp.gov/newsroom/stats/trade . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 18

*Webster's Third New International Dictionary* 1952 (2002) . . . . . . . . . . . . . . . 15

## FEDERAL CIRCUIT RULE 29 STATEMENTS

Pursuant to Fed Cir. R. 29(a)(2), American Kenda Rubber Industrial Company and its subsidiary, Americana Development, Inc. (collectively "Kenda USA"), and Plexus Corp. and its subsidiary, Plexus International Sales and Logistics (collectively "Plexus") attest that all parties to this appeal consent to their filing of this brief as *amici curiae*.

Pursuant to Fed. Cir. R. 29(a)(4)(E), counsel for *amici curiae* authored the brief in whole, and no party, party's counsel, or other person contributed money for preparing or submitting this brief.

Pursuant to Fed. Cir. R. 29(a)(4)(D), Kenda USA and Plexus, file as *amici curiae* under Fed. Cir. R. 29 in support of Appellants' actions requesting the Court to reverse the final judgment and orders in this case by the United States Court of International Trade ("CIT")[1] and to vacate Final List 3 and Final List 4 duties imposed by the United States Trade Representative ("USTR")[2] under Section 301

---

[1] *HMTX Indus., LLC et al. v. United States*, Ct. No. 20-00177 (Ct. Int'l Trade, Mar. 17, 2023); *In re Sec. 301 Cases*, 570 F. Supp. 3d 1306 (Ct. Int'l Trade, 2022); *In re Sec. 301 Cases*, Slip Op. 23-35 (Ct. Int'l Trade, Mar. 17, 2023).

[2] Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 83 Fed. Reg. 47,974 (Sept. 21, 2018); Notice of Modification of Section 301 Action:

of the Trade Act of 1974[3] on products of the People's Republic of China

("China").

Kenda USA, Plexus Corp., and their named subsidiaries, are importers of

record of products subject to the duties at issue in this appeal and plaintiffs in *Am.*

*Kenda Rubber Indus. Co. v. United States*, 1:20-cv-00234-3JP (Ct. Intl. Trade) and

*Plexus Corp. v. United States*, 4:21-cv-00195-3JP (Ct. Intl. Trade) filed at the CIT

contesting the imposition of those duties, which were among the cases stayed by

the CIT pending resolution of this master case.

## BACKGROUND AND STATEMENT OF *AMICI*:

### The Contested Government Action Doubled the Nation's Total Duties Collected on Imported Goods, Thereby Causing Significant Harm Throughout the Entire Domestic Economy

According to Customs and Border Protection ("CBP") trade statistics,

reproduced below,[4] the contested action by USTR approximately doubled the

nation's total collection of duties, taxes, and fees imposed on imported goods.

---

China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 84 Fed. Reg. 43,304 (Aug. 20, 2019).

[3] 19 U.S.C. §§ 2411-2420 (2018) (hereinafter referred collectively as "Sec. 301").

[4] U.S. Customs and Border Protection, Trade Statistics (July 13, 2023) https://www.cbp.gov/newsroom/stats/trade.

| Imports and Revenue Collections | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 |
|---|---|---|---|---|---|
| Total Import Value for Goods | $2.64 trillion | $2.67 trillion | $2.42 trillion | $2.8 trillion | $3.35 trillion |
| Total Entry Summaries | 35.0 million | 35.5 million | 32.8 million | 36.9 million | 39.1 million |
| Total Section 321 BOLs (de minimis) | 410.5 million | 503 million | 636 million | 771.5 million | 685.1 million |
| Total Duty, Taxes, and Fees Collected* | **$41.6 billion** | $71.9 billion | $74.4 billion | $93.8 billion | **$111.8 billion** |

*Amount includes Estimated and final duties, taxes, and fees paid by the trade community, including adjustments for refunds.

| Trade Remedy Enforcement | Imported Products | Total Duties Assessed[1]* |
|---|---|---|
| Section 201 Duty Assessment | Solar Panels | $3.12 billion |
| Section 232 Duty Assessment | Aluminum | $3.75 billion |
| | Steel | $12.52 billion |
| Section 301 Duty Assessment | China products[2] | **$182.91 billion** |

* Trade Remedy Duties Assessed = trade remedy duties due on imported goods.
[1] As of June 14, 2023
[2] Section 301 duty requirements were effective July 6, 2018.

The impact of the Lists 3 and 4 duties, which became fully effective FY2020, can be clearly seen in the bolded and underlined figures in the chart.

The experiences of Kenda USA and Plexus explain how the harm inflicted by this Sec. 301 action spread throughout the domestic economy to impact thousands of companies across a broad swath of U.S. industries, as well as American consumers.

The products imported by Kenda USA and Plexus subject to the Sec. 301 Lists 3 and 4 duties are intermediate goods used by other companies in the United

States to manufacture finished products for the domestic and export markets. Specifically, Kenda USA imports tires and wheels used in the production of finished vehicles and Plexus imports electronic parts, such as optical elements, cables, and printed circuit boards, for the production of finished electronic products, such as medical and communications devices.

