No. 2023-1891

_____

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

_____

HMTX INDUSTRIES LLC, HALSTEAD NEW ENGLAND CORP.,
METROFLOR CORP., JASCO PRODUCTS COMPANY LLC,
*Plaintiffs-Appellants,*

v.

UNITED STATES, OFFICE OF THE UNITED STATES TRADE
REPRESENTATIVE, KATHERINE TAI, U.S. Trade Representative,
UNITED STATES CUSTOMS AND BORDER PROTECTION, TROY
MILLER, Acting Commissioner for U.S. Customs and Border
Protection,
*Defendants-Appellees,*

_____

On Appeal from the United States Court of International Trade,
No. 1:20-cv-00177-3JP, Chief Judge Mark A. Barnett, Judge Jennifer
Choe-Groves, and Judge Claire R. Kelly.

_____

## BRIEF OF AMICI CURIAE ACUSHNET COMPANY, DIAMOND
## BASEBALL COMPANY, INC., DUPONT DE NEMOURS, INC.,
## AND THE SPORT AND FITNESS INDUSTRY ASSOCIATION IN
## SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL

Weronika Bukowski
CROWELL & MORING LLP
590 Madison Avenue
20th Floor
New York, NY 10022

John Brew
Amanda Shafer Berman
CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004
Phone: (202) 624-2500
Fax: (202) 628-5116
aberman@crowell.com

# CERTIFICATE OF INTEREST

Counsel for Acushnet Company, Diamond Baseball Company, Inc., DuPont de Nemours, Inc., and The Sports and Fitness Industry Association certify under Federal Circuit Rule 47.4 that the following information is accurate and complete to the best of their knowledge:

1.     **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case.

Acushnet Company, Diamond Baseball Company, DuPont de Nemours, Inc., and The Sports and Fitness Industry Association

2.     **Real Parties in Interest.** Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

3.     **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

Acushnet Company: Acushnet Holdings Corp.

Diamond Baseball Company, Inc.: None.

DuPont de Nemours, Inc.: None.

The Sports and Fitness Industry Association: None.

4.    **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.

Not Applicable.

5.    **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

No.

6.    **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).

Not applicable.

Dated:  July 24, 2023

/s/ John Brew

John Brew

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................i

TABLE OF AUTHORITIES .................................................................v

STATEMENT OF INTEREST ..............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT.........................3

BACKGROUND......................................................................................5

I.     USTR imposes Section 301 tariffs to redress unfair
       Chinese practices; China responds by imposing
       retaliatory tariffs...........................................................................5

II.    USTR responds by proposing tariffs on an additional
       $200 billion of Chinese imports, but asks for comment
       on all aspects of the proposal, including scope and rate. ............7

III.   USTR receives many comments opposing the proposed
       List 3 tariffs, but imposes them shortly thereafter. ......................9

IV.    USTR proposes the List 4 tariffs, again receives many
       comments in opposition, but proceeds anyway...........................12

V.     The CIT holds that USTR failed to show it considered
       key issues going to the wisdom of Lists 3 and 4A......................15

VI.    USTR's Remand Determination does not meaningfully
       address key issues raised by commenters...................................17

VII.   The CIT upholds USTR's List 3 and 4A actions despite
       USTR's failure to explain its reasoning on key issues. ..............19

ARGUMENT.........................................................................................21

I.     USTR had to consider and address key issues going to
       the fundamental wisdom of the List 3 and 4A tariffs.................21

II.    USTR failed to explain why the expansion and
       escalation of Section 301 tariffs was reasonable despite
       the failure of the prior tariffs and the harmful impact
       on U.S. companies. ....................................................................26

A.     USTR did not explain why it thought the List 3 and 4A actions would be effective after the List 1 and 2 actions failed to achieve their stated objective. ............................................................................26

B.     USTR did not address the harm to U.S. companies that would result from imposing additional tariffs on hundreds of billions of imported goods. ...................................................................28

C.     USTR's grant of product-specific, temporary exclusions and reliance on the President's directive do not answer the questions posed by commenters. ........................................................................30

CONCLUSION ......................................................................32

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Auto. Parts & Accessories Ass'n v. Boyd,*
  407 F.2d 330 (D.C. Cir. 1968) ..............................................................24

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) ..............................................................................23

*City of Waukesha v. EPA,*
  320 F.3d 228 (D.C .Cir. 2003) ..............................................................24

*Disabled Am. Veterans v. Gober,*
  234 F.3d 682 (Fed. Cir. 2000) ........................................................24, 25

*Michigan v. EPA,*
  576 U.S. 743 (2015) ........................................................................25, 30

*Moncrieffe v. Holder,*
  569 U.S. 184 (2013) ..............................................................................23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*
*Auto. Ins. Co.,*
  463 U.S. 29 (1983) ............................................ 4, 21, 22, 23, 25, 26, 32

*NMB Singapore Ltd. v. United States,*
  557 F.3d 1316 (Fed. Cir. 2009) ............................................................27

*Sherley v. Sebelius,*
  689 F.3d 776 (D.C. Cir. 2012) ........................................................17, 24

