No. 23-1891

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

---

## HMTX INDUSTRIES, LLC, HALSTEAD NEW ENGLAND CORP., MET-ROFLOR CORPORATION, JASCO PRODUCTS COMPANY LLC,

*Plaintiffs- Appellants*

v.

## UNITED STATES, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, KATHERINE TAI, U.S. Trade Representative, UNITED STATES CUSTOMS AND BORDER PROTECTION, TROY MILLER, Acting Commissioner of U.S. Customs and Border Protection,

*Defendants-Appellees*

---

Appeal from the United States Court of International Trade in
No. 1:20-cv-00177-3JP, Chief Judge Mark A. Barnett,
Judge Claire R. Kelly, and Judge Jennifer Choe-Groves

---

## AMICUS BRIEF OF ADMINSITRATIVE LAW AND
## INTERNATIONAL TRADE LAW PROFESSORS

---

Gregory Husisian, ghusisian@foley.com
David A. Hickerson, dhickerson@foley.com
Christopher Swift, cswift@foley.com
Jenlain Scott, jcscott@foley.com
Foley & Lardner LLP
3000 K Street, NW
Washington, DC 20007
(202) 945-6149

Counsel to Amici

July 24, 2023

# TABLE OF CONTENTS

INTERESTS OF AMICI ........................................................................1

STATEMENT OF THE CASE ................................................................2

SUMMARY OF ARGUMENT ................................................................9

ARGUMENT ...................................................................................11

I.   USTR LACKED THE STATUTORY AUTHORITY TO IMPOSE THE RETALIATORY LIST 3 AND LIST 4 TARIFFS ...............................................................11

II.  USTR'S CONSTRUCTION OF THE STATUTE RAISES SERIOUS DELEGATION PROBLEMS UNDER RECENT SUPREME COURT PRECEDENT .......................20

CONCLUSION .................................................................................29

ADDENDUM ...................................................................................30

4871-4346-3538.1

# TABLE OF AUTHORITIES

<div align="right">PAGE(S)</div>

Cases

*Davis v. Michigan Dept. of Treasury*,
    489 U. S. 803 (1989) ...........................................................................................23
*Gundy v. United States*,
    139 S.Ct. 2116 (2019)................................................................... *passim*
*National Assn. of Home Builders v. Defenders of Wildlife*,
    551 U. S. 644 (2007) ...........................................................................................23
*Utility Air Regulatory Group v. EPA*,
    573 U. S. 302 (2014) ...........................................................................................23

Statutes

19 U.S.C. § 2155 ...................................................................... 14-16, 20
19 U.S.C. § 2171 ..............................................................................................3
19 U.S.C. § 2411 ................................................................................. *passim*
19 U.S.C. § 2412 ................................................................................ 13-15
19 U.S.C. § 2413 ...........................................................................................15
19 U.S.C. § 2414 ................................................................................ 15-16
19 U.S.C. § 2416 ...........................................................................................19
19 U.S.C. § 2417 ............................................................................... *passim*
Pub. L. 93-618, 88 Stat. 1978 ........................................................... 2-3
Pub. L. 100-418, 102 Stat. 1107 ...............................................................2

Regulations

82 Fed. Reg. 40,213 (Aug. 24, 2017) ........................................................6
83 Fed. Reg. 28,710 (June 20, 2018) ........................................................7
83 Fed. Reg. 14,906 (Apr. 6, 2018) ..........................................................6

## INTERESTS OF AMICI

The main question presented in this appeal is whether appellee United States Trade Representative (USTR) had the statutory authority to impose new tariffs on hundreds of billions of dollars of goods imported from China, without regard for the detailed procedural and substantive limitations found in the relevant portions of Title 19, merely because China retaliated against the United States after USTR imposed tariffs on $50 billion in goods from China.

Amici, who are identified in the Addendum to this brief, are law professors who currently or in the past have taught, written about, or litigated administrative and international trade law issues in which the contents and structure of the applicable law are the critical considerations for determining the correct answer to the question presented, including under U.S. international trade laws. Amici are filing this Amicus Brief using their administrative and international trade law expertise to demonstrate that the court below erred by failing to examine the full range of procedural and substantive limits that Congress imposed on USTR under these laws. As a result of its myopic approach to reading the applicable law, the CIT reached the untenable conclusion that Congress authorized USTR to unleash unlimited retaliatory tariffs on any foreign trading partner despite USTR's failure to comply with the statutory requirements that allow modifications of its prior orders in only certain, prescribed circumstances.

To aid the Court's understanding of the statute, this Amicus Brief initially summarizes the overall framework for this law in the Statement of the Case and then discusses in detail in the Argument section the major procedural, substantive, and constitutional errors inherent in the erroneous construction of the statute adopted by USTR. As demonstrated below, the judgment below is based upon an erroneous statutory construction, and accordingly must be reversed.

