**No. 2023-1891**

## IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____

HMTX INDUSTRIES, LLC, HALSTEAD NEW ENGLAND CORP.,
METROFLOR CORPORATION, JASCO PRODUCTS COMPANY LLC,
*Plaintiffs-Appellants*,

v.

UNITED STATES, OFFICE OF THE UNITED STATES TRADE
REPRESENTATIVE, KATHERINE TAI, U.S. TRADE REPRESENTATIVE,
UNITED STATES CUSTOMS AND BORDER PROTECTION, TROY MILLER,
ACTING COMMISSIONER OF U.S. CUSTOMS AND BORDER
PROTECTION,
*Defendants-Appellees*,

_____

Appeal from the United States Court of International Trade
in No. 1:20-CV-0177-3jp

_____

### BRIEF FOR DEFENDANTS-APPELLEES

OF COUNSEL:

MELISSA N. PATTERSON
JOSHUA M. KOPPEL
  Appellate Staff, Civil Division
  U.S. Department of Justice
  950 Pennsylvania Ave N.W.
  Washington, D.C. 20530

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. MCCARTHY
Director

L. MISHA PREHEIM
Assistant Director

JUSTIN R. MILLER
Attorney-in-Charge,
International Trade Field Office

MEGAN GRIMBALL
PHILIP BUTLER
   Office of the U.S. Trade
   Representative
   600 17th Street N.W.
   Washington, D.C. 20508

VALERIE SORENSEN-CLARK
   Office of the Assistant Chief
   Counsel
   International Trade Litigation
   U.S. Customs and Border Protection
   26 Federal Plaza, Room 258
   New York, NY 10278

ELIZABETH A. SPECK
Senior Trial Counsel

SOSUN BAE
Senior Trial Counsel
   Commercial Litigation Branch
   Civil Division
   U.S. Department of Justice
   P.O. Box 480
   Ben Franklin Station
   Washington, D.C. 20044
   Telephone: (202) 307-0369
   Email:  elizabeth.speck@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASES ................................................ vi

INTRODUCTION ............................................................................... 1

STATEMENT OF THE ISSUES ........................................................ 2

STATEMENT OF THE CASE ........................................................... 2

I.    Statutory Background ................................................................ 2

II.   Factual Background ................................................................... 5

    A.    The Section 301 Investigation And Adoption Of Initial Tariffs ........... 5

    B.    The Initial Tariffs Prove Ineffective And The United States Modifies Them Repeatedly During Negotiations With China ............. 6

        1.    List 3 ............................................................................ 7

        2.    Lists 4A And 4B ......................................................... 10

III.   Proceedings Below .................................................................. 12

SUMMARY OF ARGUMENT ......................................................... 14

STANDARD OF REVIEW .............................................................. 19

ARGUMENT ................................................................................... 19

I.    The President And USTR Properly Exercised Their Modification Authority Under The Trade Act ................................ 19

    A.    The President's Decision To Impose Additional Tariffs Under The Trade Act's Modification Authority Is Subject To Limited Review .............................................. 19

i

B.     Section 307 Authorized The Challenged Modifications To The Initial Trade Action ........................................................28

      1.    The Trial Court Correctly Concluded That Section 307(a)(1)(B) Authorized The Challenged Modifications .........29

      2.    Section 307(a)(1)(C) Independently Authorized The Challenged Modifications ..........................................................35

C.     The Major-Questions Doctrine Does Not Support Plaintiffs' Atextual Reading Of Section 307 .......................................................44

II.     USTR Did Not Violate The APA's Procedural Requirements ....................46

A.     The APA's Foreign-Affairs Exception Applies ...................................47

B.     USTR's Explanations On Remand Complied With The APA ...........54

      1.    USTR Appropriately Provided Additional Detail Of Its Contemporaneous Reasoning....................................................54

      2.    USTR More Than Satisfied Any Obligation To Respond To Comments On Remand........................................................57

C.     The Trial Court Recognized That Vacating The Tariff Modifications Would Be An Inappropriate Remedy ..........................62

CONCLUSION ....................................................63

# TABLE OF AUTHORITIES

Cases

*Alpharma, Inc. v. Leavitt*,
  460 F.3d 1 (D.C. Cir. 2006)..................................................................56

*Am. Ass'n of Exps. & Imps. v. United States*,
  751 F.2d 1239 (Fed. Cir. 1985) ................................................... passim

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023) .......................................................................44

*Bloomberg L.P. v. SEC*,
  45 F.4th 462 (D.C. Cir. 2022) .............................................................57

*Chamber of Com. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996).............................................................27

*City of New York v. Permanent Mission of India to United Nations*,
  618 F.3d 172 (2d Cir. 2010) ......................................................... 48, 52

*Corus Grp. PLC v. Int'l Trade Comm'n*,
  352 F.3d 1351 (Fed. Cir. 2003) ...........................................................23

*Dalton v. Specter*,
  511 U.S. 462 (1994) ............................................................. 20, 24, 26

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020) ................................................................ passim

*Downhole Pipe & Equip., L.P. v. United States*,
  776 F.3d 1369 (Fed. Cir. 2015) ...........................................................58

*Env't Health Tr. v. FCC*,
  9 F.4th 893 (D.C. Cir. 2021) ...............................................................57

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
  426 U.S. 548 (1976) ...........................................................................43

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ...........................................................................19

*Int'l Bhd. of Teamsters v. Peña*,
    17 F.3d 1478 (D.C. Cir. 1994)..............................................................48

*Maple Leaf Fish Co. v. United States*,
    762 F.2d 86 (Fed. Cir. 1985) ...............................................................24

*Michael Simon Design, Inc. v. United States*,
    609 F.3d 1335 (Fed. Cir. 2010) ..........................................................19

*Motions Sys. Corp. v. Bush*,
    437 F.3d 1356 (Fed. Cir. 2006) .................................................. 19, 22

*Nan Ya Plastics Corp., Ltd. v. United States*,
    810 F.3d 1333 (Fed. Cir. 2016) ..........................................................19

*Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*,
    921 F.3d 1102 (D.C. Cir. 2019)...........................................................47

*Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*,
    260 F.3d 1365 (Fed. Cir. 2001) ..........................................................62

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
    139 S. Ct. 1881 (2019) .......................................................................35

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ...............................................................................51

*Pub. Citizen v. USTR*,
    5 F.3d 549 (D.C. Cir. 1993)......................................................... 26, 27

*Sherley v. Sebelius*,
    689 F.3d 776 (D.C. Cir. 2012)............................................................27

*Silfab Solar, Inc. v. United States*,
    892 F.3d 1340 (Fed. Cir. 2018) ..........................................................23

*Solar Energy Indus. Ass'n v. United States*,
    86 F.4th 885 (Fed. Cir. 2023) ............................................. 20, 23, 38

*United States v. Curtiss-Wright Exp. Corp.*,
    299 U.S. 304 (1936) ...........................................................................43

*United States v. Palomar-Santiago*,
　141 S. Ct. 1615 (2021) .......................................................................42

*USP Holdings, Inc. v. United States*,
　36 F.4th 1359 (Fed. Cir. 2022) ................................................. passim

*West Virginia* v. *EPA*,
　142 S. Ct. 2587 (2022) ......................................................... 44, 45, 46

<u>Statutes</u>

5 U.S.C. § 553 ................................................................................ passim

5 U.S.C. § 701 .....................................................................................44

19 U.S.C. § 2171 ...................................................................................2

19 U.S.C. § 2411 ........................................................................... passim

19 U.S.C. § 2412 ........................................................................ 3, 4, 28

19 U.S.C. § 2414 ........................................................................... passim

19 U.S.C. § 2417 ........................................................................... passim

Omnibus Foreign Trade and Competitiveness Act of 1988,
　Pub. L. No. 100-418, 102 Stat. 1107 (Trade Act of 1988) ............................ 4

<u>Other Authorities</u>

H.R. Rep. No. 69-1980 (1946) ............................................................. 47

H.R. Rep. No. 100-40, pt. 1 (1987) ...................................................... 36

# STATEMENT OF RELATED CASES

Pursuant to Rule 47.5, undersigned counsel for the Government states that plaintiffs' appeal challenges the third and fourth rounds of tariffs (the List 3 and List 4A tariffs) that were imposed on merchandise imported from China pursuant to Section 301 of the Trade Act of 1974 (Trade Act), 19 U.S.C. § 2411, *et seq.* The Government understands that over 4,100 similar actions have been filed in the United States Court of International Trade (trial court) challenging the List 3 and 4A tariff actions.

The trial court ordered that plaintiffs' case, CIT No. 20-0cv-00177 would serve as the sample case for purposes of the trial court's initial consideration and resolution of the issues.  Merits briefing and the trial court's opinions were docketed under CIT No. 21-cv-0052, which was designated as the master case.  All other cases were stayed pending the resolution of this case.  Given the large number of other pending cases it would not be practicable to provide the case information for the more than 4,100 other separate cases.

# **INTRODUCTION**

The 1974 Trade Act grants the Executive Branch broad power to respond to foreign governments' unreasonable or discriminatory policies burdening United States commerce. The Act permits the United States Trade Representative (USTR), after conducting an investigation and subject to the President's direction, to impose tariffs on a foreign country's goods to combat such practices. The Act allows later modification of that tariff action through procedures considerably more abbreviated than are required for a new tariff action.

In 2018, following the requisite investigation, USTR found that the Chinese government had a wide-ranging strategy to acquire U.S. technology through unfair practices. To achieve the Trade Act's goal of eliminating such practices, the President directed USTR to impose tariffs on $50 billion worth of imports from China. China then doubled down on its objectionable practices, seeking to maintain them by imposing defensive tariffs on U.S. goods. Instead of ceding to such pressure to abandon U.S. efforts to eliminate China's unfair practices, the President and USTR increased the United States' tariff action several times during fast-moving negotiations between the countries—always with the goal of stopping the investigated practices.

Plaintiffs here challenge those increases to the United States' original tariff action, which are embodied in two documents called Lists 3 and 4A. They do not

assert that the Government lacked authority to impose higher tariffs; instead, they contend only that it used the wrong procedures in promulgating these lists. Plaintiffs principally argue that the President and USTR could not use their express statutory authority to modify the existing tariff action once it proved inadequate. On plaintiffs' view, the President and USTR were obliged to start the tariff-imposition process over with a new investigation—a process that could have taken up to a year—before they were able to adjust the United States' response to China's continued unfair trade practices. This appeal concerns whether the Court of International Trade correctly rejected that and other procedural challenges.

## STATEMENT OF THE ISSUES

1. Whether the Trade Act permitted the President and USTR to modify an existing tariff action against China instead of starting the tariff-imposition process anew.

2. Whether in promulgating tariff modifications, USTR complied with any applicable Administrative Procedure Act (APA) requirements.

## STATEMENT OF THE CASE

### I.    Statutory Background

Congress has granted USTR authority to develop and implement the nation's trade policy. 19 U.S.C. § 2171(a), (c)(1)(A), (C)-(D). Section 301 of the 1974 Trade Act empowers USTR, "subject to the specific direction, if any, of the

President," to respond to unfair foreign-trade practices. *See* 19 U.S.C. § 2411. Section 301 provides "a negotiating tool . . . to obtain the elimination of . . . unjustifiable, unreasonable, or discriminatory foreign practices." S. Rep. No. 100-71, at 73 (1987).

