No. 23-1891

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

**HMTX INDUSTRIES, LLC, HALSTEAD NEW ENGLAND CORP., METROFLOR CORPORATION, JASCO PRODUCTS COMPANY LLC,**

*Plaintiffs- Appellants*

v.

**UNITED STATES, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, KATHERINE TAI, U.S. Trade Representative, UNITED STATES CUSTOMS AND BORDER PROTECTION, TROY MILLER, Acting Commissioner of U.S. Customs and Border Protection,**

*Defendants-Appellees*

Appeal from the United States Court of International Trade in No. 1:20-cv-00177-3JP, Chief Judge Mark A. Barnett, Judge Claire R. Kelly, Judge Jennifer Choe-Groves

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS HMTX INDUSTRIES, HALSTEAD NEW ENGLAND CORP., METROFLOR CORPORATION, AND JASCO PRODUCTS COMPANY

Pratik A. Shah
  pshah@akingump.com
Matthew R. Nicely
James E. Tysse
Daniel M. Witkowski
Devin S. Sikes
AKIN GUMP STRAUSS HAUER &
  FELD LLP
2001 K Street, N.W.
Washington, DC 20006
(202) 887-4000

February 12, 2024

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 23-1891

**Short Case Caption** HMTX Industries LLC v. US

**Filing Party/Entity** Appellants HMTX Industries LLC; Halstead New England Corp.;

Metroflor Corp.; and Jasco Products Company LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/25/2023

Signature: /s/ Pratik A. Shah

Name: Pratik A. Shah

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| HMTX Industries LLC | | SMYNTH Trust; HMTX Acquisition LLC |
| Halstead New England Corp. | | SMYNTH Trust; HMTX Acquisition LLC; HMTX Industries LLC |
| Metroflor Corp. | | SMYNTH Trust; HMTX Acquisition LLC; HMTX Industries LLC |
| Jasco Products Company LLC | | None |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| Sarah B. W. Kirwin, Akin Gump Strauss Hauer & Feld LLP | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)    ☐  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................... 1

ARGUMENT ................................................................................. 3

I.     USTR     EXCEEDED     ITS     "MODIFICATION" AUTHORITY UNDER SECTION 307 OF THE TRADE ACT ....................................................................................... 3

    A.     The Court Should Not Defer To USTR's Actions .......... 3

       1.     *The Court May Review USTR's Final Agency Action For Statutory Compliance* ......................... 3

       2.     *USTR's Statutory Constructions Are Not Entitled To Deference* ........................................... 9

    B.     Intervening Precedents Preclude USTR From Waging A Trade War Through The "Modification" Provision .................................................................. 12

       1.     *"Modify" Means A Modest Or Minor Change* ..... 12

       2.     *The "Major Questions" Doctrine Confirms That USTR Exceeded Its Modification Authority* ........................................................ 15

    C.     Section 307 Did Not Authorize USTR To Increase The Original Tariff Action In These Circumstances ........................................................... 18

       1.     *Section 307(a)(1)(B) Did Not Permit The Tariff Actions* ..................................................... 18

       2.     *Section 307(a)(1)(C) Did Not Permit The Tariff Actions* ..................................................... 22

II.  USTR'S    PREORDAINED    DECISION    TO
     PROMULGATE LIST 3 AND LIST 4A VIOLATED
     THE APA .................................................................... 29

     A.   The Foreign Affairs Function Exception Does Not
          Apply ............................................................... 29

     B.   USTR's    Remand    Determination    Was
          Impermissibly Post Hoc ............................................ 33

CONCLUSION ..................................................................... 36

# TABLE OF AUTHORITIES

<span style="font-variant: small-caps;">**Cases:**</span>

*Action on Smoking & Health v. C.A.B.,*
    713 F.2d 795 (D.C. Cir. 1983) ............................................. 34

*Almond Bros. Lumber Co. v. United States,*
    721 F.3d 1320 (Fed. Cir. 2013) ........................................... 5

*American Ass'n of Exps. & Imps.-Textile & Apparel Corp. v.*
    *United States,*
    751 F.2d 1239 (Fed. Cir. 1985) ........................................... 32

*Australian Meat & Live-Stock Corp. v. Block,*
    590 F. Supp. 1230 (Ct. Int'l Trade 1984) ........................... 30

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023) ............................................... *passim*

*Chamber of Com. of U.S. v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996) ........................................ 8, 10

*City of N.Y. v. Permanent Mission of India to United*
    *Nations,*
    618 F.3d 172 (2d Cir. 2010) .............................................. 30

*Dalton v. Specter,*
    511 U.S. 462 (1994) ....................................................... 7, 8

*Department of Homeland Sec. v. Regents of Univ. of Cal.,*
    140 S. Ct. 1891 (2020) ................................................. 34, 35

*East Bay Sanctuary Covenant v. Trump,*
    932 F.3d 742 (9th Cir. 2018) ............................................. 32

*Federal Energy Administration v. Algonquin SNG, Inc.,*
    426 U.S. 548 (1976) ................................................... 26, 27

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ........................................................ 7

*Gazelle v. Shulkin*,
   868 F.3d 1006 (Fed. Cir. 2017) ........................................................ 11

*Gilda Indus., Inc. v. United States*,
   622 F.3d 1358 (Fed. Cir. 2010) ........................................................ 5

*International Bhd. of Teamsters v. Pena*,
   17 F.3d 1478 (D.C. Cir. 1994) ........................................................ 32

*Invenergy Renewables LLC v. United States*,
   422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) .................................... 30

*Mast Indus., Inc. v. Regan*,
   596 F. Supp. 1567 (Ct. Int'l Trade 1984) ........................................ 29

*Michael Simon Design, Inc. v. United States*,
   609 F.3d 1335 (Fed. Cir. 2010) ........................................................ 7

*Mid Continent Nail Corp. v. United States*,
   846 F.3d 1364 (Fed. Cir. 2017) .................................................. 29, 33

*Public Citizen v. USTR*,
   5 F.3d 549 (D.C. Cir. 1993) .............................................................. 7

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) ........................................................................ 21

*Sherley v. Sebelius*,
   689 F.3d 776 (D.C. Cir. 2012) ........................................................ 10

