# United States Court of Appeals for the Federal Circuit

_____

**HMTX INDUSTRIES LLC, HALSTEAD NEW ENGLAND CORP., METROFLOR CORP., JASCO PRODUCTS COMPANY LLC,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, JAMIESON GREER, U.S. TRADE REPRESENTATIVE, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION,**
*Defendants-Appellees*

_____

2023-1891

_____

Appeal from the United States Court of International Trade in Nos. 1:20-cv-00177-3JP, 1:21-cv-00052-3JP, Chief Judge Mark A. Barnett, Judge Claire R. Kelly, Judge Jennifer Choe-Groves.

_____

Decided: September 25, 2025

_____

PRATIK A. SHAH, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, argued for plaintiffs-appellants. Also represented by MATTHEW R. NICELY, DEVIN S. SIKES, JAMES EDWARD TYSSE, DANIEL MARTIN WITKOWSKI.

EMMA E. BOND, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellees. Also represented by SOSUN BAE, BRIAN M. BOYNTON, JOSHUA KOPPEL, PATRICIA M. MCCARTHY, JUSTIN REINHART MILLER, LOREN MISHA PREHEIM, ELIZABETH ANNE SPECK; PHILIP ANDREW BUTLER, MEGAN MICHELLE GRIMBALL, Office of the United States Trade Representative, Washington, DC; VALERIE SORENSEN-CLARK, Office of the Assistant Chief Counsel, International Trade Litigation, United States Customs and Border Protection, New York, NY.

---

Before LOURIE and HUGHES, *Circuit Judges*, and GILSTRAP, *District Judge*.[1]

HUGHES, *Circuit Judge*.

From 2017 to 2018, the Office of the United States Trade Representative (USTR) conducted an investigation which found that China was engaged in unreasonable or discriminatory conduct that burdens or restricts U.S. commerce. Following a period for notice and comment, USTR took discretionary action under Section 301 of the Trade Act of 1974 by imposing 25% duties on $50 billion of imports from China. This $50 billion trade action on List 1 and List 2—a reference to the list of Chinese products included in the affected Harmonized Tariff Schedules—is not challenged. After China retaliated against these tariffs, USTR invoked Section 307 to modify its discretionary action and impose 10% duties, later increased to 25%, on an additional $200 billion of Chinese imports that fall under List 3. USTR then imposed 10% duties, later

---

[1]    Honorable Rodney Gilstrap, District Judge, United States District Court for the Eastern District of Texas, sitting by designation.

decreased to 7.5%, on approximately $120 billion in Chinese imports that fall under List 4A.

Plaintiffs-Appellants HMTX Industries, Halstead New England Corp., Metroflor Corp., and Jasco Products Co. LLC are businesses that import Chinese products subject to the List 3 and List 4A tariffs. They filed the first of over 3,600 cases at the Court of International Trade alleging that the List 3 and 4A tariffs were issued without statutory authority and in violation of the Administrative Procedure Act's requirements for notice and comment rulemaking. The main issue before this court is one of statutory interpretation, namely, whether Section 307 authorized USTR to modify its original Section 301 trade action by imposing escalatory tariffs on List 3 and List 4A.

The trial court agreed with the Government that the modifications were consistent with USTR's authority under Section 307(a)(1)(B), which allows USTR to modify an action where the burden or restriction imposed by the investigated conduct "has increased or decreased." 19 U.S.C. § 2417(a)(1)(B). Following a remand order instructing USTR to further explain how it considered significant public comments aired in response to the proposed modifications, USTR produced a remand redetermination articulating in greater detail its contemporaneous reasoning for the modified actions. On review, the trial court sustained the List 3 and List 4A tariff actions.

We decline to address the scope of USTR's authority under Section 307(a)(1)(B) and instead conclude that Section 307(a)(1)(C) independently authorized the Lists 3 and 4A tariff actions. We further conclude that USTR's remand redetermination complied with the trial court's lawful remand order and supplied the necessary clarification to meet the APA's requirements regarding notice-and-comment rulemaking. Accordingly, we affirm the trial court's

final judgment and sustain USTR's challenged modifications.

## I

## A

We begin with a brief review of the Trade Act of 1974. Section 301 of the Act originally empowered the President to respond to unfair trade practices which burden or restrict United States commerce. Pub. L. No. 93-618, § 301, 88 Stat. 1978, 2041–43. Included in the President's powers to respond was the option to impose duties on foreign countries responsible for the harmful conduct. *Id.* at 2042. Section 141 of the 1974 Trade Act also created the agency that, in 1979, was redesignated the Office of the United States Trade Representative (USTR). *Id.* at 1999 (Section 141 is currently found at 19 U.S.C. § 2171); Reorganization Plan No. 3 of 1979, § 1(a), 93 Stat. 1381, 1381. In 1988, Congress transferred the authority to implement Section 301 from the President to USTR. Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1301(a), 102 Stat. 1107 (Section 301 is currently found at 19 U.S.C. § 2411).

"[S]ubject to the specific direction, if any, of the President," Section 301 of the 1974 Trade Act empowers USTR to respond to unfair trade practices. 19 U.S.C. § 2411(a), (b)(2). Section 301 specifies the circumstances in which USTR must take either "[m]andatory action" or may take "[d]iscretionary action" to eliminate an unfair trade practice by a foreign country. *Id.* § 2411(a), (b). Like the President prior to 1988, USTR's scope of authority to take action includes the power to "impose duties or other import restrictions on the goods of . . . such foreign country for such time as [USTR] determines appropriate." *Id.* § 2411(c)(1)(B). Before taking action under Section 301, USTR has to complete various steps. It must initiate an investigation (*id.* § 2412); consult with the foreign country regarding the practices being investigated (*id.* § 2413);

determine whether the requisite conditions for action are met, and if so, publish its proposed action and the factual findings on which it is based (*id.* § 2414); and allow for public comment on the proposed action and publication of the final action (*id.* § 2412(a)(4), § 2412(b)(1)(A), § 2414(c)).

Various conditions can trigger "[m]andatory action," including "an act, policy, or practice of a foreign country" that violates a trade agreement with the United States or is "unjustifiable and burdens or restricts United States commerce." *Id.* § 2411(a)(1)(B). Mandatory actions are subject to a proportionality requirement, meaning they must "affect goods or services of the foreign country in an amount that is equivalent in value to the burden or restriction being imposed by that country on United States commerce." *Id.* § 2411(a)(3). Discretionary actions are not subject to the same restriction. Section 301(b) provides that,

> If the [USTR] determines under section 2414(a)(1) of this title that—
>
>> (1) an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce, and
>>
>> (2) action by the United States is appropriate, the [USTR] shall take all appropriate and feasible action authorized under subsection (c), subject to the specific direction, if any, of the President regarding any such action, . . . to obtain the elimination of that act, policy, or practice. . . .