In response to the Sec. 301 duties, both Kenda USA and Plexus were severely constrained in their ability to shift their sourcing to suppliers outside China, primarily because moving supply chains and establishing new factories entails significant expense and requires years of advanced planning and work. Moreover, few suppliers of these goods outside China were able to provide the large volumes needed to meet the requirements of pre-existing supply contracts Kenda USA and Plexus had with their business customers. These adverse factors led to significant supply-chain disruptions impacting sales volumes and profitability.

As with many other importers of intermediate goods, Kenda USA and Plexus were unable to absorb the cost of the Sec. 301 duties as the duty rates far exceeded their profit margins on the subject merchandise. As a result, both companies were compelled to reach agreements with their customers to pass along one-hundred percent of these duty costs.

4

This point is essential for understanding the consequent adverse impact the Sec. 301 duties have had on the U.S. economy as a whole. As a consequence of the increased duties, many domestic manufacturers have had to pay significantly more for parts and components, resulting in: (1) a decrease in production and hiring leading to domestic shortages and reduced revenue from exports; (2) decreased funding for investment and research and development, adversely affecting the long-term productivity and competitiveness of U.S. companies; and (3) an increase in prices as costs were passed along to U.S. consumers, which contributed significantly to steeply rising inflation and interest rates and slower growth in U.S. gross domestic product (GDP).

What made USTR's use of Sec. 301 duties in the present instance particularly harmful to the domestic economy is the fact that these duties hit the majority of goods supplied from one of the top three trading partners of the United States at a comparatively high duty rate of 25 percent.[5] As experienced by Kenda

---

[5] The 25 percent Sec. 301 duty rate increased the existing average duties on these goods more than ten-fold. As stated by USTR on its website, "[t]he United States currently has a trade-weighted average import tariff of 2.0 percent on industrial goods. One-half of all industrial goods imports enter the United States duty free." Office of the United States Trade Representative, Industrial Tariffs (July 13, 2023) https://ustr.gov/issue-areas/industry-manufacturing/industrial-tariffs#:~:text=The%20United%20States%20currently%20has,20%20percent%20on%20industrial%20goods.

USA, Plexus, their domestic manufacturing customers, and the ultimate U.S. consumers, USTR's imposition of Sec. 301 duties on such a substantial portion of U.S. imports at such a high duty rate significantly harmed the U.S. economy. This is exactly the problem that Congress intended to avoid when it placed clear restrictions and explicit requirements in Sec. 301 governing actions the Executive is authorized to take.

## INTRODUCTION AND SUMMARY OF ARGUMENT

### I.   The Regulatory Regime

The U.S. Constitution vests exclusively in Congress the power to lay and collect duties, and to regulate commerce with foreign nations. U.S. CONST. art. 1, sec. 8, clauses 2 & 3.

Sec. 301 authorizes USTR to take action, including imposing import duties on the goods of a foreign country, when it determines the foreign country's acts, policies, or practices are unreasonable, unjustifiable, or a discriminatory burden or restriction on U.S. commerce. 19 U.S.C. § 2411.

Sec. 301 requires USTR to implement its action no more than 180 days after the date of its determination. 19 U.S.C. § 2415(a).

Sec. 301 permits USTR to "modify" an existing action more than 180 days after its determination by imposing additional duties, but only if " . . . the burden or restriction on United States commerce of the denial of rights, or of the acts, policies and practices that are the subject of such action has increased or decreased." 19 U.S.C. § 2417(a)(1)(B) (emphasis added).

## II.  Questions Presented

1.  What is the standard of review over agency action based on a limited delegation to the Executive by Congress of its exclusive Constitutional power to impose import duties and regulate foreign commerce?

2.  Must USTR point to "clear authorization" from Congress in the language of Sec. 301 in order to use Sec. 301 in a way that significantly impacts the domestic economy?

3.  Did Congress intend USTR to use Sec. 301 to double the national duties imposed on imported goods?

4.  Does USTR's imposition of additional duties on $500 billion worth of imported goods, claimed as a modification of a previous action imposing duties on $50 billion worth of imported goods, fall within the meaning of the term "modify" in Sec. 301?

5.  Did USTR have authorization to modify its Sec. 301 action, the stated subject of which was China's intellectual property acts, policies, and

practices, without actually finding any increase in the burden on U.S. commerce from China's intellectual property acts, policies, and practices?

### III.  <u>Summary of Argument</u>

Courts should strictly adhere to the limitations and requirements set by Congress in any delegation to the Executive of its exclusive Constitutional power over import duties and foreign commerce. However, the court below in this action failed to apply the clearly limiting language of Sec. 301 and improperly affirmed that the USTR has authority under Sec. 301 to double the nation's duties imposed on imported goods, thereby causing significant harm throughout the U.S. economy as discussed in *Amici's* statement *supra*.

Congress did not authorize USTR in Sec. 301 to double the nation's duties collected on imported goods, or otherwise to impact the U.S. economy significantly. To the contrary, Sec. 301 by its own terms was intended by Congress to be used by USTR to incentivize foreign countries to negotiate removal of its practices that harm U.S. commerce through limited actions that do not have an adverse impact on the United States economy substantially out of proportion to the benefits of such action. Apart from the singular exception currently before the Court, USTR has adhered to these limitations in all past Sec. 301 actions.