**Other Authorities**

82 Fed. Reg. 39,007 (Aug. 17, 2017) ........................................................5

83 Fed. Reg. 28,710 (June 20, 2018) ........................................................6

83 Fed. Reg. 33,608 (July 17, 2018) ......................................................8, 9

83 Fed. Reg. 38,760 (Aug. 7, 2018) ..........................................................9

83 Fed. Reg. 40,823 (Aug. 16, 2018) .......................................... 7

83 Fed. Reg. 47,974 (Sept. 21, 2018) ........................... 12, 13, 17

83 Fed. Reg. 65,198 (Dec. 19, 2018) .......................................... 13

84 Fed. Reg. 7,966 (Mar. 5, 2019) ............................................ 13

84 Fed. Reg. 20,459 (May 9, 2019) ........................................... 13

84 Fed. Reg. 21,892 (May 15, 2019) ......................................... 13

84 Fed. Reg. 22,564 (May 17, 2019) .................................... 14, 15

84 Fed. Reg. 43,304 (Aug. 20, 2019) ................................... 15, 17

Office of the United States Representative, *Section 301 Fact
Sheet* (Mar. 22, 2018) .............................................................. 6

*Trump Hits China with Tariffs On $50 Billion Of Goods;
China Says It Will Retaliate*, NPR (June 15, 2018) ............................ 7

## STATEMENT OF INTEREST

Amici curiae are American manufacturers, vendors, and a trade association representing U.S. sports and fitness companies that import parts or materials from China to produce and sell products in the U.S. [1]

Amicus curiae Acushnet Company is one of the world's largest manufacturers of golf equipment, including balls, shoes, apparel and gloves sold under the "Titleist" and "Footjoy" brands. Acushnet was founded in the U.S. in 1910 and is headquartered in Fairhaven, Massachusetts. Acushnet currently employs over 2,200 Americans with highly-skilled jobs in the areas of research and development, design, manufacturing, and distribution. Its U.S. operations include several golf ball manufacturing plants, a custom golf ball plant, a golf club manufacturing plant, a custom glove and apparel facility and several research and development technology centers.

---

[1] As required by Fed. R. App. P. 29(a)(4)(E), amici curiae hereby affirm that no party's counsel authored this brief in whole or in part, and no party, party's counsel, or person other than amici, their members, and their counsel funded the preparation or submission of this brief. All parties to this case have consented to the filing of this amicus brief.

Amicus curiae Diamond Baseball Company, Inc., d/b/a Diamond Sports is one of the U.S.'s best-known makers of sports equipment including baseballs, softballs, gloves, mitts, training gear, equipment bags, and protective equipment for catchers, batters, and umpires.

Amicus curiae DuPont de Nemours, Inc. is an American multinational company that offers a diverse range of products, such as construction materials, adhesives, electronic, fabrics, fibers, medical devices, resins, printing, and consumer products.

Amicus curiae Sports and Fitness Industry Association ("SFIA") is the trade association of leading sports and fitness brands, suppliers, retailers and partners. SFIA represents more than 300 manufacturers, retailers, and marketers, with over 750 brands and over 3,000 business locations, plants and distribution centers that employ more than 375,000 people and generate over $150 billion in U.S. revenue.

Amici and their members and customers have been harmed by USTR's List 3 and 4A actions, which apply to parts and materials that amici rely on in their U.S. manufacturing and sales operations. They urge the Court to overturn the decision below upholding those tariffs and vacate them as contrary to basic administrative law principles.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Amici curiae agree with Appellants' statutory and Administrative Procedure Act ("APA") arguments challenging the Court of International Trade's ("CIT's") decision upholding the United States Trade Representative's ("USTR's") decision to impose the List 3 and 4A tariffs. Those monumental actions expanded tariffs imposed under Section 301 of the Trade Act to cover nearly $400 billion of Chinese imports annually. Amici write separately to highlight certain fundamental flaws in USTR's decision, which the CIT recognized in its *First Opinion* remanding USTR's actions, but inexplicably overlooked in its *Section Opinion*.

Specifically, even after the CIT gave USTR a chance to better explain the Agency's reasons for taking the List 3 and 4A actions, USTR failed to address important aspects of its decision, including (1) why USTR believed that additional Section 301 tariffs were likely to be effective in curbing China's unfair trade practices even though USTR's prior actions only caused retaliatory action, and (2) why the List 3 and 4A actions were worth the harm they would cause to U.S. companies.

USTR was required to address those core issues not only because they were raised in comments (including by amici), but also because they

3

are "important aspect[s]" of the question before the agency, and thus had to be addressed in order for its decision to be upheld under the APA's arbitrary and capricious standard. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").

In its Remand Determination, USTR once again failed to meaningfully respond to comments on those issues, and failed to explain the Agency's rationale for imposing the List 3 and 4A tariffs despite the immense harm they would cause U.S. companies and the failure of the prior tariff rounds. The CIT should have stuck to its guns and held USTR to its obligation to provide a thorough and reasonable explanation for its decision to nonetheless impose the List 3 and 4A tariffs, which had extremely harsh consequences for U.S. companies, their customers, and the broader U.S. economy. This Court therefore should reverse the CIT's second decision upholding the List 3 and 4A actions and vacate those unreasonable, and therefore unlawful, actions.