By email, Elizabeth Speck, on behalf of the U.S. Government, consented to the filing of the Amicus Brief at 10:29 am on July 24, 2023. Because all Parties consented to the submission of this Brief, it is properly submitted under Rule 29(a)(2).

## STATEMENT OF THE CASE

In section 301 of the Trade Act of 1974, Pub. L. 93-618, 88 Stat. 1978, Congress gave the President the authority to respond to certain trade practices of foreign nations that injured domestic producers of goods. In 1988, Congress replaced the existing authority with a significantly different (and more detailed) regime to deal with the problem. Section 1301(a), Pub. L. 100-418, 102 Stat. 1107. Perhaps the most significant change was to replace the President as the decision maker by transferring that power to the USTR, subject to defined statutory constraints imposed by Congress, in what is now 19 U.S.C. § 2411(a)(1). Through this mechanism, Con-

gress places the primary power to implement Section 301 in USTR, which was cre-

ated in 1975 by section 141 of Pub. L. 93-618, 88 Stat. 1978 (currently found at 19

U.S.C. § 2171). The USTR is a Cabinet member who is appointed by the President

with the advice and consent of the Senate and who heads the Office of the U.S. Trade

Representative (collectively referred to hereinafter as "USTR").

Section 2411 contains two alternatives by which USTR may take action in

response to certain trade actions taken by other countries. Although subsection (a)

primarily covers matters relating to international trade agreements, it also includes,

in subparagraph (a)(2)(B)(ii), authorization for USTR to act if it determines that an

"act, policy, or practice of a foreign country … is unjustifiable and burdens or re-

stricts United States commerce." Under subsection (d)(4)(A), "[a]n act, policy, or

practice is unjustifiable if the act, policy, or practice is in violation of, or inconsistent

with, the international legal rights of the United States." If USTR makes a required

determination under subsection (a), it "shall take action authorized in subsection (c),

subject to the specific direction, if any, of the President regarding any such action,

and shall take all other appropriate and feasible action within the power of the Pres-

ident that the President may direct the Trade Representative to take under this sub-

section, to enforce such rights or to obtain the elimination of such act, policy, or

practice." Subsection (a)(3) also requires that the action taken by USTR under (a)(1)

"shall be devised so as to affect goods or services of the foreign country in an amount

that is equivalent in value to the burden or restriction being imposed by that country on United States commerce," *i.e.*, "to obtain the elimination of such act, policy, or practice," but no more.

In the case of the Section 301 China action, USTR did not rely on the mandatory authority in subsection 2411(a), but instead proceeded under the discretionary provisions of subsection 2411(b). Like its mandatory counterpart, subsection 2411(b)requires USTR to focus on an "act, policy or practice of a foreign country" while also directing USTR to determine whether the act "burdens or restricts United States commerce." But unlike section 2411(a), which covers trade agreements and asks whether an act, policy, or practice of a foreign country is "unjustifiable," subsection 2411(b) applies whenever any such act, policy, or practice is "unreasonable or discriminatory."[1]

The definition of unreasonable in subsection 2411(d)(3) has two subparagraphs specifically dealing with the circumstances under which a foreign country's treatment of intellectual property rights, which was the basis on which USTR imposed the tariffs on Lists 1 and 2, becomes unreasonable. These include:

> (II)    [the] provision of adequate and effective protection of intellectual property rights notwithstanding the fact that the foreign country may be in compliance with the specific obligations of the

---

[1] USTR did not allege that China engaged in discriminatory treatment as described in subsection 2411(d)(5): "Acts, policies, and practices that are discriminatory include, when appropriate, any act, policy, and practice which denies national or most-favored-nation treatment to United States goods, services, or investment."

- 4 -

Agreement on Trade-Related Aspects of Intellectual Property
Rights referred to in section 3511(d)(15) of this title, [and]

(III)  nondiscriminatory market access opportunities for United States
persons that rely upon intellectual property protection….

Subsection 2411(d)(3)(F) further defines the adequate and effective protection of

intellectual property rights to include "adequate and effective means under the laws

of the foreign country for persons who are not citizens or nationals of such country

to secure, exercise, and enforce rights and enjoy commercial benefits relating to pa-

tents, trademarks, copyrights and related rights, mask works, trade secrets, and plant

breeder's rights."

Once USTR makes the determination required by subsection (b), its actions

are governed by subsection (c). Subparagraph (1)(B) specifically authorizes USTR

to "(B) impose duties or other import restrictions on the goods of … such foreign

country for such time as the Trade Representative determines appropriate." Nothing

else in subsection (c) has any bearing on this case.