In Section 301(a), Congress specified when a USTR action responding to foreign trade practices is "[m]andatory." 19 U.S.C. § 2411(a)(1). In Section 301(b), Congress identified other instances in which USTR action is "[d]iscretionary." *Id.* § 2411(b)(2). Before taking either mandatory or discretionary action under Section 301, USTR must conduct an investigation that allows for public input. *Id.* §§ 2412, 2413, 2414. If, following that investigation, USTR determines that "an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce" and that "action by the United States is appropriate," its discretionary powers are triggered, and USTR may "take all appropriate and feasible action … to obtain the elimination of that act, policy or practice," subject to the President's directions. *Id.* § 2411(b)(1)-(2). Among other actions, the Act authorizes USTR to "impose duties or other import restrictions on the goods of, and . . . fees or restrictions on the services of" a foreign country. *Id.* § 2411(c)(1)(B). USTR may take an initial action under Section 301 only after the months-long investigatory and consultation

3

procedures set out in Sections 302, 303, and 304 of the Act.  19 U.S.C. §§ 2412, 2413, and 2414.

By the late 1980s, despite twice amending the Trade Act to strengthen it, Congress remained frustrated by Presidential inaction.  *See* S. Rep. No. 100-71, at 73-74 (1987) ("Too often U.S. Presidents have opted to do nothing in the face of provocative foreign trade barriers and trade-distorting practices.").  Congress amended the Act again in 1988, adding Section 307, which gave USTR express authority to "modify or terminate a Section 301 action" at any time if certain conditions were met, once again "subject to the specific direction, if any, of the President."  Omnibus Foreign Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1301(a), 102 Stat. 1107, 1174 (Trade Act of 1988).  Specifically, Congress created authority to "modify or terminate any action" taken under Section 301 if:  (1) "the burden or restriction on United States commerce . . . of the acts, policies, and practices[] that are the subject of such action has increased or decreased," 19 U.S.C. § 2417(a)(1)(B); or (2) the action is a discretionary one taken under Section 301(b) and is "no longer appropriate," *id*. § 2417(a)(1)(C).  To modify an existing tariff action, USTR need only comply with Section 307's streamlined procedures.  19 U.S.C. § 2417(a)(2).

II.    **Factual Background**

A.    **The Section 301 Investigation And Adoption Of Initial Tariffs**

In August 2017, USTR initiated an investigation of the Chinese government's policies and practices concerning "the transfer of U.S. and other foreign technologies and intellectual property." Appx01540. USTR recognized that such conduct took many forms and identified specific areas to investigate, including China's use of administrative-approval processes to pressure the transfer of U.S. technologies and intellectual property, policies depriving U.S. companies of the ability to set market-based terms related to technology, systematic acquisitions to obtain cutting-edge technologies, and unauthorized intrusions into U.S. commercial networks. Appx01557, Appx01540-01541. In addition to such specific practices, USTR examined the Chinese government's "top-down national strategy" for acquiring technology, which included a "variety of tools," like threats of retaliation that had "enabled China's technology transfer regime to persist for more than a decade." Appx01557, Appx01563 Appx01573.

USTR's investigation lasted approximately eight months, with its findings released in March 2018. Appx01548-01734. Based on that investigation, USTR determined that China's policies and practices relating to acquiring foreign technology were unreasonable or discriminatory and caused billions of dollars in harm to the U.S. economy. Appx01771; *see also* Appx01569-01570. In April

2018, in accordance with the President's specific direction, USTR determined the investigated practices were actionable under Section 301(b), and proposed a 25% tariff action covering $50 billion of Chinese goods identified on "List 1" and "List 2" (specified by product subheadings from the Harmonized Tariff Schedule (HTS) of the United States). Appx01771, Appx01761-01765, Appx01870-01871, Appx01877.[1] USTR determined that such tariffs were at that point "appropriate . . . to obtain elimination of China's harmful acts, policies, and practices." Appx01771. In May 2018, the President directed USTR to announce final lists by June 2018. Appx01870, Appx01877.

## B. The Initial Tariffs Prove Ineffective And The United States Modifies Them Repeatedly During Negotiations With China

The initial $50 billion tariff action in June and August of 2018 did not prompt China to change the practices uncovered in USTR's investigation. Instead, China rapidly retaliated to protect those practices, kicking off an approximately 18-month period during which the United States engaged China in intense negotiations with the goal of eliminating China's investigated technology-related practices. *E.g.*, Appx09153. During this period, the United States repeatedly recalibrated its tariff action to advance that goal amidst the rapidly changing

---

[1] The HTS governs the classification of merchandise imported into the United States. It is organized by headings, each of which has one or more subheadings that provide more specificity.

6

diplomatic landscape.  By January 2020, the President and USTR had issued seven modifications both escalating and deescalating that action—resulting in the current Lists 3 and 4A tariffs—and secured a "Phase One" trade agreement with China requiring certain reforms.

### 1. List 3

In June 2018, when the United States' initial $50 billion tariff went into effect, China announced tariffs on $50 billion worth of U.S. exports.  Appx01872, Appx01924.  Thus, the President determined China had no current "intention of changing its unfair practices related to the acquisition of American intellectual property and technology," and within days he "directed [USTR] to identify $200 billion worth of Chinese goods for additional tariffs at a rate of 10 percent." Appx01872.  These tariffs were to take effect "[i]f China refuses to change its practices" with respect to technology and innovation, and "insists on going forward with [its] new tariffs."  Appx01872.

Thus, in July 2018, USTR proposed to use Section 307 to modify its original trade action to the levels the President directed, identifying $200 billion of Chinese goods ("List 3") for additional tariffs.  Appx01925.  USTR explained that "[i]n light of China's response . . . it has become apparent that U.S. action at th[e original] level is not sufficient to obtain the elimination of China's acts, policies, and practices covered in the investigation."  Appx01925.  USTR elaborated that

the $200 billion modification "is appropriate in light of the statutory goal of obtaining the elimination of the acts, policies, and practices covered in the investigation," given that "China has shown that it will not respond to action at a $50 billion level."  Appx01925.  USTR sought public comment and set a public hearing.  Appx1925.  When the President directed and USTR announced a possible increase of the proposed tariffs from 10% to 25% in early August 2018, the public-comment period was extended.  Appx02153-02154.

On September 17, 2018, the President released a statement that "following seven weeks of public notice, hearings, and extensive opportunities for comment, I directed [USTR] to proceed with placing additional tariffs on roughly $200 billion of imports from China."  Appx06159.  The President explained that despite multiple opportunities, "so far, China has been unwilling to change its practices" relating to U.S. technology and intellectual property.  Appx06159.  The President further directed a two-phase implementation, starting at 10% in September 2018, rising to 25% at year's end, Appx06159, and USTR accordingly published a final notice of the two-phase List 3 tariffs.  Appx06172-06173.  In response to public comments and testimony, however, USTR decided to omit "certain tariff subheadings" earlier proposed, while maintaining the trade value of the action as directed by the President.  Appx06173.

In promulgating List 3, USTR explained that two separate Trade Act provisions authorized modifying the original tariff actions:  Section 307(a)(1)(B) and Section 307(a)(1)(C).  Appx06172-06173.  With respect to Section 307(a)(1)(B), USTR explained that the burden on U.S. commerce caused by the investigated Chinese practices "continues to increase, including following the one-year investigation period."  Appx06172.  USTR explained that China's policies included not only the initial acts that were the main subject of the Section 301 investigation, but also "subsequent defensive actions taken to maintain those policies," including China's retaliatory tariffs.  Appx06172; *see also* Appx05918-05926.

USTR also invoked Section 307(a)(1)(C)'s authorization to modify a discretionary trade action that "is no longer appropriate."  Appx06172 (quoting 19 U.S.C. § 2417(a)(1)(C)).  USTR explained that China's defensive-tariff response had "shown that the current action no longer is appropriate," observing that China had clearly indicated that it "will not change its policies in response to the current Section 301 action."  Appx06173.

Following the imposition of the List 3 tariffs, USTR and China engaged in negotiations.  Appx06474.  Given perceived progress in those negotiations, in December 2018, the President directed and USTR announced delays in the increase to a 25% tariff while the parties attempted to "reach an agreement."

9

Appx06474; *see* Appx06461-06462; Appx6483-6484; *see also* Appx06465-06471; Appx06476-06481.  By May 9, 2019, however, the diplomatic situation had changed:  the President directed and USTR announced the 25% tariff to take effect the next day.  Appx06496-06497.

### 2. <u>Lists 4A And 4B</u>

As U.S. negotiations with China continued, China not only "retreated from specific commitments made in previous rounds" of talks, but it also "announced further retaliatory action against U.S. commerce."  Appx06504.  Thus, while "[t]he United States and China intend to continue further discussions," in May 2019, the President directed and USTR proposed another modification to "the action being taken in this investigation."  Appx06504.  The proposed modification, as directed by the President, was up to a 25% tariff on an additional $300 billion of Chinese products (List 4).  Appx06504.  Specifically, USTR explained that this modification was necessary "[i]n light of China's failure to meaningfully address the acts, policies, and practices that are subject to this investigation and its response to the current action being taken."  Appx06504.  USTR provided a 30-day public-comment period and held a seven-day public hearing.  Appx06505; Appx09153.

In July 2019, the countries held more meetings, at which "China remained unwilling to" honor its earlier-negotiated commitments.  Appx09154.  Against this

backdrop, in August 2019, the President directed an additional 10% (not the proposed 25%) duty on a subset of the proposed List 4 subheadings.  Appx09154; Appx08972-08984.  Taking into account public feedback, USTR removed some tariff subheadings, and per the President's directions, created Lists 4A and 4B "with different effective dates," to go into effect September 2019 and December 2019.  Appx9154; Appx8975-8977.

In promulgating Lists 4A and 4B in August 2019, USTR again explained that both Section 307(a)(1)(B) and Section 307(a)(1)(C) authorized these modifications.  Appx09153-09154.  It observed the increased harm from the "practices that are the subject of the Section 301 action," and found that China's actions during the ongoing negotiations had shown that "the current [level of] action no longer is appropriate" to the goal of eliminating the investigated Chinese practices.  Appx09153-09154; *see also* Appx08973-08975.

China responded quickly to USTR's August 2019 notice; it imposed "further tariffs on U.S. goods, starting September 1, 2019," another move "to further protect the unreasonable acts, policies, and practices identified in the investigation, resulting in increased harm to the U.S. economy."  Appx09339.  Accordingly, the President and USTR responded quickly too; in late August 2019, at the President's direction, USTR increased the List 4 tariffs to 15%, a figure within the earlier proposed 25% range.  Appx09338-09340; *see* Appx09322-09335.  Again, USTR

used its modification authority under both Section 307(a)(1)(B) and Section 307(a)(1)(C), explaining why previous actions were proving "not effective in obtaining the elimination" of the investigated trade practices.  Appx09339.