*Solar Energy Indus. Ass'n v. United States*,
   86 F.4th 885 (Fed. Cir. 2023) .................................................. *passim*

*State of N.J., Dep't of Env't Prot. v. U.S. Env't Prot. Agency*,
   626 F.2d 1038 (D.C. Cir. 1980) ...................................................... 29

*Timex V.I., Inc. v. United States*,
   157 F.3d 879 (Fed. Cir. 1998) ........................................................ 11

*USP Holdings, Inc. v. United States*,
   36 F.4th 1359 (Fed. Cir. 2022) ...................................................... 10

*West Virginia v. EPA*,
  597 U.S. 697 (2022) .................................................................. *passim*

<u>STATUTES</u>:

5 U.S.C.
  § 553(a)(1) ............................................................................... 29
  § 553(c) .................................................................................... 29
  § 704 ......................................................................................... 3
  § 706(2)(A) ............................................................................. 33

19 U.S.C.
  § 2254(b)(1) ............................................................................ 14
  § 2411 ...................................................................................... 16
  § 2411(a) .................................................................................. 23
  § 2411(a)(1) ............................................................................. 17
  § 2411(b)(1) ............................................................................. 19
  § 2411(b)(2) .................................................................... *passim*
  § 2412 ...................................................................................... 16
  § 2413 ...................................................................................... 16
  § 2414 ...................................................................................... 16
  § 2414(b)(1) ............................................................................. 21
  § 2414(b)(2) ............................................................................. 21
  § 2417(a)(1) ..................................................................... 4, 8, 9
  § 2417(a)(1)(A) ....................................................................... 23
  § 2417(a)(1)(B) ....................................................................... 18
  § 2417(a)(1)(C) ................................................................. 22, 23
  § 2417(a)(2) ............................................................................. 31

28 U.S.C.
  § 2640(e) ............................................................................ 4, 10

<u>FEDERAL REGISTER NOTICES</u>:

*Implementation of Tariff-Rate Quota for Imports of Sugar-
Containing Products*, 64 Fed. Reg. 67,152 (Dec. 1, 1999) ................. 31

<u>OTHER AUTHORITIES</u>:

H.R. REP. NO. 79-1980 (1946) .......................................................... 30, 32

H.R. REP. NO. 100-576 (1988), 1988 U.S.C.C.A.N. 1547 .................... 4, 24

S. REP. NO. 79-752 (1945) ........................................................ 30

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) .................. 26

# INTRODUCTION

Defendants are transparent about USTR's motive for acting under Section 307's limited authority rather than Section 301's broader power for promulgating tariff actions in response to new unfair practices: the former's "abbreviated" procedures were more expedient. But expediency is not a justification for transgressing Congress's limits.

Section 307 is designed for "modification" of an existing Section 301 tariff action, not a radical and unprecedented seven-fold escalation launching an unbounded trade war with China. Both the Supreme Court and this Court have recently held, across varying statutory contexts, that the term "modify" connotes a modest or minor change—not a transformative one. And it is not at all "anomalous" that Congress would have demanded a more deliberative process than Section 307's "abbreviated" procedures before authorizing actions with such dramatic political and economic fallout. Indeed, Congress must speak far more clearly to empower USTR to effectuate such "major" actions than it did through the "modification" provision at issue.

Beyond that fundamental problem, USTR failed to comply with Section 307's plain terms, which explicitly require a finding that the

burden from the investigated technology-related practices themselves (*i.e.*, the subject of the original Section 301 investigation) has increased before increasing the tariffs. USTR did not do so.

In seeking to evade accountability for those failures, Defendants argue that the actions in question are wholly unreviewable—or, at most, reviewed only for a "clear misconstruction" of the statute. But to the extent such deference is appropriate, it applies to purely *presidential* actions involving discretionary choices, not final *agency* actions subject to statutory limits—even when they are guided or prompted by presidential direction. List 3 and List 4A were undisputedly final agency actions. Although Defendants try to deny it now, they expressly conceded below that the final say on the challenged tariff actions was USTR's own. In any event, the Supreme Court's "major questions" doctrine bars Defendants' attempt to minimize judicial scrutiny; to the contrary, courts must ensure agencies do not exceed Congress's delegation, particularly in cases of such profound importance.

This Court should reverse the CIT's judgment.

## ARGUMENT

## I.    USTR EXCEEDED ITS "MODIFICATION" AUTHORITY UNDER SECTION 307 OF THE TRADE ACT

### A.    The Court Should Not Defer To USTR's Actions

Defendants begin by criticizing the CIT for "fail[ing] to limit review" of the decisions "modify[ing]" the tariffs under Section 307.   Br. 26. Defendants argue that this Court should not review the challenged actions *at all* to the extent they involve discretionary presidential actions. Br. 19-23.   Alternatively, Defendants urge the Court to defer to their statutory interpretations under a relaxed standard reserved for "presidential action in the context of foreign affairs."   Br. 23-25.   The Court should reject their attempt to evade judicial review under the APA of such "major" agency action.[1]

### 1.    *The Court May Review USTR's Final Agency Action For Statutory Compliance*

Plaintiffs challenge final agency actions taken by USTR, an agency subject to judicial review under APA standards.   *See* 5 U.S.C. § 704 ("final

---

[1] Defendants have abandoned another argument they made below for truncating review—that this case presents an unreviewable political question.   Appx00057 (denying Defendants' "motion to dismiss Plaintiffs' claims based on purported non-justiciability").

agency action" subject to judicial review); 28 U.S.C. § 2640(e) ("In any civil action not [otherwise] specified *** the Court of International Trade shall review the matter as provided in" the APA.).  USTR is the agency authorized to act under the statute.  19 U.S.C. §§ 2411(b)(2) ("If the Trade Representative determines" that "action by the United States is appropriate, the Trade Representative shall take all appropriate and feasible action[.]"), 2417(a)(1) ("Trade Representative may modify or terminate any action[.]").  In fact, the 1988 amendments specifically transferred authority under the statute from the President to USTR. H.R. REP. NO. 100-576, at 551 (1988), 1988 U.S.C.C.A.N. 1547, 1584 (Conf. Rep.).  And there is no dispute that USTR actually took the final agency actions promulgating List 3 and List 4.  *List 3 Final Rule*, Appx06172 ("Trade Representative[] has determined to modify the prior action in this investigation by imposing additional duties on products of China"); *List 4A Final Rule*, Appx09153 (similar).