*Id.* § 2411(b) (titled "Discretionary Action").

In other words, if an investigation leads USTR to determine that a burdensome foreign practice is "unreasonable or discriminatory"—as opposed to "unjustifiable"—and that action is appropriate, USTR's discretionary powers

are activated. *Id.* At that point, USTR may take "all appropriate" action to obtain a reversal of that practice, subject to the scope of its authority. *Id.* The terms "unreasonable," "unjustifiable," and "discriminatory" are defined by Section 301 at § 2411(d)(3), § 2411(d)(4), and § 2411(d)(5) respectively, and are not at issue on appeal.

As part of the 1988 amendments to the 1974 Trade Act, Congress added Section 307, titled "Modification and termination of actions," to give USTR the authority to "modify or terminate" a Section 301 action. Pub. L. No. 100-418, § 1301(a), 102 Stat. 1107 (Section 307 is currently found at 19 U.S.C. § 2417). Section 307(a)(1) articulates the circumstances in which modification is permitted:

> The [USTR] may modify or terminate any action, subject to the specific direction, if any, of the President with respect to such action, that is being taken under section 2411 of this title if—
>
>> (A) any of the conditions described in section 2411(a)(2) [releasing USTR from the requirement to take mandatory action] exist,
>>
>> (B) the burden or restriction on United States commerce of the denial rights, or of the acts, policies, and practices, that are the subject of such action has increased or decreased, or
>>
>> (C) such action is being taken under section 2411(b) of this title and is no longer appropriate.

19 U.S.C. § 2417(a)(1).

The operation of Section 307 is such that Section 307(a)(1)(A) applies only to mandatory action, Section 307(a)(1)(C) applies only to discretionary action, and Section 307(a)(1)(B) applies to either mandatory or

discretionary actions. Section 307(a)(1)(A) refers to conditions when mandatory action is no longer required, Section 307(a)(1)(C) explicitly refers to discretionary action taken under Section 301(b), and Section 307(a)(1)(B) applies to any action taken under Section 301. Before modifying an action, USTR is also obligated to consult "with representatives of the domestic industry concerned" and to provide an opportunity for other affected parties to present their views on "the effects of the modification or termination and whether any modification or termination of the action is appropriate." *Id.* § 2417(a)(2).

## B

On August 14, 2017, President Trump issued a memorandum directing USTR to determine whether to investigate "any of China's laws, policies, practices, or actions that may be unreasonable or discriminatory and that may be harming American intellectual property rights, innovation, or technology development." Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology, 82 Fed. Reg. 39,007, 39,007 (Aug. 17, 2017). Four days later, USTR initiated a "Section 301 Investigation" pursuant to the 1974 Trade Act and subsequently requested public comment. Initiation of Section 301 Investigation; Hearing; and Request for Public Comment: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 82 Fed. Reg. 40,213, 40,213–14 (Aug. 24, 2017). The notice of investigation explained that USTR would focus on four categories of conduct by the Chinese government: (1) practices to force or induce U.S. companies operating in China to transfer their technology and intellectual property to Chinese companies; (2) policies and regulations that deprive U.S. companies of the ability to set market-based terms in licensing with Chinese companies; (3) efforts to direct and unfairly facilitate the systematic investment in, and/or acquisition of, U.S. companies and their assets by Chinese companies in order to generate large-scale

technology transfer in strategic industries; and (4) cyber-theft of intellectual property, trade secrets, or confidential business information by intrusions into U.S. commercial computer networks. *Id.* Concurrently, USTR requested consultations with the government of China, which opposed the initiation of a Section 301 investigation. J.A. 01557.

After a seven-month investigation, USTR published a report detailing the factual support for its finding that the Chinese government was engaging in each of the four categories of investigated conduct in a manner that was unreasonable or discriminatory and burdened or restricted U.S. commerce. Office of the United States Trade Representative, Findings of the Investigation into China's Acts, Policies, And Practices Related to Technology Transfer, Intellectual Property, and Innovation Under Section 301 of the Trade Act of 1974 (2018), https://ustr.gov/sites/default/files/Section%20301%20FINAL.PDF. It promptly issued a notice of its determination and requested public comment on an appropriate action in response to the investigated conduct. Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 83 Fed. Reg. 14,906, 14,906–54 (Apr. 6, 2018). The notice explained that the investigated acts, policies, and practices were actionable under Section 301(b), and that, pursuant to direction from President Trump, the USTR "proposes that appropriate action would include increased tariffs on certain goods of Chinese origin." *Id.* at 14,907.

USTR's proposed discretionary action was a 25% tariff on two lists of Chinese goods, specified by product subheadings from the Harmonized Tariff Schedule (HTS) of the United States, then cumulatively worth $50 billion in annual trade value. *Id.* at 14,907, 14,910–54. These two lists are referred to as List 1 and List 2. On June 20, 2018,

USTR published notice of the final List 1 items, covering $34 billion in trade value, on which it would impose a 25% tariff. Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 83 Fed. Reg. 28,710, 28,711 (June 20, 2018). On August 16, 2018, USTR published notice of the final List 2 items, covering an additional $16 billion in trade value, that would be tariffed at the same rate. Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 83 Fed. Reg. 40,823, 40,823–24 (Aug. 16, 2018). The List 1 and List 2 tariffs are not the subject of this appeal.

In retaliation to USTR's initial action, China raised tariffs on $50 billion worth of exports from the United States. President Trump determined that China had no "intention of changing its unfair practices related to the acquisition of American intellectual property and technology" and directed the USTR to "identify $200 billion worth of Chinese goods for additional tariffs at a rate of 10 percent." J.A. 01872. Between mid-2018 and early 2020, the USTR, at the continued direction of the President, invoked Sections 307(a)(1)(B) and 307(a)(1)(C) to modify its discretionary action several times. These modifications culminated in the additional Lists 3 and 4A tariffs—imposed on at least $300 billion worth of Chinese imports—that are the subject of this appeal.