USTR defends its untimely imposition of Lists 3 and 4 duties under its Sec. 301 authority to "modify" past actions. The U.S. Supreme Court has determined that an agency's statutory authority to modify "must be read to mean to change moderately or in minor fashion."[6] Under this guidance, Appellee cannot convincingly argue that USTR, by increasing the scope of its Sec. 301 action ten-fold from $50 billion[7] to $500 billion[8] worth of targeted goods, properly exercised its authority to "modify" a previous Sec. 301 action.

The U.S. Supreme Court has stated that Courts should view with skepticism assertions by government agencies of extravagant powers over the national economy, and should hesitate before concluding that Congress meant to confer such sweeping powers.[9] The Supreme Court has required "clear Congressional authorization" to justify such impactful agency actions.[10] The clear language of Sec. 301 limits USTR's use of its authority to "modify" an action to impose additional duties only to instances when the harm caused by the subject practice

---

[6] *Biden v. Nebraska*, 600 U.S. ___, No. 22-506, 2023 Lexis 2793, *25 (June 30, 2023).

[7] 83 Fed. Reg. 47,974.

[8] 84 Fed. Reg. 43,304.

[9] *West Virginia v. EPA*, 597 U.S. ___, 142 S. Ct. 2587, 2608 (2022).

[10] *Biden*, 600 U.S. at ___, No. 22-506, 2023 Lexis 2793 at *42.

has increased.[11] However, contrary to the Supreme Court's requirement for clear Congressional authorization in such situations, the court below in this action improperly ruled that USTR's modification was permitted as long as there was a "link" between the previous and subsequent actions.[12]

## ARGUMENT OF *AMICI*

The legal issue in this case does not raise any claim of improper delegation of legislative authority by Congress to the Executive.[13] Nor does it implicate any potentially competing Constitutional power vested in the Executive, as is the case in another trade statute, Sec. 232 of the Trade Expansion Act of 1962,[14] which involves Presidential authority over national security. Rather, this case involves failure by the USTR to observe and adhere to the clear limitations of the authority delegated to it by Congress under Sec. 301.

---

[11] 19 U.S.C. § 2417(a)(1)(B).

[12] *In Re Sec. 301 Cases*, 570 F. Supp. 3d at 1332; *In Re Sec. 301 Cases*, Slip Op. 23-35 at 18.

[13] *See, e.g., Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 559 (1976), citing a fundamental principle of delegation authority in *J.W. Hampton Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928) ("If Congress shall lay down by legislative act an intelligible principle to which the [President] is directed to conform, such legislative action is not a forbidden delegation of legislative power.").

[14] 19 U.S.C. § 1862 (2023) ("Sec. 232"); *See, Transpacific Steel LLC v. United States*, 4 F.4th 1306 (Fed. Cir. 2021), *cert. denied* 142 S. Ct. 1414 (Mar. 28, 2022).

## I.    <u>Standard of Review</u>

   a.    <u>*Agency Actions under Limited Delegations to the Executive of Congress'*</u>
<u>*Exclusive Constitutional Authority Over International Trade and Tariffs*</u>
<u>*Must be Supported by Clear Authorization from Congress*</u>

Among the first enumerated powers the U.S. Constitution vests in Congress are the exclusive authority to "lay and collect . . .  duties" and to "regulate Commerce with foreign Nations."[15] Congress has a long record of extending to the Executive <u>limited</u> delegations of its Constitutional authority over tariffs and international trade for specific purposes, including to enforce U.S. trade and customs laws, counter threats to national security, protect U.S. commerce and rights under international trade agreements, and facilitate negotiations by the President to conclude such agreements.[16] Lacking any Constitutional authority of its own over international trade and tariffs, the Executive may, therefore, only undertake trade retaliation based on an explicit act of Congress authorizing such action.[17]

---

[15] U.S. CONST. art. 1, § 8, cl. 1, 3; *United States v. Guy W. Capps, Inc.*, 204 F.2d 655, 658 (4th Cir. 1953), *aff'd on other grounds*, 348 U.S. 296 (1955) ("The power to regulate foreign commerce is vested in Congress, not in the Executive or the courts").

[16] *See generally, J.W. Hampton*, 276 U.S. 394.

[17] *See, e.g., Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) (invalidating President Truman's seizure of domestic steel mills claimed necessary for the Korean War effort as lacking authority from Congress); *see also*, Edwin P.

Sec. 301, the statute at issue in this case, is an example of such delegated authority over tariffs and trade by Congress. Under Sec. 301, Congress authorizes USTR to take all appropriate action, including tariff-based and non-tariff based retaliation, to eliminate any act, policy, or practice of a foreign government that violates, is inconsistent with, or denies benefits to the United States under any international trade agreement, or is an unreasonable, unjustifiable, or discriminatory burden or restriction on U.S. commerce.[18]

Because it involves a limited grant of Constitutional authority over tariffs and international trade that is exclusive to Congress, courts should strictly examine any action taken by the Executive under Sec. 301 to ensure the action is firmly grounded in and clearly supported by that delegation of authority.[19]

b.  *Agency Action Having a Significant Economic Impact Must be Supported by Clear Authorization from Congress*

In addition to the Constitutional separation-of-powers considerations necessitating stricter examination of Executive actions pursuant to delegated trade

---

Eichmann & Gary N. Horlick, *Political Questions in International Trade: Judicial Review of Section 301?*, 10 Mich. J. Int'l L. 735, 737 (1989).