# BACKGROUND

The facts of this case are discussed at length in the Appellants' brief. Amici curiae will not repeat them, but highlight below key aspects of the administrative and procedural history relevant to their arguments.

## I.    USTR imposes Section 301 tariffs to redress unfair Chinese practices; China responds by imposing retaliatory tariffs.

In August 2017, at President Trump's direction, USTR began an investigation into Chinese laws, policies, practices, and actions related to intellectual property, innovation, and technology, and their impact on trade, under Section 301(b) of the Trade Act of 1974 ("Section 301").[2]

USTR released a report on March 22, 2018 announcing the results of its investigation (the "Report").[3] USTR found that certain acts, policies, and practices of the Chinese government related to technology transfer, intellectual property, and innovation "are    unreasonable    or

---

[2] *See Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology*, 82 Fed. Reg. 39,007 (Aug. 17, 2017).

[3] Appx01547–01762 (Office of the United States Trade Representative, *Findings of the Investigation Into China's Acts, Policies, And Practices Related to Technology Transfer, Intellectual Property, and Innovation Under Section 301 of The Trade Act of 1974*).

discriminatory and burden or restrict U.S. commerce." [4] USTR also indicated that, based on a directive from President Trump, it would propose 25% ad valorem tariffs "on certain products from China, with an annual trade value commensurate with the harm caused to the U.S. economy resulting from China's unfair policies."[5]

In mid-2018, Respondents took two actions intended to address the harm to the U.S. economy caused by the investigated unfair practices. First, in mid-June, USTR imposed the "List 1" duties on imports from China, with an approximate trade value of $34 billion.[6] In the same action, USTR requested further comments on its proposal to impose an another $16 billion in tariffs on an additional list of goods.[7] Two months

---

[4] *Id.* at 17.

[5] Office of the United States Representative, *Section 301 Fact Sheet* (Mar. 22, 2018), https://ustr.gov/about-us/policy-offices/press-office/fact-sheets/2018/march/section-301-fact-sheet.

[6] *Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710, 27,711 (June 20, 2018) ("Final List 1")

[7] *See id.* at 28,712.

later, USTR imposed duties on an additional group of imports set forth in "List 2," with an approximate trade value of $16 billion.[8]

On the same day the List 1 tariff headings were announced, China retaliated by announcing that it would impose 25% ad valorem tariffs on $50 billion in U.S. goods, to be implemented in two stages (the first applying to $34 billion in goods and the second to $16 billion), and taking effect on the same dates the United States began collecting the List 1 and List 2 tariffs.[9] China's tariff actions thus mirrored those taken by USTR.

## II. USTR responds by proposing tariffs on an additional $200 billion of Chinese imports, but asks for comment on all aspects of the proposal, including scope and rate.

On June 18, 2018—before USTR even implemented the List 1 and 2 duties—the President directed USTR to consider whether the United States should impose additional duties on products from China with an

---

[8] *Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40,823, 40,823–24 (Aug. 16, 2018).

[9] *Trump Hits China with Tariffs On $50 Billion Of Goods; China Says It Will Retaliate*, NPR, June 15, 2018, https://www.npr.org/2018/06/15/620259820/trump-levies-50-billion-in-tariffs-as-china-says-it-will-retaliate.

estimated trade value of $200 billion.[10] USTR thereafter proposed additional subheadings to be subject to tariffs, referred to as "List 3."[11]

In the List 3 NPRM, USTR pointed to the President's direction and China's decision to impose "retaliatory duties" as the basis for its proposed action.[12] USTR tied the proposed $200 billion in trade value to the retaliatory duties imposed by China on U.S. imports, asserting that "action at this level is appropriate in light of the level of China's announced retaliatory action ($50 billion) and the level of Chinese goods imported into the United States ($505 billion in 2017)."[13] But USTR asked for public comments on "any aspect of the proposed supplemental actions," including "[t]he level of increase, if any, in the rate of duty," "[t]he appropriate aggregate level of trade to be covered," and whether expanding and increasing duties "would be practicable or effective to

---

[10] Appx01873–1875 (The White House, *Statement from the President Regarding Trade with China* (June 18, 2018)).

[11] *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 33,608, 33,608–09 (July 17, 2018) ("*List 3 NPRM*").

[12] *Id.*

[13] *Id.*

obtain the elimination of China's acts, policies, and practices" or "would cause disproportionate economic harm to U.S. interests."[14]

A few weeks later, USTR extended the comment period "to [also] consider increasing the proposed level of the additional duty from 10 percent to 25 percent."[15] USTR pointed to its previous invitation, in the List 3 NPRM, for the public to submit comments, and "invited [commenters] to include comments in their written submissions and oral testimony on the possible imposition of a 25 percent additional duty.[16]

## III. USTR receives many comments opposing the proposed List 3 tariffs, but imposes them shortly thereafter.

USTR's proposals drew widespread opposition. Approximately 350 witnesses representing a broad array of businesses, trade associations, consumer, and public interest groups appeared at the hearings regarding the proposed List 3 tariffs, and over 6,000 comments were submitted in response to USTR's proposed List 3 rulemaking.

---

[14] *Id.* at 33,609.

[15] *Extension of Public Comment Period Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 38,760, 38,760–61 (Aug. 7, 2018).