On August 18, 2017, USTR, acting at the instruction of the President, com-

menced an investigation under section 2412 addressing China's "laws, policies,

practices, or actions that may be unreasonable or discriminatory and that may be

harming American intellectual property rights, innovation, or technology develop-

ment." USTR, "Addressing China's Laws, Policies, Practices, and Actions Related

to Intellectual Property, Innovation, and Technology," 82 Fed. Reg. 39,007, 39,007

(Aug. 14, 2017). On March 20, 2018, USTR announced that its investigation had established that certain "acts, policies, and practices by the Chinese government [related to technology transfer, intellectual property, and innovation] are unreasonable and discriminatory and burden or restrict U.S. commerce," which is the required finding to trigger USTR's duty to take under subsection 2411(b). USTR, "Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation," 82 Fed. Reg. 40,213, 40,214 (Aug. 24, 2017)). USTR supported its determination with a Fact Sheet that estimated the annual impact of these acts, policies and practices on the U.S. economy was $50 billion.

On April 6, 2018, USTR published notice of its intent to impose a "duty of 25 percent on a list of products of Chinese origin." USTR, "Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation," 83 Fed. Reg. 14,906, 14,907 (Apr. 6, 2018)). According to USTR, those products had a value of "approximately $50 billion in terms of estimated annual trade value for calendar year 2018" because that amount was "commensurate with an economic analysis of the harm caused by China's unreasonable technology transfer policies to the U.S. economy, as covered by USTR's Section 301 investigation." *Id.*

Because USTR imposed these tariffs under subsection (b), the subsection (a)(3) requirement under that the United States' response to the foreign country must be "in an amount that is equivalent in value to the burden or restriction being imposed by that country" on its face did not apply. Nonetheless, USTR properly read section 2411 as a whole to limit the extent of its response to a proportional one, similar to that which would apply to actions under subsection (a). After providing the required opportunity for public comment, USTR adjusted the covered products. These adjustments in List 1 (which covered annual trade equivalent to $34 billion per year) and List 2 (which covered $16 billion in additional trade), both made subject to a 25% *ad valorem* tariff. USTR, "Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation," 83 Fed. Reg. 28,710, 28,711 (June 20, 2018). The products on List 1 and List 2 are not the subject of this appeal.

After USTR announced that tariffs would be imposed annually on the combined $50 billion of goods from China, and while it was finalizing Lists 1 and 2, China responded by announcing its intention to impose tariffs on a comparable amount of goods from the United States, effective when Lists 1 and 2 began to apply. These Chinese tariffs were not and are not part of the technology transfer, intellectual property, and innovation practices that were said to be the basis for USTR's tariffs

under Lists 1 and 2. President Trump initially countered by directing USTR to add goods from China worth up to $200 billion annually, which eventually became the List 3 tariffs that are challenged in this appeal, and then another roughly $300 billion annually (covering virtually all U.S. imports from China) in List 4, about half of which was suspended, leaving intact the duties under List 4A, but not List 4B. USTR conducted no investigation to justify tariffs that were seven times larger than those on Lists 1 and 2; nor did it follow any of the other procedures set forth in Title 19 that accompanied the first investigation. USTR did purport to consider public input on which goods should be on the Lists, but did not consider whether the tariffs were authorized by law or whether the amount of the tariffs or the volume of goods subject to them were justified.

To support its action, USTR relied on subsections (a)(1)(B) and (C) of section 2417, titled "[m]odification and termination of actions." Under subsection (a)(1)(B), USTR may act if it finds that "the burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, which are the subject of such action has increased or decreased." USTR, however, did not find that the Chinese original intellectual property actions that justified Lists 1 and 2 had "increased." Instead, USTR apparently relied on the fact that China retaliated against the United States after USTR imposed tariffs on the List 1 and List 2 products. It was this linkage—which USTR again relied on in its remand determination—that the U.S. Court

- 8 -

of International Trade (CIT) eventually accepted.[2] Thus, the current appeal (in addition to covering various other issues under the Administrative Procedure Act) directly raises the issue of whether the purported linkage relied upon USTR, and accepted by the CIT, is compatible with the statutory language found in subsection (a)(1)(B).

## SUMMARY OF ARGUMENT

Congress constructed a detailed statutory scheme under which USTR may impose additional tariffs or other import restrictions if foreign countries engage in certain trade practices that burden U.S. commerce. That scheme establishes both substantive limitations and procedural protections that must be addressed before such impositions are permitted. USTR complied with these requirements when it promulgated the tariffs covering products on Lists 1 and 2, but it failed to do so for Lists 3 and 4A. USTR's defense (upheld by the CIT) under subsection 2417(a)(1)(B) is that it has unfettered discretion to respond to any new foreign government actions

---

[2] USTR also used an alternative justification that was not ruled on by the CIT. Under the alternative in (C), USTR "may modify or terminate any action … if … such action is being taken under section 301(b) of this title [2411(b)] and is no longer appropriate." According to USTR, the term "modify" is not limited to modest, incremental changes, and the term "appropriate" eliminates all restrictions on the actions of a foreign country that are needed to justify additional tariffs or other important restrictions under section 2411, as well as on the type or amount of the US response. Because the CIT upheld the tariffs under (B), it did not rule on USTR's reliance on (C).

so long as the foreign government undertook some act, policy, or practice that is deemed to burden or otherwise restrict U.S. commerce. In this reading of the statute, it does not matter that those new actions by China are distinct from the Chinese Government practices that were the subject of the Section 301 investigation (here, the effects on U.S. intellectual property rights) or if the new tariffs are sharply disproportionate to the original remedy that USTR found matched the initial, investigated burden. USTR's alternative defense under subsection 2417(a)(1)(C) is that the term "appropriate" is so capacious that it allows USTR to bypass the procedural requirements and the substantive limits Congress established in sections 2411-16, so long as USTR decides (without any need for any further study or adherence to any discernable statutory framework) that the initial action is no longer "appropriate" because the foreign country took new actions, such as responding in kind to newly-imposed U.S. tariffs.