In December 2019, "following months of negotiations, the United States and China reached . . . a Phase One trade deal" requiring China to undertake "structural reforms" to address the issues identified in the Section 301 investigation.  Appx09560.  Based upon such progress, the President and USTR indefinitely suspended the additional 15% tariffs on List 4B goods, finding them "no longer appropriate."  Appx09560; *see* Appx09549-09555.  After the Phase One agreement was signed in January 2020, the President directed and USTR implemented a reduction in the tariffs on List 4A goods to 7.5%.  Appx09571; *see* Appx09562-09569.

## III.    **Proceedings Below**

In September 2020, well after the modified tariffs had gone into effect, plaintiffs filed suit challenging List 3 and 4A as procedurally unlawful.  The action was designated a "master" case among the approximately 4,000 cases raising similar issues.  Appx00003-00029.

In April 2022, the trial court rejected plaintiffs' primary claim that USTR violated the Trade Act's processes, concluding that "USTR exercised its authority consistent with Section 307(a)(1)(B) when it promulgated List 3 and List 4A."

Appx00070.  The court explained that "China directly connected its retaliation to the U.S. action and to its own acts, policies, and practices that the U.S. action was designed to eliminate."  Appx00065.  The court did not address whether USTR's actions were also authorized under Section 307(a)(1)(C).  Appx00070.  The court further rejected most of plaintiffs' APA claims, but issued a limited remand to USTR (while retaining jurisdiction) for further proceedings based on its conclusion that USTR had not adequately responded to public comments.  Appx00086.

In August 2022, USTR filed a 90-page determination on remand. Appx10570-10659.  It responded more fully to categories of comments identified by the trial court and further explained how it had considered the factors (including Presidential direction) set out in the Trade Act.  Appx10570-10659.

In March 2023, the trial court sustained USTR's further explanation. Appx00003-00029.  It rejected plaintiffs' contention that USTR's responses to comments were impermissibly *post hoc*.  The court explained that under *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020), USTR could provide a more "expansive" explanation regarding its previously articulated bases and that USTR had not offered "new determinative reasons for its actions."  Appx00013-00014.  The court also found that USTR had responded meaningfully to major comments, Appx00017-00028, and that USTR had adequately explained the role of Presidential direction and its own role in

13

implementing that direction through "the construction" of Lists 3 and 4A. Appx00018.  Plaintiffs appealed.

## SUMMARY OF ARGUMENT

During the 18 months following the United States' imposition of tariffs on $50 billion of imported Chinese goods, the diplomatic landscape shifted swiftly, dramatically, and repeatedly as the two countries engaged in bilateral trade negotiations while taking unilateral trade actions.  Given these rapidly evolving developments, it became clear to the President and USTR that the United States' initial tariff action was inadequate to achieve its goal of eliminating China's objectionable, technology-related practices, and so they took quick action to increase it several times through Lists 3 and 4A in a continuing effort to achieve that goal.

Plaintiffs now ask this Court to vacate those tariff actions—which cover hundreds of billions of dollars in imported goods and are of enormous consequence to the United States' foreign relations—on the theory that the President and USTR used the wrong statutory procedures to increase the tariff levels.  Plaintiffs insist that the Trade Act's express provisions in Section 307 authorizing modifications to existing tariff actions through abbreviated processes were inapplicable.  Instead, they urge a narrow and atextual reading of those provisions that would have required the President and USTR to start the months-long process under Section

14

301 to impose a whole *new* tariff action—complete with a new investigation—if the Executive Branch wanted to increase tariff levels to further its continuing efforts to eliminate China's unfair trade policies amidst ongoing negotiations and rapidly changing circumstances. And even should the Court decline to accept their startling circumscription of the Trade Act's modification authorities, plaintiffs seek vacatur of the Lists 3 and 4A tariffs on the ground that the USTR's 90-page order amplifying its rationales for those lists was inconsistent with the agency's responsibilities under the APA. Plaintiffs' arguments fail at every level; this Court should affirm the judgment below.

**I.A.** As an initial matter, this Court should engage in only limited review of plaintiffs' Trade Act claims, because those claims go to the President's—not USTR's—decisions. Plaintiffs entirely ignore the President's role both under the Trade Act and in the imposition of the challenged tariffs. Sections 301 and 307 of the Act make the USTR's tariff decisions "subject to the specific direction, if any, of the President regarding" the trade action to be taken or modified. 19 U.S.C. §§ 2411(b)(2), 2417(a)(1). The President issued such direction, which was binding on USTR, regarding the challenged tariffs here. Thus, to the extent that plaintiffs challenge the amount and scope of the tariffs that the President directed USTR to impose, that discretionary decision is unreviewable presidential action. While plaintiffs may challenge the President's direction contemplating a Section 307

tariff modification rather than a new Section 301 investigation, even that Presidential decision is entitled to substantial deference and is reviewable only for a "clear misconstruction" of the statute, which plaintiffs certainly cannot establish. This Court should affirm the judgment regarding plaintiffs' Trade Act claim on that basis alone.

**B.** Under any standard of review, however, two different provisions in Section 307 authorized the tariff modifications. In contrast with a new Section 301 action, Section 307 permits tariff modifications using streamlined processes, an important feature during diplomatic exchanges requiring changes within days, not months.

**1.** The trial court correctly concluded that Section 307(a)(1)(B) authorized USTR to impose additional tariffs. In increasing the tariffs, USTR explained that Section 307(a)(1)(B) authorized such a modification because "the burden or restriction on United States commerce of the acts, policies, and practices that are the subject of the Section 301 action [against China] continues to increase." Appx06172. Plaintiffs' attempt to limit the practices forming "the subject" of an existing tariff action to foreign conduct predating the initial action cannot be reconciled with the statutory text, which contemplates post-action changes. And plaintiffs mistake the scope of the original tariff action and investigation here,

which encompassed all of China's conduct related to its technology-related practices, including retaliatory efforts to protect those practices.

**2.** Section 307(a)(1)(C) independently authorized the tariff increases, authorizing modification of a discretionary Section 301 action that is "no longer appropriate." When the Executive Branch determined that its original, $50 billion action would not cause China to cease its unreasonable practices, that action was no longer "appropriate." Using Section 301(a)(1)(C)'s modification authority, the President and USTR recalibrated the tariffs so they were once more appropriate, in light of changed circumstances, to advance the statutory goal of eliminating China's unfair practices. Plaintiffs' assertion that Section 307(a)(1)'s authorization to "*modify* or terminate" a tariff must be interpreted in subsection (C) as "*decrease* or terminate" defies basic principles of statutory interpretation, cannot be reconciled with the statute's purpose or history, creates perverse incentives to avoid measured trade actions, and introduces temporal anomalies into the Act's operation. And plaintiffs' contention that the Government's interpretation would yield "unlimited" Section 307 authority ignores that a Section 307 modification is bound by the same limits as an original Section 301 action.

**C.** The major-questions doctrine is irrelevant here. The imposition of tariffs on goods from a foreign country is manifestly within the substantive scope of the President's and USTR's power under the Trade Act. Plaintiffs do not dispute that

the Act permits later modifications of those tariffs, nor do they contend it contains some unstated dollar limit on the Executive Branch's tariff authority. The only question here is whether the modifications had to be effectuated through Section 301's processes rather than 307's, a dispute that does not implicate any transformative expansion of agency authority triggering a major-questions inquiry.

**II.** USTR's implementation of the tariffs directed by the President complied with all applicable procedural requirements under Section 307, and the modification actions were not subject to the APA's rulemaking requirements, which do not apply where a "foreign affairs function" is "involved." 5 U.S.C. § 553(a)(1). A decision to impose tariffs in response to a determination that a foreign country is harming the United States directly involves quintessential foreign-affairs functions.

Even assuming that the APA's rulemaking requirements did apply, however, USTR satisfied them by responding to comments on remand. USTR expanded on its prior reasoning, explaining more fully both how it had constructed the challenged Lists and the role that the President's direction played in its tariff-modification actions. And the trial court's decision to remand for further explanation without taking the massively disruptive step of vacating Lists 3 and 4A was well within the discretion this Court has afforded lower courts.

## STANDARD OF REVIEW

This Court "review[s] the decisions of the [Court of International Trade] de novo," while "giv[ing] great weight to the informed opinion of" that court. *Nan Ya Plastics Corp., Ltd. v. United States*, 810 F.3d 1333, 1341 (Fed. Cir. 2016).

## ARGUMENT

I. **The President And USTR Properly Exercised Their Modification Authority Under The Trade Act**

A. **The President's Decision To Impose Additional Tariffs Under The Trade Act's Modification Authority Is Subject To Limited Review**

**1.** As an initial matter, to the extent plaintiffs challenge the decision to increase the tariffs on Chinese goods beyond the initial $50 billion level—rather than challenging just the procedures used to do so—they target discretionary presidential actions beyond this Court's review. It is well established that the President is not an "agency" within the meaning of the APA, and, therefore, "the President's actions . . . are not reviewable" under that statute. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992); *see also Michael Simon Design, Inc. v. United States*, 609 F.3d 1335, 1340 (Fed. Cir. 2010) (holding that "the President's act of proclaiming modifications" to tariff schedule was not reviewable under the APA); *Motions Sys. Corp. v. Bush*, 437 F.3d 1356, 1359 (Fed. Cir. 2006) (en banc) (per curiam) (holding there was "[n]o right of judicial review" of the President's action denying import relief under the Trade Act).

While "the President's actions may still be reviewed for constitutionality," a "claim that the President exceeded his authority" under a statute "is not a constitutional claim, but a statutory one." *Dalton v. Specter*, 511 U.S. 462, 469, 476-77 (1994) (citation omitted).  And "assum[ing] for the sake of argument that some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA, . . . such review is not available when the statute in question commits the decision to the discretion of the President." *Id.* at 474.  As this Court has explained, where a statute "grants the President discretion, how he chooses to exercise the discretion Congress has granted him is not a matter for [the Court's] review." *USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1369 (Fed. Cir. 2022) (citation omitted); *see Solar Energy Indus. Ass'n v. United States*, 86 F.4th 885, 894 (Fed. Cir. 2023) (the President's "findings of fact and the motivations for his action are not subject to review") (citation omitted).

Plaintiffs take aim at the decisions to impose the tariffs at the levels reflected in Lists 3 and 4A, attributing them to USTR and ignoring the President's role. They quarrel with what they deem "USTR retaliat[ion] in extreme fashion: first imposing 10% tariffs (later increased to 25%) on an additional $200 billion in Chinese imports . . . and then imposing tariffs of 7.5% on approximately $120

billion more." Br. 3-4;[2] *see, id.* at 3 (asserting that modifications were unlawful because "Congress nowhere gave USTR the vast power to engage in an open-ended trade war"); *id.* at 4 (arguing the Lists 3 and 4A modifications were imposed "without Congressional action or imprimatur" because "USTR multiplied more than *seven-fold* the Section 301 tariff response originally deemed 'appropriate'"); *id.* at 32 (contending that "USTR exceeded its authority under Section 307 . . . when it imposed . . . tariffs on Chinese goods worth hundreds of billions of dollars—an amount orders of magnitude greater than the original $50 billion Section 301 action"); Br. 33-34 (arguing that Lists 3 and 4A were too big to qualify as modifications of the original action).