Defendants argue that "this Court should decline to review any attack on the President's discretionary decisions to direct USTR to impose tariffs at the level and scope set out in Lists 3 and 4A."  Br. 23. But Plaintiffs do not challenge discretionary policy decisions

(presidential or otherwise), such as the precise tariff rates or the precise value of trade against which new tariffs would be applied.  Rather, they challenge whether USTR had the *power* to massively escalate the tariff actions—on an unprecedented scale—under the "abbreviated" (Defs. Br. 1) procedures it used.  This Court has long reviewed such challenges, including specifically whether USTR complied with explicit and enforceable statutory limits in modifying an action under Section 307. *See, e.g., Gilda Indus., Inc. v. United States*, 622 F.3d 1358, 1363 (Fed. Cir. 2010) (affirming summary judgment to APA plaintiff challenging a "decision[] of the Trade Representative implicating the discretionary authority of the President" under Section 307); *Almond Bros. Lumber Co. v. United States*, 721 F.3d 1320, 1326 (Fed. Cir. 2013) (reviewing challenge to USTR action under Section 301).

Defendants insist that the ultimate tariff decisions "were the President's, because once directed by the President, USTR did not have discretion to act otherwise."  Br. 21.  At the threshold, that argument contradicts what USTR told the CIT, *i.e.*, that the President's directives were only "a key element," Appx10646—not fully "binding," Br. 15—in *USTR's* determinations.  Defendants now claim (Br. 22) that the "level

and quantity of tariffs *** were not subject to change by USTR" in light of the President's directions, but USTR sang a different tune below: "[I]n determining the *level of duties* to be imposed, and the *aggregate level of trade* for Final List 3 and Final List 4, the Trade Representative considered:  (1) the specific direction of the President, (2) statutory factors, *and* (3) the public comments and testimony."  Appx10643 (emphasis added); Appx10659 (explaining that "*each aspect* of the determination were [sic] made in consideration of the public comments and testimony, as well as statutory considerations, including the direction of the President") (emphasis added); *see also* Appx10728 ("USTR explained how Presidential directives guided the aggregate amount of trade and duty rate, along with other considerations, *including USTR's own judgment*.") (emphasis added); Appx10737 ("Presidential directives were a 'key element' in determining the appropriate action," but were "not the only consideration.").

The CIT accepted those representations, concluding that though "USTR did not interpret the statute to accord USTR much discretion to deviate from the President's direction, *** the judgments reflected in the construction of *Final List 3* and *Final List 4A* were its own."  Appx00018.

6

Having convinced the CIT to rule in their favor in part based on a representation that USTR was exercising its own "predictive judgment that the tariffs were 'appropriate,'" Appx00009, Defendants are estopped from claiming that USTR exercised no such judgment here.

Putting aside Defendants' about-face, the President's underlying discretionary directions cannot insulate final agency action from judicial review. The CIT properly rejected that theory, noting that courts decline to review actions under APA standards only when, unlike here, "the President has final constitutional or statutory responsibility for the *final step* necessary for the agency action directly to affect the parties." Appx00048 (quoting *Public Citizen v. USTR*, 5 F.3d 549, 552 (D.C. Cir. 1993)). Defendants' cited cases all involve statutes conferring authority to take final action directly on the President. *See, e.g.*, *Dalton v. Specter*, 511 U.S. 462, 470 (1994) (noting that "'President, not the [Commission], takes the final action that affects' the military installations"); *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992) ("[T]he final action complained of is that of the President[.]"); *Michael Simon Design, Inc. v. United States*, 609 F.3d 1335, 1339-1340 (Fed. Cir. 2010) ("[T]he President's discretionary action is required to effect modifications to the HTSUS,"

while the agency's "report cannot directly impact legal rights.").[2]  By contrast, the fact that the President may play a predicate statutory role "hardly seems to insulate [agency actions] from judicial review under the APA, even if the validity of the [President's directives are] thereby drawn into question." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1326-1327 (D.C. Cir. 1996).

Defendants' position would also lead to absurd results.  The statute gives USTR the power to "modify or terminate" an action even if the President gives no direction to USTR.  *See* 19 U.S.C. § 2417(a)(1).  If Defendants were correct, only the latter of two identical USTR modification actions—one with presidential direction and one without— would be subject to judicial review.  Indeed, the President could direct USTR to take blatantly unlawful action—such as by transforming a $1 *million* action into a $1 *trillion* action on a whim—and escape judicial

---

[2] Defendants contend that *Dalton* declined to review an agency action implementing a presidential directive even though "the Secretary of Defense was the individual charged by statute with closing the base." Br. 26.  But the *Dalton* plaintiffs did not challenge the Secretary's actions in "carrying out the President's directive," *id.*, only the underlying "decision by the President to close the" base, *Dalton*, 511 U.S. at 464; *see id.* at 470 ("Without the President's approval, no bases are closed under the Act.").

review.  *See* Pls. Br. 48.  Far from denying it, Defendants double down by arguing that any challenges to the "level and scope" of the tariffs—apparently even when alleged to exceed statutory authorization—are unreviewable "discretionary decisions."  Br. 23.  This Court should not bless such a breathtaking Executive Branch power-grab.

> 2.    *USTR's Statutory Constructions Are Not Entitled To Deference*

For similar reasons, the Court should reject Defendants' call to "limit" review of USTR's actions in "modifying" under Section 307 an existing action rather than initiating "a new [Section] 301 investigation." Br. 24.  Specifically, Defendants argue that the Court should query only "whether the President's interpretation *** is a clear misconstruction of the statute."  Br. 23 (quoting *Solar Energy Indus. Ass'n v. United States*, 86 F.4th 885, 895 (Fed. Cir. 2023) ("*SEIA*")).