The modifications began in July 2018, when USTR published a notice of its proposal to "modify the action in this investigation by taking a further, supplemental action"—specifically, "an additional 10 percent ad valorem duty on products [from] China" with "an annual trade value of approximately $200 billion," specified in List 3. Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and

Practices Related to Technology Transfer, Intellectual Property, and Innovation, 83 Fed. Reg. 33,608, 33,609 (Jul. 17, 2018) (*"List 3 NPRM"*). USTR cited to Section 307(a)(1)(C) as authority for the modification, explaining that the modification was "appropriate" in light of (1) the 1974 Trade Act's statutory goal of obtaining the elimination of the investigated conduct, (2) China's unwillingness to "respond to action at a $50 billion level by addressing U.S. concerns," (3) the President's direction, and (4) "China's announced retaliatory action ($50 billion) and the level of Chinese goods imported into the United States ($505 billion in 2017)." *Id.* About a month later, USTR proposed increasing the tariff on List 3 items from 10% to 25% and accordingly extended the period for public comments. Extension of Public Comment Period Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 83 Fed. Reg. 38,760, 38,760–61 (Aug. 7, 2018)). USTR received over 6,000 written comments in response to the proposed List 3 tariffs.[2]

Eleven days after the deadline for written comments had elapsed, on September 17, 2018, President Trump issued a statement announcing that USTR would proceed with a two-phase implementation of the List 3 tariffs on the subject $200 billion of imports from China. J.A. 06159. USTR accordingly published notice of the final List 3 tariff action, this time relying on both Section 307(a)(1)(B) and Section 307(a)(1)(C) as authority for the modification. Notice of Modification of Action Pursuant to Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and

---

[2]    Although not submitted as part of the underlying docket, these comments are publicly available at https://www.regulations.gov/docket/USTR-2018-0026.

Innovation, 83 Fed. Reg. 47,974, 47,974 (Sept. 21, 2018) (*"Final List 3"*). Paralleling the language of these provisions, USTR stated that "the burden or restriction on United States commerce of the acts, policies, and practices that are the subject of the Section 301 action continues to increase" and "China's response . . . has shown that the current action no longer is appropriate." *Id.* at 47,974–75. USTR also indicated that it "carefully reviewed the public comments" and accordingly decided "not to include certain tariff subheadings" in List 3. *Id.* at 47,975. The additional tariffs on List 3 products became effective September 24, 2018. *Id.*

In the months that followed, USTR modified implementation of the List 3 tariffs in response to U.S.-China trade negotiations. At first, and at the direction of the President, it delayed in increasing the tariffs on List 3 items from 10% to 25% in response to progress in discussions with China. Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 83 Fed. Reg. 65,198, 65,198–99 (Dec. 19, 2018); Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 84 Fed. Reg. 7,966, 7,966–67 (Mar. 5, 2019). When China decided to "retreat from specific commitments agreed to in earlier rounds" of negotiations with the United States, USTR, at President Trump's direction, increased the duties on List 3 items to 25%. Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 84 Fed. Reg. 20,459, 20,459 (May 9, 2019).

In response to "further retaliatory action against U.S. commerce," the President directed, and USTR proposed, another modification to the discretionary action against China. Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts,

Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 84 Fed. Reg. 22,564, 22,564 (May 17, 2019) (*"List 4 NPRM"*). The proposed modification took the form of an additional tariff, "of up to 25 percent," on a fourth list of Chinese imports worth $300 billion in annual trade value. *Id.* USTR again referenced Sections 307(a)(1)(B) and 307(a)(1)(C) as independent bases for the proposed List 4 tariffs. *Id.* Although the tariffs on Lists 1 through 4 would result in a duty on "essentially all products" imported from China (worth approximately $500 billion at the time, USTR explained its view that modification was reasonable "[i]n light of China's failure to meaningfully address the acts, policies, and practices that are subject to this investigation and its response to the current action being taken in this investigation." *Id.* Notice of the proposed modification again solicited comments, *id.* at 22,565, resulting in almost 3,000 additional written submissions.[3]

USTR ultimately decided to split List 4 into Lists 4A and 4B, and to begin by imposing a 10% tariff on List 4A items on September 1, 2019. Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 84 Fed. Reg. 43,304, 43,304–05 (Aug. 20, 2019) (*"Final List 4"*). Appellants estimate that the annual trade value of the items on List 4A was then approximately $120 billion. Appellants' Opening Br. 22. Ten days later, at the President's direction, USTR increased tariffs on List 4A to 15%, citing additional tariff and non-tariff retaliation from China. Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 84 Fed.

---

[3]    Although not submitted as part of the underlying docket, these comments are publicly available at https://www.regulations.gov/docket/USTR-2019-0004.

Reg. 45,821, 45,822 (Aug. 30, 2019) ("China has determined to impose tariffs on a substantial majority of U.S. goods exported to China, with the goal of pressuring the United States to cease its efforts to obtain the elimination of China's unfair policies. China has further taken or threatened to take additional countermeasures, including . . . steps to devalue its currency.").

By December 2019, however, the state of diplomatic affairs had changed. USTR announced that "the United States and China reached a historic and enforceable agreement on a Phase One trade deal that requires structural reforms and other changes to China's economic and trade regime, including with respect to certain issues covered in this Section 301 investigation." Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 84 Fed. Reg. 69,447, 69,447 (Dec. 18, 2019). Although 15% tariffs on List 4B were supposed to go into effect December 15, 2019, USTR indefinitely suspended the List 4B tariffs, finding them "no longer appropriate" in the context of the Phase One trade deal with China. *Id.* At the President's direction, USTR further reduced the tariffs on List 4A to 7.5% once the Phase One trade deal came into force. Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 85 Fed. Reg. 3,741, 3,741 (Jan. 22, 2020). Thus, by the start of 2020, USTR was imposing a 25% tariff on List 1 and List 2 items worth $50 billion (the original Section 301 action), and a 25% tariff on List 3 goods worth $200 billion as well as a 7.5% tariff on List 4A goods worth at least $100 billion (the modified Section 301 action).

The present appeal requires us to determine whether USTR had the authority to modify its original Section 301 action to impose tariffs on items enumerated in List 3 and List 4A.

C

In September 2020, Plaintiffs-Appellants, HMTX Industries, Halstead New England Corp., Metroflor Corp., and Jasco Products Co. LLC filed suit at the Court of International Trade alleging that the List 3 and 4A tariffs were issued without statutory authority and in violation of the APA. Compl. ¶¶ 65–69, 73–75, *HMTX Indus. LLC v. United States*, Case No. 20-cv-00177 (Ct. Int'l Trade Sept. 21, 2020), ECF No. 12. Appellants are all businesses that import products subject to the List 3 and List 4A tariffs. Approximately 3,500 additional suits raising substantially similar claims were brought before the trial court (the "Section 301 Cases"). In response, the trial court collected these cases into one "master case," *see In re Section 301 Cases*, Case No. 21-cv-00052 (Ct. Int'l Trade Feb. 10, 2021), ECF No. 1 at 1, and selected Appellants' case as the "the sample case for purposes of the court's initial consideration and resolution of Plaintiffs' claims," *id.*, ECF No. 267 at 1. All other Section 301 Cases were stayed pending the resolution of Appellants' case. *Id.*

The trial court found that "USTR exercised its authority consistent with [S]ection 307(a)(1)(B) when it promulgated List 3 and List 4A" and declined to address whether USTR's actions were also authorized under Section 307(a)(1)(C). *In re Section 301 Cases*, 570 F. Supp. 3d 1306, 1334–35 (Ct. Int'l Trade 2022) ("*Section 301 Cases I*"). With respect to Section 307(a)(1)(B), the trial court concluded that "China's retaliatory conduct caused an increased burden on U.S. commerce from the acts, policies, and practices that constituted the subject of the [original Section 301] action," and thus justified modified action in the form of additional tariffs. *Id.* at 1332, 1334. The trial court explained that China's retaliatory measures were linked to the original Section 301 action because they were intended to maintain China's four categories of unfair conduct and to offset the original tariffs imposed to encourage their elimination. *Id.* at 1334.