[18] 19 U.S.C. § 2411.

[19] *See*, Eichmann & Horlick, *supra* note 17, at 741-42 ("[I]n the international trade context, a court may construe Congressional delegations more strictly since Congress has explicit authority to regulate commerce with foreign nations.").

authority from Congress, the Supreme Court has also ruled that Executive

regulatory action pursuant to a statute that results in a significant economic impact

must also be based on "clear Congressional authorization."[20] As discussed *infra*,

USTR's addition of Lists 3 and 4 duties increasing existing Sec. 301 duties ten-

fold on a significant portion of the nation's imported goods, effectively doubling

the nation's duty collections, falls well within the parameters of what the Supreme

Court has previously found to have a significant economic impact.[21] *Amici* have

explained herein how this unprecedented use of Sec. 301 caused significant

economic hardship that ran throughout the entire U.S. economy.

## II.    <u>USTR Lacked Clear Congressional Authorization Under Sec. 301 to Impose the Lists 3 and 4 Duties</u>

The recent Supreme Court decision in *Biden v. Nebraska*, 600 U.S. ___ (2023)

is directly analogous to the action taken by USTR in imposing the Lists 3 and 4

duties on goods from China. In *Biden*, the Court ruled that the Secretary of

Education lacked statutory authority under the Higher Education Relief

Opportunities for Students (HEROES) Act[22] to waive approximately $430 billion

in student loan debt. The Court based its ruling on two legal points that are central

---

[20] *Biden*, 600 U.S. at ___, No. 22-506, 2023 Lexis at *42.

[21] *See e.g., id*. at *37; *Ala. Assn. of Realtors v. HHS*, 594 U. S. ___, ___, 141 S. Ct. 2485, 2489 (2021).

[22] 20 U.S.C. § 1098aa *et seq*. (2023).

to the current case. First, the Court rejected the Government's claim that the HEROES Act permitted the agency to "modify" its statutory authority under the statute. Second, that without clear statutory authority, the size and scope of the agency action and its profound impact on the U.S. economy would effectively result in the Executive arrogating to itself plenary and unfettered powers that are properly the purview of Congress under the Constitution.[23]

a. _There Is No Clear Congressional Authorization to Support Characterizing USTR's Imposition of Lists 3 and 4 Duties as a Mere Modification of Its Previous Action_

As in the _Biden_ decision, the legality of USTR's action in the current case also hinges on the meaning of the term "modify." USTR's Federal Register notices of Sept. 21, 2018 and Aug. 20, 2019[24] announcing imposition of the Lists 3 and 4 duties stated it had "determined to modify the prior action in this investigation by imposing additional duties on products of China" (emphasis added).

Sec. 301 allows USTR to modify an action to increase duties only under certain circumstances.[25] USTR relied on this provision to impose the Lists 3 and 4

---

[23] _See also, West Virginia v. EPA_, 597 U.S. at ___, 142 S. Ct. at 2616 (regulatory action by an agency of significant magnitude and consequence must be based on a clear delegation of authority from Congress).

[24] 83 Fed. Reg. at 47,974; 84 Fed. Reg. at 43,304.

[25] 19 U.S.C. § 2417(a)(1)(B).

duties, which increased the value of trade subject to the action ten-fold, from $50 billion to $500 billion, and effectively doubled the nation's total duty collections.

Likewise in the *Biden* decision, the HEROES Act also allowed the Secretary of Education to modify existing statutory or regulatory provisions applicable to financial assistance programs under the Education Act. However, the Court focused on the profound economic impact of the $440 billion student-loan waiver and observed that it was ten-times higher than the amount the Court found to be significant in past cases where it ruled the Executive requires clear Congressional authorization to justify its action. The Court observed that, under ordinary and legal definitions, the term "modify" carries "a connotation of increment or limitation," and must be read to mean "to change moderately or in minor fashion."[26]

In light of this definition, the *Biden* Court found that the agency's action was not moderate or minor and, therefore, could not be defended as a mere "modification."[27] The Court concluded it is highly unlikely that Congress would authorize such a sweeping change through such a subtle device as permission to

---

[26] *Biden*, 600 U.S. at ___, No. 22-506, 2023 Lexis at *4, citing *MCI Telecomms. Corp. v. AT&T Co.*, 512 U. S. 218, 225 (1994), *Webster's Third New International Dictionary* 1952 (2002), *Black's Law Dictionary* 1203 (11th ed. 2019).
[27] *Biden*, 600 U.S. at ___, No. 22-506, 2023 Lexis at *5.

modify and, as such, "precedent . . . requires that Congress speak clearly before a Department Secretary can unilaterally alter large sections of the American Economy."[28]

Similarly, the USTR's use of Sec. 301 was also not moderate or minor, but rather vastly expanded previous use of the statute to impact a significant volume of trade valued at half a trillion dollars. Since USTR cannot point to clear authorization from Congress to support an unprecedented action of such significant economic consequence well beyond the relatively limited scope of past Sec. 301 actions, USTR's justification for imposition of the Lists 3 and 4 duties as a "modification" must fail. To find otherwise would effectively allow USTR unfettered discretion to impose duties at any level on all products imported from a target country – in essence launching a trade war – which would be an expansive weaponization of Sec. 301, that all evidence suggests Congress never intended and is found nowhere in the statutory language.