[16] *Id.* at 38,761.

Most commenters opposed the imposition of additional tariffs and raised concerns about, *inter alia*, the harm to U.S. businesses and likelihood that more tariffs would result in further Chinese retaliation rather than having the desired effect. For example, amicus curiae SFIA testified in opposition to the Proposed List 3 Tariffs, explaining that "[m]any SFIA members will not survive an extended period of higher tariffs long enough to find sourcing options outside of China, and that "[t]his is especially true for small and medium sized enterprises."[17] Many other companies and trade associations similarly opposed the proposal to expand and increase the Section 301 tariffs based on the negative impacts to U.S. businesses and concerns that the proposed actions would be no more effective than the prior Section 301 actions. *See, e.g.,* Appx05432–5441, PR-5237 (NAM), PR-5897 (NRF and other organizations) (commenting on the negative impacts of increased costs on U.S. businesses); Appx05415–5419, PR-5174 (AFBF), PR-7577 (NASDA) (comments on the likelihood of further harmful Chinese retaliation); Appx06711–6729, PR-8841 (U.S. Chamber) (commenting that many

---

[17] Appx02337–2338 (Section 301 Hearing Transcript on Proposed List 3 Tariffs Day 1 (Aug. 20, 2018)).

Chinese products incorporate U.S. inputs or technology and are made by U.S.-owned companies, and so more tariffs would harm U.S. companies).

Eleven days after the close of the comment period, President Trump announced that he had directed USTR "to proceed with placing additional tariffs on roughly $200 billion of imports from China."[18] A few days later, USTR published the final List 3 action, imposing a 10% tariff that was set to rise automatically to 25% on January 1, 2019.[19] USTR determined that the additional duty would apply to all listed products that enter the United States from China on or after September 24, 2018.[20] USTR did not, however, respond to *any* of the over 6,000 comments that it received during the public comment period.

In the months that followed, China and the United States attempted to resolve their differences through negotiations. Based on the progress made, the Trump Administration announced in December 2018,

---

[18] Appx06161–6167 (The White House, *Statement from the President* (Sept. 17, 2018)).

[19] *Notice of Modification of Action Pursuant to Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47,974, 47,975 (Sept. 21, 2018) ("*Final List 3*").

[20] *Id.* at 47,975.

and again in February 2019, that it would delay the scheduled increase in the List 3 duty rate from 10 to 25%.[21]

In May 2019, USTR announced its intent to raise the 10% tariffs on List 3 goods to 25%, effective either May 10, 2019 or June 1, 2019 (depending on the day of export).[22]

## IV.    USTR proposes the List 4 tariffs, again receives many comments in opposition, but proceeds anyway.

A mere eight days after it published notice of its decision to increase the List 3 duty rate, USTR announced its intent to proceed with yet another list – List 4 – covering even more products. Under USTR's proposal, List 4 would impose 25% ad valorem duties on additional products worth an estimated trade value of $300 billion. [23] USTR explained that its decision was motivated by China's "retreat[] from

---

[21] *Notice of Modification of Section 301 Action*, 83 Fed. Reg. 65,198 (Dec. 19, 2018); *Notice of Modification of Section 301 Action*, 84 Fed. Reg. 7,966 (Mar. 5, 2019).

[22] *See Notice of Modification of Section 301 Action*, 84 Fed. Reg. 20,459 (May 9, 2019); *see also Implementing Modification to Section 301 Action*, 84 Fed. Reg. 21,892 (May 15, 2019).

[23] *Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 22,564 (May 17, 2019) ("List 4 NPRM").

specific commitments made in previous [negotiating] rounds [and] announce[ment of] further retaliatory action against U.S. commerce."[24] And the agency candidly stated that the proposed additional tariff action would "cover[ ] essentially all products not currently covered by action in this investigation."[25] But USTR again indicated that it was open to considering other courses of action, once again asking for comment on "[t]he level of the increase, if any, in the rate of duty" and "[t]he appropriate aggregate level of trade to be covered by additional duties," as well as whether imposing additional tariffs "would be practicable or effective" or "impose disproportionate economic harm to U.S. interests."[26]

Again, many commenters opposed USTR's proposed tariff expansion. And while many requested that specific subheadings covering products critical to their manufacturing operations be removed from the list of subheadings subject to the additional tariffs, they also highlighted broader concerns about the actions as a whole. For instance, SFIA explained in comments requesting an exclusion for golf club parts needed

---

[24] 84 Fed. Reg. at 22,564.

[25] *Id.*

[26] *Id.* at 22,565.

by Acushnet and other members that the List 4 tariffs would disproportionately harm sports equipment manufacturers who have "preserved their U.S. manufacturing operations by importing some raw materials from China" and "give foreign competitors an overwhelming competitive advantage because they do not have to pay tariffs on the raw materials used in their products."[27] SFIA opined that the tariffs "are not a practicable or effective mechanism for changing China's acts, policies, or practices[.]"[28] SFIA also submitted post-hearing comments addressing the List 4 proposal on behalf of businesses including amici Acushnet and Diamond Sports, explaining that it was "concerned that increased tariffs will harm U.S. manufacturing and exports because the Chinese have imposed retaliatory tariffs on these products."[29]

On August 20, 2019, USTR issued a final notice adopting List 4 at the proposed level and rate, but splitting the list of impacted products

---

[27] SFIA Comment Letter, PR-8764 (June 17, 2019), at 3 https://www.regulations.gov/comment/USTR-2019-0004-2589.