According to USTR, China's response to Lists 1 and 2 not only gave USTR the right to re-open its prior decision (without conducting the type of statutory analysis required to impose the initial duties), but also authorized USTR to multiply the volume of goods subject to additional tariffs by seven times while simultaneously placing no limits on the new *ad valorem* rates imposed under those additional tariffs. Moreover, according to USTR, it had the right to take such extraordinary actions without any further investigation or required findings, and by applying only those

procedural protections that USTR unilaterally decides are "appropriate." That approach to section 2417 makes a mockery of a detailed law in which Congress circumscribed what USTR may do and on what basis. Further, if USTR's approach were upheld by this Court, it would raise serious questions of undue delegation by Congress to USTR.

<div align="center">

**ARGUMENT**

</div>

## I.   USTR LACKED THE STATUTORY AUTHORITY TO IMPOSE THE RETALIATORY LIST 3 AND LIST 4 TARIFFS

In response to USTR's imposition of a 25% tariff on $50 billion in goods from China, China imposed tariffs on a like amount of goods imported from the United States. There is no doubt that section 301 (by which Amici mean all of sections 2411-17 of Title 19) allows USTR to impose duties on imports in response to the defensive actions taken by a foreign government when such actions burden or restrict U.S. commerce. The question before this Court, however, is whether, before imposing vast new or additional duties, USTR must conduct a new investigation evaluating whether impact of China's retaliation meets section 301's substantive requirements. In other words, can USTR, having conducted one section 2411(b) investigation, rely upon that investigation continuously into the future as authority to impose new 2411(c) actions or to expand existing 2411(c) actions. (Note that this is not a ques-

tion of whether USTR can use section 2417 as authority to increase tariffs in response to greater actions by the target government involving intellectual property rights that increase the burden on US commerce. For a situation such as that, USTR can lawfully rely upon its initial investigation, because that situation already was investigated.)

If, as USTR argues, it can essentially do anything in wants under the rubric of "Modification" as used in section 2417, then there would be no point in Congress providing detailed procedures (such as requiring an investigation) and carefully defining the categories of unreasonable and sanctionable foreign conduct under section 2411(b). The fact that Congress established such detailed constraints on USTR must mean that Congress delegated authority to USTR to act, but only pursuant to carefully considered requirements. It makes no sense to assert a statutory construction that would so carefully limit the USTR's authority to take the initial action, while at the same time stating that Congress's carefully constructed limitations can be completely ignored a few months or even weeks later, when USTR is considering modifying that same initial action.

Under the mandatory action provisions of section 2411(a), USTR must act if it "determines" that a foreign country has engaged in one of two activities: (1) it is not honoring a trade agreement (which does not apply here); or (2) the country has engaged in an "act, policy, or practice [that] is unjustifiable and burdens or restricts

United States commerce" (which also does not apply here). By contrast, under the discretionary actions authorization in section 2411(b), which USTR used in this case, the only basis for USTR action is if it "determines" that an "act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce" and that such action is "appropriate." 19 U.S.C. § 2411(b)(1), (2). Congress defined "unreasonable" in subsection 2411(d)(3) and its twenty paragraphs and subparagraphs, and it also defined "unjustifiable" in subsection 2411(d)(4). 19 U.S.C. § 2411(d)(3)(A)-(C); *id*. at (d)(4)(A)-(B). Those definitions are broad, but not limitless, and there is no reason to suppose that Congress only intended that they operate on the initial investigation and determination and not for any modification under section 2417 thereafter.[3]

Congress did not leave the manner in which USTR determines that the conduct of a foreign country may have been unreasonable under section 2411(b) to USTR's discretion. Rather, under subsection 2412(b)(1)(B), even before USTR undertakes an investigation "in order to determine whether the matter is actionable under section 2411 of this title," it must first "consult with appropriate committees es-

---

[3] Section 2417 also applies to modifications under section 2411(a). If USTR's reading of section 2417 is correct, then this reading would to circumvent the procedures applicable to section 2411(a), as well as the express definition in section 2411(d)(4) of when conduct by a foreign county is "unjustifiable" under section 2411(a).

tablished pursuant to section 2155 of this title," which include "representative elements of the private sector and the non-Federal governmental sector" who are knowledgeable about international trade matters. 19 U.S.C. §§ 2412(b)(1)(A)-(B). Section 2155(a)(1) makes clear that the consultation requirement is mandatory—"[t]he President shall seek information and advice"—and the inclusive elements of the committees formed under section 2155 underscore that such advice is both important and broad-based. 19 U.S.C. §§ 2155(a)-(c). Moreover, the reasons why Congress insisted that USTR obtain advice from the section 2155 committees before making an initial determination under sections 2411-12 are fully applicable when USTR made its determination under section 2417. That is especially true here, where the tariffs imposed under Lists 3 and 4 were seven times the amount of those under Lists 1 and 2 for which the section 2155 consultation was mandatory. Yet those consultations never occurred.