Those decisions, however, were the President's, because once directed by the President, USTR did not have discretion to act otherwise. Sections 301(b) and 307(a)(1) of the Trade Act provide that USTR may impose or modify a Section 301 trade action "subject to the specific direction, if any, of the President." 19 U.S.C. §§ 2411(b)(2), 2417(a)(1). The statute thus requires USTR to implement any "specific direction" from the President when taking action, and USTR may act on its own only insofar as the President has not issued a relevant direction. Here, the President specifically directed USTR to set certain levels of tariffs on a certain

---

[2] We refer to appellants' brief as "Br." and the amici's briefs as: (1) ECF No. 33, "Professor Br."; (2) ECF No. 21, "Sports Br."; (3) ECF No. 24, "Kenda Br."; and (4) ECF No. 14, "Retail Br."

amount of Chinese goods. *See* Appx10578-10591, Appx01872, Appx06159-06160, Appx06172-06173, Appx09153-09154. USTR was obligated to impose tariffs at the specified level and on the specified quantity of goods. *See, e.g.*, Appx10596-10597 (explaining USTR could remove "only a limited number of subheadings" from the Lists given the need to "maintain the $250 billion aggregate level of trade . . . covered by additional duties directed by the President"). In exercising its statutory authority, USTR was left to decide how to implement those tariffs, and such agency choices could be subject to APA review. But plaintiffs do not challenge the particulars of Lists 3 and 4A that USTR created to effectuate the President's instructions. Rather, they take aim at the level and quantity of tariffs required by the President, which were not subject to change by USTR once the President directed that such tariffs should go into effect.

Not only are the level and quantity of the challenged tariffs the result of the President's decisions, they are matters on which the Trade Act gives the President wide discretion. The Act permits the President to issue "specific direction" to USTR regarding "any" "appropriate and feasible action authorized under" Section 301(c). 19 U.S.C. § 2411(b)(2); *see id.* § 2417(a)(1). Presidential actions under such open-ended authority are "sufficiently discretionary to preclude judicial review." *Motions Sys. Corp.*, 437 F.3d at 1361-62 (finding such sufficient discretion despite statutory requirement that the President determine "that

provision of [import] relief is not in the national economic interest of the United States or . . . that the taking of action . . . would cause serious harm to the national security of the United States") (alterations in original) (citation omitted). Accordingly, this Court should decline to review any attack on the President's discretionary decisions to direct USTR to impose tariffs at the level and scope set out in Lists 3 and 4A.

**2.**  Insofar as plaintiffs challenge not the level or quantity of the tariffs, but whether the President used the right Trade Act procedures to implement them, this Court has held that review of such claims "is available to determine whether the President 'clear[ly] misconstru[ed]' his statutory authority," but that "the scope of this review is limited." *USP Holdings*, 36 F.4th at 1365-66 & n.3 (alterations in original) (first citing *Corus Grp. PLC v. Int'l Trade Comm'n*, 352 F.3d 1351, 1356 (Fed. Cir. 2003); then citing *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1346 (Fed. Cir. 2018)).  When reviewing whether "presidential action in the context of foreign affairs" complies with statutory procedures, the Court does not "decide whether the government's interpretation of the statute is correct or how [it] would have construed the statute as an original matter," but only "whether the President's interpretation, . . . is a clear misconstruction of the statute." *Solar Energy*, 86 F.4th at 895; *see Silfab Solar*, 892 F.3d at 1346 ("[T]here are limited

circumstances when a presidential action may be set aside if the President acts beyond his statutory authority, but such relief is only rarely available.").[3]

Just as it was the President whose directions determined the scope of the challenged tariffs, it was the President whose subsequent directions contemplated a modification to the existing 301 action rather than a new 301 investigation. *Compare* Appx01538 (presidential instructions to USTR to determine whether to investigate China's practices before any Section 301 action), *with* Appx01872 (presidential direction to USTR to "identify $200 billion worth of Chinese goods for additional tariffs" for List 3), Appx01925 (presidential direction to USTR "to identify $200 billion worth of Chinese goods for additional tariffs at a rate of 10 percent" in advance of the List 3 modifications), Appx06159-06160 (directing the imposition of List 3 modifications), Appx06172-06173 (reflecting that the List 3 modifications were based on presidential directives), Appx05929 (determination reflecting that List 3 modifications were made based upon presidential direction),

---

[3] *Maple Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed. Cir. 1985) was decided before the Supreme Court held in *Franklin* that the President's actions cannot be reviewed under the APA; the continuing vitality of cases permitting even narrow review of presidential action is thus debatable. Subsequently, in *Dalton*, the Supreme Court has only "assume[d] for the sake of argument that some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA" and rejected a nonstatutory challenge to a presidential decision. 511 U.S. at 474. Defendants preserve for further review the question whether nonstatutory review is available for claims that the President's actions violated a statute.

Appx05918-05926 (reflecting the presidential directive), Appx10587-10588

(reflecting that List 4 modifications were made at the President's direction),

Appx06504 (explaining that "in accordance with the direction of the President, the

Trade Representative proposes to modify the action being taken in this

investigation," in advance of List 4 modifications), Appx09153 (announcing List 4

modification and explaining it was made "[i]n accordance with the specific

direction of the President"), *and* Appx08972-08984 (reflecting that List 4

modifications were made "[a]t the direction of the President").  As discussed

below, plaintiffs' interpretation of Section 307's modification authority is incorrect

under any standard of review.  But the *President's* interpretation and application of

his Section 307 authority is not subject to plenary review for any legal error; it may

only be reviewed in a "limited" fashion for "a *clear* misconstruction of the

governing statute."  *USP Holdings, Inc.*, 36 F.4th at 1366 n.3 (emphasis added)

(citation omitted).  That deferential review is fatal to plaintiffs' invitation to

second-guess the President's use of his authority to direct USTR to modify the

initial tariff action.  Plaintiffs' novel interpretation of Section 307 hardly

establishes that the President clearly misconstrued the statutory language—

language that the trial court found authorized the challenged modifications.  This

Court need only decide that much to affirm the judgment regarding plaintiffs'

Trade Act claims.

**3.** The trial court failed to limit review of the President's decisions to modify the tariffs under Section 307 because it attached undue consequence to the USTR's implementation of those decisions.  The court considered this Court's cases regarding presidential action applicable only where the President takes the final step necessary for the action directly affecting parties.  Appx00048-00049.  But almost every presidential decision must be carried out by some other person or agency in the Executive Branch.  In *Dalton*, for example, plaintiffs "sought to enjoin the Secretary of Defense . . . from carrying out a decision by the President to close" a shipyard.  511 U.S. at 464.  The Supreme Court nonetheless held the relevant action was the President's, and thus unreviewable under the APA.  *Id.* at 469-70.  It did not matter that the Secretary of Defense was the individual charged by statute with closing the base.  *See id.* at 465.  Here too, it is of no consequence that USTR is charged with carrying out the President's directive under Section 307.  Rather, "[w]hat is crucial is the fact that the President, not the [USTR], t[ook] the final action that affects" the tariff levels, leaving USTR only to settle the details of implementing the President's order.  *Id.* at 470 (quotation marks and citations omitted).

Nor does *Public Citizen v. USTR*, 5 F.3d 549, 552 (D.C. Cir. 1993), on which the trial court relied, support disregarding the President's role here.  There, the court opined that "*Franklin* is limited to those cases in which the President has

final constitutional or statutory responsibility for the final step necessary for the

agency action directly to affect the parties," and thus concluded that antecedent

agency action was not reviewable final agency action. *Id.* at 552 (concluding that

the President's discretionary decision to submit trade agreement to Congress was a

final, unreviewable action). Here, "the final step necessary" to impose the

challenged tariffs, *id.* at 552, was the President's direction to do so.

The trial court also erroneously compared this case to one in which a court

reviews agency action taken to implement an executive order. Appx00049-00050.

In such cases, the agency exercises its own statutory authority to implement the

President's policy directives. *See Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir.

2012) ("[A]s an agency under the direction of the executive branch, it must

implement the President's policy directives to the extent permitted by law."). 

Agency decisions about how to use authority granted to it—not the President—are

not subject to the limitations on review of presidential actions. *Chamber of Com.

v. Reich*, 74 F.3d 1322, 1331-32 (D.C. Cir. 1996) (distinguishing *Dalton* "where

the claim . . . is that the presidential action" is not "even contemplated by

Congress" and "violates . . . a statute that delegates no [relevant] authority to the

President"). But where, as here, the relevant statute creates a role for the President

to issue binding directions should he choose to, this Court employs only "limited"

review of the President's compliance with that statute. *USP Holdings, Inc.*, 36 F.4th at 1366 n.3.

### B. Section 307 Authorized The Challenged Modifications To The Initial Trade Action

Section 301(b) of the Trade Act authorizes the President and USTR to take an initial trade action, such as imposing tariffs on foreign goods, only upon completion of an investigation. 19 U.S.C. § 2411(b), (c). That investigation involves a panoply of statutory procedures: publication of a Federal Register notice announcing the determination that an investigation should be initiated, consultation with the foreign country whose practices are under investigation, 30 days' notice for public comment, the opportunity for a public hearing, and consultation with statutorily established committees. *See* 19 U.S.C. §§ 2412(b), 2413(a), 2414(b)(1).

In Section 307, Congress afforded the President and USTR authority to "modify" any existing Section 301 action through much simpler procedures—USTR can thus shift its original action to any that would be "appropriate" under Section 301 without undertaking a whole new investigation, after satisfying streamlined consultation and notice requirements, with no minimum timeframes. 19 U.S.C. §§ 2411(b), 2417(a), (b). During the swiftly moving diplomatic events following the initial trade action, the President and USTR properly exercised this modification authority on two independent grounds: Section 307(a)(1)(B)'s

provision allowing modifications based on an increase or decrease in the burdens

on U.S. commerce, and Section 307(a)(1)(C)'s provision permitting modifications

for discretionary Section 301(b) actions that prove "no longer appropriate."

19 U.S.C. § 2417(a)(1)(B), (C).

### 1.     The Trial Court Correctly Concluded That Section 307(a)(1)(B) Authorized The Challenged Modifications

**a.** The trial court correctly held that USTR (acting at the President's

direction) "exercised its authority consistent with Section 307(a)(1)(B)" when it

promulgated Lists 3 and 4A.  Appx00063-00070.  Section 307(a)(1)(B) authorizes

modification of a Section 301 action if "the burden or restriction on United States

commerce . . . of the acts, policies, and practices, that are the subject of such action

has increased or decreased."  19 U.S.C. § 2417(a)(1)(B).  As USTR explained in

announcing each tariff modification challenged here, "the burden or restriction on

United States commerce of the acts, policies, and practices that are the subject of

the Section 301 action [against China] continues to increase."  Appx06172; *see*

Appx09153.

That conclusion is well supported by the record.  Following the required

investigation, USTR determined that various Chinese-government practices

"related to technology transfer, intellectual property, and innovation . . . are

unreasonable or discriminatory and burden or restrict U.S. commerce."

Appx01770-01771.  Accordingly, the President and USTR used their Section

301(b) authority to impose additional tariffs on $50 billion of Chinese goods. Appx01877. With every challenged increase to its Section 301 tariff action, USTR revisited whether Section 307(a)(1)(B)'s conditions were satisfied, concluding each time that there was an increase in harm caused by the unfair Chinese practices USTR had investigated. *See* Appx09153-09154; Appx05918-05926, Appx06159-06160, Appx06172-06173, Appx06486-06494, Appx06496-06497, Appx08972-08978.