As already explained, USTR (not the President) "interpret[ed] and appli[ed]" (Defs. Br. 25) Section 307 when USTR (not the President) chose to "modify" the original tariff action via List 3 and List 4A.  19 U.S.C. § 2417(a)(1).  Thus, Defendants' citations to cases involving deferential review in *direct* challenges to presidential action—such as the challenge to a presidential proclamation on the grounds that it "exceeded the power

9

of the President," *SEIA*, 86 F.4th at 889, or to "a series of proclamations" under which "the President imposed a twenty-five percent tariff on steel imports from a number of countries," *USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1362 (Fed. Cir. 2022)—are inapposite. *See* pp. 7-8, *supra* (distinguishing presidential action cases).

Defendants' insistence that the Court defer because this case really concerns "the *President's* interpretation and application of his Section 307 authority," Br. 25, is also inconsistent with basic APA principles. *Every* Executive Branch agency acts subject to Presidential "direction," whether explicitly or implicitly.  Yet, as the CIT recognized, courts regularly "review agency action taken to implement Presidential proclamations and Executive orders—each of which are forms of presidential direction—pursuant to the APA."  Appx00049 (citing, *inter alia*, *Sherley v. Sebelius*, 689 F.3d 776 (D.C. Cir. 2012); *Chamber of Commerce*, 74 F.3d at 1326-1327).

As the CIT further observed, courts in APA actions do not reflexively defer to USTR in matters "requiring statutory interpretation." *See* Appx00058-Appx00059 (citing 28 U.S.C. § 2640(e)).  Instead, a court "must first carefully investigate the matter to determine whether

Congress's purpose and intent on the question at issue is judicially ascertainable," Appx00059 (quoting *Timex V.I., Inc. v. United States*, 157 F.3d 879, 881 (Fed. Cir. 1998), examining "the statute's text, structure, and legislative history," *id.* (quoting *Gazelle v. Shulkin*, 868 F.3d 1006, 1010 (Fed. Cir. 2017)).

As discussed below (pp. 15-18, *infra*), that is doubly true in the "major questions" context, where the agency "must point to clear congressional authorization for the power it claims." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (internal quotation marks omitted). Where, as here, "the interpretation of [a] provision [is] a question of deep economic and political significance that is central to [the] statutory scheme," courts do "*not* assume that Congress entrusted that task to an agency without a clear statement to that effect." *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023) (third alteration in original) (emphasis added) (internal quotation marks omitted). That "clear statement" requirement is the opposite of Defendants' preferred "clear misconstruction" standard—*Chevron*-like deference that has no place in the "major questions" framework.

## B.  Intervening Precedents Preclude USTR From Waging A Trade War Through The "Modification" Provision

Intervening precedents have made clear, if there ever was a doubt, that Section 307's narrow "modification" provision did not authorize the unprecedentedly massive tariff increases—particularly in this "major questions" context.[3]

### 1.  *"Modify" Means A Modest Or Minor Change*

The central dispute in this case is whether USTR's promulgation of List 3 and List 4A went beyond its Section 307 authority to "modify" a Section 301 action.  By far the best reading of the term "modify," under any standard of review, is that USTR may make only modest or minor changes to the original action.  Pls. Br. 33-34, 59.  Although Defendants

---

[3] Without arguing waiver, Defendants contend that Plaintiffs raised the "major-questions doctrine" "[f]or the first time" on appeal.  Br. 44.  But the Supreme Court did not "announc[e] the arrival" of the "major questions doctrine" in those specific terms until after the CIT issued the decision on review.  *West Virginia*, 597 U.S. at 723.  Nevertheless, in words echoing that doctrine, Plaintiffs argued below that Congress would not have intended to "allow USTR to aggrandize its own Section 307 authority in the manner it did given the deep economic and political significance of the issues central to this statutory scheme."  Appx10159 (internal quotation marks omitted); *see also, e.g.*, Appx10121 ("The tailored 'modification' provisions on which USTR has relied do not permit the Administration unilaterally to expand its investigation-specific findings into an open-ended trade war.").

ignore it, the Supreme Court and this Court have each recently confirmed, across different statutory contexts, that the ordinary definitions of "modify" "carr[y] a connotation of increment or limitation, and must be read to mean to change moderately or in minor fashion." *Biden*, 143 S. Ct. at 2368 (internal quotations omitted).

In *Biden*, when vacating the Education Secretary's attempt to cancel $430 billion in student loan debt predicated on the President's "national emergency" declaration, the Supreme Court held that "[t]he authority to 'modify' statutes and regulations allows the Secretary to make modest adjustments and additions to existing provisions, not transform them." 143 S. Ct. at 2369. It rejected the dissent's contrary interpretation that "would grant unlimited power to the" agency to make "the most substantial kind of change imaginable"—an interpretation "inconsistent with the statutory language and past practice under the statute." *Id.* at 2372 (internal quotation marks omitted).

The Supreme Court's commonsense interpretation of "modify" is also supported by one of Defendants' own newly cited cases, which recognizes that, "*[o]n any reading*, a 'modification' must be a relatively minor adjustment." *SEIA*, 86 F.4th at 901 (emphasis added). Notably,

13

this Court in *SEIA* was interpreting another "modification" provision of the Trade Act itself, *see id.* (interpreting 19 U.S.C. § 2254(b)(1))—and "[a] term appearing in several places in a statutory text is generally read the same way each time it appears," *id.* at 897. Indeed, that modification provision conferred authority directly on the President—underscoring that the meaning of "modify" does not depend on whether a case ultimately involves agency action (like this one) or presidential action (like *SEIA*). In words that could easily be adapted to this case, this Court recognized that "expansion of a 1% duty to a 50% duty is *obviously* not a minor change." *Id.* at 901 (emphasis added). Neither is a seven-fold increase (from $50 to $370 billion) in the tariff action at issue here.[4]

Although Defendants argue that "modify" should be read according to its "ordinary meaning," they fail to confront *Biden or SEIA*. In fact, despite relying on *SEIA* for the proposition that the word "modify" is "non-directionally restricted," Defs. Br. 38, they tellingly ignore *SEIA*'s additional holding regarding the "relatively minor" nature of a Trade Act

---

[4] Had USTR fully implemented List 4 (instead of suspending List 4B), List 4 would have covered *another* $180 billion in imports annually, or approximately $550 billion total, thereby increasing the original action from under 10% to *100%* of annual imports from China.

modification, 86 F.4th at 901; *see id.* at 896 (noting that "*[t]he government *** points us to a dictionary definition of 'modify' as 'making of a limited change in something'*") (emphasis added).  In sum, the statute "provides no authorization for [USTR's] plan even when examined using the ordinary tools of statutory interpretation—let alone [the] 'clear congressional authorization'" needed.  *Biden*, 143 S. Ct. at 2375.