Regarding the alleged APA violations, the trial court agreed with Appellants that USTR failed to adequately respond to comments as required by the APA's notice-and-comment rulemaking procedures. *Id.* at 1338. Although USTR's notices of proposed rulemaking indicated a "willingness to consider factors other than the President's direction," the contested final actions did not respond to significant issues raised in the comments—including "concerns regarding the legality and efficacy of the tariffs, the potential for damage to the U.S. economy, and whether alternative measures would be more effective"—or explain the relationship between issues raised in the comments and the President's direction. *Id.* at 1341, 1339. The trial court ordered a limited remand for USTR to reconsider or further explain its rationale for the List 3 and 4A tariffs, warning that USTR "may not identify reasons that were not previously given." *Id.* at 1345.

In a 90-page remand determination, USTR responded in more detail to the categories of comments highlighted by the trial court and further contextualized how it weighed the President's direction when taking modified actions. In March 2023, the trial court sustained USTR's remand determination and entered a final judgment sustaining the List 3 and List 4A tariffs. *In re Section 301 Cases*, 628 F. Supp. 3d 1235, 1251 (Ct. Int'l Trade 2023) ("*Section 301 Cases II*"). The trial court was satisfied by USTR's explanation that it views the Trade Act of 1974 as affording it little discretion to diverge from the President's direction, and by USTR's account of how it balanced commenters' concerns with the Presidential direction it had received. *Id.* at 1246–49.

Appellants timely appealed on May 12, 2023. The trial court had jurisdiction over Appellant's case pursuant to 28 U.S.C. § 1581(i). We have jurisdiction under 28 U.S.C. § 1295(a)(5).

Before us, Appellants argue that "nothing in Section 307" permits USTR's List 3 and 4A tariff actions, and that USTR failed to cure its APA violations on remand. Appellants' Opening Br. 4–5. We conclude that USTR did not misconstrue Section 307(a)(1)(C) by interpreting it to independently authorize the Lists 3 and 4A tariff actions. We further conclude that USTR's remand redetermination complied with the trial court's remand order and cured its original violations of the APA's procedural requirements. Accordingly, we affirm.

## II

"We review the Court of International Trade's decision de novo, applying the same standard of review applied by the Court of International Trade in its review of the administrative record." *Dongbu Steel Co. v. United States*, 635 F.3d 1363, 1369 (Fed. Cir. 2011); *see also Corus Staal BV v. Dep't of Com.*, 395 F.3d 1343, 1346 (Fed. Cir. 2005) ("We review the grant of judgment on the agency record by the Court of International Trade without deference."). Because this case arose under 28 U.S.C. § 1581(i), the Administrative Procedure Act standard of review applies. *Shakeproof Indus. Prods. Div. of Ill. Tool Works Inc. v. United States*, 104 F.3d 1309, 1313 (Fed. Cir. 1997). The APA requires us to "decide all relevant questions of law, interpret constitutional and statutory provisions," and to "hold unlawful and set aside agency action" which is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence." 5 U.S.C. § 706.

In other words, and as is relevant here, we review de novo the question of whether USTR properly exercised its authority pursuant to the Trade Act of 1974 and satisfied

the statutory requirements for notice and comment procedures under the APA. Although "this court affords substantial deference to decisions of [USTR] implicating the discretionary authority of the President . . . , the judiciary is the final authority on issues of statutory construction." *Gilda Indus., Inc. v. United States*, 622 F.3d 1358, 1363 (Fed. Cir. 2010) (internal citations omitted).

### III

### A

As an initial matter, we reject the Government's argument that the List 3 and 4A tariffs were the outcome of the President's discretionary decisions, not agency action, and thus not reviewable under the APA. Appellees' Response Br. 15–16, 19–27; *see also Section 301 Cases I*, 570 F. Supp. 3d at 1324–25 (noting the lack to authority to support the government's position "that *antecedent* presidential direction lacking any direct effect on relevant parties renders List 3 and List 4A non-reviewable presidential actions.").

None of the cases the Government cites support its position, as they all relate to decisions taken by the President pursuant to statutory provisions that delegate to the President, and not to an agency, the authority to take final action. *See, e.g., USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1362–63 (Fed. Cir. 2022); *Motions Sys. Corp. v. Bush*, 437 F.3d 1356, 1357 (Fed. Cir. 2006); *Solar Energy Indus. Ass'n v. United States*, 86 F.4th 885, 890 (Fed. Cir. 2023). In 1988, Congress transferred authority to enforce Section 301 from the President to USTR. It also expanded USTR's authority by enacting Section 307, which states that USTR—not the President— "may modify or terminate any [Section 301] action, *subject to the specific direction, if any, of the President*." 19 U.S.C. § 2417(a)(1) (emphasis added). USTR's own remand determination stated that the President's specific direction was *one of three factors* it considered in deciding to modify its action by expanding tariffs on Chinese products. J.A. 10643 ("[T]he Trade

Representative considered: (1) the specific direction of the President, (2) statutory factors, and (3) the public comments and testimony.").

The trial court correctly accepted such representations and gave weight to USTR's explanation "that the judgments reflected in the construction of Final List 3 and Final List 4A were its own." *Section 301 Cases II*, 628 F. Supp. 3d at 1246 (internal citation and emphasis omitted). We affirm the trial court's well-reasoned conclusion that "'actions involving discretionary authority delegated by Congress to the President' . . . are distinct from those 'involving authority delegated by Congress to an agency,'" and that the List 3 and 4A tariffs implicate the latter category of actions reviewable under the APA. *Section 301 Cases I*, 570 F. Supp. 3d at 1324 (quoting *Detroit Int'l Bridge Co. v. Gov't of Can.*, 189 F. Supp. 3d 85, 98–105 (D.D.C. 2016)).

B

Appellants argue that USTR exceeded its statutory authority to "modify" an action under Section 307 when it increased its original $50 billion action into an at least $350 billion action by imposing tariffs on Lists 3 and 4A. Although the trial court sustained these modified actions by reference to USTR's authority under Section 307(a)(1)(B), we affirm USTR's modified actions on alternate grounds, with reference only to Section 307(a)(1)(C). The Government agrees that Section 307(a)(1)(C) provided an independent basis for USTR's modified action. Appellees' Response Br. 28–29. As such, we need not and do not reach the question of whether the modified actions on appeal are within the scope of USTR's authority under Section 307(a)(1)(B).