b. _There Is No Clear Congressional Authorization to Support USTR Taking an Action With Significant Economic Impact on the U.S. Economy_

As in the _Biden_ decision, the current case also hinges on the question whether there was clear Congressional authorization allowing an agency, in this

---

[28] _Id_., 600 U.S. at ___, No. 22-506, 2023 Lexis at *43.

case USTR, to take an action with significant impact on the U.S. economy. In examining this question, the Supreme Court in *Biden* noted that previous agency actions under the statute had been narrow in scope compared to the challenged action, which had an estimated economic impact of between $469 and $519 billion.[29] The *Biden* Court also observed that this level of economic impact was ten times the amount the Court had previously found to be significant in the past. Under these circumstances, the Supreme Court held that, lacking clear Congressional authorization in the statute to justify its decision, the agency's action could not stand.

Also as in *Biden*, "[t]he economic and political significance" of the imposition of the Lists 3 and 4 duties are "staggering by any measure."[30] As already noted, the value of imported goods subject to additional Sec. 301 duties under Lists 3 and 4 increased tenfold, from $50 to $500 billion, totaling to date over $150 billion in additional duties collected. (*See* CBP Trade Statistics *supra*). The profound economic impact of this action is further evidenced by the fact that,

---

[29] *Id.*, 600 U.S. at ___, No. 22-506, 2023 Lexis at *35-*36, ("[P]ast waivers and modifications issued under the Act have been extremely modest and narrow in scope. . . . In sum, '[n]o regulation premised on' the HEROES Act 'has even begun to approach the size or scope' of the Secretary's program.") (citing *Ala. Assn.*, 594 U.S. at ___, 141 S. Ct. at 2489).

[30] *Id.*, 600 U.S. at ___, No. 22-506, 2023 Lexis at *36; *West Virginia v. EPA*, 597 U.S. at ___, 142 S. Ct. at 2605.

for several years now, the Sec. 301 duties have accounted for approximately half of all duties, taxes, and fees collected by CBP[31] on imported goods, and have resulted in the filing of over four thousand actions at the CIT challenging the legality of those duties – a record number of cases on that court's docket. In addition, these duties have significantly complicated U.S.-China political and economic relations and U.S. domestic politics due to their impact on inflation, interest rates, and the availability of goods to companies and consumers, and effectively imposed a huge consumer tax on U.S. companies and consumers.

Under the Government's reading of Sec. 301, USTR would enjoy virtually unlimited power to rewrite the statute and use it in any way it chooses.[32] However, as the *Biden* Court stated "[a] decision of such magnitude and consequence" on a matter of "'earnest and profound debate across the country'" must "res[t] with Congress itself, or an agency acting pursuant to a <u>clear delegation from that representative body</u>."[33]

> Because the interpretation of the provision was "a question of deep 'economic and political significance' that is central to [the] statutory

---

[31] U.S. Customs and Border Protection, Trade Statistics https:///www.cbp.gov/newsroom/stats/trade.

[32] *See, Biden*, 600 U.S. at ___, No. 22-506, 2023 Lexis at *25.

[33] *Id.*, 600 U.S. at ___, No. 22-506, 2023 Lexis at *39 (emphasis added); *West Virginia v. EPA*, 597 U.S. at ___, 142 S. Ct. at 2595, 2616; *see also*, *King v. Burwell*, 576 U. S. 473, 485-86 (2015) (citing *Util. Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014)).

scheme, . . . we would not assume that Congress entrusted that task to an agency without a clear statement to that effect.[34]

There is simply no evidence in either the statutory language or history that Congress intended USTR's unfettered use of Sec. 301 in a way that would result in such profound and detrimental economic and political consequences for the country. Under these circumstances, to affirm USTR's action without such clear delegation from Congress would essentially allow the Executive to arrogate to itself plenary and unlimited power vested solely in Congress to levy and collect duties and regulate commerce with foreign nations.[35]

## III.    USTR Failed to Follow Other Congressional Requirements for Taking Action Under Sec. 301

In addition to the legal points discussed above, USTR's imposition of the Lists 3 and 4 duties was legally deficient and contrary to the plain meaning of the Sec. 301 statute in several other important respects.

---

[34] *Biden*, 600 U.S. at ___, No. 22-506, 2023 Lexis at *41-*42.

[35] *Id.*, 600 U.S. at ___, No. 22-506, 2023 Lexis at *37 ("[T]his is a case about one branch of government arrogating to itself power belonging to another. But it is the Executive seizing the power of the Legislature.").

a. _USTR Failed to Follow Requirements for Modifying Sec. 301 Trade Actions_

Assuming, *arguendo*, that USTR's imposition of the Lists 3 and 4 duties was a "modification" of the earlier action, the imposition of these additional duties was contrary to law because USTR failed to follow the requirements set by Congress for modifying a Sec. 301 action. Those requirements state that USTR may modify or terminate any action if the burden of the acts, policies, or practices that are the subject of the action has increased or decreased.[36] In fact, China's practices that were the target of the investigation did not increase or decrease, but remained unchanged.