[28] *Id.*

[29] *See* SFIA Letter, PR-9018 (July 2, 2019) (post-hearing submission), https://www.regulations.gov/comment/USTR-2019-0004-2844.

into two tranches, List 4A and List 4B.[30] The result of this last action was to bring the total amount of the Section 301 tariffs imposed on Chinese imports to $539 billion. USTR suspended implementation of List 4B before it went into effect, Appx09560, leaving the total value of Chinese imports covered by USTR's List 1–4A actions at $370 billion.

## V.    The CIT holds that USTR failed to show it considered key issues going to the wisdom of Lists 3 and 4A.

In its *First Opinion* (Appx00030–Appx00100) the CIT correctly concluded that the USTR's List 3 and 4A final actions were arbitrary and capricious because USTR failed to consider fundamental questions going to the wisdom of imposing additional Section 301 tariffs at the scope and level proposed. The CIT noted that commenters on the proposed actions had raised broad concerns questioning "the legality and efficacy of the tariffs, the potential for damage to the U.S. economy, and whether alternative measures would be more effective." Appx00050 (*First Op.* at 51). The court held that the USTR was "required to address [such] comments," as well as comments on "the aggregate level of trade subject

---

[30] *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 43,304 (Aug. 20, 2019) ("Final List 4").

to the proposed duties . . . in light of section 301's statutory purpose." Appx00051–53 (*First Op.* at 52–53).

With respect to comments questioning "the 'wisdom of the enterprise,' i.e., whether to proceed with any increase in duties," the CIT noted that "USTR explained its decisions by way of reference to China's unfair practices and stated that the increase in duties and level of trade affected by the modifications are consistent with the specific direction of the President." Appx00052 (*First Op.* at 53). But the CIT found this reasoning insufficient. The Court explained that USTR's statements "fail to apprise the court how the USTR came to its decision to act and the manner in which it chose to act, taking account of the opposition and support for the increased duties." *Id.* (emphasis added).

The court further explained that, while the "specific direction of the President" is "statutorily significant, the USTR's invocation of the President's direction does not obviate the USTR's obligation to respond to significant issued raised in the comments." Appx00053 (*First Op.* at 54) (citing *Sherley v. Sebelius*, 689 F.3d 776, 784-85 (D.C. Cir. 2012)). The CIT noted that the USTR's final determinations did not explain "whether or why the President's direction constituted the only relevant

16

consideration[,] nor do those determinations address the relationship between significant issued raised in the comments and the President's direction." Appx00054 (*First Op.* at 55). The CIT therefore concluded that "Final List 3 and Final List 4 require reconsideration or further explanation regarding the USTR's rationale for imposing the tariffs," and remanded those actions to USTR. Appx00056 (*First Op.* at 57).

## VI.  USTR's Remand Determination does not meaningfully address key issues raised by commenters.

USTR issued its Remand Determination (Appx10570–10659) on August 1, 2022, 120 days after the CIT's *First Opinion*.

The majority of the Remand Determination discusses why USTR granted or did not grant temporary exclusions for certain products. Appx10591–10650 (Remand Determination at 22–81). The Remand Determination only discusses the core "wisdom of the enterprise" issues—such as why USTR thought further tariff rounds made sense after the prior actions had been ineffective, and why the additional actions were worth the harm they caused to U.S. companies—briefly, at the very end. Appx10650–10658 (Remand Det. at 81–89). And instead of meaningfully grappling with those key issues, USTR again pointed to the President's directives to raise and broaden the 301 tariffs, taking his

proposed overall level of tariffs as a command rather than exercising independent judgment. *See, e.g.,* Appx10658 (Remand Det. at 89) ("Considering the President's . . . directives to take subsequent action under section 301, in requesting broad-based comments, USTR did not intend to invite comments on alternative measures to an action under Section 301 of the Trade Act.").

In regard to the concerns raised about the economic harm that the List 3 and 4 actions would cause, USTR pointed to its decision to delay implementation of the List 4A tariffs at 25% and its grant of temporary exclusions for certain subheadings, suggesting that those aspects of its decision provided relief for U.S. consumers. *See* Appx10650–10653 (Remand Det. at 81–84). USTR had no substantive response to commenters who questioned whether additional tariff rounds would be effective at ending China's unfair practices and policies—except to blithely assert that the inefficacy of the prior rounds did not necessarily mean that additional action would be ineffective. Appx10656 (Remand Det. at 87). USTR then set up a false dichotomy, addressing these concerns as suggestions to engage in negotiations alone. Appx10655–10656 (Remand Det. at 86–87).

## VII. The CIT upholds USTR's List 3 and 4A actions despite USTR's failure to explain its reasoning on key issues.

In its *Second Opinion*, the CIT upheld the List 3 and 4A actions despite USTR's continued failure to meaningfully address important issues including the likely inefficacy of and economic harm from those actions. *See generally Second Op.*, Appx00003–Appx00029.