Furthermore, under subsection 2412(b)(2)(C), if USTR decides not to commence an investigation, it "shall submit to the Congress a written report setting forth, in detail— (i) the reasons for the determination, and (ii) the United States economic interests that would be adversely affected by the investigation." 19 U.S.C. § 2412(b)(2)(C). Thus, even when USTR decides not to investigate to protect US economic interests, it must have a factual and legal basis for that decision. It would only stand to reason that Congress would be equally insistent that USTR's actions

under section 2417 must also have a detailed written basis to support it, which is surely not the case when USTR proceeded under paragraph (B), for which USTR made no findings. !

Once USTR determines to commence an investigation, it must publish the determination in the Federal Register. Even at that preliminary stage, section 2413(a)(1) adds another mandatory consultation (which apparently did not take place for Lists 3 & 4A): "On the date on which an investigation is initiated under section 2412 of this title, the Trade Representative, on behalf of the United States, shall request consultations with the foreign country concerned regarding the issues involved in such investigation." 19 U.S.C. § 2413(a)(1). The obvious purpose of this provision is to require USTR to try to resolve the dispute without the United States having to engage in a trade war. At the same time, under subsection 2413(a)(3), USTR must seek the advice from the relevant section 2155 committees, whose members might seek to delay USTR and/or propose less onerous options. And in some cases, section 2412(b)(2)(D) requires USTR to "consult with the Register of Copyrights, the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office, and other appropriate officers of the Federal Government." 19 U.S.C. § 2412(b)(2)(D).

Once USTR determined to commence a (formal) investigation under section 2412, it then is required by subsection 2414(b)(1) to "provide an opportunity (after

giving not less than 30 days' notice thereof) for the presentation of views by interested persons, including a public hearing if requested by any interested person [and] shall obtain advice from the appropriate committees established pursuant to section 2155 of this title." 19 U.S.C. §§ 2414(b)(1)(A)-(B). In addition, under section 2414(a)(2)(B), determinations in cases like this, not involving trade agreements, must be issued within 12 months, presumably so that the evidence on which USTR makes its determinations is not stale. *Id.* at § 2414(a)(2)(B). And if USTR determines that the other country engaged in conduct prohibited under section 2411, then USTR must publish that determination in the Federal Register, "together with a description of the facts on which such determination is based." *Id.* § 2414(c).

Finally, subsection 2411(a)(3) requires that USTR's remedies "be devised so as to affect goods or services of the foreign country in an amount that is equivalent in value to the burden or restriction being imposed by that country on United States commerce." 19 U.S.C. § 2411(a)(3). Here, USTR's initial tariffs were imposed in an amount that was commensurate with the harm that it determined resulted from China's acts, policies, and practices affecting the intellectual property rights of U.S. citizens and companies. Although subsection 2411(a)(3), by its express terms, applies only to actions taken under subsection 2411(a)(1), and USTR's actions here were taken under subsections 2411(b) and 2417, it seems to reflect a general principle of law that even lawful retaliations should be no greater than the harm to which

they are responding. Amici do not contend that section 2417 limits a modification to the precise adverse impact of the retaliation, but only that the section 2417 response requires some measure of proportionality.

Turning to section 2417, the fact that Congress chose to legislate cannot be fairly read as a blank check. Instead, Congress addressed the modification or termination of actions taken under section 2411 in section 2417. The relevant provisions, paragraphs (B) and (C) of subsection 2417(a)(1) allow USTR to "modify or terminate" a prior action if ….

> (B)  the burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, which are the subject of such action has increased or decreased, or

> (C)  such action is being taken under section 2411(b) of this title and is no longer appropriate.

In responding to China's imposition of tariffs on $50 billion in U.S. products, USTR concluded that it need not follow *any* of the procedural requirements or substantive limitations that applied when USTR first imposed the tariffs on $50 billion in imported Chinese products on Lists 1 and 2. Instead, without following any of the statutory requirements applicable on the front end, or the statutory limits on relief, USTR issued a final determination imposing tariffs of 25 percent on a new set of imports from China valued at $500 billion annually, without conducting any investigation demonstrating that China's new actions came within the terms of section 2411(b).