In particular, USTR determined that the United States was harmed by China's subsequent defensive measures, such as the $50 billion tariff imposed in response to the United States' initial tariff action. These retaliatory tariffs were connected to the unfair practices that were the "subject" of the United States' Section 301 action and were "taken to maintain those policies." Appx06172. As USTR explained, "China's unfair acts, policies, and practices include[d] not just its specific technology transfer and IP polices referenced in the notice of initiation in the investigation, but also China's subsequent defensive actions," which were designed to get "the United States to drop its efforts to obtain the elimination of China's unfair policies." Appx06172. China's retaliatory tariffs were therefore part and parcel of its practices forming the "subject" of the United States' tariff action, and they resulted "in increased harm to the U.S. economy" beyond that at the time of the initial tariffs. Appx06172.

Examining this record, the trial court correctly concluded that "USTR reasonably considered China's retaliatory actions to be within the purview of the 'subject of the action'" being modified. Appx00066; *see* Appx00065-00070. The court found "that the link between the subject of the original Section 301 action and China's retaliation is plain on its face." Appx00065. China itself "directly connected its retaliation . . . to its own acts, policies, and practices that the U.S. action was designed to eliminate." Appx00065. Accordingly, the court found a "clear connection between the defensive, retaliatory actions and the acts, policies, and practices they seek to defend," such that they were both part of the subject that was the focus of the Section 301 action. Appx00067.

"Beyond [that] clear connection," USTR's investigation underlying the Section 301 action was itself "broadly defined," covering a wide range of China's conduct in support of specific, technology-related practices. Appx00067. USTR described that investigation "as addressing 'China's Acts, Policies, and Practices *Related to* Technology Transfer, Intellectual Property, and Innovation.'" Appx00067 (citing Appx01540). "Thus, the investigation covered China's conduct *related to* the identified matters and not simply . . . the acts *constituting* the identified matters." Appx00067. USTR investigated not just "specific acts" China had taken regarding technology and intellectual property, but also "the historical context in which those actions arose," including "the Chinese government's use of

'a variety of tools'" to facilitate "'the transfer of technologies and intellectual property to Chinese companies.'"  Appx00068 (quoting Appx01557).

Not only did USTR's investigation address China's broader efforts to support unfair technology-related practices generally, as the trial court observed, it also specifically examined China's use of retaliatory measures, explaining that "'concerns about retaliation have enabled China's technology transfer regime to persist for more than a decade.'"  Appx00068-00069 (quoting Appx01573).  USTR identified U.S. companies' "reluctance . . . to 'complain about China's unfair trade practice' because of concerns about 'Chinese retaliation.'"  Appx00068 (quoting Appx01561); *see* Appx01573 & n.106.  Thus "the USTR Report provides a basis for regarding China's retaliatory actions as within the scope of the acts, policies, and practices that were the subject of the original action."  Appx00069.[4]

**b.**  Plaintiffs "conceded" that "China's retaliation . . . caused increased harm to U.S. Commerce."  Appx00069-00070.  They nonetheless insist that Section 307's modification authority was unavailable to address that harm, arguing (Br. 34-

---

[4] Plaintiffs err in asserting (Br. 40) that defendants did not rely on these facts below.  The Government's briefing cited the USTR report and emphasized that the investigation encompassed China's massive "top-down national strategy" to unfairly acquire U.S. technology."  Appx10366-10367 (citing Appx01563).  Furthermore, USTR directly relied on its report when taking action.  Appx00067-00068 (citing Appx01771).  The trial court correctly concluded that "the agency's path" regarding Chinese retaliation "reasonably may be discerned."  Appx00067.

42) that both USTR and the trial court erred in concluding that the "subject" of the Section 301 action encompassed China's defensive tariffs. Instead, they argue that the subject of the original action was limited to what they deem "the four originally investigated practices," and that any "subsequent conduct" must be beyond the scope of the Section 301 action and thus an unlawful basis for modifying that action. Br. 37 (quotation marks omitted). These arguments lack merit.

First, plaintiffs err in suggesting (Br. 36) that USTR's Section 307 modifications were taken to combat "China's *retaliation*" or "other disparate issues," separate from China's underlying unfair practices. With each tariff increase, USTR plainly stated it was modifying its action "to obtain the elimination of China's acts, policies, and practices covered in the investigation." Appx06172-06173; *see* Appx09153-09154 (similar). USTR's modifications were not based on a determination that China's defensive tariffs were themselves unfair trade practices, but rather a determination that these tariffs were a further step that China had taken to "defen[d]" or "protect the unreasonable acts, policies, and practices" that were the subject of USTR's original Section 301 action. Appx06172.

Next, plaintiffs assert (Br. 37) that Section 307(a)(1)(B) permits modifications only if the offending country causes increased harm by using precisely the same techniques to continue its investigated behavior. But plaintiffs' contention (Br. 37) that the "subject" of an investigation can only be a specific

33

"form[]" of conduct ignores the statute's plain language, which refers to a "subject" as a foreign country's "practices" or "policies" more generally. 19 U.S.C. § 2417(a)(1)(B). As discussed, China's retaliatory acts were efforts to "defend," "maintain," and "protect" its unfair trade practices. *See supra* pp. 8-9, 11, 30-31. They were very much "an exacerbation of the investigated practices." Br. 37. Plaintiffs' view that such exacerbation counts under Section 307(a)(1)(B) only if the foreign government chooses to "ramp[] up" its abuses in just the same manner it previously did disregards both Congress's language and the realities of international trade.

Even if there were some statutory requirement that the exact "form" of a foreign government's unfair trade practices have already been investigated, it would be satisfied here. As the trial court explained, USTR investigated China's larger course of conduct, including its retaliatory tactics to protect its technology-related policies. *See* Appx00068-00069; *supra* pp. 31-32; Appx01573 & n.106. China's tariffs were simply another manifestation of its retaliatory conduct long used to protect and support its practices regarding technology and intellectual property. Thus, even under plaintiffs' own theory that Section 307(a)(1)(B) can only support modifications designed to combat the same "form" of conduct, their challenge fails.

Plaintiffs' and *amici*'s interpretation of Section 307(a)(1)(B) would have startling consequences.  On their view, USTR would need to complete a new investigation, which could take at least 30 days and up to a year, to address increased harms to U.S. commerce stemming from "defensive" conduct "subsequent" to USTR's original investigation, however intimately connected that conduct was with the already-investigated policies.  Br. 37-38.  The trial court correctly rejected that position as inconsistent with the statute; Section 307(a)(1)(B) plainly gives USTR authority to modify a Section 301 action "based on activity increasing (or decreasing) the burden on U.S. commerce *after the initial determination*."  Appx00066 (emphasis added).

## 2. Section 307(a)(1)(C) Independently Authorized The Challenged Modifications

Although the trial court did not reach the issue, Lists 3 and 4A were also authorized under Section 307(a)(1)(C), which permits the President or USTR to modify a Section 301 action when "such action is being taken under Section 301(b) and is no longer appropriate."  19 U.S.C. § 2417(a)(1)(C).  As USTR explained, the original Section 301 action ceased to be "appropriate" given China's retaliatory tariffs, and Section 307(a)(1)(C) thus authorized a shift to an action "appropriate" to the goal of "obtain[ing] the elimination of" China's unfair practices.

a.  The terms of Section 307(a)(1)(C) must be "read in their context and with a view to their place in the overall statutory scheme."  *Parker Drilling Mgmt.*

*Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1888 (2019).  Section 301(b) permits

USTR to "take all *appropriate* and feasible action authorized under subsection (c)"

to eliminate unreasonable foreign practices that burden U.S. commerce.  19 U.S.C.

§ 2411(b) (emphasis added).  The ordinary meaning of "appropriate" is "specially

suitable:  Fit, Proper."  *Webster's Third New International Dictionary* (1993).  An

action under Section 301(b) would not be appropriate, therefore, if unsuitable—

whether excessive or inadequate—to further the statutory goal of eliminating

unreasonable foreign policies.  And just as a tariff would not be appropriate under

Section 301(b) if too small to motivate such elimination when initially imposed, it

is "no longer appropriate" under Section 307(a)(1)(C) if it later proves insufficient

to that end.  *See* H.R. Rep. No. 100-40, pt. 1, at 76 (1987) (explaining that a bill

with materially similar "modify or terminate" language would allow either

reductions "or additional or increased measures if further leverage or offsetting

action is deemed necessary and appropriate").  In that case, Section 307(a)(1)(C)'s

modification authority is triggered, and the President or USTR may alter the trade

action to any action that is "appropriate" under Section 301(b).  *See* Appx05923

(explaining that in Section 307(a)(1)(C), "the term 'appropriate' links back to the

primary language in Section 301(b)"); *see also* Appx06172-06174, Appx09133-

09134.

USTR properly invoked Section 307(a)(1)(C) in promulgating Lists 3 and 4A.  USTR explained that "[t]he judgment during the period of investigation, based on then-available information, was that a $50 billion action would be effective in obtaining the elimination of China's policies."  Appx06173.  China's response to those initial tariffs, however, had "shown that the current action no longer is appropriate," Appx06173; Appx09153, because "China ha[d] made clear—both in public statements and in government-to-government communications—that it will not change its policies in response to the current Section 301 action."  Appx06173.  USTR also explained that China's actions in adopting successively higher tariffs on American goods, devaluing its currency, and, at the time List 4 was issued, "retreat[ing] from specific commitments made in previous rounds" of negotiations, "made clear … that [China] will not change its policies in response to the current Section 301 action."  Appx06173, Appx09154.  Accordingly, USTR announced that the initial trade action "must be modified to a level more likely to result in the elimination of the relevant Chinese practices subject to the investigation."  Appx05923; *see also* Appx08975.

USTR deemed the additional tariffs appropriate under the same standard underlying its initial Section 301 action:  "the statutory goal of obtaining the elimination of the acts, policies, and practices covered in the investigation."  Appx01925; *see* Appx09153-09154.  Although "China was able to match" the

initial $50 billion trade action with "retaliatory tariffs on a dollar-for-dollar level,"
China would be unable to adopt a similar response to the proposed modification.
Appx05924. "In these circumstances," USTR concluded, "it is far more likely that
a combination of the initial action and the supplemental action . . . will be effective
in obtaining the elimination of China's unfair policies." Appx05924; *see also*
Appx08975.

> **b.** Plaintiffs incorrectly argue (Br. 43-49) that Section 307(a)(1)(C) allows
the President or USTR only to *decrease* or terminate—not increase—a trade
action. But Section 307(a)(1)(C) permits them to "*modify* or terminate any action"
under Section 301(b); plaintiffs' reading replaces the word "modify" with "reduce"
or "taper." *See* Br. 43, 44. But plaintiffs cannot rewrite the statute. The ordinary
meaning of the term "modify" includes "to make a basic or important change in."
*Webster's Third New International Dictionary* (1993); *see Solar Energy*, 86 F.4th
at 896 (explaining that the Supreme Court has previously used a "non-directionally
restricted definition of 'modify'"). Even if some definitions would limit "modify"
to "reduce," this Court recently explained that where the Trade Act "does not
expressly indicate whether 'modify' includes trade-restrictive changes or is limited
to trade-liberalizing alterations," that "statutory silence" favors "the government's
broader view, as the statute simply does not contain the narrowing limitation"
plaintiffs seek to "read into it." *Solar Energy*, 86 F.4th at 895.