2.    *The "Major Questions" Doctrine Confirms That USTR Exceeded Its Modification Authority*

Even if Section 307 authorization were a close call, Defendants still lose.  Plaintiffs explained in their opening brief that this case falls within the "major questions" doctrine, as recently articulated by the Supreme Court.  Pls. Br. 55-60.  As Plaintiffs pointed out—and as Defendants barely contest—all the hallmarks of a major questions case are present.  USTR discovered in a "long-extant" and "rarely used" provision an "unheralded power" allowing it to take "transformative" action of vast economic and political significance:  escalating a tariff action seven-fold to cover nearly all Sino-American trade, and thus effectively levying a $75 billion annual tax on U.S. purchasers without Congress's imprimatur.  *West Virginia*, 597 U.S. at 700, 724-731; *see Biden*, 143 S. Ct. at 2372-2373 (compared to "past waivers and modifications issued

under the Act," which were "extremely modest and narrow in scope," economic impact of "between $469 billion and $519 billion" is "staggering by any measure"). In such cases, the agency must "point to clear congressional authorization" for the power it claims. *Biden,* 143 S. Ct. at 2375 (internal quotation marks omitted). Such authorization is lacking here.

Defendants do not contest that List 3 and List 4A were major, not "relatively minor," changes to the original Section 301 action. Instead, their response boils down to this: Because "the imposition of tariffs on goods from a foreign country fits comfortably within the substantive scope of the President's and USTR's power[s]" under Section 301 (Br. 45), action under Section 307 can *never* be a "transformative expansion in *** regulatory authority." *West Virginia*, 597 U.S. at 724.

That is a non sequitur. Congress's decision to delegate USTR power to impose a new tariff action initially—subject to what Defendants themselves call "a panoply of statutory procedures"—is distinct from Section 307's "much simpler procedures[]" for a modification. Defs. Br. 28. Unlike Section 307, Section 301 requires a robust investigation, consultations, and factual findings, *see* 19 U.S.C. §§ 2411-2414, *before* it

authorizes USTR to take "appropriate and feasible action," 19 U.S.C. § 2411(a)(1) & (b)(2). Given those restrictions on an initial tariff action, it is hardly surprising that Congress would have expected USTR to act in a similarly deliberate manner before exploding an action's size—in magnitude and scope—rather than to invoke Section 307's highly "streamlined procedures." Defs. Br. 4. Thus, regardless of USTR's Section 301 powers, the question here is whether the word "modify"—which appears solely in Section 307, not Section 301—was "clear congressional authorization" for the challenged seven-fold escalation.

To be sure, Defendants obviously would prefer to avoid Section 301's "panoply" of restrictions. Presumably that is why, instead of relying on its Section 301 authority, USTR employed the "abbreviated" Section 307 procedures to radically increase duties (for the first time ever) and thereby transform the trade landscape with massive economic and political fallout. But "skeptic[ally]" addressing such "assertions of extravagant statutory power" is exactly what the "major questions" doctrine is for. *West Virginia*, 597 U.S. at 724 (internal quotation marks omitted). Defendants' paltry response cannot survive such scrutiny,

particularly in light of the unrebutted precedents confirming the modest nature of a congressionally delegated "modification" power.

### C. Section 307 Did Not Authorize USTR To Increase The Original Tariff Action In These Circumstances

#### 1. *Section 307(a)(1)(B) Did Not Permit The Tariff Actions*

Even if the word "modify" in Section 307 could be read as permitting such sweeping and transformative tariff escalations, List 3 and List 4A were still not authorized. That is because USTR failed to make the required finding that "the burden or restriction on United States commerce *** of the acts, policies, and practices, that are the subject of such action has increased or decreased." 19 U.S.C. § 2417(a)(1)(B).

Defendants argue that USTR satisfied the statute by finding that the United States was harmed by China's retaliation, which was "*connected to* the unfair practices that were the 'subject' of the United States' Section 301 action and were 'taken to maintain those policies.'" Br. 30 (emphasis added) (quoting Appx06172); *see also* Br. 31-35 (describing "connection" between China's retaliation and subject of original Section 301 action, and arguing that retaliation was meant to "protect" and "defend" those practices).

But Section 307(a)(1)(B) requires an increase in burden from the practices that were "the subject of" the original Section 301 action—not from merely any practice "connected to," or meant to "protect" and "defend," the investigated practices.  That limitation makes sense: Because the initial trade restrictions can be imposed only after a full investigation, Congress authorized further trade restrictions based only on harm from the conduct already investigated and found actionable— not from different, never-investigated conduct.

Defendants contend that the Section 307(a)(1)(B) power sweeps broadly, such that USTR is free to respond to increased harms from the "foreign country's 'practices' or 'policies' more generally," regardless of the "form[]" those practices take.  Br. 33-34 (alteration in original).  That is wrong.  The phrase "that are subject of such action" in Section 307(a)(1)(B) refers back to the specific conduct found actionable under Section 301.  Section 301(b)(1) authorizes discretionary action only after USTR finds that "*an* act, policy, or practice of a foreign country is unreasonable or discriminatory" and permits USTR to take action "to obtain the elimination of *that* act, policy, or practice."   19 U.S.C. § 2411(b)(1), (2) (emphases added).  The use of "an" and "that" to qualify

"act, policy, or practice" makes clear that there must be a specific act, policy, or practice that is the subject of the Section 301 action. That is what USTR found here: "[i]n particular," "four categories of acts, policies, and practices are unreasonable or discriminatory" and "thus actionable." Appx01771. None of those four categories (all of which relate to technology transfer and intellectual property practices) can reasonably be read to include retaliatory tariffs, and Defendants make no attempt to argue that the burden from those four investigated categories *themselves* increased.