"As in any case of statutory construction, our analysis begins with the language of the statute. And where the statutory language provides a clear answer, it ends there as well." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438

(1999) (internal citations and quotation marks omitted). Subject to the President's direction, Section 307(a)(1) allows USTR to "modify or terminate any action" being taken under Section 301, when, under subsection (C), such action is "no longer appropriate." 19 U.S.C. § 2417(a)(1), (a)(1)(C). The parties dispute both the meaning of the term "modify" and the phrase "no longer appropriate."

"When a statute includes an explicit definition of a term, we must follow that definition, even if it varies from a term's ordinary meaning." *Van Buren v. United States*, 593 U.S. 374, 387 (2021) (internal citations and quotation marks omitted). Although the parties provide conflicting dictionary definitions of "modify"—as limited to "moderate[ ]" or "minor" change, *see* Appellants' Opening Br. 33, versus broad enough to encompass "important" change, *see* Appellees' Response Br. 38—the Trade Act of 1974 only defines "modification" as a term which "includes the elimination of any duty or import restriction," 19 U.S.C. § 2481(6). As we have previously recognized, this is "an open-ended definition [that] does not *exclude* anything." *Solar Energy*, 86 F.4th at 896 (emphasis in original). Section 307(a)(1) similarly places no limit on the scope of the term "modify." Thus, we make two observations regarding the meaning of "modify" in Section 307. The first is that "modify" is indifferent to degrees of change and contains no inherent limitations: "elimination" of a duty, the only example of a modification provided by the statute at Section 2481, encompasses major changes because the relative impact of a duty could be large. Second, "modify" is indifferent to the direction of change and encompasses both escalations and de-escalations in trade actions. This understanding is confirmed by the structure of the statute. Section 307(a)(1)(B), separately from Section 307(a)(1)(C), provides for modified action in view of "increased or decreased" burdens or restrictions on United States commerce, plainly requiring that "modify," as used in the parent clause

Section 307(a)(1), covers both increases and decreases in action.

Appellants nonetheless argue that "modify" has an implied upward limit and cannot encompass a change as large as the change between USTR's original and modified Section 301 actions in this case. They rely on *Solar Energy*, where we stated that "a 'modification' must be a relatively minor adjustment," 86 F.4th at 901, and on *Biden v. Nebraska*, Appellants' Opening Br. 33, where the Supreme Court repeated that "statutory permission to 'modify' does not authorize 'basic and fundamental changes in the scheme' designed by Congress," 600 U.S. 477, 494 (2023) (quoting *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225 (1994)). The treatment of the term "modify" in both cases is distinguishable.

In *Solar Energy*, this Court observed that the President's power to "modify" duties to protect domestic industries from injury pursuant to Sections 201 and 204 of the Trade Act of 1974 was subject to a "phase-down requirement, preventing the modified tariff from being any higher than the tariff that was imposed in the preceding year." 86 F.4th at 901. Thus, there was an explicit upward limit to the President's power to "modify" an action under Section 204 that is not present on USTR's power to "modify" an action under Section 307. Meanwhile, in *Biden*, the Court was concerned with the power of the Secretary of Education to "modify" "statutory or regulatory provisions" promulgated by Congress, which implicates separation of powers concerns not at issue here. 600 U.S. at 494, 505. In Section 307, Congress gave USTR the power to modify its *own* agency actions, not the statute authorizing those actions. If Congress had wanted to limit the scope of that authority, it could have done so. And indeed, it did so when it limited the scope of USTR's authority to modify mandatory actions by subjecting them to a proportionality requirement. 19 U.S.C. § 2411(a)(3). Discretionary actions—and their modifications—are not subject to a proportionality

requirement or any other express limit on the scale of their impact.

Discretionary actions are, however, limited with regard to their "appropriate[ness]." *Id.* § 2411(b)(2). The phrase "no longer appropriate" in Section 307(a)(1)(C) refers to Section 301(b), which uses the term "appropriate" twice. To take a discretionary action, USTR must first determine that "action by the United States is appropriate." *Id.* If so, Section 301(b) permits USTR to "take all appropriate and feasible action authorized under [Section 301(c)]," subject to the President's direction, to "obtain the elimination" of the investigated acts, policies, or practices that are unreasonable or discriminatory and burden or restrict United States commerce. *Id.*

Appellants argue that Section 307(a)(1)(C) only provides authority to reduce or terminate a Section 301(b) action. Appellants' Opening Br. 43. In contrast, the Government takes the position that Section 307(a)(1)(C)'s modification authority extends to situations in which prior, predictive action proved insufficient to its stated purpose, necessitating increased action that is more appropriate. *See* Appellees' Response Br. 36. We hold that the statute "favor[s] the government's broader view, as the statute simply does not contain the narrowing limitation the [Appellants] read into it." *Solar Energy*, 86 F.4th at 895; *see also id.* at 896–98 (holding that the President did not clearly misconstrue his authority to "modify" duties under Section 204 as permitting both trade-liberalizing *and* trade-restricting modifications because nothing in the statute expressly limits the President's authority only to reducing duties).

Appellants interpret the phrase "no longer appropriate" to mean that Section 307(a)(1)(C) only allows for modification "after changed circumstances undermine the original finding that taking responsive action was 'appropriate.'" Appellants' Opening Br. 44. They note that this

reading is consistent with USTR's own prior practice; before the action on appeal, USTR had only invoked Section 307(a)(1)(C) five times, and always to reduce or terminate an action. *See id.* at 49–51 (listing prior actions). Finally, Appellants suggest that Section 307(a)(1)(A) and (C) should be read as parallel provisions. *Id.* at 45–46. Because Section 307(a)(1)(A) only allows USTR to taper down mandatory actions, Appellants ask us to read Section 307(a)(1)(C) as functioning in the same way for discretionary actions.

We decline to do so, as Appellants' arguments are untethered from the text of the statute itself. Without more, Section 307(a)(1)(C)'s reference to discretionary action that is "no longer appropriate" does not mean that no further increases in action are appropriate. Although Sections 307(a)(1)(A) and (C) are subparts of the same statutory section on USTR's modification authority, they are constrained by different criteria. Section 307(a)(1)(A) cross-references nine situations in which mandatory action is no longer required and USTR's modification authority is triggered. 19 U.S.C. § 2411(a)(2). Section 307(a)(1)(C) makes no reference to the specific circumstances in which USTR's authority to modify discretionary actions is triggered. "[W]hen we're engaged in the business of interpreting statutes we presume differences in language like this convey differences in meaning." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017). Because Sections 307(a)(1)(A) and (C) are not written to mirror each other, we cannot suppose they operate in the same way. Although USTR's prior actions can be insightful, they cannot be used to limit the proper interpretation of a statute where express limitations do not exist.