The acts, policies, and practices of the Chinese government listed in the President's 2017 Memorandum to USTR that launched the Sec. 301 investigation were specifically identified as relating to intellectual property, innovation, and technology.[37] USTR redefined this list to focus the investigation on technology transfers, intellectual property, and innovation,[38] which set the scope of "the

---

[36] 19 U.S.C. § 2417(a)(1)(B).

[37] Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology, 82 Fed. Reg. 39,007 (Aug. 14, 2017).

[38] *See*, Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 83 Fed. Reg. 14,906 (Apr. 6, 2018).

action" as laid out under Sec. 301. However, the Lists 3 and 4 duties were imposed, not due to an actual finding of additional harm inflicted by the targeted Chinese technology transfers, intellectual property, and innovation, but rather specifically to address an entirely separate and distinct set of acts, policies, and practices – *i.e.*, <u>retaliatory duties</u> imposed by China against U.S. products.[39] As such, they were not the acts, policies, and practices that were the subject of the original action as required by the statute for modification of the action.

In its decision, the CIT improperly expanded these explicit limitations on modification of a Sec. 301 action by allowing USTR to change the scope of the action to impose additional duties on Chinese goods as long as there is a "link" between the retaliatory tariffs and the subject of the original action (*i.e.*, China's IPR and technology-transfer practices).[40] This interpretation constructing a linkage is found nowhere in the statutory language and constitutes an undue expansion of the authority delegated by Congress and an unwarranted reweighing of the careful balances in the Constitution that the U.S. Supreme Court has cautioned against,

---

[39] *See* 83 Fed. Reg. at 47,974-75; 84 Fed. Reg. at 43,304-05.  In these Modification Notices, USTR fails to identify any changes to the subject Chinese technology transfers, intellectual property, and innovation practices, or any increased burden therefrom on U.S. commerce.
[40] *In re Sec. 301 Cases*, 570 F. Supp. 3d at 1332; *In Re Sec. 301 Cases*, Slip Op. 23-35 at 18.

most recently in *Biden v. Nebraska* (*supra*); *West Virginia v. EPA* (*supra*); and *Alabama Assn. v. HHS*, (*supra*).

    b. <u>*USTR Failed to Meet the Statutory Deadline for Implementation of Sec. 301 Trade Actions*</u>

USTR defends its untimely imposition of Lists 3 and 4 duties past the statutory deadline for acting under Sec. 301 as a "modification" not subject to that deadline. If USTR's imposition of the Lists 3 and 4 duties fails as a modification of its previous action, as argued *supra*, then it failed to meet the statutory deadline for implementation of Sec. 301 trade actions.

Congress amended Sec. 301 in the Trade Agreements Act of 1979,[41] the Omnibus Tariff and Trade Act of 1984,[42] and the Omnibus Trade and Competitiveness Act of 1988 [43] to establish a timeframe for taking action and procedures, and other requirements for investigations by USTR. Under this amended timeframe, once USTR makes a determination to take an action under Sec. 301, the statute is explicit that it "<u>shall</u> implement the action . . . by not more

_____

[41] Pub. L. No. 96-39, 93 Stat. 144.
[42] Pub. L. No. 98-573, 98 Stat. 2948.
[43] Pub. L. No. 100-418, 100 Stat. 1107.

than 180 days" following the determination.[44] Use of the word "shall" in a statute

connotes a requirement and obligation.[45]

The date of USTR's original determination was March 18, 2018 and

USTR's decisions to impose the Lists 3 and 4 duties were rendered more than 180

days later on September 21, 2018 and August 20, 2019, respectively. Since the

imposition of the Lists 3 and 4 duties cannot be considered a modification of the

original determination for the reasons previously discussed, both dates imposing

these duties were beyond the explicit statutory deadline set by Congress for

implementing an action under Sec. 301, and there is nothing in the statute giving

USTR authority to ignore that deadline, both sets of duties are invalid according to

the plain terms of the statute.

---

[44] 19 U.S.C. § 2415(a)(1) - (2)(A) (emphasis added). Following a determination to take action under Sec. 301, USTR has 30 days to implement the action but may delay such action by no more than 180 days if certain conditions apply. *See also*, Eichmann & Horlick, *supra* note 17, at 742 ("Congress did not authorize the President to undertake any trade retaliation at any time he pleases. . . . Congress limited when such remedies could be invoked.").

[45] *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998); *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016); *United States v. Rodgers*, 461 U.S. 677, 706 (1983).

c. <u>USTR Failed to Adhere to the Requirement to Minimize Costs to the U.S. Economy of Sec. 301 Trade Actions</u>

Throughout Sec. 301, Congress made clear its desire that actions under the statute to address harm caused by the foreign-country act, policy, or practice take into consideration and be taken in such a manner as to minimize any adverse impact to the U.S. economy.[46]

While USTR consistently adhered to this objective in past Sec. 301 actions, it significantly deviated from it in the current instance. While USTR originally estimated the cost of the harm to the U.S. economy resulting from the targeted Chinese acts, policies, and practices to be equivalent to 25 percent duties on $50