The CIT found, in its *Second Opinion*, that the Remand Determination sufficiently addressed the role of the President's direction in determining USTR's action by "reflect[ing] USTR's conclusion that statutory language . . . constrained USTR's ability to depart from the direction . . . Nothing more was required." Appx00020 (*Second Op.* at 18). The CIT thus excused USTR, this time around, from its obligation to "apprise the court how the USTR came to its decision to act and the manner in which it chose to act, taking account of the opposition and support for the increased duties." Appx00082 (*First Op.* at 53).

Regarding commenters' concerns of significant harm to U.S. businesses, consumers, and the economy, the CIT only stated that it "readily discerns USTR's attempts to balance [those] concerns . . . with the specific direction it had received from the President." Appx00021 (*Second Op.* at 19). The CIT also asserted that USTR had adequately

addressed concerns regarding "harm to U.S. *consumers*" by removing certain subheadings and initially setting the duty rate at 10% for three months (before raising it to 25%). *Id.* (emphasis added). The CIT did not, however, identify any ways in which USTR had addressed commenters' concerns regarding harm to *U.S. businesses* that depend on parts, materials, or products imported from China. Rather, it asserted that plaintiffs' challenge to the Remand Determination was really a quarrel with "the conclusions USTR reached." Appx00022 (*Second Op.* at 20).

Regarding commenters' concerns that the List 3 and 4 actions would be no more effective than the List 1 and 2 actions, the CIT asserted that USTR had explained why it thought "negotiations alone" would not be effective to change China's policies and practices. Appx00023–24 (*Second Op.* at 21–22). Otherwise, the CIT simply stated that "USTR was not bound to agree with commenters." Appx00024 (*Second Op.* at 22).

Setting aside commenters concerns regarding economic harm and efficacy—as well as USTR's obligation to address those concerns—the CIT sustained the List 3 and 4A actions. Appx00028 (*Second Op.* at 26).

# ARGUMENT

USTR's List 3 and 4A actions cannot be squared with fundamental principles of administrative law, as the CIT rightly recognized in its *First Opinion*, but failed to reaffirm in its *Second Opinion*.

USTR failed to explain its thinking on key issues going to the "wisdom of the enterprise," including the harm the List 3 and 4A actions would cause U.S. companies, and whether those actions were likely to be effective in light of China's response to List 1 and 2 actions. These issues were raised in comments, including by amici—but had to be addressed by USTR in any event because they are plainly "important aspect[s] of the problem" before the agency. *State Farm*, 463 U.S. at 43.

The Remand Determination's brief, superficial treatment of these fundamental issues does not come close to showing that they were meaningfully considered by the agency, nor did USTR satisfactorily explain why the comments raising these issues as reasons not to finalize the List 3 and 4A actions were rejected.

## I.   USTR had to consider and address key issues going to the fundamental wisdom of the List 3 and 4A tariffs.

As the CIT recognized in its First Opinion, the APA requires USTR to consider and respond to comments challenging the wisdom of the List

3 and 4A tariff actions. *See* Appx00081–84 (*First Op.* at 52–55). That includes comments on two core issues:

> (1) Whether it was reasonable to raise the level and broaden the scope of the Section 301 tariffs even after two prior rounds failed to have any positive impact on China's policies and practices, and

> (2) Whether the List 3 and 4 actions were appropriate despite the significant resulting harm to U.S. companies, their customers, and the broader U.S. economy.

These are basic, common-sense questions that USTR could not reasonably ignore when considering whether and to what extent to take further action against China under Section 301. *See* Appx00080–82 (*First Op.* at 51–53); *State Farm*, 463 U.S. at 43.

It is oft said the definition of insanity is doing the same thing repeatedly while expecting a different result. That is precisely what USTR did here. USTR's imposition of the Lists 1 and 2 tariff rounds resulted in retaliatory action by China that mirrored USTR's actions, further harming U.S. manufacturers and sellers rather than alleviating the unfair trade practices that were the stated reason for imposing the initial Section 301 tariffs. USTR nevertheless continued to raise the rate and expand the scope of the tariffs even after those actions had the opposite of the intended effect, provoking a trade war with China. USTR has never explained how such action could be considered rational. USTR

therefore failed to meet the APA's arbitrary and capricious standard of review, which requires it to provide a "satisfactory explanation for its action." *State Farm*, 463 U.S. at 43; s*ee also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) (requiring agencies to provide adequate reasons for their decisions).

In regard to the second issue—the harm to U.S. companies from imposing up to 25% tariffs on most Chinese imports—USTR was obligated to address comments raising that harm and explain why the effects of the "cure" (the Section 301 tariff actions) were not worse than the disease (the practices that the tariffs had been imposed to deter).[31] USTR's brief discussion of the potential impact to the U.S. economy failed to include any such analysis. Instead, USTR relied solely on the President's directive, *see* Appx10655–10657 (Remand Det. at 86–88), implicitly admitting that the agency ignored all considerations other than that directive—including the economic harm from the proposed List 3 and 4 actions. But that is exactly what the CIT rightly found in its *First Opinion* that USTR could not do. Appx00082–83 (*First Op.* at 53–54).

---

[31] *See Moncrieffe v. Holder,* 569 U.S. 184, 203 (2013) ("That the only cure is worse than the disease suggests the Government is simply wrong.").