The text of (B) focuses on the basis for USTR's prior action, in this case from China's actions harming U.S. intellectual property rights, and it allows modifications if the burdens from those actions have increased. But here, USTR made no finding of an increase in those burdens, and instead relied on the putative burden on U.S. commerce from a different source—retaliatory tariffs and "China's subsequent defensive actions taken to maintain those policies." USTR then imposed tariffs on Chinese goods in an amount far in excess of its original tariffs, without making a determination as to the burden imposed by the Chinese tariffs to which it was responding.

This action effectively eviscerates the careful restrictions that Congress established for taking action under section 301. Put another way, what was the point in Congress carefully defining what conduct by foreign countries will and will not be found to be unreasonable under subsection 2411(d)(3), when USTR can decide for itself what additional foreign conduct to sanction using an uncabined modification process? Equally significant, before USTR made its determination regarding Lists 3 and 4, it undertook none of the procedural steps that Congress included in sections 2411-16 to ensure that USTR received public input and engaged in necessary consultations before imposing massive burdens on U.S. trade and, ultimately, U.S. consumers.

The statutory construction adopted by USTR particularly makes no sense because Congress is aware that retaliation occurs in international trade. As a result,

Congress authorized USTR to use retaliatory measures, but limited to the circumstances, and subject to the conditions established in, 19 U.S.C. §§ 2416(b)(2) and (c). Even if USTR can rely on a foreign nation's retaliation in response to USTR's action under section 2411, it cannot do so in the amounts and without any adherence to process as it did here.

USTR's position as to subsection (C) is that it alone can decide what is "appropriate" and that its decision need not have anything to do with its original determination as to the basis for, or the amount of, any tariffs (or other import restrictions). And according to USTR, it does not need to follow any of the pre-determination procedures spelled out in the statute when modifying prior action. Thus, if USTR has imposed tariffs on $1 million of annual imports of toys because China had acted unreasonably by violating the workers' rights protections under subparagraph (d)(3)(B)(iii), it could invoke section 2417(a)(1)(C) and increase the tariff base to $10 billion per year on goods other than toys and for which there were no workers' rights issues or any other related basis for invoking section 2411. And USTR's asserted statutory construction means that it could do so for any reason USTR concluded was "appropriate," no matter how unrelated the retaliatory measures might be to the original action.

Moreover, according to Appellee, USTR could circumvent all the consultation requirements, with the section 2155 advisory committees or China, or the opportunity for public comment on whether any tariffs were needed or authorized (and on what basis), let alone regarding the magnitude of the new tariffs and their impact on importers and consumers. To be sure, USTR did seek and then respond to comments on *which* products to include on Lists 3 and 4, but did not follow the procedures under section 301 designed to assure that it had a proper basis to take the action that it did for Lists 3 and 4.

As this example shows, USTR's statutory construction leads to absurd results. Without a meaningful investigation and a specific determination that China's acts came within some portion of section 2411(b) or section 2417(a)(1)(B), USTR was not authorized to impose new tariffs on hundreds of billions of imports from China annually.

## II.    USTR's Construction of the Statute Raises Serious Delegation Problems Under Recent Supreme Court Precedent

An additional consideration is that if the Trade Act is as opened-ended in what USTR can do under section 2417(a)(1)(C), as Appellee contends, then it raises serious delegation problems, as illustrated by an application of the most recent guidance from the Supreme Court in *Gundy v. United States*, 139 S.Ct. 2116 (2019). Because it is incumbent on this Court to construe statutes to avoid constitutional issues, this

Court should reject the open-ended delegation of authority USTR claims under the statute (at least when it is in the realm of "modifying" prior agency action) and instead adopt the statutory construction proffered by Appellants and Amici, which applies the sensible approach of assuming that the same statutory guiderails that Congress prescribed for initial agency action cannot be ignored when USTR later determines it appropriate to "modify" its original agency action.

The latest Supreme Court pronouncement on the non-delegation doctrine was issued in *Gundy.* The non-delegation doctrine is a constitutional principle that prohibits Congress from delegating its legislative powers to another branch of government without providing clear guidance or standards. This constitutional principle is directly applicable here, because USTR is claiming that Section 301—at least where any modifications to its prior actions are at issue—should be interpreted as providing *no* guidance and *no* standards, other than whatever USTR itself decides is "appropriate."

Thus, the non-delegation doctrine and the Supreme Court's pronouncements in *Gundy* are directly on point. In that case, the petitioner, Herman Gundy, argued that Congress had unconstitutionally delegated its authority to the Attorney General by giving him the discretion to decide whether the Sex Offender Registration and Notification Act (SORNA) applied to pre-Act offenders. 139 S.Ct. at *2123.

In a 5-3 overall decision, with a plurality determination issued by Justice Kagan and joined by Justices Ginsburg, Breyer, and Sotomayor, the Supreme Court upheld the delegation of authority to the Attorney General under SORNA. The plurality determination reasoned that the statute provided an "intelligible principle" to guide the Attorney General's discretion, which was sufficient to meet the requirements of the non-delegation doctrine. *Id.* at *2123-24.