Reading the statute as a whole reinforces the point. Section 307(a) plainly allows USTR to escalate or deescalate a trade action, since Section 307(a)(1)(B) permits USTR to "modify" an action if the burden or restriction on U.S. commerce "has increased or decreased." 19 U.S.C. § 2417(a)(1)(B). Surely USTR is not limited to *decreasing* a Section 301 action in response to an increased burden—in in such a case USTR can surely "modify" the trade action by increasing it. The same word, "modify," must have the same meaning—to increase *or* decrease—in Section 307(a)(1)(C). And that makes sense; rendering a tariff once again "appropriate" may mean either increasing or decreasing it depending on the new developments. *See supra* pp. 35-36.

Furthermore, plaintiffs' construction of Section 307(a)(1)(C) would create anomalies in the Trade Act's operation. According to plaintiffs, should the President or USTR conclude that their initial action under Section 301(b) was inadequate and should be increased to achieve the statutory goal, their only option is to start afresh with the Section 301 process. *See* Br. 48-49. Such a regime would create the incentive for the President or USTR to initially impose the maximum trade action "appropriate," regardless of what those actors deemed *optimal*, in light of the complex foreign-relations judgments that necessarily accompany calibrating a tariff, restricting imports, or entering into "binding agreements" with a foreign country. 19 U.S.C. § 2411(c). Plaintiffs' proposed

regime would also interfere with the Executive Branch's ability to balance such complex foreign-affairs determinations against the impact on the U.S. economy and consumers. There is no indication in the statute that Congress intended such a scheme, instead of allowing the Executive Branch to take trade actions in a stepwise fashion. Declining to read plaintiffs' atextual limitation into Section 307 maintains Congress's sensible scheme, in which the President may direct, or USTR can start with, the *most* appropriate action under Section 301 based on necessarily "predictive judgment[s]" regarding an effective measure. Appx05923.

Plaintiffs' proposal would also introduce temporal anomalies. If the President or USTR realized an initial Section 301 action was inadequate and should be increased, plaintiffs' interpretation would require them to start a Section 301(b) action afresh, including the requisite investigation governed by Section 302, 303, and 304. *See supra* pp. 3, 28 (listing consultation requirements, 30-day notice obligation, and other procedural requirements). Such a process would introduce considerable delay, far beyond the time required to comply with Section 307's more modest procedural requirements, hamstringing the Government's ability to respond to rapidly changing diplomatic circumstances. And those delay-inducing procedures would serve little purpose; plaintiffs have no coherent theory why Congress would demand a "new investigation" and fresh determination of an unfair foreign practice under Section 301, Br. 49, where a foreign country's unfair

40

policies had not changed but the original Section 301 action was simply proving ineffective.

**c.** Nor does the Government's construction of Section 307(a)(1)(C) render subparagraph (B) superfluous. *See* Br. 46-47. First, Section 307(a)(1)(B) authorizes changes to either a mandatory trade action under Section 301(a) or a discretionary action under Section 301(b), while Section 307(a)(1)(C) applies only to the latter. There is thus no possibility that Section 301(a)(1)(B) would be superfluous, even assuming plaintiffs were correct to contend that in a discretionary Section 301(b) action, the government "would *always* rely on subsection (C) over (B)." Br. 46. But plaintiffs are in any event incorrect about that. Section 307(a)(1)(B) allows USTR to modify a trade action solely based on domestic impact, without making the policy determination in subparagraph (C) that the original action "is no longer appropriate" to the goal of changing the objectionable foreign practices. 19 U.S.C. § 2417(a)(1)(C). Thus, even if USTR is unwilling or unable to find that a Section 301(b) action has become inappropriate to its statutory goal—*e.g.*, given the state of delicate international trade negotiations or a specific direction of the President—Section 307(a)(1)(B) would provide USTR with authority to modify that action, but Section 307(a)(1)(C) would not.

**d.** Plaintiffs are also wrong in arguing that because USTR may only reduce or terminate a tariff under Section 307(a)(1)(A), the same limitation applies to Section 307(a)(1)(C). Br. 45. This argument ignores that other textual features—not the word "modify"—create that limit. Plaintiffs correctly observe that Section 307(a)(1)(A) is triggered by a finding that "any of the conditions described in [Section 301(a)(2)] exist," and that those conditions all address factors supporting elimination or diminution, not increase, of trade actions. 19 U.S.C. § 2411(a)(2); *see* Br. 44-45. But plaintiffs then ignore that a Section 307(a)(1)(A) modification is constrained by the same limitations attending the original Section 301(a) actions to which that provision applies. In a Section 301(a) action, both the initial action and modifications to it are restricted by Section 301(a)(3)'s requirement that the action "affect goods or services of the foreign country in an amount that is equivalent in value to the burden or restriction being imposed by that country on United States commerce." 19 U.S.C. § 2411(a)(3). If a Section 301(a)(2) condition existed and triggered Section 307(a)(1)(A)'s modification authority, the burden on U.S. commerce would not have increased, and thus Section 301(a)(3) would limit the Section 307(a)(1)(A) modification to a reduction.

**e.** Plaintiffs' reliance (Br. 52-55) on the canon of constitutional avoidance is misplaced. The canon applies only where there is both "statutory ambiguity" and "grave doubt[]" regarding constitutionality. *United States v. Palomar-Santiago*,

141 S. Ct. 1615, 1622 (2021).  Neither is present here.  "Modify" has its ordinary

meaning in Section 307(a)(1)(C).  And the Supreme Court has upheld an analogous

trade statute against a nondelegation challenge, concluding it "easily fulfill[ed]"

the requirement that Congress provide an "intelligible principle" to guide the

Executive Branch's discretion.  *See Fed. Energy Admin. v. Algonquin SNG, Inc.*,

426 U.S. 548, 559 (1976) (addressing statute permitting the President to take

actions as "he deems necessary'" given the threat that an article's import could

"impair the national security") (quotation marks omitted); *see also United States v.

Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 324 (1936) (explaining that when

"authorizing action by the President in respect of subjects affecting foreign

relations," Congress may "leave the exercise of the power to his unrestricted

judgment, or provide a standard far more general than that which has always been

considered requisite with regard to domestic affairs").

Plaintiffs' contention that the government reads Section 307's modification

authority as giving it authority to conduct "an unlimited trade war," Br. 52, is

incorrect; the limits from Section 301 apply in Section 307(a)(1) modifications.

Thus, Section 307(a)(1)(C) authorizes only those actions that would have been

permissible in the first instance under Section 301(b)—specifically, those

appropriate to obtain the elimination of the foreign practices found to be unfair

after a full investigation.  *See* 19 U.S.C. § 2417(a)(1); 19 U.S.C. § 2411(b).

Indeed, plaintiffs provide no explanation why the Trade Act would be constitutional when authorizing the Executive Branch to take initial trade action under Section 301, which they do not dispute (*see* Br. 3), but unconstitutional when authorizing the Executive Branch to revisit that action under Section 307.[5]

### C.    The Major-Questions Doctrine Does Not Support Plaintiffs' Atextual Reading Of Section 307

For the first time in this litigation, plaintiffs perceive that the major-questions doctrine applies, arguing it requires the Court to reject the Government's understanding of Section 307.  Br. 3-4, 47-48, 55-60; *see also* Kenda Br. 10-17.  That doctrine is inapplicable here.  It applies to prevent an agency from claiming "[e]xtraordinary grants of regulatory authority" based on "modest words" where the "history and the breadth" of the asserted power may provide "reason to hesitate before concluding that Congress" meant to confer such authority.  *West Virginia* v. *EPA*, 142 S. Ct. 2587, 2608-09 (2022) (citations and internal quotation marks omitted); *see also Biden v. Nebraska*, 143 S. Ct. 2355 (2023) (discussing major-questions doctrine where Government's interpretation would "effect a fundamental revision of the statute" (quotation marks and alterations omitted)).  In such cases,

---

[5]  Plaintiffs assert (Br. 53) that the Government "admitted the premise of [a] non-delegation doctrine problem" by arguing that the determination that a particular trade action was "appropriate" was committed to agency discretion and thus unreviewable under 5 U.S.C. § 701(a)(2).  *See* Appx09767-09772.  But Congress has not unconstitutionally transferred legislative powers to the Executive Branch whenever this exception to APA review applies.

the agency "must point to clear congressional authorization for the power it claims." *West Virginia*, 142 S. Ct. at 2609 (cleaned up).  The doctrine is thus a tool for determining the substantive scope of a statute the Executive Branch proposes to use to effect a "transformative expansion in . . . regulatory authority." *Id.* at 2608-10 (citation omitted).

Here, plaintiffs do not dispute that the imposition of tariffs on goods from a foreign country fits comfortably within the substantive scope of the President's and USTR's power to "impose duties or other import restrictions on the goods" in response to a finding that a foreign country's unreasonable policies burden U.S. commerce.  19 U.S.C. § 2411(b)(1), (c)(1)(B).  Nor do they claim that the Trade Act imposes some unstated dollar limit on the value of the foreign goods that the President and USTR may subject to tariffs in a Section 301 action; while plaintiffs plainly disagree with the magnitude of the tariffs here, they nowhere contend that the Trade Act ties the Executive Branch's hands when a foreign country engaging in unfair trade practices exports hundreds of billions of dollars in goods to the United States.  Plaintiffs also do not dispute that Section 307 gives USTR authority to later increase those Section 301 tariffs in certain circumstances.  *See* Br. 34-35 (acknowledging that "USTR may increase tariffs" under Section 307(a)(1)(B)).

Rather, the only disputed question here is whether the Trade Act authorized the President and USTR to impose the challenged tariffs through a Section 307

modification rather than a Section 301 initial action.  Plaintiffs quarrel with the process the President and USTR used to impose the tariffs against China, not with their power to impose those tariffs.  Such a quarrel does not implicate any hint of a "transformative expansion in . . . regulatory authority."  *West Virginia*, 142 S. Ct. at 2608-10.  And even were the interpretive principles underlying the doctrine relevant here, there would plainly be "clear congressional authorization for the power" to impose and modify tariffs in response to unfair foreign trade practices.  *West Virginia*, 142 S. Ct. at 2609 (quotation marks omitted).

## II.    <u>USTR Did Not Violate The APA's Procedural Requirements</u>

Plaintiffs contend (Br. 60-77) that USTR violated the APA's rulemaking requirements by failing to respond to significant comments.  USTR was not bound by those requirements, however, because its trade action fell within the APA's foreign-affairs exception.  Even if the requirements applied, however, USTR remedied any procedural failure on remand.