Defendants alternatively argue that China's retaliatory actions "have already been investigated." Br. 34. Not even close. The referenced report discussed isolated instances of *individual companies* being reluctant "to 'complain about China's unfair trade practice' because of concerns about 'Chinese retaliation'" against those individual companies. *Id.* at 32. Defendants claim that this is "simply another manifestation of [China's] retaliatory conduct," *id.* at 34, but it could hardly be more different from the imposition of billions of dollars in retaliatory country-to-country tariffs. Moreover, as Defendants admit, the passing references in the Section 301 report to company-specific "retaliation"

were related to "the historical context in which [China's technology and IP] actions arose." Br. 31-32.  Like actions "connected to" the investigated practices, the "historical context" for those practices are not the "acts, policies, or practices" themselves.  Regardless, as Plaintiffs argued (Br. 40), USTR neither relied on its isolated references to "retaliation" in the Section 301 report, nor suggested that country-to-country retaliation by China was a "subject" of the original Section 301 action.  USTR thus cannot rely on that justification now.  *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

Finally, Defendants appeal to policy concerns, suggesting that Plaintiffs' interpretation would have "startling consequences"—namely, that "USTR would need to complete a new investigation, which could take at least 30 days and up to a year."  Br. 35.  But a 30-day delay hardly qualifies as a "startling" procedural hurdle before USTR imposes tariffs covering hundreds of billions of dollars of annual imports on one of America's largest trading partners.  As Defendants admit, even that 30-day minimum "can be deferred where USTR determines that 'expeditious action is required.'"  Br. 50 (quoting 19 U.S.C. § 2414(b)(1), (2)).  In any event, that is the choice Congress made—at least where, as here, the

burden of the investigated practices themselves has not increased "after the initial determination."    *Id.* at 35 (emphasis omitted) (quoting Appx00066).

### 2.    *Section 307(a)(1)(C) Did Not Permit The Tariff Actions*

Section 307(a)(1)(C) also did not permit USTR to promulgate List 3 and List 4A.  Plaintiffs' reading is straightforward:  Because USTR may take discretionary action under Section 301(b) only if it first determines that "action by the United States is appropriate," 19 U.S.C. § 2411(b)(2), it logically can only reduce or terminate—not increase—that action once it becomes "*no longer* appropriate," *id.* § 2417(a)(1)(C) (emphasis added); *see* Appx05923 (explaining that in Section 307(a)(1)(C), "the term 'appropriate' links back to the primary language in Section 301(b)").

Defendants make several arguments for why Section 307(a)(1)(C) *also* authorizes USTR to increase a trade action.  None is persuasive.

*First*, Defendants argue that Section 307(a)(1) uses the term "modify," which "must have the same meaning—to increase *or* decrease— in Section 307(a)(1)(<u>C</u>)" as in Section 307(a)(1)(<u>B</u>).  Br. 39; *see id.* at 38 (contending that "plaintiffs' reading [of Section 307(a)(1)(C)] replaces the word 'modify' with 'reduce' or 'taper'").  But as Defendants themselves

elsewhere acknowledge, Section 307(a)(1)(<u>A</u>)—the neighboring subsection addressing when USTR may "modify" a *mandatory* action— allows only "elimination or diminution, not increase, of trade actions." *Id.* at 42 (conceding Plaintiffs were "correct[]" on that point). Thus, the only question is whether that same limitation applies to parallel Section 307(a)(1)(C), too.

Defendants respond that it is the surrounding context of Section 307(a)(1)(A)—not the word "modify" itself—that prevents increases under that provision. Br. 42. But the same is true of Section 307(a)(1)(C). As noted, the Act permits USTR to act if "action by the United States is appropriate," 19 U.S.C. § 2411(b)(2), and later to reduce or terminate it once "no longer appropriate," *id.* § 2417(a)(1)(C). It thus closely mirrors the procedure for mandatory actions, under which USTR is required to take action as long as no exceptions make the action inappropriate, 19 U.S.C. § 2411(a), but later may reduce or terminate that action should such an exception arise, *id.* § 2417(a)(1)(A). Section 307 is thus symmetrical: (1) Section 307(a)(1)(<u>A</u>) permits USTR to ratchet down trade restrictions due to changed circumstances in mandatory actions, (2) Section 307(a)(1)(<u>C</u>) allows USTR to do the same for discretionary

actions, and (3) Section 307(a)(1)(B) allows increases or decreases in both types of actions, as long as the burden of the actionable conduct has increased.  *See* Pls. Br. 45-46.  That is also the reading confirmed by the legislative history.[5]

*Second*, Defendants' reading would render Section 307(a)(1)(B) redundant in all discretionary cases—as vaguely announcing that an action is "no longer appropriate" is undeniably simpler than making factual findings regarding increased burdens (as this case shows). Defendants respond that Section 307(a)(1)(B) would not be *entirely* superfluous, as it could still be used in cases involving mandatory action.

---

[5] The Conference Report explains that the Senate bill, unlike the House version, did not include the power to modify a discretionary action. *See* H.R. Rep. No. 100-576, at 564 (1988), 1988 U.S.C.C.A.N. 1547, 1597. During conference, "[t]he Senate recede[d], with amendments" to, inter alia, "substitute the same applicable criteria under the conference agreement for exceptions to cases involving mandatory action and, in other cases, the criteria for discretionary action, or if the burden or restriction on U.S. commerce increases or decreases." *Id.* at 565, 1988 U.S.C.C.A.N. at 1598.  In other words, the House and Senate negotiators agreed to a parallel structure for mandatory and discretionary actions—and distinguished that structure from the authority to modify in cases of increased burdens on U.S. commerce.  By contrast, the lone snippet of legislative history cited by Defendants in support of their argument (Br. 36) reflects the views of a single House committee regarding a bill that ultimately was *not enacted*, and that contained materially different language in the provision permitting modification of Section 301 actions.

Br. 41.  But the point is that Defendants' interpretation renders the provision vestigial with respect to discretionary actions—even though everyone agrees that Section 307(a)(1)(B) (unlike Sections 307(a)(1)(A) or (C)) applies to *both* "a mandatory trade action under Section 301(a) or a discretionary action under Section 301(b)." *Id.*

Defendants also half-heartedly posit (Br. 41) hypothetical cases in which USTR might conclude that a Section 301 action both remains "appropriate" under Section 307(a)(1)(C), and yet simultaneously needs to be "increased" under Section 307(a)(1)(B).  Even assuming that position were sound as a matter of logic, it contradicts Defendants' separate assertion that "the limits from Section 301 apply in Section 307(a)(1) modifications"—including the requirement that the modification be "appropriate to obtain the elimination of the foreign practices." Br. 43.  If so, Section 307(a)(1)(B) could never lawfully modify an existing "appropriate" action.  Defendants cannot have it both ways: Either their reading renders Section 307(a)(1)(B) superfluous with regard to discretionary actions, or Section 307(a)(1)(C) does not give USTR the unbounded discretion it claims.