Although "appropriate" is a non-specific term, it is anchored by the statute to a specific purpose: an appropriate discretionary action is one that can end or reverse the investigated conduct. 19 U.S.C. § 2411(b)(2). The directive to take "all appropriate action" is broad, and what constitutes

an "appropriate" action is within USTR's discretion to determine, subject to the President's direction. *Id*.[4] The statutory silence surrounding the scope of the term "modify" and the phrase "no longer appropriate" lead us to conclude that USTR has similar discretion to determine how, and by how much, to "modify" an action under Section 307(a)(1)(C). Though Appellants may have informed reasons to disagree with the methods that USTR employed to discourage China's investigated conduct, the statute does not provide for the limits on USTR's modification authority that Appellants seek to impose.

We conclude USTR acted properly when it invoked Section 307(a)(1)(C) to promulgate the Lists 3 and 4A tariffs. When announcing that it would impose the List 3 tariffs, for example, USTR explained that "[t]he judgment during the period of investigation, based on then-available information, was that a $50 billion action would be effective in obtaining the elimination of China's policies. China's response, however, has shown that the current action no longer is appropriate. China has made clear . . . that it will not change its policies in response to the current Section 301 action." *Final List 3*, 83 Fed. Reg. 47,974, 47,975. USTR repeated this logic when justifying the List 4A tariffs. *See Final List 4*, 84 Fed. Reg. 43,304, 43,304 ("As of May 2019, China's statements and conduct indicated that action at a $250 billion level was insufficient to obtain the elimination of China's unfair and harmful policies.").

In *Solar Energy*, we acknowledged the importance of not interpreting "modify" in a way that would allow absurd results. *Solar Energy*, 86 F.4th at 901. Appellants express

---

[4]   As Appellants themselves conceded in oral argument, USTR could have properly determined that a $300 billion (as opposed to $50 billion) tariff action was an appropriate initial Section 301 action following its investigation. Oral Arg. at 2:31–2:50.

concern that interpreting Section 307(a)(1)(C) to authorize USTR's modified actions in this case amounts to "permit[ting] the Administration to prosecute a limitless trade war." Appellants' Opening Br. 4. We disagree. Any modified action taken pursuant to Section 307(a)(1)(C) is still tied to the original Section 301 action, *see* 19 U.S.C. § 2417(a)(1), and must be tailored to achieve Section 301's statutory goal of eliminating the investigated conduct, *see* 19 U.S.C. § 2411(b)(2). Nothing in the statute suggests that Section 307 can be relied upon by USTR to raise tariffs for any reason or by an amount that exceeds what USTR believes to be appropriate to achieve the ends of a discretionary Section 301(b) action. USTR appears to have responded to this limit on its modification authority throughout. For example, the List 4 tariffs were repeatedly modified to punish or reward China's willingness to address the investigated conduct and were not pursued in full when China agreed to cooperate. Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 84 Fed. Reg. 69,447, 69,447 (Dec. 18, 2019); Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 85 Fed. Reg. 3,741, 3,741 (Jan. 22, 2020).

We also disagree with Appellants' suggestion that our construction of Section 307(a)(1)(C) renders Section 307(a)(1)(B) superfluous. We have a duty to construe a statute such that "no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal citations omitted). Section 307(a)(1)(B) applies to both mandatory and discretionary actions. Even if Appellants were right that USTR will always prefer Section 307(a)(1)(C) over (B) to modify a discretionary action under our construction, Appellants' Opening Br. 46–47, Section 307(a)(1)(B) maintains independent significance as the only clause which allows USTR

to increase a mandatory action in view of increased burdens on commerce. 19 U.S.C. § 2417(a)(1)(B) (stating that USTR "may modify or terminate any action . . . if . . . the burden or restriction on United States commerce . . . has increased"). The Government adds that Appellants' assumption is in any case incorrect. Appellees' Response Br. 41. It is conceivable that USTR may be unable to determine that a given discretionary action has become inappropriate—in view of the President's direction or the state of trade negotiations—but nonetheless determine that the burden of the investigated conduct has increased or decreased. *Id.* In such a situation, USTR would still have to rely on Section 307(a)(1)(B) to modify its discretionary action. Thus, Appellants fail to demonstrate that superfluity results from our construction.

Now that we have determined that USTR did not misconstrue Section 307(a)(1)(C) by interpreting it to authorize its modified actions, we can consider whether Section 307(a)(1)(C) violates the Constitution. Appellants believe that USTR's reliance on Section 307(a)(1)(C) raises a non-delegation problem. *See* Appellants' Opening Br. 52–54. Not so. Where non-delegation concerns are raised, "[t]he constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Gundy v. United States*, 588 U.S. 128, 135 (2019). The standard for "intelligible principle" is "not demanding." *Id.* at 145–46. A statute will be unconstitutional where Congress "failed to articulate *any* policy or standard to confine [the delegee's] discretion," but broad delegations "to regulate in the public interest" or as "requisite to protect the public health" have been upheld. *Id.* (internal citations and quotation marks omitted). Section 307(a)(1)(C) plainly provides an intelligible principle for USTR's authority to modify a discretionary action. As the Government succinctly explains, "Section 307(a)(1)(C) authorizes only those actions that would have been permissible in the first instance under Section 301(b)—specifically, those

appropriate to obtain the elimination of the foreign prac-
tices found to be unfair after a full investigation." Appel-
lees' Response Br. 43 (citing 19 U.S.C. § 2417(a)(1); *id.*
§ 2411(a)–(b)).

This standard provides the specificity that is required
for Congress to delegate some of its authority to USTR. And
indeed, Appellants appear to concede that USTR's man-
date to take "all appropriate action" to end or reverse the
investigated conduct under Section 301(b) does not raise a
non-delegation problem. *See* Appellants' Opening Br. 3 (de-
scribing the List 1 and 2 tariffs as "arguably within the au-
thority Congress delegated to USTR"); Appellees' Response
Br. 44. Appellants do not explain why the Government's
construction of Section 307(a)(1)(C) risks placing fewer
boundaries on USTR's authority than Section 301(b) itself.
Their argument seems to assume that an increase in action
can become divorced from the purpose of the original Sec-
tion 301 action, as informed by USTR's investigation. Ap-
pellants' Opening Br. 52–54. Though Appellants disagree
with USTR that the Lists 3 and 4A tariffs were "appropri-
ate" means to achieve Section 301's ends, we do not discern
any constitutional violation in the statute.