---

[46] *See e.g.*, 19 U.S.C. § 2411(a)(2)(B)(iv) "The Trade Representative is not required to take action . . . where the taking of action . . . would have an adverse impact on the United States economy substantially out of proportion to the benefits of such action."; § 2412(b)(2)(B) "The Trade Representative is not required . . . to initiate an investigation . . . if the Trade representative determines that the initiation of the investigation would be detrimental to United States economic interests."; § 2414(b)(1)(C) "Before making the determination . . . the Trade Representative . . . may request the views of the United States International Trade Commission regarding the probable impact on the economy of the United States of the taking of action with respect to any goods or service."; § 2417(c)(3)(B) "If a request is submitted . . . to continue taking a particular action [under Sec. 301], the Trade Representative shall conduct a review of . . . the effects of such actions on the United States economy, including consumers."; § 2419(3)(D) "The Trade Representative shall . . . submit a report to the House of Representatives and the Senate semiannually describing . . . the commercial effects of the actions taken [under Sec. 301]."

billion worth of Chinese goods, duties were ultimately imposed on over $500 billion worth of goods.[47]

As President Trump issued increasingly belligerent comments and made additional demands for concessions from the Chinese,[48] it became increasingly apparent that the Administration's goal was to fight a broad trade war with China regardless of the damage inflicted on the U.S. economy and regardless of the unauthorized intrusion into Congress' exclusive Constitutional powers. That damage has been considerable, as shown across a wide-range of economic indicators including publicly traded companies listed on U.S. exchanges losing an estimated $1.7 trillion in the value of their stock as a result of the duties according to an article by economists at the Federal Reserve Bank of New York.[49]

---

[47] 83 Fed. Reg. 47,974 (September 21, 2018);  84 Fed. Reg. 43,304 (August 20, 2019).

[48] On March 2, 2018, President Trump revealed his true reasons for seeking to slap China with massive duties with the infamous Tweet that "trade wars are good and easy to win. . . . [W]hen we are down $100 billion with a certain country [i.e., China] and they get cute, don't trade anymore we win big, it's easy." Reuters, Trump tweets: 'trade wars are good and easy to win' (Mar. 2, 2018) https://www.reuters.com/article/us-usa-trade-trump/trump-tweets-trade-wars-are-good-and-easy-to-win-idUSKCN1GE1E9.

[49] Mary Amiti, et al., *The Investment Cost of the U.S.-China Trade War*, Liberty Street Economics (Federal Reserve Bank of New York), May 28, 2020. https://libertystreeteconomics.newyorkfed.org/2020/05/the-investment-cost-of-the-us-china-trade-war/.

In addition, according to a 2020 Brookings report:

> Numerous studies have found that U.S. companies primarily paid for U.S. tariffs, with the cost estimated at nearly $46 billion. The tariffs forced American companies to accept lower profit margins, cut wages and jobs for U.S. workers, defer potential wage hikes or expansions, and raise prices for American consumers or companies. [50]

In the end, the considerable damage inflicted on U.S. companies, consumers, and the economy as a whole as a result of the Sec. 301 duties has been for naught as there has been no meaningful change in Chinese acts, policies, and practices regarding forced and coerced transfers of U.S. technology and IP, the U.S.-China balance of trade, or Chinese commitments to increase purchases of U.S. products.

d. _USTR Expanded the Use of Sec. 301 Far Beyond What Congress Intended_

While Sec. 301 has been in existence for nearly fifty years, it has been used relatively infrequently, particularly over the past twenty-five years. Prior Sec. 301 cases often involved thorny trade issues, mainly with the European Union, Japan,

---

[50] _See_, Brookings, _More Pain than gain: How the US-China trade war hurt America_, (Aug. 7, 2020) by Ryan Hass & Abraham Denmark, https://www.brookings.edu/blog/order-from-chaos/2020/08/07/more-pain-than-gain-how-the-us-china-trade-war-hurt-america/. The $46 billion cost estimate is dated to this 2020 report and does not represent total cost to date.

Canada, and South Korea.[51] But typically, Sec. 301 duties were targeted and usually in the range of 10 percent, represented a small portion of bilateral trade with the target country, did not significantly impact U.S. consumers or the economy, and resulted in negotiated settlements as Congress intended the statute to be used.

In the size, breadth, and scope of the trade measures imposed on China, there is no question that USTR significantly expanded the use of Sec. 301 in ways that were unprecedented and, as we argue, inappropriate and contravened the language and objectives of the statute.[52] These actions resulted in substantial increases in U.S. customs duties on a large volume of foreign trade, effectively doubling the nation's total duty collections, which have adversely impacted nearly all U.S. industries and consumers.

Many Members of Congress expressed concerns with this unprecedented, aggressive and punitive use of tariffs under Sec. 301, which they viewed as inconsistent with the objectives of the statute and unnecessarily complicating resolution of the original issues raised in the initial investigation, a central goal of

---

[51] *See,* Congressional Research Service, *Section 301 of the Trade Act of 1974: Origin, Evolution, and Use*, (R46602, Dec. 14, 2020) by Andres B. Schwarzenberg, pg. 26. https://crsreports.congress.gov/product/pdf/R/R46604.
[52] *See, Ibid.* at 1 and 28-31.

Sec. 301.[53] These concerns included escalation of the dispute to advance the

Executive Branch's broader policy goals beyond what was contemplated under Sec.

301 or originally identified as the targeted practices in initiation of the

investigation, such as forcing elimination of the bilateral merchandise trade deficit

through state purchases of U.S. products and revaluation of the Chinese currency.