The CIT recognized in its *First Opinion* that comments on the effectiveness of the proposed action and the harm it would cause U.S. companies are precisely the types of comments that require not only consideration by the agency, but an explanation of the agency's reasons for rejecting them. *See* Appx00082 & Appx00084 (*First Op.* at 53 & 55) (citing and quoting *Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968), for the proposition that "the USTR had a duty to respond to the comments in a manner that enables the court to understand 'why the agency reacted to them as it did'"); *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[T]he opportunity to comment is meaningless unless the agency responds to significant points raised by the public.") (citations omitted).

As this Court explained in *Disabled Am. Veterans v. Gober*, 234 F.3d 682, 692 (Fed. Cir. 2000), an agency must "respond, in a reasoned manner, to any comments received by the agency that raise significant issues with respect to a proposed rule."[32] Moreover, the level of "detail of the agency's response depends upon the subject matter of the regulation

---

[32] *See also City of Waukesha v. EPA*, 320 F.3d 228, 257 (D.C .Cir. 2003) (the agency must "respond in a reasoned manner to those [comments] that raise significant problems").

and the comments received." *Id*. In other words, the more significant the action proposed (here, imposing billions in additional tariffs on imports on which U.S. companies rely), and the more significant the issues raised (here, whether that action would be effective, or instead only further harm U.S. companies, their customers, and the broader economy), the better the agency's explanation must be. Yet, despite the obvious significance of its actions, USTR punted on these core issues going to the heart of whether its proposed additional tariff actions made sense.

Indeed, even if commenters had not challenged the proposed List 3 and 4 actions based on the economic harm they would cause and their likely ineffectiveness—which commenters including amici most certainly did[33]—USTR would still have had an obligation to consider those issues because they are "important aspect[s]" of the question before the agency. *State Farm*, 463 U.S. at 43 ("Normally, an agency rule would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem."); *Michigan v. EPA*, 576 U.S. 743, 752 (2015) (reaffirming that "an agency may not 'entirely fai[l] to consider an

---

[33] *See* pp. 10–11 & 14, *supra*; Appx00080 (*First Op.* 51) (describing comments on the "efficacy of the tariffs" and their "potential for damage" to the U.S. economy).

important aspect of the problem' when deciding whether regulation is appropriate"). And, after considering all important aspects of the problem before it, the agency must then articulate a "satisfactory explanation for its action." *State Farm*, 463 U.S. at 43. USTR failed to do so here, even after the CIT gave it a second chance by remanding.

## II.    USTR failed to explain why the expansion and escalation of Section 301 tariffs was reasonable despite the failure of the prior tariffs and the harmful impact on U.S. companies.

Despite the CIT's mandate, in its *First Opinion*, that USTR explain the reasoning behind its decision to raise and broaden tariffs and address comments questioning whether any such action made sense given the effect of the prior tariff rounds and the negative economic impact, USTR failed to do so in the Remand Determination.

### A.    USTR did not explain why it thought the List 3 and 4A actions would be effective after the List 1 and 2 actions failed to achieve their stated objective.

In regard to whether the List 3 and 4 tariffs were likely to be effective, USTR's reasoning boiled down to its conclusory statement that "previous actions were not sufficient." Appx10656 (Remand Det. at 87). But as the CIT rightly reminded USTR in the *First Opinion*, "[c]onclusory statements . . . are insufficient." Appx00077 (*First Op.* at 48).

26

The few statements USTR made regarding the effectiveness of its prior actions only undermine its decision to impose additional rounds of tariffs. USTR itself noted that "the prior $50 billion action had *not* been effective in obtaining the elimination of China's unfair acts." App10648 (Remand Determination at 79) (emphasis added). USTR does not even try to explain why, having conceded that its prior 301 tariff actions were ineffective and insufficient, it believed that further 301 tariff actions would be effective and sufficient. Rather, USTR simply stated, in conclusory fashion with no reasoning or record support, that "more substantial trade actions were needed to encourage negotiations." *See* Appx10656 (Remand Determination at 87). But this begs the question of why USTR thought "more substantial" tariffs would bring China to the table, as opposed to simply resulting in additional Chinese retaliatory action—to the further harm of U.S. companies that both import goods from and export goods to China. This is a fundamental logical flaw that shows the arbitrary and capricious nature of USTR's action. *See NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("[W]hile [an agency's] explanations do not have to be perfect, the path of its decision must be reasonably discernable").

Instead of explaining why it thought that additional tariffs rounds would succeed where prior rounds had failed, USTR simply stated that negotiations with China had failed. Appx10655–10657 (Remand Det. at 86–88). But the fact that one alternative avenue for addressing China's unfair practices had failed does not mean (or even suggest) that additional Section 301 tariffs were likely to succeed.

In short, USTR did not question whether doubling down and increasing the Section 301 tariffs on China was likely to yield different results than the initial tariffs. This was unreasonable, and thus USTR's decision was arbitrary and capricious in violation of the APA.

### B.   USTR did not address the harm to U.S. companies that would result from imposing additional tariffs on hundreds of billions of imported goods.

USTR's response to comments arguing that the List 3 and 4 tariffs would seriously harm U.S. companies was equally lacking in substance.