In reaching this determination, the plurality first reiterated that the starting point for the analysis to determine whether the relevant guiderails exist starts in the language of the statute. As the plurality states:

> So we have held, time and again, that a statutory delegation is constitutional as long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform." … Given that standard, a non-delegation inquiry always begins (and often almost ends) with statutory interpretation. The constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion. So the answer requires construing the challenged statute to figure out what task it delegates and what instructions it provides.

*Id.* at *2123 (internal citations omitted).

The plurality noted that the non-delegation doctrine had been used to strike down an excessive delegation of authority only in cases where "'Congress had failed to articulate any policy or standard' to confine discretion." *Id.* at *2129 (internal citations omitted). With this history in mind, the Court then applied this principle to the language of the statute at issue, as follows:

This Court has long refused to construe words "in a vacuum," as Gundy attempts. Davis v. Michigan Dept. of Treasury, 489 U. S. 803, 809 (1989). "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." National Assn. of Home Builders v. Defenders of Wildlife, 551 U. S. 644, 666 (2007) (internal quotation marks omitted); see Utility Air Regulatory Group v. EPA, 573 U. S. 302, 321 (2014) ("[R]easonable statutory interpretation must account for both the specific context in which . . . language is used and the broader context of the statute as a whole" (internal quotation marks omitted)).

*Id.* at *2126.

The Court determined that Congress had provided sufficient guidance to pass the requirements of the non-delegation doctrine. As the Court determined: "By stating its demand for a 'comprehensive' registration system and by defining the 'sex offenders' required to register to include pre-Act offenders, Congress conveyed that the Attorney General had only temporary authority" to designate certain classes of sex offenders for the registration system, meaning that Congress had delegated its authority pursuant to an "intelligible principle" and key limitations and guidance for the Attorney General. *Id.* at *2130.

By contrast, the USTR construction would find that, when it comes to modifying a prior action, Congress acted without providing any "intelligible principle" to govern how that modification authority is to be exercised. Instead, USTR posits that

it can undertake *any* modification, of *any* size, without adhering to *any* of the statutory dictates required to initially implement Section 301 action. This construction suffers from at least four defects under the non-delegation doctrine:

First, as the Supreme Court noted in *Gundy*, the only instances where the Supreme Court has struck down a statute under the non-delegation doctrine is where "Congress had failed to articulate *any* policy or standard to confine discretion." *Id.* at *2129. At least in the case of modification authority, that is exactly what USTR is claiming is the proper construction of the statute. But this argument, in essence, is a plea for the kind of open-ended, no-standards claim of unfettered authority that would make the statute unsupportable under the non-delegation doctrine.

Congress granted USTR broad discretion under section 301(c) but included the restrictions and conditions in 1(A) and 1(B). But under USTR's reading of the statute, it has unbounded power to take new actions as long as it is modifying a previously taken action. This reading of the statute to give USTR unbounded power, subject to none of the requirements elsewhere found in section 301, necessarily means that the "modification" provision (under USTR's reading) lacks any "intelligible principle."

Further, USTR's reading of the statute would undermine the validity of section 301(b). Even if there is an intelligible principle in section 301(b) as to the conditions that initially justify USTR's action ("unreasonable") and how much action

USTR can take, this intelligibility disappears if the previous USTR action can be changed by USTR merely because USTR considers its previous action "no longer appropriate." In other words, if USTR has unbounded discretion later in the process to take whatever action it chooses when it is modifying agency action, then the fact that Congress gave an "intelligible directive" for the initial investigation becomes meaningless, because of the later, unbounded assertion of authority that USTR now asserts is the proper reading of the statute.

In this regard, it also is important to note that for the section 301(a) actions, there are intelligible directives to USTR for revisions to previous actions, as encapsulated in sections 306(a), 306(b)(1), and 306(b)(2)(D). The lack of parallel directives in section 301(b) for the "modification" authority only provides an intelligible directive if "modification" is read to mean a partial termination, as argued by Appellants.

Second, USTR's construction of the statute fails to "read [the words of the statute] in their context and with a view to their place in the overall statutory scheme," as the Supreme Court stated was essential under *Gundy*. *Id.* at *2126. Here, Congress carefully laid out the statutory requirements when it precisely described how USTR should conduct its initial investigations. By doing so, it established, within the overall statute, its procedural concerns through which its delegation of authority to USTR was to be executed. It makes no sense to claim that Congress was

concerned about delegating its authority pursuant to exact statutory standards when USTR was taking initial action, but showed no such concerns when USTR might, just a few months or even weeks later, be modifying its action.