### A.     The APA's Foreign-Affairs Exception Applies

**1.** The APA generally requires agencies to provide notice of a proposed rulemaking and an opportunity (generally lasting at least 30 days) for public comment.  5 U.S.C. § 553(b), (c); *see, e.g.*, *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1117 (D.C. Cir. 2019).  The APA further requires the agency to "adopt[] a concise general statement" of the rule's basis and purpose, and generally to publish substantive final rules 30 days before their effective date.  *Id.* § 553(c), (d).  By its terms, however, these provisions do not apply "to the extent that there is involved . . . a military or foreign affairs function of the United States."  5 U.S.C. § 553(a).

In *American Association of Exporters & Importers v. United States*, 751 F.2d 1239 (Fed. Cir. 1985), this Court explained that this foreign-affairs exemption was designed "to allow more cautious and sensitive consideration of those matters which 'so affect relations with other Governments that, for example, public rule-making provisions would provoke definitely undesirable international consequences.'"  *Id.* at 1249 (quoting H.R. Rep. No. 69-1980 (1946)).  The Court held that the exemption applied to the Government's imposition of import quotas, explaining that the committee implementing the quota was exercising power delegated from the President, and that exercise of the President's authority under the statute could be "part of [the President's] overall foreign policy."  *Id.*  The

Court observed that if it required the committee to "provide notice thirty days before [the quotas] take [e]ffect, the President's power to conduct foreign policy would plainly be hampered." *Id.* at 1249. Similarly, other circuits have applied the exemption to agency actions involving interactions with foreign governments. *See City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 201 (2d Cir. 2010) (State Department exemption from taxes on certain foreign-government-owned property "easily falls within the foreign affairs exception" because it "relates directly to, and has clear consequences for, foreign affairs"); *Int'l Bhd. of Teamsters v. Peña*, 17 F.3d 1478, 1486 (D.C. Cir. 1994) (Federal Highway Administration rule implementing a U.S.-Mexico agreement regarding commercial drivers' licenses fell within the exception).

The modification actions challenged here plainly involve the United States' foreign-affairs function; they concern the diplomatic relationship and business activities between the United States and China. *See Foreign Affairs*, Black's Law Dictionary (11th ed. 2019) (defining "foreign affairs" as "[m]atters concerning politics, diplomatic relations, and business activities between a given country and all others"). By definition, Section 307 is used only in the context of a foreign country engaging in unfair trade practices affecting the United States and thus "relates directly to, and has clear consequences for, foreign affairs." *City of New York*, 618 F.3d at 201; *see* 19 U.S.C. § 2411(a)(1), (b)(1); *id.* § 2417(a)(1). The

statements of the President and USTR make clear that the modification actions profoundly affected commerce between the nations as part of an effort to change the Chinese government's wide-ranging attempts to harm the United States. *See* Appx06159-06160; Appx06172-06173; Appx09153-09154. As in *American Association of Exporters*, the President's exercise of his tariff-related authority through USTR can be—and here was—part of his "overall foreign policy," and applying the APA's timing requirements to such exercises would "hamper[]" "the President's power to conduct foreign policy." 751 F.2d at 1249.

Indeed, as previously explained, the trade modifications at issue here were directed by the President as part of a broader policy concerning the United States' relationship with China and were timed to influence fast-moving, ongoing negotiations between the countries. *See supra* pp. 6-12, 36-37 (noting reciprocal actions between China and the United States within days). A holding that USTR must satisfy all the APA's requirements relevant to notice-and-comment rulemaking before modifying trade actions would hamper the Executive Branch's ability to conduct international-trade negotiations and respond nimbly as the diplomatic landscape shifts. And the procedures set out in Sections 301 and 307 indicate Congress did not intend the President and USTR to be so hampered. While Congress specified that an initial Section 301 action generally must be accompanied by a minimum 30-day notice period as part of the required

49

investigation under Section 304, it omitted any such requirement when USTR implements a Section 307 modification. *Compare* 19 U.S.C. §§ 2411(b), 2414(b)(1)(A), *with* 19 U.S.C. § 2417(a)(2). Even Section 304's 30-day notice period can be deferred where USTR determines that "expeditious action is required." 19 U.S.C. § 2414(b)(1), (2). And unlike the APA, Section 307 does not require USTR to respond to the public comments it receives—a potentially time-intensive undertaking. *Compare* 5 U.S.C. § 553(c) ("After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.") *with* 19 U.S.C. § 2417(b) ("The Trade Representative shall promptly publish in the Federal Register notice of . . . any modification or termination of any action taken under Section 2411 of this title and the reasons therefor."). Nor does Section 307 have a delayed-effective-date requirement, like the 30-day period the APA generally requires. *See* 5 U.S.C. § 553(d). Such different rulemaking requirements reflect Sections 301 and 307's role within the "foreign affairs function[s] of the United States." 5 U.S.C. § 553(a)(1).

Because the Section 307 modification was exempt from the APA's rulemaking requirements, USTR had to comply only with the consultation and notice requirements of Section 307 itself. USTR did so, properly "provid[ing] opportunity for the presentation of views by . . . interested persons" prior to taking

action and then promptly publishing notice of and reasons for its action in the

Federal Register.  19 U.S.C. § 2417(a)(2), (b).  Indeed, while not required to do so,

USTR offered the public 30 days to comment, including public hearings, on any

proposed increase in the tariffs (though not on diminutions or suspensions in the

tariff regime, as plaintiffs appear to believe was required).  *See* Appx01925,

Appx02153-02154, Appx06505.  Accordingly, USTR more than complied with all

applicable procedural requirements in promulgating the challenged tariff

modifications.

    **2.**  The trial court erroneously held that the foreign-affairs exemption does

not apply.  Appx00071-00075.[6]  First, the court deemed the challenged tariff

modifications' connection to foreign affairs insufficient because "the United States

and China did not enter into any trade agreement until after the USTR promulgated

---

[6] The trial court indicated doubt that USTR viewed the foreign-affairs exemption as applicable during the modifications.  *See* Appx00072-00073; *see also* Retail Br. 30.  As the court appeared to recognize, however, Appx00072-00073, the exception need not be invoked to apply.  Regardless, the record shows that USTR considered only Section 307 to establish the "Procedures for Modification Authority."  Appx05924; Appx09550.  And while USTR afforded the public 30-day comment periods for increases to the tariffs, agencies are "free to grant additional procedural rights in the exercise of their discretion," without licensing courts to "impose[] on agencies an obligation beyond the maximum procedural requirements specified in the APA," including exceptions to its rulemaking provisions.  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 100, 102 (2015) (quotation omitted).  In any event, while unchallenged in this litigation, USTR did not provide a delayed effective date or a finding of "good cause found" to forgo one, as would have been required under 5 U.S.C. § 553(d).

Final List 3 and Final List 4." Appx00073-00074; *see* Retail Br. 27-28. But as the record makes clear, the tariff modifications were an integral part of the intense diplomatic engagement between China and the United States that yielded that agreement. *See supra* pp. 9-12, 36-37. Nor is this an instance where a primarily domestic rule has some attenuated "relat[ionship] to ongoing negotiations," Appx00074—the agency actions here are *tariffs imposed on a foreign country's goods* entering the United States as a consequence for that foreign country's policies. Whether a trade agreement already exists is irrelevant to such an endeavor's inherent and direct nexus to the conduct of the United States' foreign affairs.

The trial court also erred in suggesting that the Government needed to make a case-specific showing that using the APA's rulemaking procedures would provoke "definitely undesirable international consequences.'" Appx00074-00075. This Court did not create such a requirement when it pointed to a House Report's description of that "example" as a circumstance where the foreign-affairs exception would apply. *See Am. Ass'n of Exps. & Imps.*, 751 F.2d at 1249. Nothing in this Court's precedent indicates that a case-by-case analysis demonstrating such consequences must inevitably accompany a determination that a matter "involve[s] . . . a . . . foreign affairs function of the United States," which is all the statute requires. 5 U.S.C. § 553(a)(1). *See City of New York*, 618 F.3d at

202 (cautioning against "turn[ing] the phrase 'provoke definitely undesirable international consequences' from an illustration given in the APA's legislative history . . . into the definition for 'foreign affairs function,'" and refusing to require such a showing where a tax on foreign-owned property "clearly and directly involve[d]" foreign affairs).  Indeed, in any case where following the rulemaking procedures of the APA would have specific undesirable consequences for foreign policy, the agency would be likely exempt from those procedures under the APA's "good cause" exception.  *See* 5 U.S.C. § 553(b)(3)(B), (d)(3).  Thus, to avoid such redundancy, the foreign-affairs exception must be a categorical exception that does not require a case-by-case showing that the rulemaking procedures would be contrary to the public interest.

In any event, requiring compliance with APA rulemaking requirements might have had undesirable consequences here.  As noted above, the modification actions at issue were crucial to international political negotiations and trade agreements announced after the modifications.  Appx09560.  Requiring the Government to disclose its strategy in the middle of trade negotiations or to delay implementation of the modifications may well have had adverse consequences for those negotiations.

## B.    USTR's Explanations On Remand Complied With The APA

Even if the trial court was correct that USTR was required to use APA rulemaking procedures, and that its initial explanations were inadequate in light of those procedures, any such error was remedied on remand.  The trial court directed USTR to respond to significant comments.  Appx00006, Appx00079-00080 (identifying areas of comment).  The trial court correctly concluded that, on remand, USTR complied with its instructions and satisfied the APA.  *See* Appx00007.

### 1.    USTR Appropriately Provided Additional Detail Of Its Contemporaneous Reasoning

In *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020), the Supreme Court explained that if the grounds an agency invoked to support its action "are inadequate, a court may remand for the agency to do one of two things." *Id.* at 1907.  "First, the agency can offer 'a fuller explanation of the agency's reasoning *at the time of the agency action*.'" *Id.* (citation omitted) An agency taking this route "may elaborate later" on the determinative reasons for its action, "but may not provide new ones." *Id.* at 1908.  Second, "the agency can deal with the problem afresh by taking new agency action," in which case the agency is "not limited to its prior reasons but must comply with the procedural requirements for new agency action." *Id.* (citation omitted).

54

The trial court correctly concluded that USTR properly followed the first route by elaborating on its earlier reasons for imposing tariffs on Lists 3 and 4A. *See* Appx00008-00015. USTR addressed each category of significant comments the trial court identified, amplifying its prior justifications based on contemporaneous public statements and documents that USTR considered when making its original decision. *See* Appx10570-10659. USTR was clear that it was "provid[ing] a more detailed explanation," Appx10594, regarding the key, original rationales for its tariff decision: the President's direction and its own predictive judgment that the tariffs were appropriate within the meaning of the statute.[7] As the trial court explained, "USTR responded to significant concerns within the context of China's actionable conduct and the specific direction of the President,"

---

[7] *Compare* Appx06172-06173 (explaining originally that the "President has exercised his authority under Section 307 to direct the Trade Representative to modify the prior action in the investigation by adopting the supplemental action") *and* Appx09154 (noting originally that USTR acted "in accordance with the specific direction of the President), *with* Appx10596 (discussing on remand the need "to maintain" the "aggregate level of trade" that was "directed by the President") *and* Appx10642-10650 (explaining on remand that the President's direction left USTR "limited flexibility," serving as a "key element" of, and "central to," USTR's determination regarding tariff levels); Appx06172-06173 (explaining originally USTR's determination that increased tariffs were necessary and appropriate to cause China to eliminate its unfair policies) *and* Appx09153-09154 (similar) *with* Appx10645-10646 (explaining on remand that USTR considered the level of duty that would "exert[] an appropriate amount of pressure on China to eliminate its harmful practices, while encouraging China to meaningfully engage in negotiations"), *and* Appx10650 (explaining on remand that USTR found the level of trade covered by tariffs "appropriate to obtain the elimination of China's harmful acts, policies, and practices").

providing amplified explanations rather than offering new reasons for the agency's promulgation of Lists 3 and 4A.  Appx00015.