25

*Third*, by asserting that Section 307(a)(1)(C) places no discernable limits on USTR's ability to increase a tariff action seven-fold (or a hundred-fold), Defendants' interpretation raises serious nondelegation concerns—thereby triggering the canon of constitutional avoidance. *See* Pls. Br. 52-55. Defendants respond that the canon applies only when there is "statutory ambiguity," and "'[m]odify' has its ordinary meaning in Section 307(a)(1)(C)." Br. 42-43. But Defendants ignore that the term is "ordinarily used" to mean "'to make more temperate and less extreme,' 'to limit or restrict the meaning of,' or 'to make minor changes in the form or structure of [or] alter without transforming'"—not to give free rein. *Biden*, 143 S. Ct. at 2368 (alteration in original) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1952 (2002)).

Defendants also contend that the Supreme Court "upheld an analogous trade statute against a nondelegation challenge" in *Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976). Br. 43-44. But *Algonquin* supports Plaintiffs, not Defendants. The nondelegation challenge failed in *Algonquin* because the statute in question (1) "establishes clear preconditions to Presidential action"; (2) permits the President to "act only to the extent 'he deems necessary

to adjust the imports of such article and its derivatives so that such imports will not threaten to impair the national security'"; and (3) "[a]rticulates a series of specific factors to be considered by the President in exercising his authority" thereunder. *Federal Energy Admin.*, 426 U.S. at 559-560. Under USTR's own interpretation, none of those factors are present in Section 307: it establishes (at best) an "abbreviated" precondition, it does not require USTR to make any findings (other than that the action "is no longer appropriate"), and offers no "specific factors to be considered" by USTR in exercising its authority.

*Finally*, Defendants fall back on a policy argument, *i.e.*, that Congress must have intended to allow USTR maximum flexibility to increase a trade action via Section 307 to avoid "anomalies in the Trade Act's operation." Br. 39-41; *see* Br. 40 (describing "temporal anomalies" in having "to start a Section 301(b) action afresh"). But the only "anomaly" USTR points to is that it cannot freely increase tariffs for whatever amount, at whatever time, and for whatever reason it likes under Section 307(a)(1)(C). There is nothing "anomalous" about Congress declining to give USTR *carte blanche*.

27

Proving the point, Defendants never dispute that, with regard to *mandatory* actions under Section 301(a)—which, by definition, involve trade practices so serious that Congress required USTR to take action— USTR's sole ability to increase a no-longer-appropriate action is either to invoke Section 307(a)(1)(B) or to take a "whole *new* tariff action— complete with a new investigation." Defs. Br. 15. Yet Defendants never explain why those "delay-inducing procedures" do not equally "hamstring[] the Government's ability to respond to rapidly changing diplomatic circumstances" when dealing with mandatory actions. Br. 40. Although Defendants argue that "plaintiffs have no coherent theory why Congress would demand a 'new investigation' and fresh determination of an unfair foreign practice under Section 301" in cases where "the original Section 301 action was simply proving ineffective," *id.* at 40-41, it is actually Defendants who lack a coherent theory about why Congress would have restricted mandatory actions *alone*. If anything, the fact that USTR had never once (until now) used Section 307 to increase trade restrictions (in either a mandatory *or* discretionary action) in the three decades since its enactment demonstrates that USTR's ability to increase

tariffs through Section 307(a)(1)(C) is hardly essential to effectuating the Act's goals.

## II. USTR'S PREORDAINED DECISION TO PROMULGATE LIST 3 AND LIST 4A VIOLATED THE APA

### A. The Foreign Affairs Function Exception Does Not Apply

The APA imposes certain procedural requirements on USTR, including the obligation to consider and respond to comments adequately. 5 U.S.C. § 553(c). Because "notice-and-comment rule-making is a primary method of assuring that an agency's decisions will be informed and responsive," *State of N.J., Dep't of Env't Prot. v. U.S. Env't Prot. Agency*, 626 F.2d 1038, 1045 (D.C. Cir. 1980), any claim of exemption from APA rulemaking requirements is "narrowly construed and only reluctantly countenanced." *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1380 (Fed. Cir. 2017).

Defendants contend that the "foreign affairs function" exception excuses their obligation to respond to comments. 5 U.S.C. § 553(a)(1). But that exception does not apply "merely because [the challenged actions] have impact beyond the borders of the United States." *Mast Indus., Inc. v. Regan*, 596 F. Supp. 1567, 1581 (Ct. Int'l Trade 1984); *see*

*City of N.Y. v. Permanent Mission of India to United Nations*, 618 F.3d 172, 202 (2d Cir. 2010) ("Congress[] admoni[shed] in the legislative history of the APA not to interpret the phrase 'foreign affairs function' loosely to mean any function extending beyond the borders of the United States." (internal quotation marks and ellipsis omitted) (citing S. REP. NO. 79-752, at 13 (1945); H.R. REP. NO. 79-1980, at 23 (1946))). Nor does it apply in challenges to a "routine change to the tariff rates imposed on imported goods by the United States," or to agency action taken "pursuant to a U.S. statutory authority." *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1289-1290 (Ct. Int'l Trade 2019). And it does not apply to disputes over whether an agency possessed "legal[] authori[ty]" to act. *Australian Meat & Live-Stock Corp. v. Block*, 590 F. Supp. 1230, 1235 (Ct. Int'l Trade 1984). Instead, "[f]or the exception to apply, the public rulemaking provisions should provoke definitively undesirable international consequences." *Invenergy Renewables*, 422 F. Supp. 3d at 1289 (citation omitted).