For similar reasons, we reject Appellants' theory that
USTR's challenged modifications implicate the major ques-
tions doctrine. "Agencies have only those powers given to
them by Congress," and the major questions doctrine pre-
vents agencies from claiming "[e]xtraordinary grants of
regulatory authority" based on "vague" or "modest words"
where there may be "reason to hesitate before concluding
that Congress meant to confer such authority." *West Vir-
ginia v. EPA*, 597 U.S. 697, 721, 723 (2022) (internal cita-
tions and quotation marks omitted). Though Appellants
analogize the scale and magnitude of USTR's Lists 3 and
4A tariffs to the kinds of changes unsuccessfully pursued
by the EPA in *West Virginia* and the Secretary of Education
in *Biden*, the agency actions at issue here could not be more
different. In the cases cited by Appellants, the agencies

attempted to modify the very nature of their regulatory authority. In *West Virginia*, for example, the EPA transformed the scope of Section 111 of the Clean Air Act "to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself." 597 U.S. at 724. Similarly, in *Biden*, the Secretary effectively rewrote the HEROES Act to grant itself the power to waive repayment obligations in circumstances beyond those provided for by the statute. 600 U.S. at 496 (concluding that while Congress specified in the Education Act "a few narrowly delineated situations" that could qualify a borrower for loan discharge, "the Secretary has expanded forgiveness to nearly every borrower in the country"). Likewise, this case is distinguishable from our recent decision in *V.O.S.*, where the major questions doctrine was implicated because the tariffs at issue were "'unheralded' and 'transformative,'" the government had "never previously claimed powers of th[at] magnitude" under the relevant statute (International Emergency Economic Powers Act (IEEPA)), the "basic and consequential tradeoffs" inherent in the President's decision to impose those tariffs were "ones that Congress would likely have intended for itself," and there was "no clear congressional authorization by IEEPA for tariffs of the magnitude of [those implemented]." *V.O.S. Selections, Inc. v. Trump*, No. 2025-1812, 2025 WL 2490634, at *13–15 (Fed. Cir. Aug. 29, 2025) (en banc) (citations omitted), *cert. granted*, 2025 WL 2601020 (U.S. Sept. 9, 2025) (No. 25-250).

The Lists 3 and 4A tariffs may, at best, be a new use of USTR's regulatory authority, but they do not involve a transformation of USTR's regulatory authority. USTR has modified its own unchallenged and statutorily permissible original action in this case, not the underlying Trade Act of 1974. As we have established, the statute permits USTR to impose and modify tariffs in response to unfair foreign trade practices, and Congress afforded USTR substantial discretion in determining what trade actions are

appropriate. Such "clear congressional authorization" for the challenged action means that this cannot be a major questions case. *West Virginia*, 597 U.S. at 724.

IV

Appellants contend that USTR violated the APA's rule-making requirements by failing to consider and adequately respond to significant public comments expressing concern about the Lists 3 and 4A tariffs. We affirm the trial court's holding that USTR's elaboration on remand remedied any such procedural violations. *See Section 301 Cases II*, 628 F. Supp. 3d at 1246.

The APA requires agencies proceeding with notice and comment rulemaking to publish a notice of the proposed rule in the Federal Register, justify the rule by reference to legal authority, describe what the rule is about, and allow interested parties to submit comments. 5 U.S.C. § 553(b)–(c). "After consideration of the relevant matter presented," an agency's explanation of its final rule "shall incorporate . . . a concise general statement of [its] basis and purpose." *Id.* § 553(c). This means that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citation and quotation marks omitted). The agency must also "consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *see also City of Portland v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007) ("Significant comments are those which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule." (internal citation and quotation marks omitted)). The Lists 3 and 4A tariffs are agency-made rules subject to these procedural require-ments. *See Perez*, 575 U.S. at 96 ("Rules issued through the

notice-and-comment process are often referred to as 'legis-lative rules' because they have the 'force and effect of law.'") (quoting *Chrysler Corp. v. Brown,* 441 U.S. 281, 302–03 (1979)).

Section 307 additionally requires USTR to "provide op-portunity for the presentation of views by other interested persons affected by the proposed modification" regarding "effects of the modification . . . and whether any modifica-tion . . . of the action is appropriate." 19 U.S.C. § 2417(a)(2). This requirement echoes Section 304(b), which generally requires USTR to give interested parties an opportunity to present their views before an action is taken pursuant to findings made during an investigation. *Id.* § 2414(b)(1)(A).

It is not disputed that USTR complied with the various requirements to provide opportunity to comment on the proposed modifications to its original Section 301 action. Before promulgating the Lists 3 and 4A tariffs, USTR so-licited comments on "any aspect of the proposed supple-mental action," including the "tariff subheadings to be subject to increased duties," "[t]he level of the increase, if any, in the rate of duty," "[t]he appropriate aggregate level of trade to be covered by additional duties," "whether im-posing increased duties on a particular product would be practicable or effective to obtain the elimination of China's acts," and "whether imposing additional duties on a partic-ular product would cause disproportionate economic harm to U.S. interests." *List 3 NPRM,* 83 Fed. Reg. at 33,609; *List 4 NPRM,* 84 Fed. Reg. at 22,565.

On appeal, the Government argues that the require-ment to *respond* to comments did not apply to USTR be-cause the subject of the challenged modifications fell within the APA's foreign-affairs exception. Appellees' Response Br. 47–53. The APA creates an exception to notice and com-ment procedures for proposed rulemaking "to the extent that there is involved . . . a military or foreign affairs

function of the United States." 5 U.S.C. § 553(a). "The purpose of the exemption [i]s to allow more cautious and sensitive consideration of those matters which so affect relations with other Governments that, for example, public rule-making provisions would provoke definitely undesirable international consequences." *Am. Ass'n of Exporters & Imps.-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985).

We affirm the trial court's holding that the exemption does not apply to the case before us, as "the Government's invocation of the exemption is entirely *post hoc* and inconsistent with the manner in which the USTR conducted the modification processes." *Section 301 Cases I*, 570 F. Supp. 3d at 1336. USTR published notice of its proposed modifications and the amendments to those modifications in the Federal Register, and on remand, cited public comments as a factor it considered in its rulemaking. J.A. 10643. As the trial court observed, USTR's decision to repeatedly publish its proposed modifications undermines the notion that "definitely undesirable international consequences" were at risk in public rulemaking. *Section 301 Cases I*, 570 F. Supp. 3d at 1337. Though "[r]equiring the Government to disclose its strategy in the middle of trade negotiations . . . may well have had adverse consequences for those negotiations," Appellees' Response Br. 53, that is exactly what the Government did and without expressing concern prior to Appellants' suit before the trial court. In any case, we decline to apply the exemption whenever a rule relates to ongoing trade negotiations, especially where, as here, the controlling statute explicitly requires the public to have an opportunity to comment on modifications to Section 301 trade actions. 19 U.S.C. § 2417(a)(2). It strikes us as counterintuitive to assume that Congress did not anticipate Section 301 modifications would be subject to trade negotiations when it created this requirement.