USTR's actions also flouted the statute's intended purpose "not to punish or inflict

economic harm on trading partners," but rather to promote the use of dispute-

settlement mechanisms and negotiations to reach agreements that protect U.S.

rights under trade agreements and rectify discriminatory trade practices by other

countries that unjustifiably or unreasonably burden U.S. commerce.[54]

There is no evidence in the legislative language or history that Congress

intended to give the Executive branch essentially unlimited authority to use Sec.

301 to engage in an ever-escalating trade war impacting a significant portion of

foreign trade; inflicting considerable damage on the U.S. economy, companies, and

industries; effectively eliminating China's Permanent Normal Trade Relations

("PNTR") status conferred legislatively by Congress; usurping Congress' taxing

---

[53] *See, Id.* at 1 and 49.

[54] *Id*. at 5; *see also*, U.S. Senate Committee on Finance, "Trade Reform Act of
1974: Report of the Committee on Finance, United States Senate, Together with
Additional Views on H.R. 10710", S. Rep. No. 93-1298, 93rd Congress, 2nd
Session, Nov. 26, 1974 ("The authority in [Sec. 301] should not be used
frivolously or without justification.").

authority through imposition by the Executive branch of a huge new consumer tax on U.S. companies and consumers; and deviating ever more from the goals of the statute and the original stated objectives of the underlying trade action to protect U.S. technology and intellectual-property rights.

Limitations set by Congress on its delegated Constitutional authority must be adhered to by the Executive and respected and narrowly construed by the Judiciary. Otherwise, there are essentially no restraints on Executive action, which risks moving ever further toward improper usurpation by the Executive of Congress' exclusive legislative powers and function under Article 1, Section 1 of the Constitution.[55] Sec. 301 does not grant USTR unlimited authority.[56] For these

---

[55] *See, Marshall Field v. Clark*, 143 U.S. 649, 692 (1891) ("That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution."); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935) ("The Constitution provides that 'All legislative powers herein granted shall be vested in a Congress of the United States . . . . The Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested.").

[56] Eichmann and Horlick carefully examined the question of the authority delegated to the President by Congress under Sec. 301. A key point throughout their paper is that, while "Section 301 provides the President broad authority to take trade action against unfair foreign conduct, . . . Congress did not grant the President unchecked powers over international trade, . . . [but] expressly limited the President's authority to specific circumstances . . . [and] discretion in setting trade policy." Eichmann & Horlick, supra note 17, at 735-736.

reasons, the U.S. Court of International Trade erred in upholding USTR's actions imposing the Lists 3 and 4 duties under Sec. 301, which were at odds with the language, legislative history, and goals of the statute.

## **CONCLUSION**

This Court should strictly adhere to the limitations and requirements set by Congress in its delegation to the Executive through Sec. 301 of its exclusive Constitutional authority over import duties and foreign commerce to find that USTR overstepped the bounds of that limited authority by: (1) taking an action with such significant economic impact on the U.S. economy that it could not be properly characterized as a mere modification under the statute or supported by clear authorization from Congress; (2) failing to follow the requirements for modifying an existing action; (3) failing to adhere to the deadline for implementing an action following an investigation; (4) taking retaliatory action vastly out of proportion to the benefits of such action and the damage inflicted on the U.S. economy; and (5) expanding the use of Sec. 301 to sweep in other trade-policy objectives that were beyond the scope of Sec. 301 as envisioned and defined by Congress and identified by USTR its original investigation and determination.

For these reasons and the additional legal points in Appellants' comments, Kenda USA and Plexus respectfully request that this Court reverse the judgment

and orders by the U.S. Court of International Trade in this case and vacate the List 3 and List 4 duties imposed by USTR as being in violation of Sec. 301 of the Trade Act of 1974 (19 U.S.C. § 2411 *et seq.*).

Dated: July 24, 2023

Respectfully submitted,

BARLOW & COMPANY, LLC

Erik O. Autor
Myron P. Barlow
5335 Wisconsin Ave., NW, Suite 440
Washington, DC 20025
Tel. (202) 250-9580; (202) 895-1714
ea@barlowpllc.com
mb@barlowpllc.com

Counsel for *Amici Curiae*
American Kenda Rubber Industrial Co.
Americana Development, Inc.
Plexus Corp.
Plexus Int'l Sales and Logistics

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned certifies that this brief complies with the type-volume limitations of Fed. Cir. R. 32(a).

1. This brief has been prepared in proportionately spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

2. Exclusive of the portions of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b), this brief includes 5,591 words according to the word-processing system used to prepare the brief. As permitted by Federal Rule of Appellate Procedure 32(g)(1), the undersigned has relied on the word count of the word-processing system in preparation of this certification.

Dated: July 24, 2023

_Erik O. Autor_

_____

Erik O. Autor

*Attorney for Amici Curiae*

*American Kenda Rubber Industrial Co.*

*Americana Development, Inc.*

*Plexus Corp.*

*Plexus Int'l Sales and Logistics*

32

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit using the appellate CM/ECF filer system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Dated: July 24, 2023

_____

Erik O. Autor

*Attorney for Amici Curiae*

*American Kenda Rubber Industrial Co.*

*Americana Development, Inc.*

*Plexus Corp.*

*Plexus Int'l Sales and Logistics*