Regarding List 3, USTR only stated, in a conclusory fashion, that "the selection process . . . took account of likely impacts on *U.S. consumers*, and involved the removal of subheadings . . . likely to cause disruptions to the U.S. economy.'" Appx10652 (Remand Det. at 83) (emphasis added). But USTR provided no explanation of *how* it had

accounted for harm to consumers, beyond pointing to the grant of exemptions for certain subheadings. *See id*. As discussed further in section C below, the grant of temporary exclusions for a very small percentage of products does not obviate the massive economic harm caused to consumers by the imposition of 25% tariffs on almost $400 billion in imported goods. And in any event, USTR failed to address the separate harms to U.S. *companies* that rely on Chinese imports, including amici that manufacture and sell goods in the U.S. that use or include Chinese components or materials. *See* p. 10–11 & 14 *supra*.

With respect to List 4A, USTR again pointed to its grant of exclusions, and otherwise noted only that it had delayed implementation of certain duties (those covered by List 4B), while conceding that effectively *all* consumer goods would be impacted once the duties came into effect. Appx10652–10653 (Remand Det. at 83–84). Again, this is a non-answer to the core concern raised by commenters regarding the massive economic harm to U.S. companies and their customers that would be caused—whether immediately or down the road—by imposing additional duties on hundreds of billions in imports.

Critically, USTR's statements do not answer the key question asked by commenters on the List 3 and 4A actions, and which must be answered for USTR's decision to be fundamentally rationale: Why did USTR think that imposing over $300 billion in additional tariffs would have greater benefits to the U.S. economy than costs to U.S. companies and their customers? An agency decision that fails to address whether its massive costs are worth the expected benefits (and whether those benefits realistically can be expected to materialize) is inherently irrational—and thus arbitrary, capricious, and unlawful. *See Michigan v. EPA*, 576 U.S. at 760 ("The Agency must consider cost . . . before deciding whether regulation is appropriate and necessary.").

### C.   USTR's grant of product-specific, temporary exclusions and reliance on the President's directive do not answer the questions posed by commenters.

Rather than addressing these core issues regarding the economic harm that the List 3 and 4A tariffs would cause, most of USTR's Remand Determination focused on the reason for *granting individual exclusions*. But the decision to grant or not grant a particular temporary exclusion says nothing about the *wisdom of the enterprise as a whole*; i.e., whether it is likely to have the desired impact on China's unfair practices, and

whether (even if so) it is worth the corresponding damage to U.S. companies, their customers, and the broader American economy.

Even after USTR's grant of a very small percentage of temporary exclusions to limited products, the scale of the List 3 and 4A tariffs remained huge—and hugely damaging to U.S. companies that were not lucky enough to receive an exclusion for needed products. USTR never grappled with the magnitude of its actions, and the magnitude of the resulting harms, even after it was raised by commenters, including amici. *See* Background § III (describing comments from amici and others on the competitive and other economic harms to U.S. companies).[34]

USTR's brief response, at the end of the Remand Determination, to comments questioning the "wisdom of the enterprise" in light of the negative effect of the prior tariff rounds and the harms of further action to U.S. companies was instead exactly the same thing it had said in its initial decision: the President's directive required the agency to proceed in this manner. *See* Appx10647–10650 (Remand Determination at 78–81) ("As we explained, increasing the aggregate trade value of the action

---

[34] Like the vast majority of companies requesting exclusions from Lists 3 and 4, amici Acushnet and Diamond's requests were not granted.

31

was based on the specific direction of the President . . . . ”). But the CIT rightly recognized, in its *First Opinion*, that Presidential direction is but one relevant consideration under the statute, not in and of itself sufficient justification for the tariff actions. Appx00082 (*First Op.* at 53).

If pointing to the President's direction were enough to satisfy USTR's APA obligations, then USTR's request for comment on the scope and rate of the List 3 and 4 tariffs was an exercise in futility, and the entire comment and response process a sham. But because USTR is the entity that Congress directed to consider and decide whether and when to impose Section 301 tariffs, the President's direction alone is not enough to justify USTR's actions. USTR must fulfill its APA obligation to explain the reasoning for its decision, addressing all “important aspects” of that decision. *See, e.g.*, *State Farm*, 463 U.S. at 43. Here, that includes whether the List 3 and 4A tariffs were reasonable and appropriate after prior rounds were ineffective, and despite their very harmful impacts on U.S. companies like amici and their customers.

## CONCLUSION

This Court should reverse the CIT's decision and vacate the List 3 and 4A actions, which USTR failed to justify.

/s/ *John Brew*

John Brew
Amanda Shafer Berman
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: (202) 624-2500
Fax: (202) 628-5116
aberman@crowell.com

Weronika Bukowski
CROWELL & MORING LLP
590 Madison Avenue
20th Floor
New York, NY 10022

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation contained in Fed. R. App. P. 32(a)(7) because, excluding the portions exempted by Rule 32(f), this brief contains 6,466 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Century Schoolbook.

/s/ *John Brew*
John Brew

## CERTIFICATE OF SERVICE

I certify that on July 24, 2023, I electronically filed the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Federal Circuit through the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ John Brew
John Brew