Indeed, consideration of this very case demonstrates how important it is to consider the statutory requirements as a whole. Here, the initial statutory action, which took place pursuant to the exacting procedural standards imposed by Congress when it delegated its authority in this area to USTR, amounted to $50 billion in total targeted trade with China. By contrast, the modification in this action amounted to a collective total seven times greater. If Congress was required to provide an "intelligible standard" and reasonable guidelines for its delegation of authority for the initial action, as it surely must under the longstanding non-delegation doctrine, then it makes no sense to state that this requirement disappears when potentially far more meaningful modification are to occur. Any claim to the contrary not only ignores common sense, but also ignores the admonition of the *Gundy* plurality that the modification provision be viewed within the context of the statute as a whole.

Third, USTR has failed to provide any governing principle that would indicate why Congress would have wanted to place guardrails on USTR action when it *initially implemented* Section 301 action (such as by requiring a USTR investigation and determination that the agency action proportionately addressed the investigated conduct), but then would no longer care about such guardrails when USTR *modified*

those same actions. As shown by this case, it is entirely possible that the modification could be more consequential than the initial action. Indeed, the modification could seemingly employ any of the instruments available in subsections 2411(c)(1)(A) and (B), which further underscores why it would make no sense to state that different standards apply to initial and modification actions.

Therefore, if the non-delegation doctrine requires that Congress provide discernible guiderails to guide its delegation of authority to USTR at the time of the initial decision-making, it would make a mockery of the requirement to state that no such guiderails are needed under the non-delegation doctrine when USTR is modifying its initial action. Any such modification raises the same concerns as arise at the time of the original action and, indeed, may even be more consequential than the initial action being modified.

Fourth, because modification can be just as—or even more—consequential than the initial action, it is especially important to heed the statutory construction principle. As the dissent noted in *Gundy*, the non-delegation doctrine is important because, "[i]f Congress could pass off its legislative power to the executive branch," then "legislation would risk becoming nothing more than the will of the current President." *Gundy,* 139 S.Ct. at *2135 (Gorsuch, dissenting). As the dissent further noted, a permissible delegation is one where the statute leaves the agency "with only details to dispatch." *Id.* at *2143. Here, however, at least in the case of modifications

under (C), USTR claims that it can proceed, however it wishes, subject only to a self-proclaimed judgment that it has acted "appropriately," including through the claimed authority to engage in a massive increase in the size of its initial proposed measures without going through the same procedural requirements that Congress specifically imposed for all initial action under Section 301. This is not USTR filling in "only details"; it is USTR setting forth a theory that, once it has taken initial action, it can thereafter ignore the very investigative steps that Congress determined were crucial.

In short, the non-delegation doctrine reinforces the statutory arguments raised by Appellants and Amici. Under the non-delegation doctrine, it is plain that Congress needed to provide an "intelligible principle" to guide USTR's discretion, which it plainly did regarding initial USTR action. Because the exact same non-delegation concerns arise when there is a modification of agency action, the same principle should apply for that as well, especially if the statute is read as a whole, as the Supreme Court stated in *Gundy* that it should be when applying the non-delegation doctrine.

All these problems under the non-delegation doctrine can be avoided if the statute is read properly and in accordance with Supreme Court precedent under the non-delegation doctrine. For this reason as well, USTR's unfounded usurpation of authority when it comes to the modification of prior Section 301 action is incorrect.

The CIT's acceptance of this unbridled theory of modification authority is erroneous, and this Court accordingly should reject it.

<div align="center"><u>**CONCLUSION**</u></div>

For the foregoing reasons, the Court should reverse the CIT's judgment and vacate the List 3 and List 4A tariff actions.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ *Gregory Husisian*
David A. Hickerson
Christopher Swift
Jenlain Scott
Counsel to Amici

</div>

July 24, 2023

## <u>ADDENDUM</u>

Professor Raj Bhala
Brenneisen Distinguished Professor
University of Kansas School of Law
Green Hall
1535 W. 15th Street
Lawrence, KS 66045
bhala@ku.edu
(785) 864-9224
https://law.ku.edu/people/raj-bhala

Professor Steve Charnovitz
Associate Professor of Law
George Washington Law School
2000 H Street, NW
Washington, D.C. 20052
scharnovitz@law.gwu.edu
(202) 994-7808
https://www.law.gwu.edu/steve-charnovitz

Professor Timothy Meyer
Richard Allen/Cravath Distinguished Professor in Int'l Business Law
Duke Law School
210 Science Drive
Durham, NC 27708
meyer@law.duke.edu
(919) 613-7014
https://law.duke.edu/fac/meyer/

Alan B. Morrison
Associate Dean
George Washington University Law School
2000 H Street, NW
Washington, D.C. 20052
abmorrison@law.gwu.edu
(202) 994-7120
https://www.law.gwu.edu/alan-b-morrison

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Circuit Rule 32(a). The brief contains 6,896 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman type style.

July 24, 2023                                    */s/ David A. Hickerson*
                                                 David A. Hickerson

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically caused to be filed the foregoing with the Clerk of the Court of the United States Court of the Federal Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.


July 24, 2023                          */s/ David A. Hickerson*
                                       David A. Hickerson