Plaintiffs argue (Br. 67-68) that USTR was required to undertake a new agency action because it had "offered no response whatsoever" to significant comments and "limited its reasoning at the time [of the modifications] to mere assertions that it had 'reviewed' public input."  Plaintiffs ignore, however, that USTR did provide contemporaneous explanations for the Section 307 modifications in the original Federal Register notices.  *See* Appx06172-06173, Appx09153-09154.  Thus, USTR had originally "indicate[d] the determinative reason[s] for" Lists 3 and 4A, and could "elaborate later on that reason (or reasons)."  *Regents*, 141 S. Ct. at 1908.

To the extent that plaintiffs suggest that an agency may never respond to unaddressed comments on remand without offering an impermissible *post hoc* rationale, they err.  *Regents* makes clear that just because an agency's "observation[s]" may have been too "'conclusory'" originally, an agency is not precluded from offering "'amplified articulation'" of those observations.  *Regents*, 141 S. Ct. at 1908 (quoting *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 5-6 (D.C. Cir. 2006)).  Thus, as the trial court recognized, so long as its responses to unaddressed comments on remand did not introduce a new rationale for its decision, USTR was free to use *Regents*' first route for remedying an "inadequate" articulation of the

grounds on which it acted. *Regents*, 140 S. Ct. at 1907-08; *see* Appx00014-00015. Indeed, remand for amplified responses to comments has been the consistent judicial remand practice post-*Regents*. *See, e.g.*, *Bloomberg L.P. v. SEC*, 45 F.4th 462, 477 (D.C. Cir. 2022); *Env't Health Tr. v. FCC*, 9 F.4th 893, 909, 914 (D.C. Cir. 2021).

Nor were USTR's explanations *post hoc* or otherwise "gin[ned] up" after the fact. Br. 69, 75. USTR based its remand responses on the record underlying its original decision, including hearing transcripts, Federal Register notices, and press statements. *See, e.g.*, Appx10596-10620, Appx10652-10653. USTR's citations to, and discussion of, those documents and comments highlights how USTR contemporaneously grappled with the "significant issues" identified by the Court and supports the justifications already set forth in its Federal Register notices. *See Regents*, 140 S. Ct. at 1908.

## 2.    USTR More Than Satisfied Any Obligation To Respond To Comments On Remand

USTR's 90-page decision on remand responded to significant comments and provided a reasoned explanation for the Section 307 modification decisions. As the trial court observed, although plaintiffs "fram[e] the issue as a procedural failure to explain," their arguments amount to "mere disagreement" with USTR's actions. Appx00022. Having "accounted for concerns regarding the potential for economic harm within the context of the statutory factors it was required to

consider and adequately explained how it did so," USTR satisfied the APA's

requirements, and the trial court properly explained that "[i]t is not the court's role

to reweigh the evidence or opine on USTR's (or the President's) policy choices

such as the appropriate 'cure' for China's conduct."  Appx00023 (citing *Downhole*

*Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376-77 (Fed. Cir. 2015)).

As the trial court acknowledged, Appx00018-00019, USTR explained that it

had limited flexibility due to the President's specific direction regarding certain

aspects of the proposed lists—particularly, the tariff percentage and aggregate

dollar value covered.  Nevertheless, USTR exercised its own judgment to

determine what action was appropriate within the flexibility it retained.

Appx10596-10597, Appx10646-10647.  Thus, "the judgments reflected in the

construction of" Lists 3 and 4—including which subheadings to include and the

creation of a process to exclude specific products otherwise subject to the tariffs—

"were [USTR's] own."  Appx00018.

Plaintiffs contend (Br. 70) that USTR could not rely on the President's

directions to justify the Section 307 actions because "Congress delegated to the

USTR authority over modifications to Section 301 actions."  *See* Sports Br. 31-32

(similar).  But, as noted, Congress imposed an important constraint on USTR's

discretion under Section 307:  USTR must act "subject to the specific direction, if

any, of the President."  19 U.S.C. § 2417(a)(1).  In exercising its statutory

authority, USTR was thus required to comply with the President's directive.

Plaintiffs' only basis for suggesting that USTR could disregard this clear statutory

command is their observation that the trial court identified the agency's solicitation

of comments regarding the tariffs' scope as a reason further explanation was

required. Br. 70.[8] But the trial court originally sought clarification from USTR

only as to "whether or why the President's direction constituted the only relevant

consideration" on the matters those directions covered; it never indicated that

USTR could not treat those directions as binding. Appx00084. And after USTR

clarified the role that presidential directions played in its promulgation of Lists 3

and 4A, the trial court correctly concluded that USTR was not required to "analyze

the President's directives" or explain its "reasons for agreeing with the President

that the challenged actions were appropriate." Appx00019-00020. Plaintiffs thus

err in suggesting USTR had to further consider comments on "the wisdom of the

---

[8] Had the public comments altered the President's view of an appropriate
Section 307 action, he was of course free to either revise his directions or empower
USTR to do so.

enterprise, the appropriate tariff level and potential alternative courses of action." Br. 70-71, 73-74.[9]

USTR also fully explained its consideration of economic harm on matters within its discretion on remand. To minimize harm to domestic consumers, USTR noted that, as with Lists 1 and 2, in developing List 3 it avoided consumer goods and removed subheadings from List 3 in response to concerns regarding disruption to the U.S. economy. Appx10651-10652 (citing Appx01770-01771, Appx01870-01871, Appx01925). USTR explained that it also phased in the additional tariffs to minimize disruption (initially setting the tariffs for goods on List 3 at 10% and providing an adjustment time for goods on List 4 that were more dependent on imports from China). Appx10646, Appx10652. The possibility of "severe economic harm," USTR explained, motivated its creation of an "exclusion process" for individual products on List 4. Appx10647. From such explanations, the trial court was "readily" able to discern "USTR's attempts to balance commenters' concerns about economic harm with the specific direction that it had

---

[9] Although not required, USTR explained that it agreed with the President that the level of duty struck "the appropriate balance between exerting an appropriate amount of pressure on China to eliminate its harmful practices, while encouraging China to meaningfully engage in negotiations, against comments suggesting additional duties would result in severe economic harm to U.S. consumers and industries." Appx10646. The trial court accepted such explanations, *see* Appx00018-00020, which accord with USTR's Federal Register notices announcing Lists 3 and 4A, *see* Appx06172-06173, Appx09153-09154.

received from the President and the ongoing need to respond to China's" practices. Appx00021.

Plaintiffs and the Retail *amici* insist that the trial court should not have credited USTR's discussion on these points.  Br. 73-74; Retail Br. 21; Appx00022. Fundamentally, these arguments reflect their disagreement with the Government's policy choices, rather than a serious contention that USTR inadequately explained its consideration of economic harm.  Plaintiffs also err in arguing (Br. 74) that USTR must not have considered economic harm when it imposed List 3 because it did not initially include an exclusion process, as USTR later did for List 4A.  But as explained above, USTR originally addressed economic concerns with List 3 by removing certain subheadings, which USTR had less "flexibility" to do with List 4 given the volume of trade involved.  Appx10647 (citing Appx09154).

Finally, there is no merit to plaintiffs' claim (Br. 73) that USTR "effectively conceded that it never considered alternatives to 301."  USTR simply explained that it did not consider its request for comments to "invit[e] alternatives to an action under Section 301."  Appx10743.  Nonetheless, USTR addressed significant comments regarding proposed alternatives—such as a suggestion to use Section 337 of the Tariff Act instead of Section 301—and explained why it rejected them. Appx10657-10658.  And as the trial court correctly recognized, USTR explained

that it had already explored proposed alternatives, including negotiations with China and additional WTO cases.  Appx00025-00026.

## C.    The Trial Court Recognized That Vacating The Tariff Modifications Would Be An Inappropriate Remedy

Plaintiffs attack the trial court's decision to remand to USTR to address comments without vacating the challenged tariff modifications.  Br. 63-65. Plaintiffs fundamentally mistake the remedial options and discretion available to reviewing courts.  Their contention (Br. 64) that vacatur is mandatory ignores this Court's clear precedent holding that "'[a]n inadequately supported rule . . . need not necessarily be vacated'" but can "remain in effect" during a remand to the agency to elaborate on its reasoning.  *Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 260 F.3d 1365, 1380 (Fed. Cir. 2001) (*NOVA*) (cleaned up).[10]

Nor did the trial court abuse its discretion in declining to vacate.  Br. 64-65. The court correctly weighed the factors this Court employs:  the seriousness of the deficiencies and the disruption of an interim change.  *NOVA*, 260 F.3d at 1380. Deciding that an insufficient explanation "leaves room for doubt as to the legality" of USTR's action, the court nonetheless concluded that the disruptive consequences of a potentially interim vacatur weighed against vacatur.

---

[10]   We recognize that this Court has concluded that vacatur of a rule is an appropriate APA remedy, *see, e.g.*, *NOVA*, 260 F.3d at 1375, but preserve for further review our argument that the APA does not authorize such relief.

Appx00088.  The court recognized that vacatur would disturb "a continuum of actions taken in conjunction with ongoing negotiations with China," as well as the "complex and evolving process" related to such negotiations.  Appx00088. Indeed, the same considerations would strongly support remand without vacatur should this Court find any material inadequacies in USTR's explanations.

## CONCLUSION

For these reasons, the Court should affirm the trial court's judgment.

<div style="margin-left:50%">

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

</div>

OF COUNSEL:

MELISSA N. PATTERSON
JOSHUA M. KOPPEL
Attorneys
Appellate Staff, Civil Division
U.S. Department of Justice
950 Pennsylvania Ave N.W.
Washington, D.C. 20530

<div style="margin-left:50%">

PATRICIA M. MCCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

JUSTIN R. MILLER
Attorney-In-Charge,
International Trade Field Office

</div>

MEGAN GRIMBALL
PHILIP BUTLER
Office of General Counsel
Office of the U.S. Trade
Representative
600 17th Street N.W.
Washington, D.C. 20508

VALERIE SORENSEN-
CLARK
Office of the Assistant Chief
Counsel
International Trade Litigation
U.S. Customs and Border
Protection
26 Federal Plaza, Room 258
New York, NY 10278

December 21, 2023

/s/ Elizabeth A. Speck
ELIZABETH A. SPECK
Senior Trial Counsel
SOSUN BAE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone:  (202) 307-0369
E-mail: elizabeth.speck@usdoj.gov

*Attorneys for Defendants
-Appellees*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief: (1) complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B); (2) contains 13,984 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b); (3) complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6); and (4) has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman type style and 14 point size. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system (Microsoft Word) that was used to prepare the brief.

/s/ Elizabeth A. Speck
ELIZABETH A. SPECK