Defendants do not contend that public rulemaking over Lists 3 and 4A would "provoke definitively undesirable international consequences." Nor could Defendants, considering they *actually provided* notice and an

opportunity to comment without invoking the exception. *See* Appx00072-Appx00073 ("USTR did not invoke the \*\*\* exemption" at any point during the rulemakings, meaning that "the Government's invocation of the exemption is entirely *post hoc* and inconsistent with the manner in which the USTR conducted the modification processes."); *compare, e.g.*, *Implementation of Tariff-Rate Quota for Imports of Sugar-Containing Products*, 64 Fed. Reg. 67,152, 67,153 (Dec. 1, 1999) ("Pursuant to the provisions of 5 U.S.C. 553(a), public notice is inapplicable to this interim rule because it is within the foreign affairs function of the United States."). That is no surprise given that the Trade Act itself imposes APA-like procedures. *See* 19 U.S.C. § 2417(a)(2) (requiring USTR to "consult with \*\*\* representatives of the domestic industry concerned" and to afford an "opportunity for the presentation of views by other interested persons affected by the proposed modification").

Defendants instead contend that the foreign affairs function exception applies because Lists 3 and 4A "concern the diplomatic relationship and business activities between the United States and China" and "were timed to influence fast-moving, ongoing negotiations between" the nations. Br. 48-49. But the exception is typically applied

to agency action implementing international agreements. *See American Ass'n of Exps. & Imps.-Textile & Apparel Corp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985) (quoting H.R. REP. NO. 79-1980 (1946)); *International Bhd. of Teamsters v. Pena*, 17 F.3d 1478, 1481-1486 (D.C. Cir. 1994). By contrast, USTR promulgated Lists 3 and 4A pursuant to a domestic statute (Section 307(a)(1)), not an international treaty that the Government had already negotiated. Defendants cite no case in which a USTR action taken under Section 301 fell within the foreign affairs function.

Moreover, as the CIT recognized, Defendants' argument also suffers from a timing problem: "the United States and China did not enter into any trade agreement until *after*" USTR promulgated Lists 3 and 4A. Appx00073-Appx00074 (emphasis added). And the exception does not apply "simply because [] rule[s] relate[] to ongoing negotiations" between nations. Appx00074 (citing *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 776 (9th Cir. 2018)).

Defendants finally argue that the foreign affairs function exception is "categorical," such that they should not have had to make "a case-specific showing that using the APA's rulemaking procedures would

32

provoke 'definitely undesirable international consequences.'"  Br. 52-53.

But if Defendants were correct that the foreign affairs function excludes any matters that (in their view) broadly implicate the "diplomatic relationship and business activities between the United States and" its major trading partners, it would exempt most trade-related government functions from the APA.  Congress plainly never intended the exception to be construed so broadly.

### B.  USTR's Remand Determination Was Impermissibly Post Hoc

When USTR issued Lists 3 and 4A, the APA required it to respond "in a reasoned manner[] to any comments [it] received *** that raise significant issues with respect to [the] proposed rule[s]." *Mid Continent*, 846 F.3d at 1379 n.11 (citation omitted).  Defendants no longer contend, as they did before the CIT, that USTR adequately responded to comments when it initially issued List 3 (just 11 days after the comments deadline) and List 4A (just six weeks after the deadline for post-hearing submissions).  That failure alone should have resulted in vacatur. *See* 5 U.S.C. § 706(2)(A) (requiring courts to "hold unlawful and set aside agency action" that is "not in accordance with law").  Vacatur is especially appropriate where (as here) "the required explanation of the agency's

action is totally absent[] or palpably inadequate." *Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 798 n.2 (D.C. Cir. 1983) (internal quotation marks omitted).

Instead, Defendants argue that USTR remedied any failure to respond to comments via its Remand Determination.    Br. 54-62. Although USTR could have responded to its initial failure by "deal[ing] with the problem afresh by taking *new* agency action," *Department of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1908 (2020) (internal quotation marks and citation omitted), USTR declined that option and instead attempted to address the comments for the first time on remand.    Defendants acknowledge (at 54) that USTR could only defend Lists 3 and 4A based on contemporary reasoning found in the administrative record, not "belated justifications" or "impermissible *post hoc* rationalization." *Regents*, 140 S. Ct. at 1907-1909 (internal quotation marks omitted).

USTR's Remand Determination flunks that test.  Rather than point to anything in the contemporaneous record, USTR converted vague sentences about internal deliberative processes into a 90-page tome that told a brand-new story about why it rejected significant comments.

34

Appx10570-Appx10659; *see* Pls. Br. 71-77.  And, as discussed (*see* pp. 5-7, *supra*), now that story has shifted again:  Defendants contend on appeal that presidential direction was in fact dispositive, not just "a key element" as USTR said in its Remand Determination.  That alone is reason to vacate.

USTR still offers *zero* contemporaneous evidence that it grappled with substantial comments *at the time* it developed Lists 3 and 4A. Defendants contend that *Regents* allows USTR to "elaborat[e] on its earlier reasons" or "amplify[] its prior justifications" for rejecting significant comments.  Br. 55; *see* Br. 57-62 (discussing *post hoc* rationale).  But in issuing Lists 3 and 4A, USTR did not provide *any* reason (conclusory or otherwise) for its rejection of significant comments. Appx06173, Appx09154; *see* Pls. Br. 67-68, 72-73.  Put simply, USTR should not have been permitted to "expand on" reasoning that it never gave when it first acted.

# CONCLUSION

The Court should reverse the CIT's judgment, and vacate the List

3 and List 4A tariff actions.

Respectfully submitted,

/s/ *Pratik A. Shah*
Pratik A. Shah
Matthew R. Nicely
James E. Tysse
Daniel M. Witkowski
Devin S. Sikes
AKIN GUMP STRAUSS HAUER &
  FELD LLP

*Counsel to Plaintiffs-Appellants*
*HMTX Industries, LLC, Halstead*
*New England Corp., Metroflor*
*Corporation, and Jasco Products*
*Company LLC*

February 12, 2024

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Circuit Rule 32(a). The brief contains 6,802 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook type style.

February 12, 2024                         */s/ Pratik A. Shah*
                                          Pratik A. Shah

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of the Court of the United States Court of the Federal Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.


February 12, 2024                    */s/ Pratik A. Shah*
                                      Pratik A. Shah