For the most part, USTR's notices of final action complied with the requirements of 5 U.S.C. § 553. As the trial

court found, the "statutory factors relevant to the USTR's determination of whether and how to modify its action include ensuring that appropriate action is taken to eliminate discriminatory and burdensome acts [as required by Section 301] and the President's specific direction, if any. The notices of proposed rulemaking . . . reflected these considerations." *Section 301 Cases I*, 570 F. Supp. 3d at 1339. In both *List 3 NPRM* and *List 4 NPRM*, USTR explained that it was pursuing a modified action in response to direction from President Trump, described what the proposed modifications were about, and referenced Section 307(a)(1)(C) as legal authority for the modifications. *See List 3 NPRM,* 83 Fed. Reg. at 33,609; *List 4 NPRM,* 84 Fed. Reg. at 22,564. USTR's *Final List 3* and *Final List 4* notices offered a "general statement of their basis and purpose," 5 U.S.C. § 553(c)—to the extent that they repeated the President's direction and why USTR considered China's conduct to be actionable—but the trial court found that they failed to address significant issues raised in the comments that USTR had solicited in *List 3 NPRM* and *List 4 NPRM. Section 301 Cases I*, 570 F. Supp. 3d at 1340–41. Specifically, the trial court explained that USTR's final notices "fail[ed] to apprise the court how the USTR came to its decision to act and the manner in which it chose to act, taking account of the opposition and support for the increased duties and the inclusion or exclusion of particular subheadings, the concerns raised about the impact of the duties on the U.S. economy, and the potential availability of alternative courses of action, within the context of the specific direction provided by the President." *Id.*; *see also id.*, at 1338 ("[T]he opportunity to comment is meaningless unless the agency responds to significant points raised by the public.") (citing *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012)). The trial court rejected Appellants' request for outright vacatur and instead allowed USTR to cure the defect—which it characterized as giving rise to "legal uncertainty," as opposed to "illegality," with regard to

the sufficiency of USTR's reasoning—on remand. *Id.* at 1344.

Appellants argue that the decision to remand was legal error because the trial court was obligated to vacate the Lists 3 and 4A tariffs once it found that the modified actions could not be sustained by USTR's explanations on the record. Appellants' Opening Br. 64–65. As the trial court explained, however, vacatur is not always required when an agency has provided inadequate reasoning for its actions. *Section 301 Cases II*, 628 F. Supp. 3d at 1242. In *Department of Homeland Security v. Regents of the University of California*, the Supreme Court summarized that if the grounds provided by an agency for promulgating a rule are inadequate, "a court may remand for the agency to do one of two things: First, the agency can offer a fuller explanation of the agency's reasoning *at the time of the agency action*. . . . [Second], the agency can deal with the problem afresh by taking *new* agency action." 591 U.S. 1, 20–21 (2020) (internal citations and quotation marks omitted) (emphasis in original). If the agency pursues option one on remand, "the agency may elaborate" on what it had previously indicated as "the determinative reason[s] for the final action taken," but it "may not provide new ones." *Id.* (internal quotation marks and citation omitted). Consistent with this precedent, the trial court lawfully remanded for USTR to contextualize the reasons for its modified action in view of significant public comments. *See Section 301 Cases I*, 570 F. Supp. 3d at 1344 (prohibiting USTR from offering *post hoc* reasoning for the challenged modifications on remand).

Appellants' contention that this option was not available essentially conflates failure to *address* significant comments with failure to *consider* those significant comments at all. *Regents* and the cases that followed it "do not distinguish between failures of explanation and failures of consideration." *Section 301 Cases II*, 628 F. Supp. 3d at 1243. So long as the agency indicated the factors relevant to its

action in the first instance, it is allowed to elaborate on remand. *See Regents*, 591 U.S. at 20–21. USTR indicated that it considered issues relevant to the categories of comments it solicited. *Final List 3*, 83 Fed. Reg. 47,974, 47,975 (stating that USTR "reviewed the public comments and the testimony from the six-day public hearing" and "[b]ased on this review . . . determined not to include certain tariff subheadings"); *Final List 4*, 84 Fed. Reg. 43,304, 43,305 (explaining that the decision to impose 10% duties on List 4—as opposed to the 25% duties originally proposed—"takes account of the public comments" and that "[c]ertain tariff subheadings proposed in the [List 4 NPRM] have been removed from the final list of tariff subheadings subject to additional duties, based on health, safety, national security, and other factors"). Although USTR did not explain how, for example, it weighed comments raising concerns about the harm the Lists 3 and 4A tariffs would have on the U.S. economy, it is plainly implied that USTR considered the risk of such harms because it requested comments on whether additional tariffs would be appropriate, practicable, or effective and because it is the broad duty of USTR to coordinate U.S. trade policy. 19 U.S.C. § 2171(c). The trial court was not, as Appellants suggest, faced with a "total explanatory void" for USTR's *Final List 3* and *Final List 4* actions that failed to provide "one word" on significant factors related to the modifications. Appellants' Opening Br. 65 (citing *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 117 (D.C. Cir. 2020)). Thus, the trial court's remand to USTR to elaborate the basis for its action was appropriate.

The final issue we consider on appeal is whether the additional detail USTR provided on remand cured the original deficiencies in USTR's notice-and-comment procedures. We conclude that it did. As the trial court found, USTR's remand redetermination successfully "responded to significant concerns within the context of China's actionable conduct and the specific direction of the President"

without the use of *post hoc* rationalization. *Section 301 Cases II*, 628 F. Supp. 3d at 1245. USTR addressed each category of significant comments the trial court identified as requiring further response—comments regarding the inclusion or exclusion of certain tariff subheadings, harm to the U.S. economy, efficacy of the tariffs, and alternatives to the tariffs—using public statements, hearing transcripts, and other documents that provided insight into USTR's reasoning prior to the issuance of the final Lists 3 and 4A tariffs. *Id.* at 1246–50. USTR also provided a more detailed account of how it weighed significant comments against the statutory factors it was required to consider—the President's direction and the "appropriate"-ness of action. *Id.* at 1248. As the trial court recited, "[t]he standard that an agency's response to comments must meet 'is not particularly demanding,'" as the agency's reasons must only "enable the court 'to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did.'" *Section 301 Cases II*, 628 F. Supp. 3d at 1246 (citing *Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 549 (D.C. Cir. 1997) and *Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968)). Upon complete review of the USTR's redetermination on remand, we agree with the trial court's determination that this standard was met. *Id.* at 1250 ("[T]he court finds that USTR has complied with the court's remand order and has supplied the necessary explanation supporting the imposition of duties pursuant to *Final List 3* and *Final List 4*.").

V

Because Section 307(a)(1)(C) authorizes USTR to take escalatory, modified trade actions, and because USTR's remand redetermination meets the APA's procedural requirements in 5 U.S.C. § 553, we affirm the trial court and sustain the challenged Lists 3 and 4A tariffs.

## AFFIRMED

Costs

No costs.